AMERICAN ARBITRATION ASSOCIATION

IN THE MATTER OF THE ARBITRATION BETWEEN

UFCW LOCAL 1546,

and

ILLINOIS AMERICAN WATER COMPANY.

No. 51 300 0021407

- - - - - - - - - - - - - - -

Taken on April 30, 2007

- - - - - - - - - - - - - - -

Original File A:\ufcw043007.txt

82 pages

Word Index included

MAYLEEN MENDELSON
CERTIFIED COURT REPORTER
ROMAY CORP.

120 West Madison Street, Suite 14M         2738 West Fitch Avenue
Chicago, Illinois  60602                   Chicago, Illinois  60645
            (773) 761-0449 FAX (773) 761-6155

AMERICAN ARBITRATION ASSOCIATION

IN THE MATTER OF THE    )
                       )
ARBITRATION BETWEEN:   )
                       )
                       )
UFCW LOCAL 1546,       ) No. 51 300 0021407
                       )
    and                )
                       )
ILLINOIS AMERICAN      )
                       )
WATER COMPANY,         )

       REPORT OF PROCEEDINGS had at 1000 International Parkway, Woodridge, Illinois, on April 30, 2007, at the hour of 10:00 a.m. before MARTIN MALIN, the Arbitrator to whom the matter in difference between the parties has been submitted for settlement.

Page 2

1  APPEARANCES:
2     JACOBS, BURNS, ORLOVE,
3     STANTON & HERNANDEZ
4     BY: MR. CHARLES ORLOVE
5     122 South Michigan Avenue
6     Suite 1720
7     Chicago, Illinois 60603
8     (312) 372-1646
9        Appeared on behalf of the
10       Union;
11
12    BLACKWELL, SANDERS, PEPER, MARTIN, LLP
13    BY: MR. TERRY L. POTTER
14    720 Olive Street
15    Suite 2400
16    St. Louis, Missouri 63101
17    (314) 345-6438
18       Appeared on behalf of the
19       Company.
20
21 ALSO PRESENT:
22 STEPHEN J. PHILLIPS, WAYNE A. CLAVIO,
23 CHRISTOPHER MARTENS, DAN LEPPERT, RAY ROSSA,
24 GLEN WILLIAMS

Page 3

```
             INDEX
WITNESS:                        PAGE:

RAYMOND      DIRECT EXAMINATION    14
ROSSA        BY MR. ORLOVE
             CROSS-EXAMINATION     30
             BY MR. POTTER
CHRISTOPHER  DIRECT EXAMINATION    36
MARTENS      BY MR. ORLOVE
             CROSS-EXAMINATION     47
             BY MR. POTTER
WAYNE        DIRECT EXAMINATION    49
CLAVIO       BY MR. ORLOVE
             CROSS-EXAMINATION     55
             BY MR. POTTER
STEPHEN      DIRECT EXAMINATION    57
PHILLIPS     BY MR. POTTER
             CROSS-EXAMINATION     68
             BY MR. ORLOVE
             REDIRECT EXAMINATION  70
             BY MR. POTTER
                *****

Joint Exhibit Nos. 1, 2, 3 received     6
Union Exhibit No. 1 Received           21
Union Exhibit No. 2 Received           22
Union Exhibit No. 3 Received           22
Union Exhibit No. 4 Received           24
Union Exhibit No. 5 Received           27
Union Exhibit No. 6 Received           28
Union Exhibit No. 7 Received           30
Union Exhibit No. 8 Received           41
Union Exhibit No. 9 Received           43
Union Exhibit Nos. 10 - 13 Received    47
Union Exhibit No. 14 Received          54
Union Exhibit No. 15 Received          55
Company Exhibit No. 1 Received         60
                *****
```

Page 4

1        ARBITRATOR MALIN: This is the
2  hearing in the matter of the arbitration
3  between the United Food and Commercial Workers
4  Local 1546 and Illinois American Water Company.
5  This is American Arbitration Association Case
6  Number 51 300 0021407. For the record,
7  Mr. Orlove, would you please identify yourself
8  and those present for the union.
9        MR. ORLOVE: Yes. My name is Charles
10 Orlove of Jacobs, Burns, Orlove, Stanton &
11 Hernandez, attorney on behalf of Local 1546.
12 And with me is Wayne Clavio, vice president of
13 1546. And going down this line, Chris Martens
14 an employee, Dan Leppert, one of the grievants,
15 Ray Rossa, the chief steward, and Glen
16 Williams, one of the grievants.
17       ARBITRATOR MALIN: Thank you.
18 Mr. Potter, would you --
19       MR. ORLOVE: I should say also, and I
20 just learned this morning, Ken Nelson, who is
21 another of the grievants, was called away due
22 to what appears to be a serious illness out of
23 state of a close relative. And he just left
24 word with the chief steward that he couldn't be

