**Page 46**

1    A. The discipline concerning the
2   employees.
3    Q. When you were meeting with
4   Mr. Phillips, were the employees present?
5    A. No.
6    Q. Was any objection raised to you by
7   Mr. Stein or Mr. Phillips that you can't
8   present these three at one time?
9    A. I don't believe so.
10    Q. Did either Mr. Phillips or Mr. Stein
11   refuse to take them up as you presented them to
12   him?
13    A. No.
14      MR. ORLOVE: No further questions.
15      ARBITRATOR MALIN: Are you moving the
16   admission of --
17      MR. ORLOVE: I am moving the
18   admission, thank you very much, of Union
19   Exhibits 10 through 13.
20      ARBITRATOR MALIN: And just for the
21   record, 10 is Step 1 on Nelson, 11 is Step 2 on
22   Nelson, 12 is Step 1 on Leppert, and 13 is Step
23   2 on Leppert. Any objection?
24      MR. POTTER: None.

**Page 47**

1      ARBITRATOR MALIN: Union Exhibits 10,
2   11, 12, and 13 are admitted. You may
3   cross-examine.
4         (Union Exhibit Nos. 10 - 13
5          received.)
6         CROSS-EXAMINATION
7   BY MR. POTTER:
8    Q. So you were present at the meetings in
9   which each employee here received their written
10   discipline for their loss of their license,
11   correct?
12    A. Correct.
13    Q. And there were three separate meetings
14   regarding that --
15    A. Correct.
16    Q. -- further discipline?
17    A. Correct.
18    Q. And three separate written documents
19   each received, correct?
20    A. Correct.
21    Q. And then that's when the grievances
22   started flowing, correct?
23    A. Correct.
24    Q. So we have really in the record being

**Page 48**

1   from Union Exhibit 8 through 13 is the first
2   and second steps of those grievance processes?
3    A. Correct.
4    Q. And there's a separate grievance, both
5   first step and second step, for each one of the
6   employees who received discipline, correct?
7    A. Correct.
8    Q. Now, you said that there was no
9   objection when you approached Mr. Stein and
10   Mr. Phillips about the presentation of these
11   grievances which you presented jointly to them,
12   correct?
13    A. Correct.
14    Q. Okay. But they were still filed as
15   three independent grievances, correct?
16    A. Correct.
17    Q. And the underlying discipline for each
18   three was different, correct? Williams had a
19   last-chance, for example --
20    A. Yeah. There's some similarities, but
21   there were differences amongst them.
22    Q. And when you had your -- when you made
23   your presentation of these grievances, Chris,
24   on each occasion with Mr. Stein and

**Page 49**

1   Mr. Phillips, did you indicate to them in any
2   fashion that you intended to -- or the union
3   intended to proceed and discuss each one of
4   these in the future on any sort of consolidated
5   or joint basis?
6    A. No.
7      MR. POTTER: Nothing further.
8      MR. ORLOVE: Nothing further.
9      ARBITRATOR MALIN: Thank you very
10   much, Mr. Martens, you're excused.
11         (Witness Excused)
12      MR. ORLOVE: Our next witness is Wayne
13   Clavio.
14         (The witness was duly sworn.)
15      WAYNE CLAVIO,
16   called as a witness herein, having been first
17   duly sworn, was examined and testified as
18   follows:
19         DIRECT EXAMINATION
20   BY MR. ORLOVE:
21    Q. Tell us your name, please.
22    A. Wayne Clavio.
23    Q. And by whom are you employed?
24    A. UFCW Local 1546.

Page 50

1  Q. And what is your present position with
2  them?
3  A. I'm business representative and vice
4  president.
5  Q. And are you a full-time officer of the
6  union?
7  A. Yes, sir.
8  Q. And among your duties, do you service
9  the unit -- the union's representation of the
10 unit at Illinois American Water Company?
11 A. Yes, sir.
12 Q. How long have you serviced the unit?
13 A. I would say about two and a half years
14 now.
15 Q. In connection with the grievance
16 procedure at Illinois American, at what step of
17 that process do you customarily get involved?
18 A. Third step.
19 Q. Directing your attention to the fall
20 of 2006, what if anything came to your
21 attention concerning employees Williams,
22 Nelson, and Leppert?
23 A. After the second-step meetings were
24 held, I was given a call, I believe, by Ray

