AMERICAN ARBITRATION ASSOCIATION

IN THE MATTER OF THE ARBITRATION BETWEEN

UFCW LOCAL 1546,

and

ILLINOIS AMERICAN WATER COMPANY.

No. 51 300 0021407

- - - - - - - - - - - - - - - -

Taken on November 20, 2007

- - - - - - - - - - - - - - - -

Original File A:\ufcw112007.txt

Pages 83 - 352

Word Index included

MAYLEEN MENDELSON
CERTIFIED COURT REPORTER
ROMAY CORP.

120 West Madison Street, Suite 14M          2738 West Fitch Avenue
Chicago, Illinois  60602                    Chicago, Illinois  60645
              (773) 761-0449 FAX (773) 761-6155

AMERICAN ARBITRATION ASSOCIATION

IN THE MATTER OF THE        )
                            )
ARBITRATION BETWEEN:        )
                            )
                            )
UFCW LOCAL 1546,            ) No. 51 300 0021407
                            )
    and                     )
                            )
ILLINOIS AMERICAN           )
                            )
WATER COMPANY,              )

Volume II - Pages 83 to 352

REPORT OF PROCEEDINGS had at 1000 International Parkway, Woodridge, Illinois, on November 20, 2007, at the hour of 9:00 a.m. before MARTIN MALIN, the Arbitrator to whom the matter in difference between the parties has been submitted for settlement.

Page 84

```
 1   APPEARANCES:
 2       JACOBS, BURNS, ORLOVE,
 3       STANTON & HERNANDEZ
 4       BY: MR. CHARLES ORLOVE
 5       122 South Michigan Avenue
 6       Suite 1720
 7       Chicago, Illinois 60603
 8       (312) 372-1646
 9           Appeared on behalf of the
10           Union;
11
12       BLACKWELL, SANDERS, PEPER, MARTIN, LLP
13       BY: MR. TERRY L. POTTER
14       720 Olive Street
15       Suite 2400
16       St. Louis, Missouri 63101
17       (314) 345-6438
18           Appeared on behalf of the
19           Company.
20
21   ALSO PRESENT:
22   STEPHEN J. PHILLIPS, WAYNE A. CLAVIO, DAN
23   LEPPERT, RAY ROSSA, GLENN WILLIAMS, JOHN STEIN,
24   MICHAEL JACKSON, KEN NELSON
```

Page 85

```
            INDEX
  WITNESS:              PAGE:

  STEPHEN   DIRECT EXAMINATION   107
  PHILLIPS  BY MR. POTTER
            CROSS-EXAMINATION    169
            BY MR. ORLOVE
            REDIRECT EXAMINATION 194
            BY MR. POTTER
  MICHAEL   DIRECT EXAMINATION   200
  JACKSON   BY MR. POTTER
            CROSS-EXAMINATION    217
            BY MR. ORLOVE
  DANIEL    DIRECT EXAMINATION   223
  LEPPERT   BY MR. ORLOVE
            CROSS-EXAMINATION    236
            BY MR. POTTER
            REDIRECT EXAMINATION 243
            BY MR. ORLOVE
  KENNETH   DIRECT EXAMINATION   245
  NELSON    BY MR. ORLOVE
            CROSS-EXAMINATION    254
            BY MR. POTTER
            REDIRECT EXAMINATION 263
            BY MR. ORLOVE
  GLENN     DIRECT EXAMINATION   265
  WILLIAMS  BY MR. ORLOVE
            CROSS-EXAMINATION    285
            BY MR. POTTER
  CHRIS     DIRECT EXAMINATION   300
  MARTENS   BY MR. ORLOVE
            CROSS-EXAMINATION    304
            BY MR. POTTER
            REDIRECT EXAMINATION 310
            BY MR. ORLOVE
            RECROSS-EXAMINATION  310
            BY MR. POTTER
  RAY ROSSA DIRECT EXAMINATION   314
            BY MR. ORLOVE
            CROSS-EXAMINATION    323
            BY MR. POTTER
            REDIRECT EXAMINATION 329
            BY MR. ORLOVE
  WAYNE     DIRECT EXAMINATION   329
  CLAVIO    BY MR. ORLOVE
            CROSS-EXAMINATION    340
```

Page 86

```
            BY MR. POTTER
            REDIRECT EXAMINATION 343
            BY MR. ORLOVE
  STEPHEN   REDIRECT EXAMINATION 345
  PHILLIPS  BY MR. POTTER
            RECROSS-EXAMINATION  349
            BY MR. ORLOVE
                 *****
                         Rec'd
  Joint Exhibit Nos. 4, 5, 6, 7    89
  Company Exhibit No. 2           113
  Company Exhibit No. 3           115
  Company Exhibit No. 4           121
  Company Exhibit No. 5           124
  Company Exhibit No. 6           127
  Company Exhibit No. 7           129
  Company Exhibit No. 8           137
  Company Exhibit No. 10          149
  Company Exhibit No. 11          160
  Company Exhibit No. 12          166
  Union Exhibit No. 16            235

                 *****
```

Page 87

ARBITRATOR MALIN: Let's go on the record. This is the continuation of the hearing between the United Food and Commercial Workers Local 1546 and Illinois American Water Company. This was formerly American Arbitration Association Case Number 51 300 0021407. For the record, Mr. Potter, would you identify yourself and those present for the company?

MR. POTTER: Terry Potter from the law firm of Blackwell Sanders located in St. Louis, Missouri. And the two witnesses -- three witnesses potentially we'll have today, John Phillips, Mike Jackson, and John Stein.

ARBITRATOR MALIN: Thank you. And Mr. Orlove, would you do the same for the union, please.

MR. ORLOVE: Sure. My name is Charles Orlove of the firm of Jacobs, Burnes, Orlove, Stanton & Hernandez in Chicago. And with me are, and they will be witnesses as well, Dan Leppert, Ken Nelson, Glenn Williams. The three of them are the employees who are the subject of the grievances. Ray Rossa, the chief

Page 88

1  steward, Chris Martens, who is not in the room,
2  but he's in the building doing other things.
3  And he's also a union steward. And Wayne
4  Clavio, who is an officer of Local 1546.
5      ARBITRATOR MALIN: Thank you.
6      MR. POTTER: Just so the record is
7  clear, apparently I've been advised I misspoke.
8  I said John Phillips, who is actually a partner
9  of mine in the firm. He's not here. But Steve
10 Phillips is.
11     ARBITRATOR MALIN: Thank you for that
12 correction.
13         The record should reflect in an
14 off-the-record discussion among counsel and the
15 Arbitrator that counsel have tendered four
16 additional joint exhibits. Joint Exhibit
17 Number 4 being a charge dated January 18th,
18 2007 filed by the company against the union
19 with the National Labor Relations Board. Joint
20 Exhibit 5, a letter from the National Labor
21 Relations Board regional director Joseph Barker
22 to Mr. Orlove and Ms. Elzemeyer,
23 E-L-Z-E-M-E-Y-E-R, corporate counsel for the
24 company, deferring that charge which now gets

