Page 144

1  haven't missed anything, making sure that we're
2  being thorough.
3      Q. And was there a meeting prior to the
4  24th?
5      A. Yes. I believe on October 19th.
6      Q. Okay. And who was present for that
7  meeting?
8      A. Same parties, same people.
9      Q. And what was the purpose behind that
10 meeting?
11     A. Same purpose, getting the facts,
12 making sure we're not missing anything.
13     Q. Was there anything that came out in
14 that meeting that made you think that
15 discipline wouldn't be appropriate here?
16     A. No. No. Again, it was just
17 reassuring ourselves we haven't missed
18 something.
19        ARBITRATOR MALIN: By that meeting are
20 you referring to the 24th, the 19th, or both of
21 them?
22        MR. POTTER: Both of them. I'm sorry.
23 Thank you.
24 BY MR. POTTER:

Page 145

1      Q. 19th or 24th meetings, Steve, was
2  there anything that came out of those meetings
3  that --
4      A. No. Neither meeting.
5      Q. Any explanation by Mr. Nelson as to
6  why his license expired?
7      A. Just he wasn't tracking it. He
8  just -- he first became aware of it, I believe,
9  within a few weeks of this prior.
10     Q. But there was nothing that came out of
11 those meetings --
12     A. No.
13     Q. -- either meeting indicating that
14 there was some mitigation in terms of
15 discipline?
16     A. No.
17     Q. And did you have a meeting with
18 Mr. Leppert?
19     A. Yes.
20     Q. And what dates or date did you have a
21 meeting with Mr. Leppert?
22     A. The same dates, same situation.
23 Again, investigation, fact finding, making sure
24 that we haven't missed anything, that we've

Page 146

1  covered everything.
2      Q. So same parties present?
3      A. Same parties present.
4      Q. Same MO?
5      A. Yes. Same MO.
6      Q. And again, anything come out of that
7  meeting that would mitigate --
8      A. No.
9      Q. -- discipline?
10     A. No.
11     Q. And what about Mr. Williams; have a
12 meeting with Mr. Williams?
13     A. Yes.
14     Q. Was it an interview much like
15 Mr. Nelson and Mr. Leppert?
16     A. Yes.
17     Q. Same parties present?
18     A. Yes.
19     Q. What dates?
20     A. Same dates.
21     Q. Okay. Again, same procedure?
22     A. Yes.
23     Q. Was there anything that came out of
24 those meetings that would mitigate discipline

Page 147

1  in Mr. Williams's situation?
2      A. No.
3         MR. POTTER: At this point I will go
4  ahead and withdraw Company Exhibit 9, just so
5  the record's clear.
6  BY MR. POTTER:
7      Q. Now, with respect to Mr. Williams,
8  we've already indicated he had an active
9  discipline earlier that year?
10     A. Yes.
11        MR. POTTER: Even though I've
12 withdrawn 9, just be consistent, let's mark
13 this 10.
14        ARBITRATOR MALIN: That's fine.
15 BY MR. POTTER:
16     Q. And you were aware of that discipline?
17     A. Yes.
18     Q. Let me show you Company Exhibit 10.
19 Is that your signature on the second page?
20     A. Yes, it is.
21     Q. And what is Company Exhibit 10?
22     A. This is a disciplinary suspension for
23 not responding to a main break.
24     Q. And for how many days was the

Page 148

1  suspension?
2      A. The suspension was for five days, I
3  believe.
4      Q. And it refers to what section of the
5  Guide for Conduct?
6      A. Item Number 12.
7      Q. And where is that noted? The last
8  paragraph?
9      A. The last paragraph, first page.
10     Q. All right. Again, we've talked about
11 in the Guide for Conduct, the first offense is
12 a suspension and the second offense results in
13 what?
14     A. Termination.
15     Q. Okay. Now, was this matter grieved?
16     A. This matter, it was grieved.
17     Q. And what was the ultimate resolution?
18     A. It was denied. Was not timely.
19     Q. And so did it go beyond the third
20 step?
21     A. No.
22     MR. POTTER: And then we've already
23 previously entered into evidence from the prior
24 hearing the last-chance agreement for

Page 149

1  Mr. Nelson -- I mean for Mr. Williams, as well
2  as the disciplinary suspensions for Mr. Nelson
3  and Mr. Leppert.
4      ARBITRATOR MALIN: The last chance is
5  Union 1?
6      MR. POTTER: Right.
7      ARBITRATOR MALIN: The suspensions are
8  Union 2 and 3?
9      MR. POTTER: Right.
10     ARBITRATOR MALIN: Are you offering
11 Company 10, by the way?
12     MR. POTTER: I am. I'm sorry.
13     ARBITRATOR MALIN: Is there any
14 objection to Company 10?
15     MR. ORLOVE: No.
16     ARBITRATOR MALIN: Company 10 is
17 admitted.
18         (Company Exhibit No. 10
19          received.)
20 BY MR. POTTER:
21     Q. What role did you play in terms of the
22 disciplinary suspension for Mr. Nelson?
23 Looking at Union Exhibit 2, Steve, is that your
24 signature on the second page?

Page 150

1      A. Yes, it is.
2      Q. So you were the author of that
3  discipline, correct?
4      A. Yes.
5      Q. All right. And were you involved in
6  the decision making in terms of the level of
7  discipline?
8      A. Yes.
9      Q. And the level of discipline in this
10 case was a 15-day suspension, correct?
11     A. That's correct.
12     Q. And a reduced pay status?
13     A. Yes. That's correct.
14     Q. Okay. And also restitution, correct?
15     A. Yes.
16     Q. Let's talk about those. The
17 discharge -- not discharge. The discipline in
18 this case for Mr. Nelson was a 15-day
19 suspension, and that was pursuant to the Guide
20 for Conduct?
21     A. That's correct.
22     Q. Again, neglect of duty gives you the
23 option, to a certain extent, regarding the
24 level of suspension, correct?

Page 151

1      A. That's correct.
2      Q. Now, we also had a reduced pay status
3  and restitution. Kind of explain to the
4  Arbitrator the thought process for the company
5  in terms of reducing the pay status to begin
6  with.
7      A. Well, the reduction in pay status was
8  the fact that he did not hold a current license
9  that he had prior to this. So we brought him
10 down to the level of operator in training.
11     Q. And why an operator in training?
12     A. He did not have the proper licensing
13 for operator.
14     Q. And were you also -- did you also
15 request for them to reinstate the license?
16     A. Yes, yes.
17     Q. And that's set forth in the exhibit?
18     A. Yes.
19     Q. All right. And so why then
20 restitution?
21     A. Because we just were looking for him
22 to reinstate his license.
23     Q. No. I'm sorry. Restitution -- I'm
24 sorry. The payback, the moneys.

Page 152

1   A. The payback. Simply because he did
2 not hold a license for that period in time, so
3 therefore, we felt that the restitution was
4 merited.
5   Q. Okay.
6   A. Simply because he didn't hold a
7 license.
8   Q. And his pay was a function of?
9   A. Of his job duties.
10  Q. Of his license?
11  A. His license, yes.
12  Q. So he didn't hold the license for a
13 period of time?
14  A. Yes, that's right.
15  Q. Okay. And for Mr. Nelson,
16 approximately how long had his license lapsed
17 at that point?
18  A. His license had lapsed over two years.
19  Q. All right. And then we have
20 Mr. Leppert, which was Union Exhibit 3. Let's
21 review that for a minute. Mr. Leppert also had
22 a 15-day suspension?
23  A. Yes.
24  Q. Same as Mr. Nelson?