Page 5

1  here. I had not intended to call him for the
2  purpose of the issue today.
3        ARBITRATOR MALIN: Okay. So you have
4  no problem with proceeding in his absence?
5        MR. ORLOVE: That's correct. On the
6  issue of consolidation.
7        ARBITRATOR MALIN: And Mr. Potter,
8  would you do the same for the company, please?
9        MR. POTTER: Sure. Terry Potter of
10 the law firm of Blackwell, Sanders, Peper,
11 Martin, 720 Olive, St. Louis, Missouri. And
12 our witness today will be Mr. Stephen Phillips,
13 who is in charge of overall operations of this
14 location.
15       ARBITRATOR MALIN: Thank you. The
16 record should reflect in an off-the-record
17 discussion among counsel and the Arbitrator
18 three joint exhibits have been tendered. Joint
19 Exhibit Number 1 being the Collective
20 Bargaining Agreement between the parties
21 effective May 11, 2006 through April 30, 2009;
22 Joint Exhibit Number 2, an arbitration demand
23 filed by the union on February 7th, 2007 on the
24 form for the demand for arbitration of the

Page 6

1   American Arbitration Association; and Joint
2   Exhibit Number 3, a letter from Mr. Orlove to
3   Mr. Potter dated April 23, 2007. Counsel, for
4   the record do you concur those joints exhibits?
5           MR. ORLOVE: Yes. For the union, yes.
6           MR. POTTER: And for the company, yes.
7           ARBITRATOR MALIN: Joint Exhibits 1, 2
8   and 3 are admitted.
9               (Joint Exhibit Nos. 1, 2, 3
10                  received.)
11          ARBITRATOR MALIN: The record should
12  also reflect that the parties have stipulated
13  that the issue presented for me to resolve is
14  whether the grievances concerning employees
15  Williams, Nelson, and Leppert may be
16  consolidated in one proceeding before the
17  Arbitrator. And if so, what is the appropriate
18  remedy.
19          For the record, Counsel, do you
20  concur with that framing of the issue?
21          MR. ORLOVE: For the union, yes.
22          MR. POTTER: For the company, yes.
23          ARBITRATOR MALIN: Thank you. The
24  record should also reflect that the parties

Page 7

1   have stipulated that the grievances are
2   properly before the Arbitrator for resolution
3   subject to a third-step meeting on the second
4   Williams grievance. And the parties have
5   stipulated that there was no objection to Joint
6   Exhibit 2, the demand for arbitration. Again
7   for the record, Counsel, will you indicate your
8   concurrence with those stipulations?
9           MR. ORLOVE: Yes.
10          MR. POTTER: And for the company, yes,
11  although again, I want to make the record clear
12  in terms of the second Williams' grievance.
13  There is an outstanding issue regarding
14  timeliness, which will be addressed later as
15  part of those proceedings, not as part of these
16  proceedings.
17          ARBITRATOR MALIN: But this proceeding
18  is limited to the consolidation issue and for
19  that purpose --
20          MR. POTTER: Yes. It's appropriately
21  before you, yes.
22          MR. ORLOVE: We agreed that the union
23  would go first, and I'm prepared to go first.
24          ARBITRATOR MALIN: Are there any other

Page 8

1   preliminary matters, or are we ready to proceed
2   with opening statements?
3           MR. POTTER: We're ready to roll.
4           MR. ORLOVE: Yes, we're all set.
5           ARBITRATOR MALIN: Mr. Orlove, if you
6   have an opening statement, I'd be pleased to
7   receive it.
8           MR. ORLOVE: Sure. The union sought
9   arbitration in this matter, and as Joint
10  Exhibit 2 indicates, identifying all three
11  employees. There was no objection from the
12  employer.
13          In the course of making these
14  arrangements, the employer advised it was
15  taking a position that each grievance should be
16  heard separately. The union disagrees with
17  that, indeed, strongly disagrees with that.
18  And accordingly, we're here today to take up
19  the company's position, essentially, the
20  preliminary issue of whether these grievances
21  may be consolidated.
22          There are four grievances, one for
23  each of the employees, and there are two for
24  Williams. You will see as we put on the

Page 9

1   grievants' material, and it's unavoidable,
2   although we're here on the issue of
3   consolidation, that the second Williams
4   grievance arises out of the first one, which it
5   appears -- I don't know on the substance. The
6   company will argue that it was resolved, and
7   the union will argue that it wasn't resolved.
8   But the issue underlying it remains the same.
9           And the issue in all these cases
10  is the propriety of discipline given to these
11  employees for having let their respective water
12  operator license expire. The facts were
13  investigated at the same time. The discipline
14  was meted out on the same day to each man,
15  although the discipline was different for each
16  employee. The discipline for each was grieved
17  by the union on the same day for the same
18  reasons, taken up through the grievance
19  procedure as a unified group in the first and
20  second and third steps, except for Williams'
21  second grievance which was taken up and is to
22  be taken up separately. And the company's
23  answer was identical for all the grievances.
24          We believe it is clear under the

Page 10

1  law of arbitral authority and generally the law
2  of federal procedure and no doubt state
3  procedure that joinder of claims, joinder of
4  parties, consolidation of grievances in the
5  arbitral world is the only process that makes
6  sense in terms of coming to a prompt conclusion
7  on identical issues.
8       And we believe so strongly in this
9  that you will see the letter I sent to
10 Mr. Potter. I wanted to put him on notice --
11 or put the company on notice, not him -- but
12 through him put the company on notice that we
13 think the position is so clear -- the issue is
14 so clear-cut that we will be seeking exemplary
15 damages.
16       And in connection with exemplary
17 damages, we believe they're warranted not as
18 punitive damages, although that might suffice,
19 but as damages inherent in the Collective
20 Bargaining Agreement as damages for obfuscating
21 the process of resolving matters in dispute.
22 And we will be seeking attorneys' fees as well
23 as other appropriate exemplary damages as there
24 may be. That concludes my opening statement.