Page 51

1  Rossa who was the chief steward. He told me
2  that the grievances had been filed, taken
3  through Step 1 and Step 2, and that he had sent
4  a letter to -- or e-mailed a letter to Michael
5  Jackson requesting a Step 3. And usually he
6  gives me a copy of that e-mail, which he did in
7  this case.
8  Q. And was there a Step 3 meeting
9  concerning the grievances of Williams, Leppert,
10 and Nelson?
11 A. Yes, sir, there was.
12 Q. And when was that meeting?
13 A. Could you refresh my memory on the
14 exact date? I believe it was in --
15 Q. You were here when Ray testified that
16 there was a meeting -- third-step meeting on
17 December 8?
18 A. Correct.
19 Q. Does that sound --
20 A. Correct.
21 Q. -- right to you?
22 A. Correct. I was just going through a
23 bunch of dates over there. I apologize.
24 Q. Okay. Where was the meeting held?

Page 52

1  A. It was held right across the hallway
2  in the library of the company.
3  Q. In this building?
4  A. Yes, sir.
5  Q. And who was present?
6  A. Ray Rossa, Jerry Rosenwinkel, myself,
7  Steve Phillips, Michael Jackson. I believe --
8  I know Erin was in there, Erin Holden, another
9  steward, and Chris Martens.
10 Q. Were the employees who were the
11 subject of the grievances present at the
12 meeting?
13 A. No, they were not.
14 Q. Were their grievances taken up at this
15 meeting?
16 A. Yes, they were.
17 Q. Were they taken up in a group or
18 separately?
19 A. In a group.
20 Q. Did you receive a response from the
21 company as a result of the third-step meeting?
22 A. Yes, I did.
23 MR. ORLOVE: May we be off the record
24 for a moment?

Page 53

1  ARBITRATOR MALIN: Sure. We'll go off
2  the record.
3  (Discussion off the Record.)
4  BY MR. ORLOVE:
5  Q. Wayne, tell us whether or not you
6  received a written response from the company
7  concerning your meeting you just testified
8  about on December 8th?
9  A. Yes, I did.
10 Q. Let me show you what I have marked as
11 Union Exhibit 14 and point out to you and the
12 record and everyone present that I blocked out
13 what I considered to be the substance of the
14 grievances. But I'm leaving in what I consider
15 to be procedural matters.
16 But can you identify -- given my
17 explanation of why there's a lot of black in
18 here, can you identify this as the e-mail you
19 received from Mr. Jackson?
20 A. Yes, I can.
21 Q. And is this that e-mail?
22 A. Yes, it is.
23 Q. Okay. And it's entitled response --
24 from him, Response to Third-Step Meeting for

Page 54

1  Williams, Nelson, and Leppert. And is that
2  correct; is that what this document is?
3     A. Yes, it is.
4        MR. ORLOVE: I move for the admission
5  of Union 14.
6        MR. POTTER: No objection.
7        ARBITRATOR MALIN: Union 14 is
8  admitted.
9            (Union Exhibit No. 14
10           Received.)
11 BY MR. ORLOVE:
12    Q. In the course of preparing for this
13 arbitration proceeding, was a demand or a
14 request, I should say, placed upon you to
15 answer certain questions by the company?
16    A. Yes. I received a letter from Steve
17 Phillips.
18    Q. And did you answer that --
19    A. Yes, I did.
20    Q. -- letter?
21        Let me show you what I have marked
22 as Union Exhibit 15 and ask you if this is your
23 response to that letter.
24    A. Yes, it is.