Page 89

1  the number of 13-CB-18585 deferring that matter
2  to arbitration.
3          Joint Exhibit 6 being National
4  Labor Relations Board Charge 13-CA-44221, a
5  charge filed by the union against the company
6  dated August 20th, 2007. And Joint Exhibit 7,
7  a letter from Mr. Barker to Mr. Potter and
8  Mr. Orlove deferring that charge to
9  arbitration.
10         For the record, counsel, do you
11 concur with the admission of those joint
12 exhibits?
13     MR. ORLOVE: For the union, yes.
14     MR. POTTER: And for the employer,
15 yes.
16     ARBITRATOR MALIN: Joint Exhibits 4,
17 5, 6, and 7 are admitted.
18         (Joint Exhibit Nos. 4, 5, 6, 7
19         received.)
20     ARBITRATOR MALIN: Counsel, I
21 understand you also have some stipulations you
22 wish to enter at this time.
23     MR. ORLOVE: Yes. Mr. Potter and I
24 have agreed and I propose for stipulation that

Page 90

1  all conditions preceding this arbitration have
2  either been met or waived, and this matter is
3  properly before the Arbitrator for decision.
4  Perhaps I can stop here and we can take each
5  one separately.
6      ARBITRATOR MALIN: Mr. Potter, for the
7  record, do you concur with that?
8      MR. POTTER: So stipulated.
9      ARBITRATOR MALIN: Thank you. That
10 stipulation is received.
11     MR. ORLOVE: We also agree that the
12 Arbitrator may retain jurisdiction to determine
13 any issues which may arise over the
14 implementation of the remedy, including the
15 calculation of backpay, if any, after the
16 parties have exhausted good-faith efforts to
17 resolve same.
18     ARBITRATOR MALIN: Mr. Potter?
19     MR. POTTER: So stipulated.
20     ARBITRATOR MALIN: That stipulation is
21 received.
22     MR. ORLOVE: I propose for the issues
23 three of them. The first two, I believe,
24 are -- we are in agreement. Whether the

Page 91

1  company had cause, and I'll just mention cause
2  is the word used in Section 2.1 of the
3  contract. Whether the company had cause to
4  discipline employees Dan Leppert, Ken Nelson,
5  and Glenn Williams in November 2006.
6      MR. POTTER: So stipulated.
7      MR. ORLOVE: And the thought just
8  occurred to me, but perhaps we could clear it
9  up as the case goes along.
10         Mr. Williams was given a reduction
11 in pay in October, among other acts of
12 discipline. So I would like to make it clear
13 that that issue will include discipline given
14 to Mr. Williams in October --
15     MR. POTTER: Sure.
16     MR. ORLOVE: -- as well as November.
17     MR. POTTER: It would be the whole
18 ball of wax, so to speak. We had a number of
19 items. We had the actual suspensions, we had
20 the restitution element for two of them, and we
21 had the change in pay status.
22     MR. ORLOVE: Okay. Thank you. So
23 would you want to amend this statement of the
24 issue from November 2006 to in October and

Page 92

1  November 2006?
2       MR. ORLOVE: October and
3  November 2006.
4       ARBITRATOR MALIN: Is that acceptable?
5       MR. POTTER: That's fine.
6       MR. ORLOVE: Secondly, whether the
7  company had cause to terminate Glenn Williams
8  on March 2, 2007.
9       MR. POTTER: So stipulated.
10      MR. ORLOVE: And thirdly, whether the
11 extent or the amount of discipline administered
12 or given to employees Leppert, Nelson, and
13 Williams in October and November of 2006 was
14 appropriate under the circumstances of this
15 case.
16      MR. POTTER: And we're not willing to
17 stipulate to that. We believe the just cause
18 standard is the standard to be applied.
19      MR. ORLOVE: That concludes our
20 stipulations.
21      ARBITRATOR MALIN: Thank you. Those
22 stipulations are received. And I do note the
23 company's not in agreement on the statement of
24 the third issue as presented by the union.

Page 93

1       Anything further before we move to
2  opening statements?
3       MR. POTTER: I don't believe so.
4       ARBITRATOR MALIN: Well, Mr. Potter,
5  if you have an opening statement on behalf of
6  the company, I'd be pleased to receive it.
7       MR. POTTER: Sure. Just to kind of
8  refresh everybody's memory, as much as
9  anything, on why we're here, although I'm sure
10 everybody knows, this is the second part of an
11 arbitration involving three operators for the
12 company, Mr. Nelson, Mr. Leppert, and
13 Mr. Williams, who were disciplined, as we've
14 discussed earlier, for not maintaining their
15 license as required under the Collective
16 Bargaining Agreement, 26.2 in particular.
17      These operators are the most
18 highly paid union employees for the company for
19 good reason. They have a great deal of
20 responsibility. And consistent with that
21 responsibility we pay them a very nice wage.
22      What you'll also note that their
23 wage is tied into the license that they hold in
24 their respective positions. Under the Illinois

Page 94

1  EPA regulations, an operator can have a
2  hierarchy of licenses, in this situation, an A,
3  B, or C license. And whether or not -- what
4  level you hold a license determines your pay
5  rate. And you'll note that also in the
6  Collective Bargaining Agreement in the
7  appendix, so that much is abundantly clear.
8       In any event, these three
9  operators again were subject to discipline
10 because they didn't maintain their license.
11 And what is important here is that the licenses
12 for these three individuals lapsed. Again
13 they're required to maintain their license, but
14 they didn't. Nelson, Mr. Nelson, for two years
15 approximately; Mr. Williams for ten years, and
16 Mr. Leppert for approximately 18 months.
17      And frankly, there was no reason
18 for this to occur. Each operator who maintains
19 a license under the state receives timely
20 notice in advance of the possible lapsing of
21 their license. In addition to which, each is
22 issued what they call a wallet card when they
23 receive their license from the State that they
24 can carry on their person which identifies the

Page 95

1  expiration date for their license. So in any
2  event, there's just really no reason for this
3  to have occurred in the first place.
4       The license requires training to
5  make sure these individuals are up to speed
6  regarding the latest regulations in particular.
7  And receive, if you hold an A or a B license,
8  30 hours of training every three years, and a C
9  or D License, it's 15 hours.
10      And again, the Collective
11 Bargaining Agreement provides that it's the
12 responsibility of the employees to make sure
13 that they have the required education to
14 maintain their license, again set forth in
15 26.2. About as clear as you're going to get.
16      There are approximately 35
17 operators in the Chicago metropolitan system.
18 To the company's knowledge, these three are the
19 first ones who have failed to maintain their
20 licenses. We're unaware of anyone else in the
21 system who has ever failed to maintain their
22 license. And there's a long history of these
23 operators being in the system.
24      We became aware of their lapse