Page 153

1   A. Yes.
2   Q. And he didn't have his pay status
3 reduced or restitution, correct?
4   A. No, he didn't.
5   Q. And why was that?
6   A. Because he currently held a waste
7 water license equal to the level of his water
8 license.
9   Q. So he met that requirement?
10  A. Yes.
11  Q. So why give him a 15-day suspension if
12 he already had a waste water license?
13  A. Because he did not -- he's operating
14 water facilities, and he did not maintain his
15 water license.
16  Q. Pursuant to 26.2?
17  A. Yes.
18  Q. All right. Were you involved -- and
19 Mr. Leppert was also asked as part of his
20 discipline to obtain his license and get
21 reinstated, correct?
22  A. Yes.
23  Q. And that's all noted in the exhibit,
24 correct?

Page 154

1   A. Yes.
2   Q. All right. And then Mr. Williams, you
3 met with him regarding the last-chance
4 agreement?
5   A. Yes.
6   Q. Let's back up for a minute. When you
7 introduced a discipline for Mr. Nelson and
8 Mr. Leppert who was present?
9   A. John Stein and the shop steward.
10  Q. And yourself?
11  A. And myself.
12  Q. For each?
13  A. For each.
14  Q. And then you met with Mr. Williams,
15 and who was present for that discussion?
16  A. John Stein, shop steward, myself.
17  Q. And who was the shop steward?
18  A. For Mr. Williams, Chris Martens.
19  Q. And just review what took place in the
20 course of that discussion with Mr. Williams.
21  A. We presented the disciplinary
22 suspension.
23  Q. For the last-chance agreement?
24  A. Yes.

Page 155

1   Q. So Union Exhibit 1?
2   A. Yes.
3   Q. Okay.
4   A. Explained to them the suspension and
5 then the last-chance agreement, that we could
6 have terminated, but we're going to a
7 last-chance agreement, looking to work this
8 out. I guess if they'd take the time to read
9 it, go through it. If they have any questions,
10 please ask and to please sign.
11  Q. And what happened as a result of that
12 comment by you?
13  A. As a result of that they read it, they
14 took some time to go through it, they signed
15 it, then there was really no questions.
16  Q. No objections?
17  A. No objections.
18  Q. No questions?
19  A. None.
20  Q. And then again, and that -- part of
21 that process, that last-chance agreement, they
22 were to -- he was to obtain a 30-day
23 suspension, correct?
24  A. That's correct.

Page 156

1    Q. Plus restitution?
2    A. Yes.
3    Q. Plus reinstate his license?
4    A. Yes.
5    Q. And a reduced pay grade?
6    A. Yes.
7    Q. All right. Did the steward ever
8  indicate to you or anyone present in the room
9  he didn't have the authority to sign that
10 agreement?
11   A. No.
12   Q. I'm assuming in terms of processing
13 grievances at the company that you play a role
14 in terms of the processing of grievances?
15   A. Yes.
16   Q. And you're familiar with the contract
17 and the grievance arbitration procedure?
18   A. Uh-huh.
19   Q. Yes?
20   A. Yes.
21   Q. Okay. Let me -- Page 25 of the
22 agreement, in particular, Sections 14.2, the
23 first two steps. Who is involved from the --
24 in that procedure, in the first two steps in

Page 157

1  terms of resolving the grievance?
2    A. The first step is presented to the
3  supervisor. Shop steward normally presents
4  those.
5    Q. And the contract specifies that?
6    A. Yes.
7    Q. And Step 2?
8    A. Step 2 is the same. It goes -- if
9  it's not resolved at the first step, it goes to
10 the second step.
11   Q. And as part of that process, does the
12 contract not -- does it not state that the
13 parties will endeavor to settle the grievance?
14   A. Yes, it does.
15   Q. And again, the party involved in both
16 those first two steps is the shop steward,
17 correct?
18   A. Yes. That's correct.
19   Q. As a matter of practice, are
20 grievances resolved in the first two steps?
21   A. I'm sorry?
22   Q. As a matter of practice, are
23 grievances resolved in the first two steps?
24   A. Yes.

Page 158

1    Q. And resolved by stewards?
2    A. That's correct, yes.
3       MR. POTTER: We're at Company 11?
4       ARBITRATOR MALIN: Correct.
5  BY MR. POTTER:
6    Q. Let me show you, Steve, Company
7  Exhibit 11. Tell the Arbitrator what that is,
8  please.
9    A. This is a second step grievance here.
10   Q. It was a first and second, summarizing
11 first and second steps?
12   A. Yes. Second step that came to me,
13 yes.
14   Q. And you were involved in the second
15 step?
16   A. Yes. Uh-huh.
17   Q. And who were you dealing with?
18   A. Ray Rossa.
19   Q. With the union?
20   A. Yes.
21   Q. And what is his title?
22   A. Ray Rossa's title?
23   Q. Yeah.
24   A. He's union shop steward.

Page 159

1    Q. And this matter was resolved at a
2  second step?
3    A. That's correct.
4    Q. And there's an attachment to this
5  actually on the second page in terms of the
6  resolution?
7    A. Yes, there is.
8       MR. POTTER: Move for admission of
9  Company Exhibit 11.
10      MR. ORLOVE: It's authentic, but it's
11 not relevant.
12      ARBITRATOR MALIN: Do you want to
13 elaborate?
14      MR. ORLOVE: Yeah. We'll get into it
15 in our case. But apparently, the company is
16 resting on the fact that a steward was present
17 when somebody is to be discharged and
18 disciplined.
19      This has nothing to do with
20 discharge and discipline, and we'll have
21 testimony about what stewards' functions are.
22      MR. POTTER: We'll go through
23 authority obviously in terms of resolving
24 matters. That's the key point.

Page 160

1  MR. ORLOVE: And the fact that a
2  steward was present when Mr. Williams was given
3  a last-chance agreement doesn't mean that that
4  represents the union's agreement, as the
5  contract states. But that was overlooked. So
6  I'll get into that on cross-examination.
7      I'm not going to -- to move it
8  along, I'm not going to question that this is
9  an authentic document. It just doesn't mean
10 anything in this case.
11     ARBITRATOR MALIN: Mr. Potter, I'm
12 inferring that you're trying to develop a case
13 of apparent authority?
14     MR. POTTER: You got it.
15     ARBITRATOR MALIN: It's clearly
16 relevant to the company's theory of the case.
17 I realize the union disagrees with that theory
18 of the case.
19     MR. ORLOVE: Yes.
20     ARBITRATOR MALIN: So I'll admit
21 Company Exhibit 11.
22         (Company Exhibit No. 11
23         received.)
24

Page 161

1      MR. POTTER: Now, this will be Company
2  Exhibit 12.
3      ARBITRATOR MALIN: Can we go off the
4  record for a moment?
5         (Discussion off the Record.)
6      ARBITRATOR MALIN: Back on the record.
7  BY MR. POTTER:
8      Q. Company Exhibit 12. Handing you that,
9  Steve. Can you tell the Arbitrator what that
10 is?
11     A. This is another grievance right here,
12 a third-step level grievance that was resolved
13 at the third step.
14     Q. And who was involved for both parties?
15     A. Reed Shepman, the general manager at
16 the time, and Ray Rossa, the chief union
17 steward.
18     Q. This is a third-step level?
19     A. Yes, it is.
20     MR. POTTER: Move for admission of
21 Company Exhibit 12.
22     MR. ORLOVE: I object to this in
23 particular because it doesn't involve stewards.
24 It involves the business agent of the union.