Page 11

1       ARBITRATOR MALIN: Thank you,
2  Mr. Orlove. Mr. Potter, would you like to make
3  or reserve your opening statement?
4       MR. POTTER: I'm going to -- it's the
5  kind of case I think it's best if I proceed now
6  with the opening statement.
7       ARBITRATOR MALIN: Thank you. I'd be
8  pleased to receive it.
9       MR. POTTER: Sure. I think the major
10 hole which Chuck has omitted from his opening
11 statement and which undermines his entire case
12 is that let's face it. Arbitration is a
13 creature of contract. It's what the parties
14 have agreed to procedurally.
15       Chuck makes no mention of that in
16 his opening. That is what controls here. You
17 look at the grievance arbitration process that
18 we agreed to, and there's absolutely no
19 provision, none whatever, for consolidation of
20 grievances. In fact, when you look at the
21 language, and I'm sure you will when processing
22 this case, what sticks out time and time again
23 is the fact that in processing matters in
24 dispute the term used by the parties

Page 12

1  negotiating this agreement is the word
2  grievance in the singular, not the plural.
3  Cases are to be reviewed on an individual
4  basis.
5       Frankly, I don't care what the
6  rules of state or federal law are on joinder.
7  Those are not contractual issues. What we're
8  here about is a contractual issue regarding the
9  procedures as what was agreed to by the
10 parties. There's been absolutely no past
11 practice regarding consolidation in the past.
12       These individuals received totally
13 separate discipline, totally separate meetings
14 with these individuals as to that discipline.
15 The discipline was distinct and different for
16 each one. So we've got a pattern here of
17 differences more than sames.
18       The union recognized that fact and
19 filed three independent, now four independent
20 grievances. They didn't consolidate their
21 grievances. The union didn't even present the
22 issue as a potential for consolidation until
23 the arbitration request was made.
24       In terms of a Collective

Page 13

1  Bargaining Agreement in particular, the
2  standard language is included within that
3  agreement that the arbitrator has no ability to
4  add, subtract, or modify this agreement.
5       What the union is wanting to do is
6  to ask you, Mr. Arbitrator, to act outside the
7  scope of your ability, outside the scope of the
8  contract, outside the scope of the grievance
9  arbitration language and do just that, add,
10 modify the contract. You don't have that
11 authority. This is plain as day, and it's as
12 plain as arbitral authority going back way
13 before anyone in this room even existed.
14       So on that basis, we think that
15 any claims of damages of any kind due to the
16 company's well-founded position in this case is
17 frankly outrageous. It's posturing, and that's
18 all it is. And we believe you will agree with
19 that once you review all the facts. And that
20 is our opening.
21       ARBITRATOR MALIN: Thank you.
22 Mr. Orlove, are you ready to proceed with the
23 union's case in chief?
24       MR. ORLOVE: Yes. Ray Rossa.

Page 14

1  (The witness was duly sworn.)
2  RAYMOND ROSSA,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6  DIRECT EXAMINATION
7  BY MR. ORLOVE:
8  Q. Ray, give us your full name.
9  A. It's Raymond Rossa, R-O-S-S-A.
10  Q. And by whom are you employed?
11  A. Illinois American Water Company.
12  Q. What position do you occupy with them?
13  A. I'm classified as an operator
14  currently.
15  Q. And how long have you been employed
16  with the company?
17  A. It's coming up on 13 years.
18  Q. What if any position do you occupy on
19  behalf of UFCW 1546?
20  A. I have been elected to be the chief
21  union steward of our local shop here.
22  Q. Just briefly tell the Arbitrator the
23  steward structure at this facility.
24  A. Our steward structure is a chief

Page 15

1  steward, one position, and then there are two
2  steward positions. That's it.
3  Q. Okay. When did it first come to your
4  attention that there was any issue concerning
5  any employee over the expiration of their water
6  operator licenses?
7  A. That would have been on October 19th.
8  Q. And where were you at the time?
9  A. I was assigned to work in the lab that
10  day actually.
11  Q. And tell us what happened. How did
12  that come to your attention and what happened?
13  A. My immediate supervisor at that time,
14  John Stein, asked me to sit in on some meetings
15  they were having. He had told me Glen Williams
16  come in.
17  Q. Okay. Did he identify anything more
18  than that?
19  A. He did mention that he was going to
20  also have Dan Leppert and Glen Williams -- or,
21  I'm sorry -- Ken Nelson come in also that day.
22  Q. Okay. And then tell us what happened
23  after that.
24  A. Well, we had our meeting, and then

Page 16

1  approximately five days later on October --
2  Q. Let me stop you there. That's fine.
3  Let me just stop you there.
4  When you say the meeting, who was
5  at the meeting?
6  A. John Stein, Steve Phillips, myself,
7  and Glen Williams was at the first one.
8  Q. Okay. And identify for us
9  Mr. Phillips; what position does he occupy?
10  A. I'm not sure of his exact title, but
11  he's in the production end of the company. I
12  believe it's superintendent.
13  Q. He's on behalf of management, of
14  course?
15  A. Yes.
16  Q. Okay. And what was the subject taken
17  up at that meeting with Mr. Williams?
18  A. Steve said that they were conducting
19  an investigation into the lapse or non-renewal
20  of Glen's license.
21  Q. And on what -- how did that meeting
22  end? What conclusion was reached at that
23  meeting?
24  A. There really wasn't a conclusion.