Page 55

1     Q. Now, directing your attention to the
2  second page, the second line of that page which
3  ends by saying: Please supply me with the
4  following... And there's a request for four
5  items.
6     A. Yes.
7     Q. Have you received information as --
8  anything -- strike that.
9        Have you received anything
10 pursuant to your request for that information?
11    A. No, I have not.
12       MR. ORLOVE: I move for the admission
13 of Union Exhibit 15.
14       MR. POTTER: No objection.
15       ARBITRATOR MALIN: Union 15 is
16 admitted.
17           (Union Exhibit No. 15
18           Received.)
19       MR. ORLOVE: And I have no further
20 questions.
21          CROSS-EXAMINATION
22 BY MR. POTTER:
23    Q. Just so the record's clear, Wayne, you
24 didn't get a letter in response to your

Page 56

1  information request from Steve?
2     A. No, I did not.
3     Q. Really? Okay. Interesting.
4        So if I'm understanding this, you
5  don't get involved normally in terms of any
6  grievances involving Illinois American's
7  bargaining unit employees until a third step?
8     A. Correct.
9     Q. And you come in and you're kind of the
10 last door before you go to arbitration,
11 correct?
12    A. Correct.
13    Q. Okay. And you come in, and normally
14 there's a number of different grievances that
15 are on the table and you're discussing,
16 correct?
17    A. Sometimes there's more than one
18 grievance we're discussing. Sometimes it is
19 only one grievance.
20    Q. But it wouldn't be unusual for you to
21 come in and review more than one independent
22 grievance in terms of issues that had developed
23 to the point where they were at third step?
24    A. No, it would not.

Page 57

1        MR. POTTER: Okay. That's it.
2        MR. ORLOVE: Nothing further.
3        ARBITRATOR MALIN: Thank you very
4  much, Mr. Clavio.
5            (Witness Excused)
6        MR. ORLOVE: Union rests.
7        MR. POTTER: If you could just give us
8  a few minutes.
9        ARBITRATOR MALIN: Sure. We'll take a
10 recess.
11           (Recess Taken)
12           (The witness was duly sworn.)
13       STEPHEN PHILLIPS,
14 called as a witness herein, having been first
15 duly sworn, was examined and testified as
16 follows:
17          DIRECT EXAMINATION
18 BY MR. POTTER:
19    Q. Steve, there been some discussion
20 regarding your title and duties and functions
21 here, but if you could explain to the
22 Arbitrator your viewpoint anyway regarding what
23 you're supposed to be doing with the company.
24    A. I'm production superintendent of the

Page 58

1   operations out of the Chicago division.
2      Q. And for what it's worth, just kind of
3   give the Arbitrator an idea what really
4   operates out of this facility, this division.
5      A. As far as the utility itself?
6      Q. Uh-huh.
7      A. Basically it's water, waste water
8   collection, approximately 80,000 connections,
9   roughly about 27, 28 different service areas
10  scattered throughout metropolitan Chicago.
11     Q. And how long have you held your
12  current position?
13     A. Production superintendent? Last three
14  or four years.
15     Q. Okay. And prior to that, what was
16  your position with the company?
17     A. Manager of north operations, Citizens
18  Utilities.
19     Q. Citizens Utilities being the
20  predecessor to the current operation?
21     A. Yes.
22     Q. Okay. And how long had you held that
23  position?
24     A. Four, five years.

Page 59

1      Q. Okay. And so you've got a long
2   history with the company?
3      A. Yes, I do.
4      Q. How long have you worked with the
5   company overall?
6      A. Overall, this October it will be
7   34 years.
8      Q. Okay. I guess starting out the easy
9   way first, let me show you Company Exhibit 1.
10  Can you tell us what that document is?
11     A. This is a response to Wayne Clavio's
12  letter dated --
13     Q. So it's Union Exhibit 15?
14     A. Yes. His letter dated April 5th.
15  This is my response to his letter, my letter
16  being April 25th.
17     Q. All right. And so that was mailed on
18  the 25th of this month?
19     A. Yes.
20     Q. All right. And prior to this
21  arbitration, were you aware that -- at any time
22  that Mr. Clavio didn't receive a response to
23  his April 5th correspondence to you?
24     A. No.

Page 60

1         MR. POTTER: Move for admission of
2   Company Exhibit 1.
3         MR. ORLOVE: Other than stating the
4   obvious, that he didn't get it, it lacks what
5   my contract law professor many thousand years
6   ago said, he made up a word: It lacks
7   transmissiveness.
8         ARBITRATOR MALIN: Well, Mr. Clavio's
9   letter asks for a response by April 30th, which
10  is today, so I guess he's got it on time. So
11  Company 1 is admitted.
12            (Company Exhibit No. 1
13            Received.)
14  BY MR. POTTER:
15     Q. Let's talk about the meat of the
16  matter, I guess, to a certain extent.
17         What's your role in the grievance
18  arbitration process?
19     A. In the grievance procedure?
20     Q. Uh-huh.
21     A. Second step.
22     Q. Okay. Historically, that's when you
23  kick into gear and get involved?
24     A. Yes.