Page 96

1  because frankly, Mr. Williams approached one of
2  his supervisors with the information. And
3  accordingly, the company began an investigation
4  regarding who else might have an issue along
5  these lines. And hence, we became aware of not
6  only Mr. Williams, but Mr. Leppert and
7  Mr. Nelson's situation.
8       We interviewed them regarding the
9  situation. There really wasn't any mitigating
10 circumstances that would warrant discipline not
11 issuing. And so in terms of Mr. Nelson and
12 Mr. Leppert, they were subject to a 15-day
13 suspension.
14      Mr. Williams was further
15 complicated by the fact that just a few months
16 prior he had been subject to a suspension. And
17 it was under the Guide for Conduct. And it was
18 rule or offense 12. So this was the second
19 suspension. We also cited Rule 12 for all
20 these three individuals too. Neglect of duties
21 as the basis for the discipline.
22      Under the Guide for Conduct, at
23 this point Mr. Williams was subject to
24 termination. So that didn't hold well for

Page 97

1  Mr. Williams.
2       The company did not take that
3  approach. Looking at the situation and his
4  tenure, they were trying to salvage this
5  employee, quite frankly, and offered a
6  last-chance agreement with a 30-day suspension
7  and restitution.
8       The company met with all three
9  individuals and issued the discipline for each.
10 What's interesting is frankly, if you look at
11 the Guide for Conduct, I think the company was
12 very lenient in their interpretation of what
13 occurred here in terms of potential offenses
14 because Offense Number 1 was probably the most
15 applicable offense that could have applied
16 here, falsification or misrepresentation. And
17 that cause -- and that is a cause for immediate
18 discharge. They didn't go that route. Again,
19 they chose an Offense Number 12, and in an
20 attempt again to try to take a reasonable
21 approach in this situation.
22      What's interesting in this case in
23 particular, as you know, is that Mr. Williams
24 signed with his steward present, and both

Page 98

1  Mr. Williams and the steward signed off on the
2  last-chance agreement. Obviously allowed to
3  review it, and didn't have any substantive
4  questions, didn't question its content.
5       And then lo and behold the company
6  was surprised when a grievance was actually
7  filed over his discipline, which obviously was
8  in breach of the last-chance agreement.
9       The union's position throughout
10 the grievance arbitration proceedings has been
11 that the steward didn't have authority to enter
12 into the agreement, therefore, it wasn't
13 binding, which is contrary to past practice and
14 also the contract. Because in particular, in
15 Steps 1 and 2 of the grievance arbitration
16 proceedings, stewards are involved in the
17 process, identified as such, and are identified
18 -- one of their functions in that process is an
19 attempt to resolve the grievances. So saying
20 the steward didn't have authority just doesn't
21 apply.
22      Even though Mr. Williams filed a
23 grievance and breached his last-chance
24 agreement, the parties processed the matter

Page 99

1  through the grievance arbitration procedure,
2  didn't immediately discharge Mr. Williams.
3  They were attempting to reach a middle ground
4  in the situation.
5       There were a number of discussions
6  between the parties, but ultimately, it was
7  clear by March of this year that Mr. Williams
8  was not going to act consistent with the
9  last-chance agreement.
10      There were some modifications to
11 the restitution element that were offered, and
12 again they were rejected. So the company felt
13 it had no choice at that point but to terminate
14 Mr. Williams.
15      The union's never really contested
16 that misconduct had happened here, but really
17 what you see in the grievance documents
18 themselves, they simply find that the
19 discipline was excessive. So they admit that
20 there was misconduct. And I'd think anybody
21 would have to in this situation. Obviously the
22 licenses weren't maintained, and the employees
23 screwed up, quite frankly.
24      So yes, there was misconduct. But

Page 100

1  I think that again, the company was extremely
2  reasonable and just in this situation by not
3  utilizing Offense Number 1 in the Guide for
4  Conduct, which they could have, and discharge
5  all three.
6       They could have easily discharged
7  Mr. Williams because under the Guide for
8  Conduct upon a second suspension or offense
9  under Rule 12 he should have been discharged.
10    Q. So if anyone acted reasonably, I think
11 it was the employer in this situation. And its
12 actions should be upheld in these proceedings.
13 And that's our opening statement.
14       ARBITRATOR MALIN: Thank you.
15 Mr. Orlove, would you care to make or reserve
16 your opening statement?
17       MR. ORLOVE: No, I'd like to make it
18 now. Thank you.
19       ARBITRATOR MALIN: I'd be pleased to
20 receive it.
21       MR. ORLOVE: You're going to see soon
22 on that the company's case is riddled with
23 inconsistencies, illogic, unfairness, and
24 disparate treatment. Worst of all, you're

Page 101

1  going to see disciplinary action here more than
2  without cause, but with respect to Mr. Williams
3  in particular, outrageously without cause.
4       You're going to see that discharge
5  is prohibited by anti-union discrimination laws
6  under the NLRB, and you'll also see that the
7  pressure that the company was putting on him
8  and then forced -- and then under the threat of
9  discharge and ultimate discharge is contrary to
10 the public policy of Illinois requiring people
11 to make deductions out of their pay without
12 their permission.
13       The discipline of these employees
14 over a failure to renew their water treatment
15 license, contrary to what the company says is
16 required by Section 26.2 of the contract is not
17 the case. We'll put on evidence of what the
18 intendment was of Section 26.2.
19       When I first was approached by
20 this case, I thought it was simply over the
21 amount of the discipline, as Mr. Potter just
22 said. But as I got into the facts, it became
23 clear to me that there is no cause for
24 discipline at all. And that's why we

Page 102

1  stipulated that issue. But we're in
2  disagreement over the issue of the amount of
3  discipline.
4       You'll hear that the requirement
5  for licenses supported by continuing education
6  is a relatively new procedure in Illinois. The
7  IPEA, who knows about this, took no action
8  against the employees. The IPEA, that's the
9  Illinois Environmental Protection Agency,
10 IEPA -- I'm saying it wrong -- Environmental
11 Protection Agency of Illinois took no action
12 against the employees. The IEPA took no action
13 against the employer.
14       The act of renewing licenses has
15 been and appears to be purely a ministerial
16 act, including the taking of exams and the
17 taking of tests.
18       It can't be that serious because
19 the company doesn't even keep records of
20 licenses of employees. And it can't be that
21 serious because you'll hear that when it came
22 to the company's attention that they didn't
23 have their licenses, they merry well went on
24 their way asking them to continue working -- or

Page 103

1  instructing them to continue working without
2  their license except that they reduced their
3  pay, which has no logic at all.
4       And there are no rules in the code
5  of conduct other than the general catchall of
6  being a good employee. There are no rules
7  assessing a penalty for the lapse of a license.
8  And you'd think that if a license were that
9  important or that critical to the operation of
10 the company, and I repeat to the operation of
11 the company, it would have taken the men out of
12 service. But they didn't.
13       They knowingly allowed them to
14 continue working without a license as long as
15 they took steps with the IEPA to renew their
16 licenses.
17       All of this notwithstanding, the
18 company not only overreacted to the fact --
19 which the employees brought it to their
20 attention, that they didn't have their
21 licenses, and they're going to take steps to
22 perfect their licenses. The company not only
23 overreacted to this, but exploded irrationally,
24 suspending employees without pay, reducing