Page 162

1  And as we'll go into the contract, you'll see
2  that at Step 3 the business agent gets
3  involved, and he has authority to make
4  settlements, but not -- but our position is
5  stewards do not.
6  BY MR. POTTER:
7      Q. Was it your testimony that Ray Rossa
8  was involved in the resolution; is that his
9  signature?
10     A. Yes, uh-huh.
11     Q. And Wayne Clavio was the business
12 agent, correct?
13     A. At the time -- this is in '04? I'm
14 not certain when he was --
15     Q. Well, just fundamentally, who resolved
16 this? To the best of your knowledge, it was
17 Ray Rossa?
18     A. That's correct.
19     Q. Not the business agent?
20     A. I don't see his name on here, no.
21     MR. POTTER: Okay. Thank you.
22     MR. ORLOVE: You don't see his name on
23 there. Okay.
24     MR. POTTER: So move for admission of

Page 163

1  Company Exhibit 12.
2      MR. ORLOVE: Well, his name is on
3  there, and it says that it was presented --
4      ARBITRATOR MALIN: Would you like voir
5  dire?
6      MR. ORLOVE: Yes.
7      ARBITRATOR MALIN: Proceed.
8  BY MR. ORLOVE:
9      Q. You see the third line? You see that
10 it was presented to the HR manager by Wayne
11 Clavio?
12     A. I see that. I'm sorry. I mis --
13     Q. And were you involved in this? Were
14 you involved in this grievance?
15     A. I'd have to look back. I do not
16 recall.
17     Q. You can't tell us you were or were
18 not; is that right?
19     A. No, I can't.
20     Q. But in any case, this was a resolution
21 of -- will you agree with me that this was a
22 resolution of the third-step grievance
23 involving Mr. Clavio who you know to be officer
24 of the union?

Page 164

1    A. I don't recall being involved. I
2 don't know that he was present. I can't speak
3 to that.
4    MR. ORLOVE: We object to this. If
5 it's intended to show authority of stewards, it
6 doesn't, and I object to it.
7 BY MR. POTTER:
8    Q. Okay, Steve. Let's go through this.
9    A. Okay.
10    Q. The process is on the second half of
11 the grievance form, if it's resolved, it's a
12 check mark or an X by Matter Resolved, correct?
13    A. That's correct.
14    Q. And here, this one apparently resolved
15 at Step 3, correct?
16    A. That's correct.
17    Q. And the chief steward's signature is
18 Ray Rossa's; is that correct?
19    A. That's correct.
20    Q. And Mr. Wayne Clavio's signature
21 doesn't appear anywhere on this document?
22    A. That's correct.
23    Q. There's a reference to Mr. Clavio at
24 the top, correct?

Page 165

1    A. Yes.
2    Q. There is no other indication that
3 Mr. Clavio was involved in a resolution of this
4 grievance?
5    MR. ORLOVE: I object. He testified
6 he doesn't have a recollection of it.
7    ARBITRATOR MALIN: He testified he
8 doesn't recall being involved in it. You know,
9 I'll admit the document just -- you can make
10 your argument, but at this point I don't see
11 any foundation to provide -- to give this
12 particular exhibit any probative value at all.
13 This witness says he doesn't recall being
14 involved in it. So the document is whatever
15 the document is.
16    MR. POTTER: Okay. Fair enough.
17    ARBITRATOR MALIN: If you want it
18 admitted, I'll admit it but --
19    MR. POTTER: Okay. That's fine.
20    ARBITRATOR MALIN: -- with that
21 warning that at this point I don't have any
22 foundation to give it any probative value. So
23 just for the record, we'll, admit Company 12
24 but...

Page 166

1    (Company Exhibit No. 12
2    received.)
3    MR. ORLOVE: Company 12 is admitted?
4    ARBITRATOR MALIN: It's admitted. But
5 as I just indicated, without any further
6 foundation, I don't see any basis for giving it
7 any probative value, since this witness wasn't
8 involved and can't testify from personal
9 knowledge as to what it represents in terms of
10 what actually happened in the settlement.
11 BY MR. POTTER:
12    Q. Well, then let's just turn our
13 attention to Company Exhibit 11. Let's go back
14 to that, Steve, for a moment.
15    A. Okay.
16    Q. And this was the grievance which you
17 were personally involved in --
18    A. That's correct, yes.
19    Q. -- in resolving?
20    And again, you play a role in
21 resolving grievances --
22    A. Yes.
23    Q. -- for the company?
24    And to your knowledge, how often

Page 167

1 does a steward get involved in terms of
2 resolving grievances at any step level?
3    A. It's reviewed as we go through first,
4 second, and step. I mean, there's always the
5 opportunity to resolve them. That's the goal.
6    MR. ORLOVE: Well, I guess the answer
7 will stand, but it's not responsive to the
8 question.
9    MR. POTTER: I'm following up on that.
10    ARBITRATOR MALIN: Proceed.
11    MR. POTTER: Give me time.
12 BY MR. POTTER:
13    Q. And in your experience, how often does
14 it occur that a steward is able to resolve the
15 matter at a first or second step?
16    A. Rephrase the question again.
17    Q. How often, in your experience, has a
18 steward been able to resolve the matter at the
19 first and second step?
20    A. How often? It happens from time to
21 time.
22    Q. So what percentage of the grievances
23 do you think get resolved by stewards in the
24 first and second step, ballpark?

Page 168

1  A. 25 percent.
2  Q. Okay. And when the stewards go into
3  grievances, in your experience, how often do
4  they attempt to resolve on behalf of the union,
5  just attempt?
6  A. 25 percent.
7  Q. No. They're attempting. You're
8  telling me 75 percent they're not going in and
9  trying to attempt to resolve the grievance?
10  A. Yes, yes. They are. I'm sorry.
11  Q. So they're going in every time to
12  resolve the grievance; are they not?
13  A. Yes.
14  Q. So 100 percent of the time?
15  A. Yes.
16  Q. So that's their goal pursuant to the
17  Collective Bargaining Agreement, correct?
18  A. Yes.
19  Q. Okay. Let me just take a moment here,
20  make sure I've covered everything with this
21  witness.
22      (Brief Pause)
23      MR. POTTER: Nothing further of this
24  witness.

Page 169

1      ARBITRATOR MALIN: You may
2  cross-examine.
3          CROSS-EXAMINATION
4  BY MR. ORLOVE:
5  Q. I guess I'll start with the end first.
6      Every time a grievance is filed,
7  wouldn't it indicate to you the union wants a
8  certain resolution?
9  A. Yes, yes.
10  Q. So they want to resolve 100 percent of
11  what they file?
12  A. Yes. Yes, I'm sorry.
13  Q. 25 percent maybe --
14  A. I'm just a little nervous here. I
15  apologize.
16  Q. Don't be nervous. We've never given
17  the electric chair to any witness.
18      But when a grievance is filed,
19  you're just a functionary to process them,
20  right?
21  A. Not necessarily, no.
22  Q. Do you send them all up to HR?
23  A. Yes. But there's an attempt to try to
24  resolve them.

Page 170

1  Q. And do you get directions from HR how
2  to handle these?
3  A. Not necessary. If we feel we can
4  resolve them amongst ourselves, we do. That's
5  the goal.
6  Q. Isn't it a fact that never has any
7  discipline or discharge case been resolved at
8  the first or second step?
9  A. Discipline or discharge?
10  Q. Isn't it a fact that when the company
11  has administered discipline or discharge, they
12  have never been resolved at the first or second
13  step; isn't that a fact?
14  A. Not that I can recall.
15  Q. You don't remember?
16  A. Right, yes.
17  Q. Saying it another way, all discharge
18  and discipline cases end up at Step 3 or
19  beyond, correct?
20  A. For the most part, yes.
21  Q. For the most part?
22  A. Yes.
23  Q. My question was all. Yes or no?
24  A. Yes.