Page 17

1  They just said that -- thank you for your time,
2  and we're going to be continuing our
3  investigation.
4  Q. Okay. And was there a meeting -- was
5  there a further meeting on that day with either
6  Mr. Nelson or Mr. Leppert?
7  A. Yes. Immediately after that they
8  had -- I believe that was Dan that followed up
9  right after.
10  Q. That's Dan Leppert?
11  A. Yes.
12  Q. And who was present at that meeting?
13  A. All of us. It was Steve Phillips,
14  John Stein, myself, and Dan Leppert.
15  Q. So Williams departed and Leppert came
16  in?
17  A. Yes.
18  Q. And what subject was taken up at that
19  meeting?
20  A. It was the exact same one. It was
21  about Dan's license not being renewed.
22  Q. And on what basis did that meeting
23  end?
24  A. That was the same. Said that they

Page 18

1 were conducting an investigation and left it at
2 that.
3     Q. Okay. And was there a further meeting
4 on that day?
5     A. Yeah. Immediately after that one, Ken
6 Nelson was in.
7     Q. So to make this -- to shorten this
8 somewhat, is it correct that Leppert left and
9 Nelson came in?
10    A. Yes. That's correct.
11    Q. And the other parties remained in the
12 room?
13    A. It was John Stein, Steve Phillips,
14 myself, and Ken Nelson this time.
15    Q. And what subject was taken up at that
16 meeting?
17    A. That was the exact same one again,
18 questioning Ken about his license not being
19 renewed.
20    Q. And on what basis did that meeting
21 end?
22    A. That was left at we are conducting an
23 investigation. That was it.
24    Q. And in connection with the issue of

Page 19

1 this investigation over licenses which may have
2 expired, what was the next thing that happened,
3 as far as you know?
4     A. Well, we got called -- or I got called
5 in again to meet with John Stein, Steve
6 Phillips, and Glen Williams on the 24th of
7 October.
8     Q. And what was the subject of that
9 meeting?
10    A. There was additional questions and
11 clarification that Steve had for Glen.
12    Q. On what issue?
13    A. On the license expiring.
14    Q. And how did that meeting end?
15    A. Pretty much like the other ones.
16 Thank you for your time. We're conducting an
17 investigation.
18    Q. And was there a further meeting with
19 anyone else about that issue on that day?
20    A. Yes. Immediately after Glen, Ken
21 Nelson was asked to come in for re-questioning
22 again.
23    Q. And on the same issue?
24    A. Same date, right after Glen, same

Page 20

1 issue, licensing, yes.
2     Q. And did that meeting end with any
3 different outcome?
4     A. No. Just thank you for your time.
5 We're conducting an investigation.
6     Q. And so it's clear for the Arbitrator,
7 on that day, October 24, was there a meeting
8 with Mr. Leppert?
9     A. No.
10    Q. Were you at work on November 7th?
11    A. No.
12    Q. And do you recall why you were absent
13 from work?
14    A. Yes. I had a sick day that day.
15    Q. What if anything came to your
16 attention upon your return to work that any
17 disciplinary action was taken against employees
18 Williams, Nelson, and Leppert?
19    A. I received three disciplinary notices
20 regarding Glen Williams, Ken Nelson, and Dan
21 Leppert dated for November 7th.
22    Q. Okay. I'm going to show you what I
23 will mark as Union Exhibit 1. And tell us what
24 that is.

Page 21

1     A. This is the disciplinary suspension
2 paperwork that was given to Glen. I had
3 received a copy of this.
4     Q. Do you remember when you got a copy?
5     A. It was shortly after my return. I
6 don't remember the exact day.
7     Q. And it shows that a copy was copied to
8 you?
9     A. Yes.
10    Q. Okay. Let me show you what --
11        MR. ORLOVE: I'll move for the
12 admission of Union Exhibit 1.
13        ARBITRATOR MALIN: Any objection?
14        MR. POTTER: No objection.
15        ARBITRATOR MALIN: Union 1 is
16 admitted.
17        (Union Exhibit No. 1
18        received.)
19 BY MR. ORLOVE:
20    Q. I'll show you what I have marked as
21 Union Exhibit 2 and ask you if you can identify
22 that, please.
23    A. This is disciplinary paperwork dated
24 November 7th given to Ken Nelson.