Page 61

1      Q. And from the testimony that we've
2   heard this morning, it sounds like you were
3   involved in the second-step processing of the
4   three grievances that resulted from the
5   discipline of the employees in question here?
6      A. Yes.
7      Q. All right. So when you have a
8   second-step meeting, is it a meeting in which
9   what? One individual grievance is discussed
10  and then there is a recess and you have another
11  meeting, or how is that handled in the second
12  step?
13     A. Typically it's -- it can be one
14  grievance. It can be a couple different
15  grievances, just depending upon what's going on
16  at the time.
17     Q. Okay. And are you also involved
18  normally in the third-step process?
19     A. Yes, I am.
20     Q. Okay. And how does that normally
21  operate in terms of processing say more than
22  one grievance?
23     A. It's not unusual, multiple grievances
24  have been heard in the past.

Page 62

1  Q. And multiple grievances that end up
2  being sent to arbitration jointly?
3  A. No. Not that I ever recall.
4  Q. Okay. So let's talk about that.
5      Are you aware of any proceeding in
6  the past in which multiple grievances have been
7  consolidated for purposes of arbitration?
8  A. No.
9  Q. And in looking at the Collective
10 Bargaining Agreement, which will be Joint
11 Exhibit 1. It's beginning on Page 25, I
12 believe. It's the grievance arbitration
13 language, Steve. Are you familiar with that
14 language?
15 A. Yes.
16 Q. Is there something about that language
17 that would make you feel like consolidation
18 would be proper or improper in these
19 circumstances?
20     MR. ORLOVE: Well, I object to his
21 feeling, or I guess you really mean
22 interpretation of the contract?
23     MR. POTTER: Yes.
24     MR. ORLOVE: What page are you on?

Page 63

1      MR. POTTER: Page 25.
2      MR. ORLOVE: That's what we're asking
3  the Arbitrator to do. So obviously we know
4  what the company's position is. I think it's
5  irrelevant what he thinks.
6      MR. POTTER: Well, I think it's a
7  matter of being rational and reasonable in
8  their interpretation of the contract. It will
9  be helpful to the Arbitrator to understand the
10 company's position on why they feel
11 consolidation is improper.
12     If it's obviously totally
13 irrational and not based upon the contract,
14 it's one thing. If they have a contractual
15 basis, I think you're allowed to explain why
16 they believe they have a contractual basis for
17 their position.
18     ARBITRATOR MALIN: I'll take the
19 answer as a statement of the company's
20 position. Proceed.
21     THE WITNESS: There's no reference to
22 consolidation. It refers to a grievance.
23 BY MR. POTTER:
24 Q. Okay. And if I can direct your

Page 64

1  attention to Page 26 of the Collective
2  Bargaining Agreement under Step 4, that sets
3  forth the arbitration procedures; does it not?
4  A. Yes.
5  Q. And about halfway down is there a
6  reference in terms of the rights or
7  responsibilities of the arbitrator in terms of
8  the contract?
9      MR. ORLOVE: Well, just so the record
10 is clear, I'm objecting to all of this. It's
11 set forth in the contract. We can all read it.
12 His interpretation is immaterial. It's the
13 Arbitrator's interpretation that will control.
14     But I won't continue to object if
15 you allow me to just state I have a continuing
16 objection.
17     ARBITRATOR MALIN: Certainly. You may
18 have a standing line of objection. I'll allow
19 the inquiry.
20     MR. POTTER: Okay.
21     ARBITRATOR MALIN: Proceed.
22 BY MR. POTTER:
23 Q. Is there something in that contractual
24 language that supports the company's position

Page 65

1  in these proceedings?
2  A. Can I read it?
3  Q. Yeah.
4  A. The decision of the arbitrator shall
5  be the final and binding upon the company and
6  the union, provided however, that the
7  arbitrator shall have no right to add to or
8  detract from or modify any of the provisions of
9  this agreement.
10 Q. And did that language somehow affect
11 the company's position in this case?
12 A. Yes.
13 Q. And how?
14 A. That it can't be changed.
15 Q. Okay. And so what's trying to be
16 changed here?
17 A. Consolidation of grievances.
18 Q. Because there's no language currently
19 in the contract providing for such, correct?
20 A. That's correct.
21 Q. Now, each of these three individuals
22 we're here today to discuss all received
23 separate discipline, correct?
24 A. That's correct.