Page 104

1  their pay for the very same work that they had
2  been doing, demanding a payback of wages that
3  they earned while they were without a license,
4  and then insisting on a repayment of the wages
5  which we contend is not discipline at all, but
6  it's a penalty, unanimously forbidden in
7  arbitral -- almost unanimously forbidden in
8  arbitral authorities. And it comes to be an
9  unjust enrichment to the company to ask the
10 people to pay back for the work they've been
11 doing.
12      But it gets worse. If one can
13 imagine that it gets worse, it does. One
14 employee was required to restore his license in
15 six months or be fired. He didn't, and he was
16 excused. Another employee was ordered to pay
17 back part of his earned wages. He failed to do
18 so and yet no action has been taken with
19 respect to him.
20      The other employee, Mr. Williams,
21 a 34-year employee, a lead man, and but for the
22 earlier suspension, an employee without blemish
23 for 34 years refused to sign a check-off to pay
24 back part of his wages, despite the company's

Page 105

1  threats that they'll fire him if he doesn't
2  authorize a check-off of his wages. Now, that
3  right to have your wages intact and not taken
4  by your employer without your permission is a
5  right protected by Illinois law.
6      And he was so advised by the union
7  not to sign the check-off because, in addition
8  to everything else I've said, the matter was
9  pending in arbitration then and there in March.
10 And it made no sense to insist that he give up
11 what you'll hear amounts to well over half his
12 wages via check-off while the whole issue of
13 whether that was appropriate at all is pending
14 before you. Yet the company fired him for
15 failing to authorize a deduction in his wages.
16 These actions, we submit, were not just without
17 cause. They were mindless, they're illogical,
18 they're manifestly unfair, and obviously
19 without cause.
20      So we're going to ask you to
21 sustain the grievances, order the company to
22 reinstate Mr. Williams and -- with a make-whole
23 remedy, order the company to restore the
24 employees' wage rates that they unilaterally

Page 106

1  cut, order the company to pay the difference
2  between the prediscipline wage rate and the
3  rate to which they were reduced, order interest
4  thereon.
5       And lastly, I'm going to renew a
6  claim you denied earlier for attorneys' fees.
7  And I realize you denied that claim, and I must
8  say it's not a claim that I routinely make.
9  It's a claim that I think deserves -- it's an
10 extraordinary remedy, but I believe it's
11 warranted here. Because when all the facts are
12 presented to you, you will see that they are so
13 devoid -- the company's action was so devoid of
14 reason and fairness that it cries out for
15 something more than reinstatement and the
16 recovery of lost wages. Thank you.
17     ARBITRATOR MALIN: Thank you.
18 Mr. Potter, are you ready to proceed with the
19 company's case in chief?
20     MR. POTTER: I am.
21     ARBITRATOR MALIN: Go off the record
22 for a moment.
23     (Brief Pause)
24     ARBITRATOR MALIN: Back on the record.

Page 107

1       (The witness was duly sworn.)
2       ARBITRATOR MALIN: Mr. Potter, proceed
3  whenever you're ready.
4       STEPHEN PHILLIPS,
5  called as a witness herein, having been first
6  duly sworn, was examined and testified as
7  follows:
8           DIRECT EXAMINATION
9  BY MR. POTTER:
10     Q. Steve, can you state your name for the
11 record?
12     A. Stephen Phillips.
13     Q. And what is your position with the
14 company?
15     A. Superintendent over production.
16     Q. And how long have you held that
17 position with the company?
18     A. Roughly three years, four years.
19     Q. And how long have you been -- what
20 other positions have you held with the company?
21     A. Manager of operations. Prior to that,
22 supervisory positions. Prior to that, going
23 way back, field positions.
24     Q. What are your present duties and

**Page 108**

1 responsibilities?
2   A. Responsible for the oversight of the
3 production.
4   Q. Okay. And the three grievants
5 involved in this case, what is your role in
6 terms of their job duties and functions?
7   A. The oversight.
8   Q. And who do you report to?
9   A. I report to Michael Jackson.
10   Q. And who is Mike Jackson?
11   A. He is the manager over production.
12   Q. Okay. And generally speaking, what
13 was your role in terms of the discipline with
14 respect to these three gentlemen, just in
15 general?
16   A. The oversight of the investigation.
17   Q. And were you involved in the actual
18 distribution of the discipline in each case?
19   A. Yes, I was.
20   Q. And also in the grievance arbitration
21 process?
22   A. Yes.
23   Q. We'll go into that in more detail, but
24 I just kind of wanted to lay that foundation.

**Page 109**

1     So Mr. Williams and Mr. Nelson and
2 Mr. Leppert were employed as operators?
3   A. That's correct.
4   Q. Can you tell the Arbitrator what an
5 arbitrator (sic) does with the company?
6   A. An operator?
7   Q. Yeah.
8   A. Basically they're operating our water
9 and waste water facilities.
10   Q. And let me show you company exhibit
11 which -- bear with me here. I'm trying to get
12 my references. We are at...
13     ARBITRATOR MALIN: We're up to Company
14 2.
15     MR. POTTER: 2?
16 BY MR. POTTER:
17   Q. Hand you Company Exhibit 2, Steve.
18 Can you tell the Arbitrator what that document
19 is?
20   A. It's basically a job description of an
21 operator's position.
22   Q. Okay. And these are the operator
23 positions for the three individuals --
24   A. Yes.

**Page 110**

1   Q. -- involved here?
2     And under Qualifications, Minimum
3 Requirements, is there a reference to
4 licensing?
5   A. Yes, there is.
6   Q. And what does it provide?
7   A. Stating for licensing in waste and
8 water and waste water.
9   Q. And what's it specify though? What's
10 it tell you?
11   A. That --
12     MR. ORLOVE: Excuse me. If it's
13 stated in here, then it speaks for itself.
14 Maybe you can just identify where it is. I'm
15 trying to find it.
16     THE WITNESS: It's under Minimum
17 Requirements. Qualifications.
18     ARBITRATOR MALIN: Bottom half of the
19 document.
20     MR. ORLOVE: I see.
21     MR. POTTER: Just trying to get some
22 explanation, some foundation.
23     ARBITRATOR MALIN: Sure. It does
24 speak for itself, but you can -- by way of

**Page 111**

1 background, if you want to highlight something,
2 that's fine.
3 BY MR. POTTER:
4   Q. So certain minimum requirements are
5 required in terms of licensing?
6   A. Yes.
7   Q. And a Class C water license in
8 particular?
9   A. Yes.
10   Q. Okay. And I notice there's a date at
11 the top, 4/30/90?
12   A. Yes.
13   Q. What does that tell us?
14   A. That's the day of the job description.
15   Q. Okay. Now, are these job descriptions
16 known to the union or to the employees?
17   A. Yes.
18   Q. And how is that?
19   A. They're made available as part of the
20 Collective Bargaining Agreement.
21   Q. Okay. And this particular job
22 description has been in effect since 1990 --
23   A. That's correct.
24   Q. -- the date noted?