Page 171

1  Q. Yes. And the third step -- and you
2  are familiar with the contract; are you not?
3  A. Yes.
4  Q. And you are familiar with what the
5  contract says about the authority of stewards
6  and chief steward?
7  A. Uh-huh.
8  Q. Is that yes?
9  A. Yes.
10  Q. That they have limited authority; you
11  would agree with that?
12  A. I wouldn't agree with limited
13  authority, no.
14  Q. Isn't that what the contract says,
15  that their authority is to simply investigate
16  and present grievances?
17  A. Yes.
18      MR. POTTER: Well, objection because
19  what part of the contract are you referring to?
20      MR. ORLOVE: Well, Section 13.2,
21  Authority.
22  BY MR. ORLOVE:
23  Q. Are you familiar with that?
24  A. Yes.

Page 172

1   Q. Okay. Having looked at it, do you
2   want to change your answer, or is your answer
3   still the same, you're familiar with that,
4   13.2?
5   A. 13.2, I'm familiar with that, yes.
6   Q. The authority of stewards, correct?
7   A. Uh-huh.
8   Q. And -- yes or no, for the reporter's
9   sake.
10   A. Yes.
11   Q. And you were familiar with that back
12   in October and November of 2006; is that
13   correct?
14   A. That's correct.
15   Q. So isn't it a fact that the practice
16   of the company is that when you're going to
17   discharge or discipline someone, you routinely
18   call in a steward to witness that, correct?
19   A. Yes.
20   Q. And that's why stewards are called in,
21   correct?
22   A. Correct, yes.
23   Q. Looking at Company Exhibit 11, the
24   writing of which escapes me, although I have

Page 173

1   Mr. Rossa here to read his handwriting. Is it
2   correct that Company Exhibit 11 is not a
3   discharge or a discipline case?
4   A. That's correct.
5   Q. Okay. Thank you. And I imagine you
6   were asked to comb the files and look for any
7   settlements you made at Steps 1 or 2 with
8   stewards; is that correct?
9   A. Correct, yes.
10   Q. And we found this one; is that
11   correct?
12   A. Yes.
13   Q. None other, correct?
14   A. Correct.
15      MR. ORLOVE: Give me a moment, please.
16         (Brief Pause)
17   BY MR. ORLOVE:
18   Q. Directing your attention to Company
19   Exhibit 3, which is a list of water licenses
20   per employees, do I understand correctly that
21   the company makes this record to identify what
22   water license it knows of an employee occupies?
23   A. Yes. That's correct.
24   Q. This Company Exhibit 3, is it correct,

Page 174

1   is not intended to indicate dates of expiration
2   of licenses or whether they're up to date or
3   not?
4   A. That's correct.
5   Q. And as I understand the facts, the
6   company has no internal mechanism to keep track
7   of dates of licenses; is that correct?
8   A. That's correct.
9   Q. You do check drivers' licenses, right?
10   A. Periodically, yes.
11   Q. Okay. But up until the facts of this
12   case, you haven't checked water licenses?
13   A. That's correct.
14   Q. Both are important, aren't they?
15   A. Yes.
16   Q. You don't want your employees driving
17   trucks without a driver's license?
18   A. That's correct.
19   Q. So that's why you check those,
20   correct?
21   A. That's correct.
22   Q. And you'd prefer your employees to not
23   operate water or waste water production -- I
24   hope I'm using the right word -- functions

Page 175

1   without the proper license?
2   A. That's correct.
3   Q. But you have no mechanism for checking
4   those, correct?
5   A. We do now.
6   Q. Thank you. But how about in September
7   of '06?
8   A. No.
9   Q. No. Okay. Let's turn to the
10   contract, the provision you testified about,
11   Section 26.2. It's on Page 37. Were you
12   involved in these negotiations?
13   A. Yes.
14   Q. Were you involved in the negotiations
15   before this contract?
16   A. Yes.
17   Q. Is it correct that before this
18   contract there was no provision like continuing
19   education or 26.2?
20   A. I believe that's correct.
21   Q. Isn't it correct that before this
22   contract there was not any language that said
23   employees will be responsible to acquire CEU
24   credits?

Page 176

1    A. I believe that's correct.
2    Q. This provision came into being because
3  the union proposed the company financial
4  support for them to get CEU credits; is that
5  right?
6    A. That's correct.
7    Q. The company did not -- strike that.
8       Before negotiations began, the
9  company had no proposal such as Sentence 1 of
10 26.2, that it's understood employees will be
11 responsible?
12   A. That's correct.
13   Q. This first sentence of 26.2 came into
14 being only in response to the union's proposal
15 for economic support of acquiring CEU credits,
16 correct?
17   A. Correct.
18   Q. Now, we have in evidence Company
19 Exhibits 5, 6, and 7. I'll take them up as a
20 group. These are documents that the company
21 got from the EPA; is that correct?
22   A. Yes, I believe so.
23   Q. I'm looking at the fax indication at
24 the top of each one that indicates it was sent

Page 177

1  or received on October 28, 2006, correct?
2    A. October 20th?
3    Q. 20th. Forgive me. That's -- you're
4  correct. I confused the zero with an eight.
5       So it came to the company on
6  October 20th, 2006?
7    A. I don't believe -- I don't recall
8  exactly how it came to us, to be honest with
9  you.
10   Q. Well, how did the company get these?
11   A. I'm not certain if the supervisor
12 obtained them. To be honest with you, I don't
13 recall.
14   Q. Looking at the fax identification date
15 up at the top, is it fair to say that prior to
16 October 20th you didn't have any knowledge of
17 these?
18   A. That would be safe to say.
19   Q. Who interacted for the company with --
20 strike that.
21      And is it correct also that these
22 documents 5, 6, 7 came from the IPEA?
23   A. It appears they did.
24   Q. The IEPA --

Page 178

1    A. EPA.
2    Q. I don't know why I want to interchange
3  the letters.
4       And it's correct that these came
5  about or the inquiry was made to IEPA because
6  Williams brought to the company's attention
7  that his license had lapsed?
8    A. That's possible, yes.
9    Q. Possible. Well, how did these get
10 into your hands?
11   A. May have been through his supervisor.
12   Q. Through John Stein?
13   A. Yes.
14   Q. Okay. Is it correct that -- or strike
15 that.
16      May we assume from these documents
17 that IEPA knew that these men were working
18 without a license?
19   A. Yes.
20   Q. What action did -- is it correct --
21 strike that.
22      Is it correct that IEPA has taken
23 no action against the company?
24   A. That's correct.

Page 179

1    Q. And IPEA -- strike that.
2       And IEPA has taken no action
3  against the employees, other than to report
4  their status of holding or not holding a
5  license?
6    A. Their action, they lost their license,
7  they expired.
8    Q. That's what they said? That's what
9  EPA said, as far as you know?
10   A. It said it's expired, yes.
11   Q. Any penalty attached to that?
12   A. No. Not that I'm aware of.
13   Q. Any punishment by EPA against the
14 company or the employees?
15   A. No, not that I'm aware of.
16   Q. So but for Glenn Williams bringing
17 this to the company's attention, you would
18 never know about the status of these
19 individuals, correct?
20   A. Probably not at the time, no.
21   Q. Now, in connection with your
22 investigation, you -- I get the impression from
23 your testimony you reported that fact to
24 personnel at headquarters?