Page 22

1   Q. And also a copy was given to you as
2 you've testified?
3   A. Yes. I got a copy of this also.
4     MR. ORLOVE: And I'll move for the
5 admission of Union Exhibit 2.
6     MR. POTTER: No objection.
7     ARBITRATOR MALIN: Union 2 is
8 admitted.
9       (Union Exhibit No. 2
10        received.)
11 BY MR. ORLOVE:
12   Q. Let me show you what I have marked as
13 Union Exhibit 3 and ask you if you can identify
14 that, please.
15   A. Yes. This is disciplinary paperwork
16 given to Dan Leppert dated November 7th, which
17 I had been given a copy of this also.
18     MR. ORLOVE: I'll move for the
19 admission of Union Exhibit 3.
20     MR. POTTER: No objection.
21     ARBITRATOR MALIN: Union 3 is
22 admitted.
23       (Union Exhibit No. 3
24        received.)

Page 23

1 BY MR. ORLOVE:
2   Q. Who was serving as steward on
3 November 7th in your absence?
4   A. That would have been Chris Martens.
5   Q. And as chief steward, are you aware of
6 all the grievances that are filed -- all the
7 grievances that were filed with respect to
8 Williams, Nelson, and Leppert?
9   A. Yes. Chris Martens, he informed me
10 that he had filed grievances on these.
11     MR. ORLOVE: Okay. And just for
12 other's attention, I'm going to call
13 Mr. Martens, and we'll put those grievances in
14 through him.
15 BY MR. ORLOVE:
16   Q. Let me show you what I've marked as
17 Union Exhibit 4 and ask you to identify that,
18 please.
19   A. That's an e-mail that I had sent to
20 Michael Jackson, who normally hears our
21 third-step grievances, that we had conducted
22 steps one and two regarding Glen, Ken, and Dan.
23 And it was our intent, the union's intent to
24 proceed to a third step on that.

Page 24

1   Q. Okay.
2   A. And that Wayne Clavio, our business
3 agent, would be contacting him to hold that
4 meeting.
5   Q. Was there any objection ever expressed
6 to you by anyone at the company in the course
7 of processing the grievances that you would not
8 take them up in this fashion as you've noted on
9 your e-mail?
10   A. No.
11     MR. ORLOVE: I'll move for the
12 admission of Union Exhibit 4.
13     MR. POTTER: No objection.
14     ARBITRATOR MALIN: Union 4 is
15 admitted.
16       (Union Exhibit No. 4
17        Received.)
18 BY MR. ORLOVE:
19   Q. Was there a third-step meeting as you
20 requested for Williams, his first grievance,
21 and Nelson and Leppert?
22   A. Yes.
23   Q. And when was that?
24   A. That was held on December 8th.

Page 25

1   Q. And tell us who was present at this
2 meeting.
3   A. That was Michael Jackson, Steve
4 Phillips, myself, Chris Martens, Erin Holden
5 Jerry Rosenwinkel.
6   Q. Identify when you give their names.
7 We know who Chris Martens is. The position of
8 the other people you named?
9   A. Okay. Michael Jackson, I believe he's
10 considered manager of production. Jerry
11 Rosenwinkel, he holds a vice president position
12 with the union, and Erin Holden is our other
13 union steward. And also Wayne Clavio was at
14 that meeting also.
15   Q. He is the union official?
16   A. The business agent, correct.
17   Q. Business agent, vice president of the
18 union?
19   A. Yes, yes.
20   Q. Were any of the employees, Williams,
21 Nelson, Leppert present at this meeting?
22   A. No.
23   Q. This was a third-step meeting?
24   A. Yes.

Page 26

1   Q. And what was discussed at this
2 meeting?
3   A. We were discussing the discipline that
4 was handed down to these three individuals.
5   Q. Was there any objection expressed by
6 anyone from management about taking them up as
7 you did at one meeting?
8   A. No.
9   Q. Was there any separation within the
10 meeting of talking about one employee first and
11 then another employee second?
12   A. No.
13   Q. Was there any different issue
14 involving any of the employees other than the
15 expiration of their license and the discipline
16 for that?
17   A. I don't recall anything different.
18     ARBITRATOR MALIN: This will be
19 Union 5?
20     MR. ORLOVE: Oh, I beg your pardon.
21 Yes, indeed.
22
23 BY MR. ORLOVE:
24   Q. Showing you Union Exhibit 5 for

Page 27

1 identification, tell us what this is, please.
2   A. This here is a letter dated March 2nd
3 to Glen Williams regarding his termination,
4 which I received a copy of this.
5   Q. And this makes reference to the
6 last-chance agreement that -- which the letter
7 says Williams reviewed and executed.
8     As far as you know, what
9 last-chance agreement was referred to in this
10 letter? You can look at those exhibits, if you
11 need to.
12   A. What I believe they're referring to is
13 the exhibit, Union Exhibit 1, there's mention
14 of it on there.
15     MR. ORLOVE: I'll move for the
16 admission of Union Exhibit 5.
17     MR. POTTER: No objection.
18     ARBITRATOR MALIN: Union 5 is
19 admitted.
20         (Union Exhibit No. 5
21         Received.)
22 BY MR. ORLOVE:
23   Q. And what did you do in connection with
24 or after you received Union Exhibit 5?