Page 66

1    Q. And we've got it as part of the
2 exhibits in this case.
3        Was all the discipline the same?
4    A. No.
5    Q. And how did the company come about
6 making a determination that discipline should
7 be different for each of these three employees?
8    A. Past work history plays into the
9 decision.
10   Q. For example, Mr. Williams was subject
11 to a last-chance agreement, correct?
12   A. That's correct.
13   Q. Were the other two individuals subject
14 to a last-chance?
15   A. No, they weren't.
16   Q. What about restitution for money paid
17 to these three individuals, is that relevant to
18 all three employees?
19   A. No.
20   Q. Is there one who's not subject to
21 restitution demand?
22   A. That would be correct.
23   Q. Who is that individual?
24   A. Dan Leppert.

Page 67

1    Q. Okay. Are you aware of any
2 circumstance that you were present or anyone
3 else in a managerial position was present in
4 which the union made a demand to consolidate
5 these three grievances, and the company never
6 protested that position?
7    A. No.
8    Q. When was the first time that you're
9 aware that there was any attempt by the union
10 to consolidate these three matters?
11   A. Through the attorneys.
12      MR. POTTER: Okay. That's it.
13      ARBITRATOR MALIN: You may cross
14 examine.
15      MR. ORLOVE: I'll ask the Arbitrator
16 to take official notice that Chicago is first
17 in the poorest delivery of the mail, as
18 reported recently --
19      ARBITRATOR MALIN: I think we can all
20 stipulate to that.
21      MR. ORLOVE: As reported recently, I
22 think, as last week, that we came in absolutely
23 dead last in the efficiency of the mail
24 delivery.

Page 68

1       ARBITRATOR MALIN: And you have no
2 basis to dispute the testimony that this was
3 mailed, that Company Exhibit 1 was mailed?
4       MR. ORLOVE: I suspect that in a week
5 or two when Wayne gets to his office there will
6 be a letter sitting there, and he can throw it
7 away because he'll say I already have it in the
8 arbitration case.
9         CROSS-EXAMINATION
10 BY MR. ORLOVE:
11   Q. But now, switching back to serious
12 matters, Mr. Phillips, you said this is the
13 first time the issue of consolidation ever
14 arose?
15   A. Yes, that's correct.
16   Q. In your experience --
17   A. Yes, sir.
18   Q. -- for the company?
19      Were you at the meeting with
20 Mr. Jackson?
21   A. Yes.
22   Q. And when he sent this e-mail to Wayne
23 proposing the handling of the three grievances,
24 it does not indicate whether you got a copy or

Page 69

1 not. But -- oh, wait. No. I'm sorry. It
2 does not indicate whether you got a copy or
3 not. I'm referring to Union Exhibit 14.
4       Did you in fact get a copy of
5 that?
6    A. Yes.
7    Q. In its full unredacted state, right?
8    A. Yes.
9    Q. Okay. And Mr. Jackson is -- let's
10 see -- production manager for the company. So
11 he's your supervisor?
12   A. That's correct. Yes, sir.
13   Q. So you wouldn't say to him, hey, wait,
14 Mike. We're not going to take these three up
15 at one time. I mean, he's your boss, right?
16   A. Yes.
17   Q. If that's what he chooses to do.
18      Who decided that there's an
19 objection to consolidation? Whose decision is
20 that? Is that yours?
21   A. No, sir.
22   Q. Came from up on high?
23   A. Yes, sir.
24   Q. And somebody just said to you we're