Page 112

1   A. Yes.
2   Q. And it would apply to the -- again,
3 the three operators in question here?
4   A. Yes.
5     MR. POTTER: All right. Move for
6 admission of Company 2.
7     ARBITRATOR MALIN: Any objection?
8     MR. ORLOVE: No objection now. I
9 could either voir dire now or later.
10    ARBITRATOR MALIN: It's your choice.
11    MR. ORLOVE: Let me just ask a few
12 questions.
13    ARBITRATOR MALIN: Sure. You may have
14 voir dire.
15 BY MR. ORLOVE:
16   Q. You mentioned that it's made available
17 to employees in the Collective Bargaining
18 Agreement. I'm trying to find where that is in
19 the Collective Bargaining Agreement.
20   A. It's always been available to
21 everybody. I know we've made them available to
22 them -- the union in the past.
23   Q. Okay. How do you do that, just when
24 somebody asks for it or --

Page 113

1   A. It's common knowledge.
2   Q. -- do you automatically give it to
3 them?
4   A. It's common knowledge.
5   Q. Okay.
6     MR. ORLOVE: No objection.
7     ARBITRATOR MALIN: Okay. Company
8 Exhibit 2 is admitted.
9       (Company Exhibit No. 2
10      received.)
11 BY MR. POTTER:
12   Q. And just for clarification, Steve, let
13 me show Joint Exhibit 1 under Section 2.2 of
14 the Collective Bargaining Agreement. Does that
15 address job descriptions?
16   A. Yeah. It states that the company
17 shall furnish a list of job classification and
18 job descriptions to the union and any new job
19 classifications and descriptions.
20 BY MR. POTTER:
21   Q. All right. Thank you. Let me show
22 you Company Exhibit 3, Steve. Can you tell the
23 Arbitrator what that document is?
24   A. This is a listing. This was last

Page 114

1 revised May 16th of all of our licensed
2 operators, both on the water and waste water
3 side.
4   Q. And what does this chart tell us?
5   A. It tells us which employees or
6 operators hold which licensing or which
7 licenses.
8   Q. Is this something you maintain in your
9 system?
10   A. Yes.
11   Q. Okay. And it looks like there's -- at
12 least in May of '06 approximately 30 -- or were
13 35 individuals with licenses?
14   A. Approximately, yes.
15   Q. Is this the general number that you
16 normally have on board maintaining licenses in
17 the Metro system?
18   A. Yes.
19   Q. And prior to the events leading up to
20 the discipline of the three individuals
21 involved here were you aware of any operator
22 not maintaining their license?
23   A. No.
24     MR. POTTER: Move for admission of

Page 115

1 Company Exhibit 3.
2     MR. ORLOVE: No objection on that
3 score. I'll question him on Cross-Examination.
4     ARBITRATOR MALIN: That's fine.
5 Company 3 is admitted.
6       (Company Exhibit No. 3
7      received.)
8 BY MR. POTTER:
9   Q. So the minimum qualifications we now
10 have assessed in the job description saying you
11 have to have at least a Class S-3 for waste
12 water and Class C for water plant operator, and
13 Company Exhibit 3 indicates there are a number
14 of individuals who have licenses above and
15 beyond that, correct?
16   A. Yes.
17   Q. And each one of these individuals in
18 the past operators who held these multiple
19 license ever been allowed to have their license
20 lapse?
21   A. No. Not to my knowledge.
22   Q. And in particular, turning to the
23 Collective Bargaining Agreement, 26.2, which
24 we've referred to in the past, the first

Page 116

1  sentence, does it not require employees to
2  maintain sufficient education credits so that
3  they maintain their license?
4      MR. ORLOVE: Objection.
5      THE WITNESS: Yes.
6      MR. ORLOVE: Objection to the leading
7  nature of the question.
8  BY MR. POTTER:
9      Q. Okay. Well, tell the Arbitrator how
10 the company interprets 26.2.
11     A. It's the understanding the employees
12 will be responsible to require enough CE
13 credits to maintain their license.
14     Q. And that's how it's been applied by --
15     A. Yes.
16     Q. -- the company?
17     A. Yes.
18     Q. Have you historically been involved in
19 negotiating Joint Exhibit 1?
20     A. Yes.
21     Q. Do you know the history in terms of
22 the development of that language 26.2?
23     A. Yes.
24     Q. Okay. Can you tell the Arbitrator how

Page 117

1  that language came into being?
2      A. It was a proposal at the time of
3  negotiations.
4      Q. Whose proposal?
5      A. Union proposal.
6      Q. Okay. And did it morph into the
7  current language? Was that the proposal, or
8  how exactly do we get there?
9      A. It ended up that language.
10     Q. And do you remember the background in
11 terms of how it got from Point A to Point B?
12     A. Yes. I believe the union proposal was
13 they were looking for reimbursement for time
14 spent for training.
15     Q. So we ended up with the language now
16 in 26.6?
17     A. That's correct.
18     Q. And why is that? How did we get to
19 26.2?
20     A. Because of the requirement the
21 operators are responsible to acquire the
22 necessary CEU's to maintain the license.
23     Q. So the other aspect of that under 26.2
24 is originally the union, you were saying,

Page 118

1  wanted compensation for training. What was the
2  second part, the second paragraph?
3      A. Yes. The company shall endeavor to
4  provide assistance through on-line courses and
5  in-house training.
6      Q. Let's also turn to the contract to the
7  Appendix A. And can you inform the Arbitrator
8  how the pay structure is made for operators?
9      A. Yes. There's different
10 classifications for licensing that is held
11 ranging from operator in training all the way
12 up to central control operator.
13     Q. So they get paid as a function of the
14 level of license held?
15     A. That's correct. Yes.
16     Q. And how long has that language, that
17 tie in, license level to pay been in existence?
18     A. As far as the different license --
19     Q. Uh-huh.
20     A. It's for many years.
21     Q. Let me show you Company Exhibit 4. I
22 show you Company Exhibit 4, Steve. Are you
23 familiar with that document?
24     A. Yes, I am.