Page 180

1  A. Yes.
2  Q. That's in St. Louis?
3  A. Yes. Along with my boss, Michael
4  Jackson.
5  Q. Is he located in St. Louis?
6  A. Belleville.
7  Q. Belleville...
8  A. Illinois.
9  Q. Up north?
10 A. Down south. Close to St. Louis.
11 Q. Okay. I'm getting my state mixed up.
12    And you reported to them
13 everything that you found out about --
14 A. Yes.
15 Q. -- the licenses?
16 A. Yes.
17 Q. Did you report to them what we just
18 discussed, that is that it came to your
19 attention only through Williams?
20 A. Yes.
21 Q. Did you report to them that no
22 punishment has been meted out by EPA against
23 the company?
24 A. No.

Page 181

1  Q. Or against the employees; did you
2  report that?
3  A. No.
4  Q. Did you report to them that if
5  Williams hadn't brought it to your attention,
6  nobody would have ever known about this? Did
7  you report that to the superiors?
8  A. We reported the facts as they --
9  Q. Did you report that fact?
10 A. That was apparent. No. I mean...
11 Q. Okay. He turned himself in, so to
12 speak, right?
13 A. He needed a letter to -- the reason he
14 approached his supervisor is he needed a letter
15 to go back and take his license, to
16 reinstate -- he needed a letter of
17 recommendation to take the license again.
18 That's the reason he approached the supervisor.
19 Q. Okay.
20 A. He needed something from us.
21 Q. And he got it. He got it from you?
22 A. Yes.
23 Q. Issuing a letter to him means you'd
24 like him to continue -- you'd like him to get a

Page 182

1  license so he can continue working for the
2  company?
3  A. Absolutely.
4  Q. And the letter was issued?
5  A. Yes, it was.
6  Q. And ultimately, we know he got his
7  license during his suspension, correct?
8  A. Yes, he did.
9  Q. Who in the company organization
10 actually determined what discipline would be
11 given to these three people?
12 A. I think it was more -- it came out of
13 HR, but it was more -- it was a team, a group,
14 everybody had input. Everything was looked at
15 very thoroughly.
16    I think based on all the input of
17 everybody, we all came to the common consensus
18 this was the direction we were going, based on
19 a lot of lengthy discussions, several phone
20 calls back and forth. Just wanted to make sure
21 we were covering all the bases and doing the
22 right thing.
23 Q. Now, in connection with Williams.
24 When the second offense indicates discharge

Page 183

1  it's true, it is not, that the company could
2  impose more or less discipline?
3  A. That's true, yes.
4  Q. So discharge is not automatic?
5  A. No.
6  Q. And in fact, he wasn't -- he was not
7  discharged?
8  A. That's correct.
9  Q. He was suspended, correct?
10 A. Yes.
11 Q. During his suspension he got his
12 license, correct?
13 A. That's correct.
14 Q. Would it be fair to say that this
15 34-year employee who was a lead man and
16 grandfathered at a higher rate is a rather
17 highly prized employee?
18 A. 34-year employee, yes. That's a
19 long-term employee.
20 Q. Lead man?
21 A. Yes.
22 Q. Grandfathered at a higher rate,
23 correct?
24 A. Yes.

Page 184

1  Q. But for the earlier incident, I think
2  in August, a clean record?
3  A. For the most part.
4  Q. Was that all brought out to the
5  decision makers?
6  A. Yes. The prior discipline? Yes.
7  Q. And his longevity with the company?
8  A. Yes.
9  Q. His lead man status?
10 A. Yes.
11 Q. Okay. His, for the most part, clean
12 record?
13 A. For the most part.
14 Q. Okay.
15 A. I wouldn't say clean record.
16 Q. Okay. Were his personal problems that
17 he related to you also brought to the attention
18 of the decision makers?
19 A. His personal problems?
20 Q. You know that he lost an adult son?
21 A. Yes, I do.
22 Q. And that was somewhere in the time
23 frame that his license had lapsed?
24 A. Going back many years, several years

Page 185

1  ago.
2  Q. Was that brought to the attention of
3  the decision makers?
4  A. This was sometime ago, many years
5  back. I can tell you, the decision makers, HR,
6  they've got a complete file on this individual.
7  Q. No, I'm asking in connection with the
8  multiple phone calls and thoroughness that you
9  described with respect to determining
10 discipline, was it brought out in any of those
11 phone calls --
12 A. No.
13 Q. -- that he had some personal life
14 experiences like the --
15 A. No.
16 Q. -- death of an adult son?
17 A. No, because it wasn't recent. This is
18 going back many years ago.
19 Q. Well, was it brought out again in
20 those conversations in connection with the
21 discipline given that his wife had cancer? Was
22 that brought out?
23 A. No. This is all prior history, going
24 back many years ago.

Page 186

1  Q. And while you were investigating the
2  three employees and the lapse of their
3  licenses, they continued working, correct?
4  A. That's correct.
5  Q. Were they put under any different
6  terms and conditions of employment other than
7  the reduction in pay?
8  A. No.
9  Q. Were they put under any supervision --
10 on any different supervision than they
11 previously had?
12 A. They've always been over -- they've
13 always had supervision over them.
14 Q. Any different supervision than they --
15 A. No.
16 Q. -- previously had?
17    When they were reduced to operator
18 in training, were you giving them training
19 during that period that they were, quote,
20 operators in training?
21 A. No field training.
22 Q. Or any training?
23 A. There may have been safety training.
24 Q. When they were working without a

Page 187

1  license, when you knew they had no license,
2  were their duties changed in any way?
3  A. Their field duties, no.
4  Q. And I want to emphasize that is the
5  case when you knew they were working without a
6  license, correct?
7  A. Yes.
8  Q. You testified that you sought
9  restitution on the basis that the contract
10 calls for a pay rate based on the license they
11 hold?
12 A. That's correct, yes.
13 Q. But you did not seek restitution for
14 the entire period during which the license had
15 lapsed?
16 A. That's correct.
17 Q. Why?
18 A. That was discussed at length. Given
19 in the case of Williams, that would have
20 exceeded $100,000 in restitution. We wanted to
21 be fair. We wanted to resolve the matter. We
22 wanted to see him get his license reinstated.
23 So we took the path, and we decided that we'd
24 only go back ten months. And we're trying to

Page 188

1  be fair and we're trying to bring this to a
2  resolution.
3      Q. To your knowledge, did anyone consult
4  with the Illinois statutes about getting
5  authority from an employee to make deductions
6  from his wages?
7      A. Not to my knowledge.
8      Q. To your knowledge, did anyone consult
9  with the IEPA about discipline or discharge of
10 employees who let their licenses lapse?
11     A. Not to my knowledge.
12     Q. Who in your organization actually
13 interacted with IEPA?
14     A. I interacted with them. I believe
15 John Stein interacted with them.
16     Q. I mean, in connection with these three
17 men.
18     A. There was interaction by myself and
19 John Stein.
20     Q. When did you contact IEPA?
21     A. Shortly after this came to our
22 knowledge.
23     Q. Who did you speak with?
24     A. I'd have to refer back to my notes.

Page 189

1      Q. Okay. But you spoke to somebody?
2      A. We spoke with somebody, yes.
3      Q. Would this have been in the time frame
4  of October 2006?
5      A. Yes.
6      Q. How many times did you speak with
7  personnel from IEPA?
8      A. I believe I spoke with them a couple
9  times.
10     Q. Okay. Give us your best recollection
11 of the conversation you had with them.
12     A. Basically we were just looking to
13 generate a list of all the operators and
14 looking for their current status where they
15 were at.
16     Q. Okay.
17     A. As far as their licensing, whether we
18 had current licensed operators.
19     Q. And you gave them the names of current
20 employees?
21     A. Yes.
22     Q. And they came back to you with
23 information of whether their licenses were in
24 effect or not?