Page 28

1   A. After learning of this, initiated the
2 first-step grievance.
3   Q. I will show you what I have marked for
4 identification as Union Exhibit 6, and can you
5 identify that as the grievance you just
6 mentioned?
7   A. Yes. It's the first-step grievance
8 that I started regarding that termination
9 letter.
10   Q. There's handwriting on here along the
11 bottom on an angle. Did not receive a
12 response, et cetera. Whose writing is that?
13   A. That's my handwriting.
14   Q. And whose handwriting is it in the
15 body of the grievance?
16   A. That's mine also.
17     MR. ORLOVE: I forgot if I moved for
18 admission of 6. If not, I move for admission
19 of 6.
20     MR. POTTER: No objection.
21     ARBITRATOR MALIN: Union 6 is
22 admitted.
23         (Union Exhibit No. 6
24         Received.)

Page 29

1 BY MR. ORLOVE:
2   Q. What connection, if any, is there
3 between this grievance, Union Exhibit 6, and
4 the Williams grievance which was discussed on
5 December 8th? What was the issue involved in
6 both?
7   A. It's all related to this operator's
8 license expiring.
9   Q. I'm showing you what I have marked for
10 identification as Union Exhibit 7, and can you
11 identify that for us, please?
12   A. Yes. This is an e-mail notification
13 to Michael Jackson regarding proceeding to a
14 third step.
15   Q. And the third step on what grievance?
16   A. There's actually two of them. One was
17 a central control operator pay issue. And the
18 other one was an unjust termination which is
19 referring to Glen Williams's grievance.
20   Q. Okay. And the issue on central
21 control operator pay, is that an issue involved
22 here today?
23   A. Not what we're talking about, no.
24   Q. But this -- am I correct in saying

Page 30

1  this advanced the second Williams grievance to
2  the third step?
3    A. Yes.
4      MR. ORLOVE: I move for the admission
5  of Union 7.
6      MR. POTTER: No objection.
7      ARBITRATOR MALIN: Union 7 is
8  admitted.
9         (Union Exhibit No. 7
10        Received.)
11     MR. ORLOVE: No further questions.
12 Thank you, Ray.
13     ARBITRATOR MALIN: You may
14 cross-examine.
15     MR. POTTER: Ray, we meet again. Hope
16 you're doing well. Just got a few questions
17 for you here.
18        CROSS-EXAMINATION
19 BY MR. POTTER:
20   Q. I guess the first question to ask is,
21 I mean, we're talking about three different
22 individuals here, Mr. Williams, Mr. Leppert,
23 and Mr. Nelson, correct, three different
24 employees?

Page 31

1    A. Three employees, yes.
2    Q. So we're not talking about discipline
3  related to one individual, correct? Just to
4  state the obvious --
5    A. Correct.
6    Q. I'm just trying to state the obvious,
7  to be honest with you. We're here talking
8  about --
9    A. I'm not understanding your question.
10 I'm sorry.
11   Q. Just talking about consolidation of
12 the discipline involving three different
13 people; Nelson, Williams, and Leppert, correct?
14   A. They were all disciplined, yes.
15   Q. Right. Okay. So again, the
16 discipline relates to three different people,
17 and which there were three different grievances
18 filed as a result, correct?
19   A. That's our standard procedure, yeah.
20   Q. Right, okay. So and with respect to
21 the discipline involved here, there wasn't one
22 grievance consolidating all three individuals
23 in the first instance by the union, correct?
24   A. No. There's three individual

Page 32

1  grievances.
2    Q. I know we haven't got there yet, but
3  eventually we'll see those.
4    A. Okay.
5    Q. And in terms of the discipline handed
6  out, with respect to each of these individuals,
7  Nelson and Williams and Leppert, they received
8  separate pieces of paper announcing the nature
9  of their discipline, correct, their suspension
10 notices, or in Williams' case, the last-chance
11 agreement, correct?
12   A. Yeah. All dated November 7th, yeah.
13   Q. Yeah, yeah, okay. And each one
14 received different discipline, correct?
15   A. Yes. There were similarities, but the
16 levels were a little different.
17   Q. Right. Exactly.
18       Okay. And the other issue is, you
19 had testified regarding Union Exhibit 4.
20 That's an e-mail, Ray, that you sent to Mike
21 Jackson on 11/22. It's Union Exhibit 4. You
22 got it? Yeah.
23   A. Yes.
24   Q. Okay. Now, you had testified that

Page 33

1  there wasn't a protest by the union regarding a
2  discussion with respect to all three grievances
3  or the notification. You were going to proceed
4  to the third step jointly, correct?
5      MR. ORLOVE: You said union.
6      THE WITNESS: Yes. I don't understand
7  that question.
8  BY MR. POTTER:
9    Q. I'm sorry. There was no protests by
10 the company in terms of proceeding to the third
11 step jointly with respect to Nelson, Williams,
12 and Leppert?
13   A. No. We discussed them all at that
14 meeting.
15   Q. Okay. I don't see anything in here,
16 however, regarding consolidation -- the term
17 consolidation being used. Is that word in this
18 e-mail?
19   A. I don't normally do that --
20     MR. ORLOVE: It speaks for itself.
21     ARBITRATOR MALIN: I'll take the
22 answer.
23 BY MR. POTTER:
24   Q. And there's nothing in this document