Page 70

1  not going to consolidate these things, or words
2  to that effect?
3      A. The contract doesn't call for it.
4      Q. No. I'm asking you who made the
5  decision. You did not?
6      A. I'm not certain.
7      Q. But you're certain whether you did or
8  not?
9      A. That's correct.
10     Q. And you did not?
11     A. Uh-huh.
12     Q. Correct?
13     A. That's correct.
14        MR. ORLOVE: Okay. Nothing further.
15        REDIRECT EXAMINATION
16  BY MR. POTTER:
17     Q. Let's state the obvious. Steve, did
18  you somehow feel an objection to the company's
19  position about consolidation?
20        THE WITNESS: No.
21        MR. ORLOVE: Objection to what he
22  felt.
23        ARBITRATOR MALIN: Overruled.
24        MR. POTTER: Nothing further.

Page 71

1         MR. ORLOVE: Nor I.
2         ARBITRATOR MALIN: Thank you very
3   much, Mr. Phillips. You're excused.
4             (Witness Excused)
5         MR. POTTER: Company rests.
6         MR. ORLOVE: No rebuttal.
7         ARBITRATOR MALIN: Let's go off the
8   record.
9             (Discussion off the Record.)
10        ARBITRATOR MALIN: Let's go on the
11  record. The record should reflect in our
12  off-the-record discussion we have agreed to
13  proceed as follows. Mr. Orlove is going to
14  make a closing oral argument on behalf of the
15  union. Mr. Potter has indicated a desire to
16  file a written brief, so he will do so. We've
17  agreed that his brief will be due 30 days
18  following receipt of the transcript. And my
19  practice is when I receive a copy of the
20  transcript, to just shoot you an e-mail, and
21  your 30 days runs from that date. But since
22  you're in St. Louis, given our postal system,
23  you'll probably get it before I get mine.
24        MR. POTTER: Got you.

Page 72

1         ARBITRATOR MALIN: But if you get
2   yours later, then just respond, and we'll
3   adjust the date accordingly.
4         MR. POTTER: Okay.
5         ARBITRATOR MALIN: And Mr. Potter will
6   serve Mr. Orlove directly with his brief. And
7   do you want to just do that by e-mail?
8         MR. POTTER: Sure. Oh, sure.
9         ARBITRATOR MALIN: So you can just
10  send an e-mail to Mr. Orlove and to me at the
11  same time attaching your brief. Very good.
12        Mr. Orlove, you may proceed with
13  your closing argument, or do you need a recess
14  to organize your thoughts?
15        MR. ORLOVE: No.
16        ARBITRATOR MALIN: Proceed.
17        MR. ORLOVE: They will remain
18  unorganized.
19        I trust the Arbitrator will
20  certainly review the transcript and review the
21  exhibits, and he may find greater or more
22  similarities than I am able to capture and
23  vocalize at this one sitting.
24        But the basic point is that there

Page 73

1   are three grievances. As been testified, the
2   union is in the practice of making a grievance
3   for each individual, but the point is that all
4   the grievances relate in substance, issue, and
5   time to the very same thing.
6         While you're not to get into the
7   substance of the matter, we'll save that and
8   you for a later date, the fact is that they all
9   involve the allegation or the investigation
10  that three employees let their licenses lapse.
11  And the union feels that the discipline given
12  to them was too harsh.
13        By the way, we're not saying that
14  some discipline isn't warranted. It is
15  warranted, but we're saying that the discipline
16  given was too harsh.
17        But for the procedural issue we're
18  confronted with now, the question is whether
19  these can be consolidated or joined. And
20  they're all accused of the same offense with
21  varying degrees of discipline based on, as
22  Mr. Phillips said, other factors.
23        You will review the grievances, I
24  am sure, and you will see that except for

Page 74

1  Williams' second grievance, the grievances and
2  the responses are identical. And I'll take a
3  moment here just to discuss the Glen Williams
4  second grievance.
5       You'll see that he was given a
6  last-chance agreement which then the union
7  terminated, and then he was discharged because
8  the last-chance agreement was not obeyed. The
9  fact is the union wasn't part of that
10 last-chance agreement, we will argue later.
11      But that aside, his discharge
12 results from letting his operator's license
13 lapse. If you look at the initial three
14 grievances that flowed from the November 7
15 meetings, you'll see that they were called in
16 separately, seriatim, one right after the
17 other, given discipline, immediately grieved in
18 the same language, taken up at the first and
19 second steps in the same language. The company
20 responded in essentially or almost identical,
21 same language.
22      And then it gets to the third
23 step; and interestingly, it's Mr. Jackson who
24 isn't here who drafts a response for all three.