Page 119

1      Q. And in fact, if we look at the end of
2  that document -- actually, the next to last
3  page, is that your signature on the right
4  second from the top?
5      A. Yes, it is.
6      Q. Okay. That's probably worse than my
7  signature.
8          All right. Can you tell the
9  Arbitrator in general what this document's all
10 about?
11     A. Basically this was an acquisition,
12 what we refer to as a Metro acquisition going
13 back to '94, and this is where we were taking
14 in Metro employees and merging them into, at
15 that time, Citizens Utilities.
16     Q. And the attachment on that, the very
17 final page sets out wage information with this
18 takeover operations, correct?
19     A. Yes.
20     Q. And in particular, Mr. Nelson and
21 Mr. Leppert were part of this takeover?
22     A. That's correct.
23     Q. And again, consistent with the
24 language in the current contract, they were

Page 120

1 paid more based upon the license held, correct?
2     A. That's correct.
3     Q. And this was a document that goes back
4 to 1994?
5     A. That's correct.
6     Q. Now, also going back to the signature
7 page in this document --
8     A. Uh-huh.
9     Q. -- on the union side, is that the
10 grievant Mr. Williams's signature on the
11 left-hand side second from the top?
12     A. Yes, it is.
13     Q. And was Mr. Williams a steward for the
14 union at this point in time?
15     A. Yes, he was.
16     Q. And so he would have been intimately
17 familiar with this agreement?
18         MR. ORLOVE: Objection to --
19         THE WITNESS: Yes, he was.
20         MR. ORLOVE: Objection.
21         ARBITRATOR MALIN: Sustained.
22 BY MR. POTTER:
23     Q. Mr. Williams would have been aware of
24 this agreement?

Page 121

1         MR. ORLOVE: Objection.
2         THE WITNESS: Yes.
3         ARBITRATOR MALIN: Sustained. You can
4 ask him if Williams evidenced it, but he can't
5 read his mind.
6         MR. POTTER: All right.
7 BY MR. POTTER:
8     Q. That is Mr. Williams's signature,
9 correct?
10     A. Yes, it is.
11         MR. POTTER: Move for admission of
12 Company Exhibit 4.
13         ARBITRATOR MALIN: Any objection?
14         MR. ORLOVE: Give me a moment.
15         ARBITRATOR MALIN: Sure.
16         (Brief Pause)
17         MR. ORLOVE: I don't have a chance to
18 read the whole thing, but based on the
19 questions that were asked and if this is put in
20 for that purpose, we have no objection.
21         ARBITRATOR MALIN: Company 4 is
22 admitted.
23         (Company Exhibit No. 4
24              received.)

Page 122

1 BY MR. POTTER:
2     Q. Okay. This is Company Exhibit 5.
3 Steve, I'm going to show you Company Exhibit 5.
4 Can you tell me what that document is?
5     A. This is a training summary from the
6 State of Illinois, the IEPA, outlining CEU
7 hours for training that was taken.
8     Q. And it's in reference to who?
9     A. Ken Nelson.
10     Q. And how did the company obtain this
11 document?
12     A. I'm not -- to be honest, I'm not
13 certain. If this was provided to a supervisor,
14 I'm not certain.
15     Q. All right. But as a reference to
16 Mr. Nelson, it's dated 11/3/03 at the top,
17 correct?
18     A. That's correct, yes.
19     Q. And it's an update regarding his
20 training credit, correct?
21     A. Yes.
22     Q. And it gives a certificate expiration
23 date on the right-hand side, 7/1/2004?
24     A. Yes.

Page 123

1     Q. To your knowledge, is that
2 Mr. Nelson's correct home address?
3     A. I believe so.
4     Q. Do you have any information to believe
5 that Mr. Nelson wouldn't have received this?
6     A. No.
7         MR. ORLOVE: Objection. He doesn't
8 know.
9         MR. POTTER: To the best of his
10 knowledge.
11         MR. ORLOVE: But he has no knowledge.
12 I object.
13         ARBITRATOR MALIN: Overruled.
14         MR. POTTER: Move for admission of
15 Company Exhibit 5.
16         ARBITRATOR MALIN: Any objection?
17         MR. ORLOVE: Yes. But I'll cover it
18 on cross.
19         ARBITRATOR MALIN: I don't understand.
20 Is there any objection to admission of the
21 document? You may cross-examine him about the
22 document at the appropriate time, of course.
23         MR. ORLOVE: Yes, of course. But he
24 couldn't identify how he got it. And what's

Page 124

1  critical here, I think, is when it came into
2  his knowledge. I don't question the
3  authenticity of the document, if that's what
4  you're asking. If you want to admit it for
5  that purpose, and I'll cross-examine him on it
6  later.
7       MR. POTTER: That's fine.
8       ARBITRATOR MALIN: We'll admit Company
9  Exhibit 5.
10          (Company Exhibit No. 5
11          received.)
12  BY MR. POTTER:
13     Q. All right. Let's go with Company
14  Exhibit 6. Steve, I'm going to show you
15  Company Exhibit 6. Can you tell the Arbitrator
16  what that document is?
17     A. It's a drinking water operator's
18  certificate of competency renewal receipt, and
19  it's from the Illinois EPA.
20     Q. Right. And it's dated what?
21     A. Dated July 29th, 2002.
22     Q. And it's to who?
23     A. It's directed to Dan Leppert.
24     Q. And does it provide information to him

Page 125

1  regarding when his license will expire?
2     A. Yes.
3     Q. And where does it provide that?
4     A. It's in the boxed-in area.
5  Certificate expiration date.
6     Q. 7/1/2005?
7     A. That's correct.
8     Q. To the best of your knowledge, is that
9  Mr. Leppert's home address?
10     A. To the best of my knowledge, that is,
11  yes.
12     Q. And also I notice on the bottom right
13  of this document there's a reference to a
14  wallet card?
15     A. That's correct.
16     Q. First of all, do you maintain a
17  license with the Illinois --
18     A. Yes, I do.
19     Q. -- EPA? So you're familiar with these
20  documents?
21     A. Yes.
22     Q. And a wallet card serves what purpose?
23     A. Just for the purpose showing that you
24  have a license and it also shows when your

Page 126

1  license expires.
2       MR. POTTER: We move for admission of
3  Company Exhibit 6.
4       MR. ORLOVE: The problem I'm having
5  with it, and I hope I'm not sounding
6  hyper-technical, and I'll cross-examine the
7  witness on it, but it's being put in out of
8  order.
9          You'll learn as the case goes
10  along that there's no question that their
11  licenses lapsed. But how the company knew
12  about it, when they knew about it, this is
13  being put in as if -- strike that.
14          He seems to be speaking for the
15  IPEA who issued this. He has no authority to
16  speak for the IPEA. He can speak for the
17  company. What the company knew, when they knew
18  it. That's what's critical here. That's
19  what's important.
20          So I don't want to hold us up with
21  that, but I want the record to indicate that
22  the case is being put in sort of to give an
23  impression that isn't really accurate.
24          To the extent that these are

Page 127

1  records of the IEPA, it appears to be accurate
2  to me. But that's not what's at issue in this
3  case. So as to the authenticity of the
4  document, I don't object. As to its relevance
5  or its meaningfulness in this proceeding, I do
6  object. Does that seem to make sense?
7       ARBITRATOR MALIN: I think so.
8       MR. POTTER: Yeah. We just want to
9  also establish that there were mechanisms in
10  place for these three individuals to be put on
11  notice when their license was going to expire.
12  Simple as that. That's all it amounts to.
13       ARBITRATOR MALIN: I'm going to admit
14  Company Exhibit 6. As with all documents,
15  they're of course subject to each party's
16  arguments and its theory of the case.
17          (Company Exhibit No. 6
18          received.)
19  BY MR. POTTER:
20     Q. All right. Now we have Company
21  Exhibit 7. Steve, let me show you Company
22  Exhibit 7. Can you tell the Arbitrator what
23  that document is?
24     A. It's another notice from the IEPA