Page 190

1      A. Yes.
2      Q. So then they knew or IEPA knew that
3  employees -- certain employees of yours did not
4  have licenses?
5      A. That's correct.
6      Q. Were any instructions given to you by
7  IEPA that you were to take them out of service?
8      A. No.
9      Q. Who in your organization is
10 responsible for billing your customers?
11     A. Billing our end user customers; is
12 that the question?
13     Q. I mean, somebody pays your company for
14 its services?
15     A. Uh-huh.
16     Q. Yes, correct?
17     A. Yes.
18     Q. And do you oversee that as well?
19     A. No. You're talking about the end
20 user, our customers --
21     Q. Right.
22     A. -- who bills them?
23     Q. Right?
24     A. I don't oversee that at all.

Page 191

1      Q. Were they given a reduction in their
2  fees by reason of the reduction in the
3  employees' wages? Did you pass that along to
4  them?
5      A. No. But down the road with tariffs
6  for the ICC, all of that's reflected when we go
7  for rate increases.
8      Q. But whatever restitution you got or
9  will get from the employees, you haven't passed
10 that along to the customer; is that correct?
11     A. It will affect the customer down the
12 road, yes.
13     Q. Based on your wage levels?
14     A. That's correct.
15     Q. And if we're successful in this case,
16 that won't matter, correct?
17     A. It's the end of the day what we paid
18 out, that's what's reviewed by the ICC.
19     Q. When do those reviews take place?
20     A. It varies. Rate increase, the last
21 one was ten years ago. And I believe it's been
22 five years, and we're up for another one. So
23 that can vary --
24     Q. You're up for another one tomorrow,

Page 192

```
 1  next year, five years?
 2     A. Next year.
 3     Q. From your testimony I gather that
 4  there's been no change in the fee structure to
 5  customers based on the reduction in wages of
 6  the employees?
 7     A. It will be impacted in the upcoming
 8  increase or the --
 9     Q. It hasn't so far?
10     A. -- proposed increase. It hasn't so
11  far. But there -- understand, there's always a
12  lag period.
13     Q. You have been aware since November 7th
14  when the last-chance agreement and the other
15  discipline was grieved, you're aware that the
16  union objects to that discipline, correct?
17     A. Correct.
18     Q. And you've been aware of that
19  throughout these -- this time period involving
20  these proceedings?
21     A. Now, can we back up? You said the
22  last-chance agreement?
23     Q. Yeah.
24     A. We -- there was no objection
```

Page 193

```
 1  initially, and there was no objection for some
 2  time.
 3     Q. The union issued a grievance
 4  immediately after the November 7th letter of
 5  discipline, correct?
 6     A. Yeah. That's correct.
 7     Q. And that grievance involved everything
 8  in the November 7th letter of discipline,
 9  didn't it?
10     A. Yes.
11     Q. Licenses to operate water equipment
12  are important, aren't they?
13     A. Very important.
14     Q. But for some reason, they're not in
15  the employee conduct material as such, correct?
16     A. Correct.
17        MR. ORLOVE: Can we take a few minutes
18  just to consult with my clients?
19        ARBITRATOR MALIN: Sure.
20           (Brief Pause)
21        MR. ORLOVE: No further
22  cross-examination.
23        ARBITRATOR MALIN: Redirect?
24        MR. POTTER: Yes. A few questions.
```

Page 194

```
 1            REDIRECT EXAMINATION
 2  BY MR. POTTER:
 3     Q. When you were being cross-examined by
 4  Chuck, he brought up the fact that the copy
 5  doesn't track operator's license, correct?
 6     A. That's correct.
 7     Q. And nor is there a contractual
 8  requirement to maintain your driver's license,
 9  correct?
10     A. That's correct.
11     Q. And yet there is a contractual
12  requirement to maintain your operator's
13  license, correct?
14     A. That's correct, yes.
15        MR. ORLOVE: Objection to the leading.
16  It's also repetitive.
17        MR. POTTER: Well, there is --
18        ARBITRATOR MALIN: It is leading. It
19  is repetitive.
20        MR. POTTER: Right. Right.
21        ARBITRATOR MALIN: You can take a hint
22  when you see I'm not writing.
23        MR. POTTER: I know. I know. I'm
24  getting there.
```

Page 195

```
 1  BY MR. POTTER:
 2     Q. In terms of Union Exhibit 5, which is
 3  Mr. Williams's termination letter?
 4     A. Yes.
 5     Q. Okay. It's your signature at the
 6  bottom?
 7     A. Yes, it is.
 8     Q. So who was involved in the termination
 9  associated with that letter to Mr. Williams?
10     A. Myself and I believe John Stein.
11     Q. Who was there for the union; do you
12  remember?
13     A. I don't know if it was Ray Rossa. I
14  don't recall. It was one of the union
15  stewards.
16     Q. But you presented that termination
17  letter to Mr. Williams?
18     A. Yes, I did.
19     Q. Okay. And now at that point in time
20  did he relate to you any of his personal
21  problems that union's counsel referred to
22  earlier?
23     A. No, he didn't.
24     Q. At any time in the course of this
```

Page 196

1  investigation did he --
2    A. No.
3    Q. -- relate to any -- let me finish my
4  question. Did he relate to you any questions
5  regarding personal problems that might have
6  mitigated the circumstances here or his
7  actions?
8    A. No, he didn't.
9    Q. Okay. And again, you were aware of
10 the death of his adult son in the past,
11 correct?
12   A. Correct, yes.
13   Q. And that was several years ago?
14   A. Several years ago, yes.
15   Q. And his wife contracting cancer also
16 was several years ago?
17   A. Several years ago, yes.
18   Q. When you presented the termination
19 letter to Mr. Williams, was that it? I mean,
20 did you offer any -- did you, the company offer
21 anything besides termination?
22   A. No, that's -- we also offered him one
23 last chance to sign the deduction, agree to a
24 deduction. It was made clear that, you know,

Page 197

1  that was out there. That was an option for
2  him. And I opted -- he opted not to sign --
3  not to agree to it.
4       MR. ORLOVE: You were examining on
5  Union Exhibit 5, the discharge?
6       MR. POTTER: Right. The termination,
7  yeah.
8       MR. ORLOVE: Thank you.
9  BY MR. POTTER:
10   Q. And counsel for the union also had
11 cross-examined you on your knowledge whether
12 anyone had consulted certain statutes regarding
13 the company's authority to obtain the wage
14 deduction. And you weren't aware of anyone who
15 may have done that?
16   A. Rephra -- I'm sorry.
17   Q. Yeah. On cross-examination he asked
18 you whether you were aware of anyone that's
19 investigated whether or not wage deductions
20 were appropriate under state law.
21   A. Yeah, I'm not aware of, no.
22   Q. And are you normally involved in that?
23   A. No. No.
24   Q. All right. And the same regarding

Page 198

1  whether or not anyone consulted the appropriate
2  regulations or statutes under the IEPA
3  regarding the impact of a license lapsing?
4    A. Not aware of that, no.
5    Q. I mean, this case isn't about a breach
6  of the Illinois EPA regulations, is it?
7    A. No.
8       MR. ORLOVE: Objection to closing
9  argument and leading questions.
10      ARBITRATOR MALIN: Sustained.
11 BY MR. POTTER:
12   Q. Okay. And what was the basis for the
13 discipline here?
14   A. Losing the licenses.
15   Q. As a function of... It was losing
16 their license pursuant to?
17   A. Well, restitution, the repayment.
18   Q. All right. You disciplined these
19 three individuals because they -- obviously
20 their license lapsed, correct?
21   A. That's right.
22      MR. ORLOVE: Objection to leading.
23      MR. POTTER: Well, that's kind of an
24 undisputed fact at this point, I would assume.