Page 34

1  which addresses arbitration; does it not?
2      A. Well, no. It's only going to a third
3  step at that point. Was hoping it wouldn't get
4  to this point.
5      Q. I understand. I understand. Just one
6  step at a time.
7          And then Union Exhibit 5 is the
8  letter to Mr. Williams announcing his
9  termination, correct, dated March 2nd, 2007?
10     A. Yes.
11     Q. Now, neither -- the other two
12 individuals involved here, Mr. Nelson and
13 Mr. Leppert have not been terminated, correct?
14     A. No.
15     Q. Okay. And they weren't subject to a
16 last-chance agreement, correct, either one?
17     A. No.
18     Q. Okay. And then Union Exhibit 7, which
19 was another e-mail to Mr. Jackson from you,
20 correct?
21     A. Correct.
22     Q. And this addresses the union's receipt
23 of the second-step denials by Steve Phillips,
24 correct?

Page 35

1      A. Correct.
2      Q. And your statement, The union feels
3  these grievances are unresolved and notifying
4  the company of its intent to proceed to Step 3
5  on both, correct?
6      A. Yes.
7      Q. And the word consolidation is not
8  included within your e-mail, correct?
9      A. I've never used that word in there,
10 no.
11     Q. And there's no reference to the other
12 outstanding grievances involving Mr. Nelson or
13 Mr. Leppert in your e-mail, is there?
14     A. Because they weren't terminated, no.
15 It's not my choice.
16     Q. Again, I'm sometimes stating the
17 obvious, but we're going to go through that.
18         (Brief Pause)
19     MR. POTTER: That's all I have.
20     MR. ORLOVE: Nothing further.
21     ARBITRATOR MALIN: Thank you very
22 much, Mr. Rossa. You're excused.
23     MR. ORLOVE: May we take a break?
24     ARBITRATOR MALIN: Sure.

Page 36

1          (Recess Taken)
2          (The witness was duly sworn.)
3          CHRISTOPHER MARTENS,
4  called as a witness herein, having been first
5  duly sworn, was examined and testified as
6  follows:
7          DIRECT EXAMINATION
8  BY MR. ORLOVE:
9      Q. State your name, please.
10     A. Christopher Martens, M-A-R-T-E-N-S.
11     Q. And by whom are you employed?
12     A. Illinois American Water.
13     Q. What is your position with them?
14     A. Maintenance technician.
15     Q. How long have you been employed with
16 the company?
17     A. It will be 18 years in June.
18     Q. Directing your attention back to
19 November of 2006, what if any position did you
20 have on behalf of the union?
21     A. I was a steward.
22     Q. And there's chief steward and other
23 stewards; is that correct?
24     A. Correct.

Page 37

1      Q. What level steward were you?
2      A. I was just plain steward.
3      Q. And do you occupy any position for the
4  union now?
5      A. No.
6      Q. Directing your attention to
7  November 7, were you involved in any meetings
8  involving employees Glen Williams, Ken Nelson,
9  and Dan Leppert?
10     A. Yes, I was.
11     Q. Tell us how it happened that you
12 became involved in these meetings.
13     A. I was in the back of the shop doing
14 something, and John Stein came up to me and
15 said that my presence was needed today, that
16 day, for meetings with the company concerning
17 Glen Williams, Ken Nelson, and Dan Leppert.
18     Q. Why were you there instead of the
19 chief steward?
20     A. I guess Ray was off that day. Ray
21 Rossa was off that day.
22     Q. Well, tell us what happened when you
23 came to the meeting. Who was there?
24     A. It was myself, Dan Leppert at the

Page 38

1  first meeting, Steve Phillips, and John Stein.
2      Q. And tell us what was discussed at that
3  meeting.
4      A. Discipline concerning the expiration
5  of his water license.
6      Q. And when that meeting ended, was there
7  other discussion also, but we're here about
8  consolidation. I just wanted to ask you what
9  issue or what matter was discussed.
10     A. The discipline of Dan Leppert over an
11 expired water license.
12     Q. And when that meeting ended, were they
13 given anything at that meeting?
14     A. Dan received, I believe, a copy of his
15 suspension.
16     Q. And when that meeting ended, what
17 happened after that?
18     A. I was told to go and find Ken Nelson.
19     Q. And did you do so?
20     A. Yes, I did.
21     Q. And then what happened?
22     A. Then I brought Ken Nelson in and sat
23 down with myself, Ken Nelson, Steve Phillips,
24 and John Stein again.

Page 39

1      Q. And what was discussed at that
2  meeting? What was the issue at that meeting?
3      A. The disciplining of him for his
4  expired water license.
5      Q. And was he given a letter as well?
6      A. Yes, he was.
7      Q. And then what happened after that?
8      A. Then I was told to go find Glen
9  Williams.
10     Q. And you did so?
11     A. Correct.
12     Q. And what happened?
13     A. Glen went in the office and sat down.
14 It was me, Glen Williams, Steve Phillips, and
15 John Stein.
16     Q. And again, what was the subject taken
17 up at that meeting?
18     A. The disciplining of him for his
19 expired water license.
20     Q. How much time passed from one employee
21 to another -- strike that.
22         How much time passed between
23 meetings from one employee to another?
24     A. Maybe five minutes, if that.