Page 75

1  And he proposes a resolution to the grievances
2  plural, a group resolution. And at the bottom
3  of that, and I wanted to spare you the
4  substance or not prejudice you when you hear
5  the substance of the case, he says, I must
6  receive -- and I blacked it out, something --
7  by December 29 or the company will assume the
8  matter will proceed under the grievance
9  procedure. And these grievances, plural, will
10 be considered denied by the company at the
11 third step. Well, then logically, the union
12 proceeds to ask for grievances, Joint
13 Exhibit 2, for the three employees.
14      No objection at this point to
15 consolidation. In fact, it appears that
16 Jackson himself consolidated them, if indeed
17 they weren't earlier consolidated by the
18 company when they dealt with the same issue at
19 the same time, but simply calling people in
20 seriatim.
21      No objection to proceeding to
22 arbitration for three employees until we get
23 closer, and you will have seen by your e-mail
24 that we agreed to disagree over whether they

Page 76

1  should be consolidated or not.
2       Again, I trust you will study the
3  record more carefully than I've been able to
4  paraphrase by just going through the exhibits
5  quickly here. But let me get to the law, if
6  you will, or the governing rules of arbitration
7  and court procedures as part of our legal
8  argument.
9       Elkouri states in his 6th Edition
10 or in the work called Elkouri, 6th Edition, on
11 Page 299: Arbitration of grievances reaching
12 arbitration at the same time can be compelled,
13 compelled, by either party, unless the contract
14 clearly and unambiguously provides otherwise.
15      It's clear here the contract does
16 not prohibit consolidation. It's silent on the
17 issue.
18      Interesting, Mr. Phillips said,
19 which only makes sense, a lot of times at
20 second and third-step meetings they hear a
21 couple things at the same time. It only makes
22 sense, as I will quote from other arbitrators
23 in a moment.
24      In Apex Smelty, 53 Labor

Page 77

1  Arbitration 239 at 244, Arbitrator Dworkin,
2  quote: Both courts and arbitrators have ruled
3  that several cases may be consolidated for the
4  purposes of arbitration proceedings. Several
5  cases. Unless it is clearly shown that to do
6  so would result in confusion, prejudice, or
7  substantial detriment to either party. No
8  claim has been made yet, and I trust we won't
9  hear one post-hearing, that there's some kind
10 of substantial detriment or prejudice or
11 confusion. Indeed, how could there be? It's
12 the same issue.
13      And in a later case, 1988 -- that
14 case was in 1969. In a later case, 1988, by
15 Arbitrator Boedecker called Ben Franklin
16 Transit 91 Labor Arbitration 880 at 883.
17 Quote: Joinder of similar issues for one
18 arbitration hearing supports the basic intent
19 of having an expeditious disposition of
20 disputes. Similarities of the parties, issues,
21 and events involved in disputes are among the
22 factors which tend to support joinder of cases
23 for the sake of efficiency.
24      Here we don't have similarities.

Page 78

1  We have almost identical issues. The only
2  differences are based on the amount of
3  discipline given to one person rather than
4  another because of their past history with the
5  company.
6      I went to the Federal Rules of
7  Civil Procedure which learned counsel suggests
8  aren't appropriate here, but indeed they are.
9  In fact, arbitration and arbitrators uniformly
10 look at things like that for an efficient
11 operation of the arbitration procedure.
12     The joinder of claims, I think, is
13 Rule 21. The party asserting a claim to relief
14 as an original claim, counterclaim,
15 cross-claim, or third-party claim may join,
16 either as an independent or alternative claims,
17 as many claims legal, equitable, or maritime as
18 a party has against an opposing party.
19     It all sounds kind of high and
20 mighty, but the fact is the courts are saying
21 guys, we don't have a lot of time to waste on
22 you. Marshal up all your claims you have
23 against each other, and bring them in at one
24 time and let's dispose of them all at one time.