Page 128

1  pertaining to Glenn Williams dated April 24th,
2  1997 stating that his license, his Class A
3  license is due up for renewal. You must
4  complete this form by July 31, 1997 to renew
5  your certificate.
6      Q. And to the best of your knowledge was
7  that an accurate address for Mr. Williams back
8  in '97?
9      A. Yes.
10     MR. POTTER: I move for admission of
11 Company Exhibit 7.
12     ARBITRATOR MALIN: Would you like a
13 standing line of objection?
14     MR. ORLOVE: Yes. But in this case I
15 want to ask him a question.
16     ARBITRATOR MALIN: Voir dire. Okay.
17 BY MR. ORLOVE:
18     Q. How do you know that's his address?
19     A. To the best of my knowledge it is, at
20 the time. This is back in 1997.
21     MR. ORLOVE: Didn't he in fact tell
22 you he moved?
23     THE WITNESS: This dates back to 1997.
24     MR. ORLOVE: I'm asking you though.

Page 129

1  Didn't he in fact tell you that he had moved?
2      THE WITNESS: Recently, in recent
3  years, but again, this is 1997.
4      MR. ORLOVE: You're swearing you know
5  that this is his address; is that right?
6      THE WITNESS: To the best of my
7  knowledge.
8      MR. ORLOVE: And what is your
9  knowledge?
10     THE WITNESS: I know he's moved. I
11 know he lived in Bloomingdale. It's to the
12 best of my knowledge.
13     MR. ORLOVE: Same standing objection.
14     ARBITRATOR MALIN: You may have that
15 standing line of objection.
16     MR. ORLOVE: Thank you.
17     ARBITRATOR MALIN: All documentation
18 from the IEPA related to any of the grievants'
19 licenses, expirations, thereof, et cetera.
20 Company Exhibit 7 is admitted.
21         (Company Exhibit No. 7
22         received.)
23     MR. POTTER: This is company
24 Exhibit 8.

Page 130

1  BY MR. POTTER:
2      Q. I'm going to hand you Company
3  Exhibit 8, Steve, and tell the Arbitrator what
4  this document is.
5      A. This is an Employee Guide for Conduct.
6      MR. ORLOVE: There won't be any issue
7  over this.
8      MR. POTTER: Okay. I'm just going to
9  review it in general.
10 BY MR. POTTER:
11     Q. And was this in effect at the time of
12 the discipline in issue here?
13     A. Yes.
14     Q. Okay. And do you know how long this
15 guide for conduct's been in place?
16     A. Ever since we became Illinois American
17 Water.
18     Q. Which was about when?
19     A. January 2002, I believe.
20     Q. Okay. And just looking, knowing that
21 these individuals were disciplined under
22 Offense Number 12, that's on the second page.
23     A. Yes.
24     Q. And again, just to give the format for

Page 131

1  the Arbitrator so we can understand this. On
2  the first page you've got the levels of
3  discipline by a numerical reference. So 1,
4  counseling or warning; 2, is a suspension up to
5  five days; 3 is a suspension from 5 to 30, and
6  4 is discharge?
7      A. That's correct.
8      Q. So in the codes on the right under
9  Penalty for the various offenses --
10     A. Yes.
11     Q. -- lines up with that reference,
12 right?
13     A. Yes.
14     Q. So that, going to 12, the first
15 offense is a 3, meaning normally it's a
16 suspension between five and 30 days, correct?
17     A. That is correct.
18     Q. And a second offense is a 4, which
19 means discharge, correct?
20     A. That's correct.
21     Q. In your role and involvement in the
22 discipline issued in these cases, and let's
23 talk about the initial discipline first, the
24 last-chance agreement and for Mr. Williams the

**Page 132**

1  two suspensions for 15 days for the individuals
2  Mr. Nelson and Mr. Leppert, was this document
3  reviewed?
4      A. Yes, it was.
5      Q. Tell us about that process. Tell us
6  about what came into play in terms of
7  determining what discipline would issue for
8  them?
9      A. Any time there is an investigation or
10 a potential discipline matter --
11     MR. ORLOVE: Excuse me. May I just
12 ask that a foundation be laid for that? I
13 don't know whether he's giving his mental
14 processes, whether it is discussed with
15 employees or discussed with anyone else.
16     MR. POTTER: We're getting there.
17 Just give us a chance.
18     ARBITRATOR MALIN: I'll give you some
19 leeway. Some time frame would also be helpful
20 for my understanding of the witness's
21 testimony.
22 BY MR. POTTER:
23     Q. So you were involved in discipline of
24 these three employees?

**Page 133**

1      A. Yes.
2      Q. And as a result, you had interaction
3  with who?
4      A. John Stein, the direct supervisor,
5  along with the three individuals. Are you
6  talking about within the company?
7      Q. Yes.
8      A. Okay. That would be HR, my boss,
9  Michael Jackson. That's who the interaction
10 was with?
11     Q. And who in HR were you dealing with?
12     A. Dennis Federle.
13     Q. And who is Dennis Federle?
14     A. He was the manager.
15     Q. For HR?
16     A. Yes.
17     Q. And who else?
18     A. Maxine Mitch had involvement.
19     Q. And who is Maxine Mitch?
20     A. She is the director over HR.
21     Q. For this area?
22     A. Yes.
23     Q. And who else did you have a role with?
24     A. Mike Jackson.

**Page 134**

1      Q. And was this one meeting, several
2  meetings, what took place?
3      A. It was several calls, several
4  meetings, lot of discussion.
5      Q. Okay. And what were you discussing?
6      A. We were discussing the case and how
7  best to handle it. Any time there's a
8  discipline issue, it's just not one person
9  that's not internally here making a decision.
10 It's a team, group, everybody gets input
11 because it's viewed very seriously. And we
12 just want to make sure we're doing the --
13 outcome is the best and fair.
14     Q. Okay.
15     A. To the employee.
16     Q. And in terms of the level of
17 discipline, was that discussed?
18     A. Yes.
19     Q. Who with?
20     A. All parties.
21     Q. How many times?
22     A. Several times. Several phone calls.
23     Q. Can you just elaborate here and kind
24 give us a big picture?