Page 199

1       ARBITRATOR MALIN: I think that's
2  undisputed.
3       MR. ORLOVE: Well, we have the letters
4  that set forth --
5       ARBITRATOR MALIN: The reasons for the
6  discipline.
7       MR. ORLOVE: The reason for the
8  discipline.
9  BY MR. POTTER:
10   Q. And the reasons for the discipline in
11 each of the letters reflects that it was done
12 because of?
13   A. Expired licenses.
14   Q. Right. But let's go back to the
15 fundamentals here.
16      ARBITRATOR MALIN: You're trying to
17 lead him, and he doesn't want to go where you
18 want to lead him to. You might just want to
19 make your argument from the written record.
20      MR. POTTER: Yeah, maybe that's the
21 easiest way of doing it. Yeah. We'll just do
22 it that way. You're right. I can take a hint.
23 Nothing further.
24      ARBITRATOR MALIN: Anything further of

Page 200

1  this witness?
2      MR. ORLOVE: No.
3      ARBITRATOR MALIN: Thank you very
4  much, Mr. Phillips. You're excused.
5      (Witness Excused.)
6      MR. POTTER: You want to take a break?
7      ARBITRATOR MALIN: Why don't we go off
8  the record.
9      (Discussion off the Record.)
10     (Break Taken)
11     ARBITRATOR MALIN: We're back on the
12 record.
13     (The witness was duly sworn.)
14     ARBITRATOR MALIN: Proceed whenever
15 you're ready, Mr. Potter.
16     MICHAEL JACKSON,
17 called as a witness herein, having been first
18 duly sworn, was examined and testified as
19 follows:
20     DIRECT EXAMINATION
21 BY MR. POTTER:
22    Q. Mike, can you state your name for the
23 record?
24    A. Mike Jackson.

Page 201

1     Q. And you're employed by the company in
2  what capacity?
3     A. I'm production manager for Illinois.
4     Q. And in general, what the hell does
5  that mean?
6     A. I manage the production operations for
7  the water plants in Illinois. Operations and
8  maintenance of the plants and production
9  equipment.
10    Q. Okay. And what's your relationship to
11 the three grievants?
12    A. I was involved with these grievances
13 and issues from when the folks up here brought
14 this issue to my attention, and we had to do
15 our investigation. And I was part of the team
16 ultimately deciding what the outcome was.
17    Q. And normally in terms of the grievance
18 process where do you get involved?
19    A. Step 3.
20    Q. And that's the step immediately before
21 arbitration?
22    A. Uh-huh.
23    Q. Yes?
24    A. Yes.

Page 202

1     Q. Okay. And were you involved in the
2  Step 3 for each one of these individuals --
3     A. Yes.
4     Q. -- in their grievances? Okay.
5        And who did you meet with -- who
6  was present in the Step 3 meeting for the
7  initial grievances involving before Mr. --
8  we'll cover Mr. Williams's Step 3 and his
9  termination. But just for the initial
10 discipline for the three, who was involved in
11 that Step 3 meeting?
12    A. To the best of my recollection, it's
13 myself, Steve Phillips, Wayne Clavio, Ray
14 Rossa. I'm not sure Chris Martens may have
15 been there too, but I'm not sure of that.
16    Q. And where was that Step 3 held?
17    A. Here.
18    Q. And was it limited to these three
19 individuals, I mean, the Step 3 meeting; do you
20 remember? Not all that important, but just if
21 you remember.
22    A. I believe the Step 3 meeting we talked
23 about some -- there were three issues, and the
24 Glenn Williams was the last issue that we

Page 203

1  talked about. There was a couple meetings and
2  I'm -- you know, that we talked about it.
3     Q. I'm talking about Step 3. The Step 3
4  meeting, was it limited -- see, because
5  sometimes you have Step 3 meetings, do you not,
6  where you cover other grievances, a number of
7  action items, a number of different people.
8        Was this a meeting in which a
9  number of different grievances were discussed,
10 or just the three grievants in these
11 proceedings where their discipline was
12 discussed? Don't remember?
13    A. Yeah. I'm...
14    Q. Not important. We'll move on.
15    A. I want to make sure I get the answer
16 right here.
17    Q. So you're talking about their
18 discipline. What was discussed -- what was the
19 case made by the union in the Step 3?
20    A. Well, we talked about --
21    Q. What was the union's case? What did
22 they say was the basis for their reaction?
23    A. The union's case was the repayment of
24 the funds. They didn't feel like that that was

Page 204

1   -- should be -- should be there, repayment of
2   the restitution component.
3       Q. Okay.
4       A. Talked about, you know, the harshness
5   of -- that they felt the discipline was and how
6   much it was tough on the employees. And
7   that's -- but the big thing was the restitution
8   component, that they were -- did not think that
9   they should have to -- that these employees
10  should have to pay that back.
11      Q. What about the suspensions?
12      A. The suspensions, it was -- you know,
13  it was in the conversation, but I remember the
14  suspensions were not the big component of the
15  conversation.
16      Q. Okay.
17      A. You know. The situation where, you
18  know, there was a -- for whatever reason, the
19  licenses were not kept up to date, and this is
20  where we got to the level of discipline that
21  we're at. And they were just upset with having
22  to pay the dollars back.
23      Q. Okay. What mitigating factors were
24  presented by the union as to why the discipline

Page 205

1   should be reduced?
2       A. Why the discipline should be reduced?
3   Just of the fact -- just the comment that it
4   was too tough on the employees. It was -- they
5   felt it was more than they felt it should be.
6   Other than...
7       Q. Too tough how? You keep using the
8   word too tough.
9       A. Financially. Financially and, you
10  know, the reduction back to operator in
11  training pay. And compounded with needing to
12  pay the dollars back was going to be -- going
13  to put hardship on the employees.
14      Q. Okay. Do you remember anything else
15  being presented by the union in the third step
16  as a basis for reducing the discipline?
17      A. The discussion of the work was getting
18  done was in the third-step meeting as well.
19  The union felt like the work -- these employees
20  had done the work. And in their opinion, you
21  know, why should we be getting into this
22  discipline end of things? And we let the union
23  know that these licenses are part of their job
24  title, job duties here, and that their pay is

Page 206

1   based on that.
2       Q. Any other factors presented by the
3   union as a way of trying to reduce or mitigate
4   the discipline?
5       A. I can't recall anything much else.
6       Q. That was it? Okay.
7           Did you submit a response as a
8   result of that third-step --
9       A. Yes.
10      Q. -- meeting?
11          MR. POTTER: What are we at?
12          ARBITRATOR MALIN: 13.
13  BY MR. POTTER:
14      Q. I'm going to show you Company
15  Exhibit 13. Is that your signature on Company
16  Exhibit 13?
17      A. Yes.
18      Q. The last page?
19      A. Yes.
20      Q. And did you draft this response?
21      A. Yes.
22      Q. And on the date indicated,
23  December 21?
24      A. That's the date that I sent it to

Page 207

1   Wayne.
2       Q. Okay. And you did send it to Wayne
3   Clavio?
4       A. Uh-huh.
5       Q. And you sent it to him in what
6   meetings?
7       A. I believe this was e-mailed to Wayne.
8       Q. And without reading it, just
9   paraphrasing, what did you tell to Wayne in
10  this document?
11      A. Well, I summarized what we talked
12  about at the third-step meetings. We did make
13  a proposal out there to take care of the issue
14  along with some other documents that had a
15  memorandum of understanding, that the company
16  would consider this -- consider this
17  situation -- it was an offer for a settlement
18  on this particular letter.
19      Q. Okay. Let me show you Company
20  Exhibit 14. You mentioned a memo of
21  understanding. Is this the memo of
22  understanding that was attached to your
23  communication December 21st to Wayne Clavio?
24      A. Yes.