Page 40

1      Q. You were the one to go find them?
2      A. Yeah. They were all kind of -- they
3  already kind of knew, so they were kind of off
4  in the one room kind of, doing some paperwork.
5      Q. Chris, I'm going to show you what I
6  have marked as Union Exhibit 8, and will you
7  tell us what that is, please?
8      A. This is a first-step grievance for
9  Glen Williams.
10     Q. And up to the line that's darker, up
11 to where it says, Verbal grievance presented to
12 John Stein, whose -- including that line, whose
13 writing is that?
14     A. Mine.
15     Q. And the description of the grievance,
16 whose writing is on that line?
17     A. Mine.
18     Q. And where it says First-step meeting
19 held at, it appears to be a different type
20 anyway or a heavier pen. Whose writing is
21 that?
22     A. I believe that's John Stein's.
23     Q. Okay. And to try to shorten this, is
24 this correct that there was a first-step

Page 41

1  meeting held on November 13th?
2      A. Correct.
3      Q. And you were the steward involved in
4  that?
5      A. Correct.
6      Q. Okay. And down below where it says
7  Response of supervisor at first-step, whose
8  writing is that, if you know?
9      A. I believe it's John Stein's.
10     Q. And whose signature is that, if you
11 know?
12     A. John Stein's.
13     Q. And he dated it?
14     A. Correct.
15         MR. ORLOVE: We move for admission of
16 Union Exhibit 8.
17         MR. POTTER: No objection.
18         ARBITRATOR MALIN: Union 8 is
19 admitted.
20             (Union Exhibit No. 8
21             Received.)
22 BY MR. ORLOVE:
23     Q. And this is for Glen Williams,
24 correct?

Page 42

1   A. Correct.
2   Q. Let me show you what I have marked as
3 Union Exhibit 9. And once again, you see your
4 signature appearing at the bottom?
5   A. Correct.
6   Q. And let's go up to the top, the first
7 two lines. Whose writing is that?
8   A. Mine.
9   Q. And where it says, Second -- Step 2
10 grievance presented to, whose writing is that?
11   A. I believe that's Steve's.
12   Q. Steve Phillips?
13   A. Steve Phillips.
14   Q. And was it presented to him on
15 November 16th?
16   A. Correct.
17   Q. And the next line, Statement of
18 grievable incident, whose writing is that?
19   A. Mine.
20   Q. And going further down, Union
21 position, whose writing is that?
22   A. Mine.
23   Q. And further down, Step 2 meeting held
24 at?

Page 43

1   A. I believe that's Steve's, Phillips.
2   Q. And the next two lines below it, is
3 that Steve's as well?
4   A. I believe so.
5   Q. Okay. And can you identify, besides
6 your own, the signature below your name at the
7 bottom?
8   A. Yes.
9   Q. And whose is that?
10   A. Steve Phillips.
11     MR. ORLOVE: Okay. I move for
12 admission of Union Exhibit 9.
13     MR. POTTER: No objection.
14     ARBITRATOR MALIN: Union 9 is
15 admitted.
16        (Union Exhibit No. 9
17         Received.)
18     MR. ORLOVE: Could we go off the
19 record for a minute?
20     ARBITRATOR MALIN: Sure.
21        (Discussion off the Record.)
22 BY MR. ORLOVE:
23   Q. Chris, I'm going to put in front of
24 you a series of exhibits, Exhibit 10

Page 44

1 through 13. Are these -- if you don't mind my
2 leading -- is it correct that these are a
3 series of grievances that you processed for Ken
4 Nelson and Dan Leppert?
5   A. That's correct.
6   Q. And were these processed on or about
7 the date they bear?
8   A. That's correct.
9   Q. And is it correct that they all relate
10 to the discipline that was administered to them
11 on November 7th, as you were present at that
12 meeting?
13   A. Yes.
14   Q. And although the text of these and the
15 letter is clear, but because you were present
16 at the November 7 meeting and at each of these
17 steps of the grievance meeting, what was the
18 issue or problem with respect to these
19 employees?
20   A. That their water license expired.
21   Q. When you presented these grievances,
22 let's say to John Stein at the first step, were
23 they presented at one time or each separate
24 times?

Page 45

1   A. I believe I presented -- gave all
2 three of them at one time.
3   Q. And was there discussion between you
4 and Mr. Stein about them at the first-step
5 meeting?
6   A. I believe so.
7   Q. Was the discussion by each employee
8 separate or the group together?
9   A. I believe I just -- you know, it was
10 just about the group, the punishment in general
11 was just unfair.
12   Q. And the same questions essentially
13 with the second step, that was presented to
14 Mr. Phillips?
15   A. Yes.
16   Q. Were these grievances presented to
17 Mr. Phillips separately or at one sitting?
18   A. All three were presented at one
19 sitting.
20   Q. And was there discussion with
21 Mr. Phillips at the second step?
22   A. Yes, there was.
23   Q. And what was the subject of that
24 discussion?