Page 79

1  It only makes sense for cost, for efficiency.
2  And whatever sense that makes in the court
3  world, it makes even more sense in the spirit
4  of labor arbitration and the ongoing
5  relationships between parties.
6      And lastly, I'll quote from a very
7  recent case in the Northern District of
8  Illinois, it's called O'Sullivan versus the
9  City of Chicago. And it's at 2007 Westlaw,
10 that's WL -- is that West Law? I'm showing my
11 age -- 671040 at Note 9. And it isn't that
12 case in particular, but what the judge said in
13 that case that is really commanding.
14     Under the rules, the impulse is
15 towards entertaining the broadest possible
16 scope of action consistent with fairness to the
17 parties. Joinder of claims, parties, and
18 remedies is strongly encouraged.
19     And that judge was quoting the
20 United Mine Workers of America versus Gibbs at
21 383 US 715. The Judge goes on: It is within
22 the Court's broad discretion whether to sever a
23 claim under Rule 21. Citing Rice versus
24 Sunrise Express, 209 Fed 3d 1008 at 1016, a 7th

Page 80

1  Circuit case. Quote -- the quote is taken from
2  the Rice case:
3      As long as there is a discrete and
4  separate claim, the District Court may exercise
5  its discretion to sever it. But at the same
6  token, the Court ought not to attempt to
7  separate essentially a unitary problem.
8      So we believe that under court
9  procedures, and even more so under arbitration
10 procedures, consolidation is the only thing
11 that makes sense, which brings me to my last
12 argument.
13     Why for any reason would anyone
14 want to hear four cases, four separate times
15 and put the union and the company itself
16 through four different expense modes? In fact,
17 why are we even here to argue that issue other
18 than to waste time and waste money? The
19 antithesis of what labor arbitration is all
20 about.
21     And while Mr. Phillips couldn't
22 identify who made the decision, he gave his
23 opinion why. I'm suggesting that that
24 interpretation is so far outside the field of

Page 81

1  labor arbitration, that under the ordinary
2  rules of good faith and fair dealing under any
3  contract, some award should be made to the
4  union in the nature of exemplary damages for us
5  having to suffer this issue today. And I'm
6  suggesting attorneys' fees as an appropriate
7  award to the union, not by way of punishment,
8  but by way of recouping the damages that the
9  union suffers for having to litigate what
10 should be a very clear issue. Thank you very
11 much.
12     ARBITRATOR MALIN: Thank you. And
13 I'll await your written brief. Anything
14 further before we adjourn?
15     MR. POTTER: I think that's it.
16     MR. ORLOVE: I have nothing further.
17     ARBITRATOR MALIN: We are adjourned.
18         (Which were all the
19          proceedings had in the
20          above-entitled cause this
21          date and time.)
22
23
24

```
                                      Page 82
 1   STATE OF ILLINOIS  )
                        ) SS.
 2   COUNTY OF COOK     )
 3
 4          PAMELA A. STAFFORD, being first
 5   duly sworn on oath says that she is a court
 6   reporter doing business in the City of Chicago
 7   and that she reported in shorthand the
 8   proceedings of said hearing and that the
 9   foregoing is a true and correct transcript of
10   her shorthand notes so taken as aforesaid and
11   contains the proceedings given at said hearing.
12
13
14
     _____
15   Notary Public, Cook County
     Illinois,
16   My Commission expires 5/31/2010
17
18
19
20
21
22
23
24
```

```
1  STATE OF ILLINOIS    )
                        ) SS.
2  COUNTY OF COOK       )

3

4          PAMELA A. STAFFORD, being first
5  duly sworn on oath says that she is a court
6  reporter doing business in the City of Chicago
7  and that she reported in shorthand the
8  proceedings of said hearing and that the
9  foregoing is a true and correct transcript of
10 her shorthand notes so taken as aforesaid and
11 contains the proceedings given at said hearing.
12
13
14
15 _____
   Notary Public, Cook County
   Illinois,
16 My Commission expires 5/31/2010
```

"OFFICIAL SEAL"
Pamela A. Stafford
Notary Public, State of Illinois
My Commission Exp. 05/31/2010