**Page 135**

1      A. It probably went on for a week, two
2  weeks. I mean, it went on for a while. We
3  brought back the people involved and questioned
4  them a number of times to make sure we had all
5  the facts.
6      Q. And then you reported back. What was
7  your role in that investigation?
8      A. Reporting back --
9      Q. To?
10     A. -- what was found to everybody
11 involved, as I mentioned. My boss, HR. We had
12 several calls in.
13     Q. And again, you were referring to the
14 Guide for Conduct at times?
15     A. Yes.
16     Q. And what were you discussing in terms
17 of the Guide for Conduct?
18     A. The appropriate discipline.
19     Q. And what was discussed in terms of the
20 appropriate discipline?
21     A. The extent, the nature of it. There
22 was some past history with one individual.
23     Q. What options were you considering?
24     A. We were considering termination of one

Page 136

1  employee.
2      Q. And who was that?
3      A. Glenn Williams.
4      Q. Okay. And why was that?
5      A. Based on a recent prior suspension.
6      Q. And how does that fit into the Guide
7  for Conduct?
8      A. For the guide of conduct under Number
9  12, second offense would be discharge.
10     Q. So Mr. Williams had a prior offense
11 under 12?
12     A. Yes.
13     Q. Okay. And the decision was made not
14 to discharge?
15     A. That's correct.
16     Q. And why was that?
17     A. Because he was a long-term employee.
18 We wanted to resolve the issue. We wanted to
19 get him his license reinstated, and we wanted
20 to try to work through it.
21     Q. And so we'll address that in a minute.
22        Were there other levels of
23 discipline in the Guide for Conduct that you
24 looked at that could have resulted in discharge

Page 137

1  for all three individuals?
2      A. Yes. We looked at them all. The
3  first one, falsifying personal or other company
4  records, we looked at that one hard.
5      Q. And what was the result of discipline
6  for that breach?
7      A. That indicates a discharge.
8      Q. Okay. Were there others that you
9  looked at as possible sources for discipline?
10     A. That's the one that pops to mind.
11 There were a couple others as we went through
12 this, but we focused on -- we ended up with 12.
13        MR. POTTER: Move for admission of
14 Company Exhibit 8.
15        MR. ORLOVE: No objection.
16        ARBITRATOR MALIN: Company 8 is
17 admitted.
18        (Company Exhibit No. 8
19        received.)
20 BY MR. POTTER:
21     Q. So how did the company find out that
22 these licenses had lapsed?
23     A. I believe Glenn Williams brought it to
24 his supervisor's attention.

Page 138

1      Q. And who was his supervisor?
2      A. John Stein.
3      Q. And what resulted from that
4  conversation?
5      A. Resulted from that conversation?
6      Q. What next steps took place?
7      A. We checked with the state.
8      Q. Okay. And?
9      A. It was determined that there was two
10 other people as well that had expired licenses.
11     Q. And those two were?
12     A. Dan Leppert and Ken Nelson.
13     Q. And so what was the next step in that
14 process?
15     A. To investigate them.
16     Q. And how did you go about investigating
17 it?
18     A. Same process.
19     Q. Meaning?
20     A. All parties involved, made sure
21 everybody -- there was a group discussion. And
22 there was investigation. Couple times we
23 pulled them in, made sure we had all the facts.
24     Q. So you pulled in the three

Page 139

1  individuals?
2      A. Yes.
3      Q. Were you party to those interviews?
4      A. Yes.
5      Q. And do you remember when those
6  interviews took place?
7      A. October of '06.
8      Q. And who else was present during those
9  interviews?
10     A. John Stein.
11     Q. And you say you brought them in twice
12 or once. Do you remember how many times you
13 brought them in?
14     A. I believe it was twice.
15     Q. All right. And was it just you and
16 Mr. Stein on both occasions?
17     A. Yes.
18     Q. And where did the interviews take
19 place at?
20     A. In my office.
21     Q. Here at --
22     A. Here at the --
23     Q. Here at the facilities?
24     A. Yes.

Page 140

1  Q. Anyone else present?
2  A. No. Well, there was union reps, yes.
3  Q. And who was the union rep?
4  A. I believe -- I don't recall. It was
5  either Ray Rossa or Chris Martens.
6  Q. And who are those individuals?
7  A. Union stewards.
8  Q. And let's go through each. So you
9  interviewed Mr. Nelson, correct?
10 A. Yes.
11 Q. And what did you ask Mr. Nelson and
12 what were his responses?
13 A. Basically questioning his license, if
14 he had knowledge of it.
15 Q. Uh-huh.
16 A. And he had indicated yes.
17 Q. He indicated yes what?
18 A. That his license was expired.
19 Q. That he was aware of it?
20 A. Yes.
21 Q. What else did you ask him?
22 A. How long he had knowledge. We had a
23 series of questions that we'd had answered --
24 we would ask him.

Page 141

1  Q. And how long did he say he had
2  knowledge?
3  A. I believe, if I recall correctly --
4  I'd have to refer back to the document.
5  Q. Okay. This was Mr. Nelson now?
6  A. That's correct.
7  Q. And so he didn't deny that he was
8  aware his license had lapsed?
9  A. No. He was fully aware of it.
10 Q. And did he have any -- were any
11 mitigating factors presented to you as to why
12 he had not maintained his license?
13 A. I'd have to refer back to the
14 document.
15 Q. Okay.
16    ARBITRATOR MALIN: Do you need a quick
17 recess to run some more copies?
18    MR. POTTER: Sure. Why don't we.
19    ARBITRATOR MALIN: Sure. We'll take a
20 short recess.
21    (Recess Taken)
22    ARBITRATOR MALIN: Back on the record.
23 BY MR. POTTER:
24 Q. Steve, let me show you Company

Page 142

1  Exhibit 9 and tell us what that is.
2  A. This is when we interviewed Ken
3  Nelson.
4  Q. Okay.
5  A. During our investigation.
6  Q. And on what date?
7  A. This was on October 24th.
8  Q. Okay. And this are -- whose notes are
9  these?
10 A. These are John Stein's.
11 Q. Well, you were present --
12 A. I was present, John Stein and myself.
13 Q. So you reviewed these notes?
14 A. Yes.
15 Q. After they were typed up?
16 A. Yes.
17 Q. And they were accurate?
18 A. Yes.
19 Q. And again, let's go back to what took
20 place on 10/24 with Mr. Nelson. It was you,
21 John Stein, Ray Rossa?
22    MR. ORLOVE: I would ask if you're
23 going to ask the witness to recite from memory
24 what happened that he not have the company's

Page 143

1  recordation of what happened in front of him.
2     MR. POTTER: Just trying to expedite
3  things, but that's fine.
4     MR. ORLOVE: Well, no. I objected.
5     ARBITRATOR MALIN: And Mr. Potter has
6  agreed. He's taking the document away from the
7  witness. So let's proceed.
8  BY MR. ORLOVE:
9  Q. You had meeting on the 24th?
10 A. Yes.
11 Q. Rossa is there as a steward?
12 A. Correct.
13 Q. John Stein is there--
14 A. Correct.
15 Q. -- his immediate supervisor? You're
16 there, correct?
17 A. Right.
18 Q. Mr. Nelson's there?
19 A. Right.
20 Q. And the meeting's held in your office?
21 A. Yes.
22 Q. And what's the purpose of the meeting?
23 A. To investigate, make sure we're
24 getting all the facts, make sure that we