Page 208

1    MR. ORLOVE: May I inquire as long as
2 the witness said these are settlement offers,
3 I'm unclear as to its admissibility as
4 settlement documents.
5    ARBITRATOR MALIN: Mr. Potter?
6    MR. ORLOVE: Which obviously didn't
7 happen.
8    MR. POTTER: It's really a response --
9 you know, the process, as you know, in the
10 contract is a series of statements by the
11 union, then a response by the company to the
12 grievances. And this is no more than what they
13 normally do in a third step.
14    Normally, this witness presents a
15 response of this nature trying to resolve
16 matters at the third step. This is their
17 normal grievance response, which almost always
18 resolves in some sort of attempt to resolve or
19 settle. So it's really part of the grievance
20 filing string more than a settlement outside
21 the context of that.
22    And so I think it's appropriate in
23 these circumstances. Normally, I don't get
24 into settlement offers. But here --

Page 209

1    ARBITRATOR MALIN: Typically, we won't
2 want to chill the settlement process by having
3 offers that aren't accepted come back to bite
4 one of these --
5    MR. POTTER: Exactly.
6    ARBITRATOR MALIN: -- one party or the
7 other.
8    MR. POTTER: Exactly. But here it's a
9 little bit different because it's really part
10 of the grievant string of responses to the Step
11 1, Step 2, Step 3. This is no more than the
12 standard Step 3 response that they have in
13 these proceedings.
14    ARBITRATOR MALIN: So this is just
15 background or -- I mean, there's no dispute
16 that the prior steps of the grievance procedure
17 were complied with.
18    MR. POTTER: Right. Exactly. And to
19 show the reasonableness of the company's
20 position in terms of what steps it took to
21 again respond to what the union was saying in
22 the Step 3 meeting. So that their actions, you
23 know, were reasonable in this circumstance.
24    ARBITRATOR MALIN: Mr. Orlove?

Page 210

1    MR. ORLOVE: No, I object to this
2 going in. I mean, we know because we're here
3 that no settlement was reached. The document
4 speaks in terms of a settlement proposal. It's
5 not like a processing of a grievance where the
6 company says denied for this reason.
7    And when he was asking the witness
8 questions about what the union's position was,
9 I thought well, okay. Maybe they're going to
10 make some argument that the union is heavy on
11 this issue or waive that issue.
12    But now that I see that what he's
13 offering is settlement, I strongly object to
14 it. It has no place in this. And the only
15 purpose it can have is to prejudice the mind of
16 the Arbitrator.
17    ARBITRATOR MALIN: Anything further
18 before I rule?
19    MR. POTTER: Well, no, I think again
20 we're going to whether or not always in some
21 sense, even though it's a just-cause standard,
22 whether it's reasonable under the
23 circumstances, and what took place in terms of
24 trying to resolve the matter, be it in whatever

Page 211

1 step in the process, in the grievance steps. I
2 mean, that's always part of the joint exhibits
3 is this string that the -- the grievance
4 history that -- what took place. And this is
5 the grievance history.
6    This is the company's response to
7 the third-step meeting. And it's nothing more
8 than that. And I think it's -- so I think it's
9 important that it become part of the record in
10 these proceedings.
11    ARBITRATOR MALIN: Anything further?
12    MR. ORLOVE: It's more than -- it's
13 not a response to the third-step meeting. It's
14 an offer to settle, and that's more than a
15 response.
16    And the Arbitrator will recall
17 that in the first hearing when we took up the
18 issue of consolidation, I put this document
19 into evidence, but I put it in redacted,
20 leaving only those portions that say in order
21 to resolve these three cases or we heard these
22 three cases, wanting to argue that the three
23 cases were looked at together and considered
24 together. I was careful not to put in any

Page 212

1  settlement proposals.
2        This, to me, is not the handling
3  of the grievance. It is for some reason, which
4  I think is inappropriate -- which I really
5  consider highly inappropriate to somehow or
6  other offer a reduction in the suspension -- in
7  the -- offer a reduction in the discipline,
8  which I think is -- the only intention it could
9  have is to prejudice the Arbitrator.
10       ARBITRATOR MALIN: Anything further?
11       MR. POTTER: No.
12       ARBITRATOR MALIN: I'm going to
13 sustain the objection for a number of reasons.
14 First, there is no need to put in -- that I can
15 see to put in the grievant -- the record of
16 what was done at Step 3 to satisfy my
17 authority. We've already stipulated the
18 matter's properly before me.
19       Certainly -- you know, and I
20 assume Mr. Orlove would not object to this.
21 You can stipulate that offers of settlement
22 were made at Step 3 that were not accepted.
23 But I fail to -- two concerns. One, I fail to
24 see the relevance that the company may have

Page 213

1  made some offers of settlement at Step 3 to the
2  question of whether there was just cause for
3  the suspensions and the rest of the
4  disciplinary package in the first instance.
5        And second, generally offers of
6  settlement are privileged, and there are very
7  strong reasons for that. We usually presume
8  that the parties want to -- in their grievance
9  process to be able to make offers without
10 having them come into evidence later because
11 that may chill the making of offers in future
12 grievances.
13       So I'm very reluctant to put the
14 substance of settlement offers that were not
15 accepted into the record or to even look at
16 them. I really don't see how they're relevant
17 to the issues presented to me.
18       MR. POTTER: Okay.
19 BY MR. POTTER:
20    Q. All right. Let's turn to the separate
21 grievance and the separate Step 3 meeting that
22 was held regarding Mr. Williams's termination.
23 Were you involved in that Step 3 meeting?
24    A. Step 3, yeah.

Page 214

1     Q. And who was present for that Step 3,
2  the best that you can recall?
3     A. Same group as the other --
4     Q. Normally it's the same crew?
5     A. Yeah.
6     Q. So let's just repeat those just for
7  the record. Who was present?
8     A. Myself, Steve Phillips, Ray Rossa,
9  Wayne Clavio, Chris Martens, and there was one
10 other person I can't recall.
11    Q. And what did the union present in the
12 way of facts to support some change in the
13 outcome regarding Mr. Williams's termination?
14    A. Not really any other -- any other
15 facts to warrant or to make us change our mind.
16 It was just a conversation to again express
17 that they were uncomfortable with the harshness
18 of the penalty. They talked about the
19 last-chance agreement. That they didn't feel
20 like it was -- felt like that someone signed it
21 that should not -- didn't have the authority
22 to. And that's -- I mean, that's about it.
23    Q. Okay. Let's back up, maybe get some
24 more details if we can, and maybe there isn't

Page 215

1  any more than that.
2        But in terms of the last-chance
3  agreement, their objection to that was simply
4  the steward didn't have authority?
5     A. No. That -- big thing about the
6  last-chance agreement was the restitution
7  money. That was a very long part of the
8  conversation.
9     Q. What about the authority -- you
10 mentioned the authority of stewards too though.
11 I'm confused.
12    A. Yeah. Of signing the last-chance
13 agreement. It has a signature of Mr. Williams
14 and...
15    Q. Whoever the steward was?
16    A. Whoever the steward was. But they
17 discussed that those stewards should not have
18 signed that particular paper.
19    Q. Okay. What was your response in terms
20 of their position on the steward not signing
21 the paper -- shouldn't have signed the paper?
22    A. Stewards are a representative of the
23 bargaining unit, and the employee and the
24 steward signed it. And it's a union