Page 216

1  representation is the way we saw it.
2      Q. Did they present any grounds for
3  saying the steward didn't have authority to
4  sign it?
5      A. I don't recall any grounds. I do
6  recall a lot of conversation that the steward
7  should not have signed it.
8      Q. That he shouldn't have?
9      A. That he should not have.
10     Q. But nothing in terms of why it was
11 signed?
12     A. I don't recall any --
13     Q. Specific grounds?
14     A. Right.
15     Q. And in terms of the last-chance
16 agreement, they were focusing on the
17 restitution only?
18     A. Right.
19        MR. ORLOVE: I object to leading.
20        MR. POTTER: Just summarizing.
21 BY MR. POTTER:
22     Q. And anything else in terms of the
23 last-chance agreement?
24        ARBITRATOR MALIN: I don't think that

Page 217

1  was an accurate summary. My notes reflect that
2  he said that was a long part of the
3  conversation. I don't think this witness said
4  that that was the only part of the
5  conversation.
6        MR. POTTER: Okay. Okay.
7  BY MR. POTTER:
8      Q. So any other part of the conversation
9  in terms of what was important to the union
10 about the last-chance agreement that you
11 haven't already testified to?
12     A. No.
13     Q. Okay. Was Mr. Williams present?
14     A. No.
15        MR. POTTER: That's all of this
16 witness.
17        ARBITRATOR MALIN: Any cross-examine?
18        CROSS-EXAMINATION
19 BY MR. ORLOVE:
20     Q. I gather you are involved in steps of
21 a grievance procedure with other contracts,
22 correct?
23     A. Yes.
24     Q. And I imagine you have had a number of

Page 218

1  final step grievance meetings with this unit
2  and other units?
3      A. Yes.
4      Q. From March until now?
5      A. From March of what year?
6      Q. March of this year until now.
7      A. Third step March of this year till
8  now? I can't recall of any other third step in
9  any other -- I'm just answering your question
10 first. I am involved in that.
11     Q. That's fine. I get the impression
12 your memory is a little vague on exactly what
13 happened back in March at this third-step
14 meeting, the meeting over Glenn Williams.
15     A. I'm giving you what I do remember.
16     Q. Okay. Thank you. Do you recall the
17 union bringing to your attention -- well,
18 strike that.
19        Are you aware that in this
20 Collective Bargaining Agreement there is a
21 provision that limits the authority of stewards
22 at this unit?
23        MR. POTTER: Well, I object to the
24 question. I think it mischaracterizes the --

Page 219

1        ARBITRATOR MALIN: I'm going to
2  sustain that. You can refer him to that
3  specific provision.
4        MR. ORLOVE: That's fine.
5  BY MR. ORLOVE:
6      Q. Looking at the contract, Page 25. At
7  the time these events occurred, that is in
8  October/November of 2006, were you then aware
9  of Section 13.2 of the contract?
10     A. Repeat the question, please.
11     Q. When these facts occurred with respect
12 to the three individuals, but particularly with
13 respect to Mr. Williams back in November
14 of 2006, at that time were you aware of
15 Section 13.2 of the contract which you're
16 looking at now?
17     A. I can't say that I read that
18 specifically back at that time.
19     Q. Okay. A different subject.
20        You testified you were involved in
21 the decision-making process of the discipline
22 to administer in these cases, correct?
23     A. Yes.
24     Q. And HR personnel were also part of

Page 220

1  that?
2      A. That's right.
3      Q. And I heard testified by Mr. Phillips
4  that it was a team decision?
5      A. Yes.
6      Q. Would you agree with that
7  characterization?
8      A. Yes, I would.
9      Q. But then there is quarterbacks and
10 there's tackles, to use football expressions.
11         To what extent did HR -- to what
12 extent was the input from the HR given weight?
13     A. It was a team decision. Conference
14 calls, meetings, everyone weighing in on the
15 proper discipline to handle these situations.
16 I would not want to say that one had lots more
17 influence than any other group.
18         We had -- it's from the top
19 management of the central region, the human
20 resources group, legal group, and the
21 production group.
22     Q. And except for the third-step
23 meetings, you were not involved in the
24 investigation of these grievances, correct?

Page 221

1      A. I was --
2      Q. When I say involved, let me -- I may
3  have misspoke.
4         You were not present during the
5  investigation?
6      A. I was not present during those
7  interviews, no.
8      Q. So the source of your knowledge comes
9  from what was reported to you about what
10 happened at those interviews?
11     A. Correct.
12     Q. Okay. And I guess the information
13 shared among the team would have been whatever
14 was reported to the team by Mr. Phillips or
15 Mr. Stein in connection with the interviews --
16     A. Yes.
17     Q. -- correct?
18     A. Yes.
19     Q. In connection with this contract and
20 the wage schedule, are you aware that there
21 are, at times, people who hold licenses but are
22 paid at a rate different than the licenses they
23 hold?
24     A. The wage payment is taken care of here

Page 222

1  locally, based on their licensing and what
2  their particular job is.
3      Q. Okay.
4      A. I can't say that I'm aware of per se
5  your question.
6      Q. Okay. So you don't know whether a
7  person holding a particular license may be paid
8  at a rate other than that license? You don't
9  know that? I mean, you have no knowledge that
10 that may or may not be the case; is that so?
11     A. Well, we follow the Collective
12 Bargaining Agreement to what a person's
13 position is and what their job duties are.
14     Q. Okay.
15     A. We follow the Appendix A for what a
16 person is doing and based on their license.
17     Q. Thank you.
18         (Brief Pause)
19     MR. ORLOVE: Nothing further.
20     ARBITRATOR MALIN: Anything further of
21 this witness?
22     MR. POTTER: No.
23     ARBITRATOR MALIN: Thank you very
24 much. You're excused.

Page 223

1         (Witness Excused.)
2     ARBITRATOR MALIN: Go off the record.
3         (At 12:30 p.m. a luncheon
4         recess was taken until 1:30
5         p.m.)
6     ARBITRATOR MALIN: Back on the record.
7  Anything further in the Company's case in
8  chief?
9     MR. POTTER: No, we rest.
10    ARBITRATOR MALIN: Mr. Orlove,
11 whenever you're ready to proceed.
12    MR. ORLOVE: Yes, we are. We'll call
13 Dan Leppert as our first witness. Dan, you
14 want to come up to the witness stand.
15        (The witness was duly sworn.)
16    ARBITRATOR MALIN: Proceed whenever
17 you're ready.
18        DANIEL LEPPERT,
19 called as a witness herein, having been first
20 duly sworn, was examined and testified as
21 follows:
22        DIRECT EXAMINATION
23 BY MR. ORLOVE:
24    Q. Dan, by whom are you employed?

Page 224

1   A. Illinois American Water.
2   Q. And how long have you worked for them or any predecessor company?
3 
4   A. Since 1983.
5   Q. And what is your job?
6   A. I'm a water and waste water operator.
7   Q. Directing your attention to October 19th, were you called into a meeting with supervision?
8 
9 
10   A. Yes.
11   Q. And tell us who was present at that meeting?
12 
13   A. Steve Phillips, John Stein, Ray Rossa, and myself.
14 
15   Q. Tell us everything you can recall being said at that meeting.
16 
17   A. Steve led the meeting. Said they were conducting an investigation, and it had come to their attention that my license had expired. They asked if I knew it was expired, and I told them yes.
18 
19 
20 
21 
22   Q. Anything else?
23   A. Asked me why it had expired, when it was -- had been due the year before, I had come
24 

Page 225

1 up short about two and a half, three hours of CEU's. So I wasn't able to renew it.
2 
3     I told them I had planned on taking -- upgrading my license to a Class B but just hadn't gotten around to it.
4 
5 
6   Q. What was your license at that time?
7   A. A Class C.
8   Q. And what would be required -- at that time what would be required to go up to a Class B?
9 
10 
11   A. I would have to apply -- to take the exam, I would need a letter of reference and just apply to the EPA.
12 
13 
14   Q. How did that meeting end?
15   A. Steve said that they were going to continue the investigation, and they considered it very seriously. Asked if I had anything to say. I told them, you know, I knew it was wrong to let it lapse. But I told them I made sure in that year and a half that I had not represented myself as a licensed operator. I signed nothing as a licensed operator. As a licensed operator I'm not a licensed operator and responsible charge for any of the systems.
16 
17 
18 
19 
20 
21 
22 
23 
24 

Page 226

1 I don't file the reports. I don't sign the reports.
2 
3   Q. Can you explain that to the Arbitrator, what the significance is of signing reports?
4 
5 
6   A. Properly for each water system we have -- somebody has filed a document with the EPA stating that they are the properly licensed operator and responsible charge.
7 
8 
9 
10     I used to sign those for Metro Utility. When Citizens took over Metro, I was no longer that operator.
11 
12 
13   Q. So there was Metro Utility, and then Citizens took over from Metro Utility?
14 
15   A. They merged in '94.
16   Q. And then Illinois American, when did it come into the picture?
17 
18   A. 2002.
19   Q. So from the time Citizens Utilities was the employer, had you ever signed any paperwork as an operator?
20 
21 
22   A. No.
23   Q. And under Illinois American had you ever signed any of the certification or
24 

Page 227

1 paperwork?
2   A. No.
3   Q. I'm going to ask you a few questions about these different licenses. What kinds of licenses are there?
4 
5 
6   A. A class A, B, C, and D.
7   Q. And what do those classes represent?
8   A. What kind of plants you're supposed to be operating or what you can be a responsible charge for. Anywhere from a distribution license on up through filtration and lime soda softening.
9 
10 
11 
12 
13   Q. What must one do to obtain a water supply license?
14 
15   A. You have to have a minimum amount of a year's experience. You apply to the EPA, tell them your work background, your education background, and you need a letter of recommendation from your supervisor.
16 
17 
18 
19 
20   Q. You mentioned CEU's. Can you tell us -- or please tell us what that is.
21 
22   A. For the renewal program now they -- it is now required that you have what they call continuing education units. For the Class C,
23 
24

Page 228

1  it's 15 hours in every three years.
2  Q. So it's 15 hours for the total three
3  years or 15 hours per year?
4  A. No. For the total three years.
5  Q. Okay. And for an A and B -- A or B
6  license?
7  A. 30 hours.
8  Q. For three years?
9  A. Over three years.
10 Q. When did the requirement of CEU's
11 first come into being or existence?
12 A. I believe 2003 was the first renewal
13 year that you had to show your CEU's
14 Q. Before you had to show your CEU's
15 before 2003, what did one do to renew a
16 license?
17 A. You sign the renewal application and
18 sent in a check for $10.
19 Q. And back in October when this meeting
20 was held, what kind of license did you have?
21 A. My water license was expired. It had
22 been a Class C.
23 Q. Following that meeting, what if
24 anything was said or done by the company as far

Page 229

1  as your ability and qualifications to continue
2  on your job?
3  A. Nothing.
4  Q. Tell the Arbitrator did you continue
5  your work after that meeting?
6  A. I went back to work the same day doing
7  the exact same job.
8  Q. And that was my next question. Did
9  your duties and responsibilities change in any
10 way?
11 A. No.
12 Q. Was there anyone supervising you
13 differently than you had been supervised
14 before?
15 A. No.
16 Q. There will be testimony -- it hasn't
17 come in yet -- of a meeting on October 24 where
18 other employees were called in a second time.
19 Were you called into a meeting on October 24?
20 A. No.
21 Q. Directing your attention to
22 November 7, and that's the day on which you
23 were issued a disciplinary letter or a letter
24 spelling out discipline, were you at a meeting

Page 230

1  on that day?
2  A. Yes.
3  Q. And tell us who was present at that
4  time.
5  A. Steve Phillips, John Stein, Chris
6  Martens, and myself.
7  Q. And tell us everything that you can
8  recall being said.
9  A. Again, it was led by Steve. And he
10 said as a result of the investigation, they had
11 determined that my discipline would consist of
12 15 days' suspension without pay. I would be
13 given six months to renew my license, and it
14 would...
15 Q. Was your pay rate reduced?
16 A. No.
17 Q. Just showing you Union Exhibit 3, is
18 that an accurate copy of what you were given at
19 that meeting?
20 A. Yes.
21 Q. What if anything did you do following
22 this meeting to -- strike that.
23     What if anything did you do after
24 October 19th, the first meeting you had, to

Page 231

1  bring your license up to date or renew your
2  license?
3  A. After October 19th? Nothing before
4  the discipline meeting. At the discipline
5  meeting I was told they thought there was a
6  clause in the EPA rules where I would be able
7  to have my license reinstated if I could show
8  further training, submit further training.
9  Q. Who said that?
10 A. Steve said that in their talks with
11 the EPA they thought there was a clause where I
12 could have my license reinstated because it had
13 been expired for less than two years.
14 Q. Tell us what happened then as far
15 as -- what happened as far as you renewing your
16 license?
17 A. Well, at that meeting I was told that
18 they had a number of a person I could contact
19 at the EPA, and they would get it to me later.
20 Never -- I didn't get the phone number. Served
21 my suspension. When I came back --
22 Q. Excuse me. Let me interrupt you.
23     Who told you there was a number
24 that they would give you to call EPA?

Page 232

1    A. John Stein said they had a phone
2    number, a contact number of a Jewel
3    something -- her first name is Jewel -- that I
4    could contact at the EPA.
5    Q. Did you ever get that number?
6    A. No. And I asked twice in March, and
7    he said he had the number. He would get it to
8    me later. And I never got it.
9    Q. Okay. Now, continue with what you
10   were saying, what steps you took to renew your
11   license.
12   A. In April I filled out an application
13   and sent a letter to whom it may concern at the
14   EPA that, you know, I have additional credit
15   hours. I sent them a check. If you can
16   reinstate my license for -- with these hours,
17   you know, I'd like to do that. I'd also like
18   to submit an application to test for a Class B
19   license.
20   Q. Now, that was in April you say?
21   A. Yes.
22   Q. April of this year, 2007?
23   A. Yes.
24   Q. Okay. Please continue.

Page 233

1    A. The last week of April I got a call
2    back from Jewel, and she said yes, she would be
3    able to reinstate my license. Did I want to go
4    ahead and take the test too? And I said well,
5    I need to take the test, but I have to have it
6    reinstated as soon as possible.
7        And she told me she could send me
8    a form to reinstate. And she would also give
9    me an admittance letter to the May exam. She
10   never sent it to me. When I called back after
11   the May date, that would be maybe about the 9th
12   or 10th of May, I contacted her and she said
13   well, she had sent it. Didn't know why I
14   didn't get it. And she said the hours that I
15   had submitted would not be acceptable because I
16   had to have all 15 hours before July 1st of
17   2005. She could not accept any credit hours
18   after that.
19       So I told her I would need to test
20   in June. The test is only given the first
21   Monday of every -- first Monday of every month.
22       I informed John that I was not
23   going to make the six-month deadline, but I was
24   testing on June 4th. I put it in for time off

Page 234

1    so I could take the exam. And May 30th I was
2    given a letter that I had far exceeded the six
3    months deadline. And if I did not have my
4    license restored by July 31st, I would be
5    terminated.
6    Q. Let me show you what I've marked as
7    Union Exhibit 16 and ask you to identify that,
8    please.
9    A. Yes.
10   Q. What is that?
11   A. That's the letter I received March --
12   on May 31st.
13   Q. And you got this from the company?
14   A. From John Stein.
15   Q. When did you actually get your
16   license?
17   A. I had tested on June 4th. I got a
18   letter dated June 7th.
19       MR. ORLOVE: I move for the admission
20   of Union Exhibit 16.
21       MR. POTTER: No objection.
22       ARBITRATOR MALIN: Union 16 is
23   admitted.
24

Page 235

1        (Union Exhibit No. 16
2         received.)
3    BY MR. ORLOVE:
4    Q. So you passed the deadline for which
5    you would be fired if you didn't meet the
6    deadline. Were you fired?
7    A. No. I was -- I passed the original
8    discipline letter deadline. I did not pass
9    this deadline.
10   Q. This deadline meaning the one in Union
11   Exhibit 16?
12   A. Yes.
13   Q. Okay. Thank you. So you worked
14   without a license at the establishment for what
15   period to what period?
16   A. From July 2005 until June of 2007.
17   Q. And was any action taken against you
18   by the IEPA for having worked without a
19   license?
20   A. No.
21   Q. And was any action taken against you
22   by IEPA because your license had expired?
23   A. No.
24   Q. Now, the company's original letter to

Page 236

1  you gave you six months to reinstate your
2  license, and the failure to do so could result
3  in further discipline. Was there any further
4  discipline given to you?
5     A. No.
6        MR. ORLOVE: I have no further
7  questions.
8        ARBITRATOR MALIN: You may
9  cross-examine.
10           CROSS-EXAMINATION
11 BY MR. POTTER:
12    Q. Dan, Terry Potter. So you went to the
13 exam and sat for the exam this last year, so
14 you probably have a pretty good recall of what
15 was on it, correct, as far as the exam
16 questions?
17    A. Yeah.
18    Q. Just in general.
19    A. Okay.
20    Q. What were the nature of the questions?
21 What was the exam about?
22    A. General chemical addition and basic
23 math that we use. Geometry. Being able to
24 figure areas, volumes, chemical addition.

Page 237

1     Q. Now, you know what all this means and
2  some other people in the room in terms of your
3  job content. But for the Arbitrator and
4  frankly myself, who doesn't know what all an
5  arbitrator (sic) does, can you kind of expand
6  upon that in terms of the impact of what that
7  exam was testing you for?
8     A. Being able to do simple -- basic math
9  that's used every day by an operator. If you
10 have a known volume in a tank and you're
11 drawing out of it at a steady rate for so many
12 hours, how much is left? How much did you pump
13 out?
14    Q. Okay.
15    A. Or how much chemical you would need to
16 dose that to a certain concentration.
17    Q. What else do you remember being tested
18 on?
19    A. Different types of wells.
20    Q. There's different types of wells?
21    A. There's gravel wells. And if you met
22 a condition, if you had a -- if your drawdown
23 rate started changing, what symptoms would you
24 be looking at in a gravel well or if you're in

Page 238

1  a sandstone well.
2     Q. So like if there is a sudden change in
3  level?
4     A. Yeah. Could you identify it.
5     Q. Troubleshooting?
6     A. Different types of chlorination
7  equipment. Different types of fluorination
8  equipment. What's the purpose of this chemical
9  and so on.
10    Q. And those are important facts to know
11 as an operator, correct?
12    A. Correct.
13    Q. And that's probably a pretty good
14 idea, I would assume, from your position that
15 operators, as a matter of public policy, get
16 tested on those basic procedures by Illinois
17 EPA, correct?
18    A. They get tested once or only when --
19 if you have to renew your license.
20    Q. Right.
21    A. Not on a regular basis.
22    Q. But three years you have --
23    A. No.
24    Q. -- 15?

Page 239

1     A. No. You go through training. You
2  select an outside training to show you sat in a
3  classroom in front of somebody and they talked
4  about something. That's what their training
5  is.
6        You can go sit and listen to three
7  hours of how -- different types of water meters
8  or three hours of this is how we paint water
9  towers, and that's considered training.
10    Q. Okay. And again, you've been quite
11 honest that you fouled up here and you didn't
12 maintain your license, correct?
13    A. I didn't get enough hours in.
14    Q. And you knew that was against the
15 rules of the company, correct?
16    A. In what way?
17    Q. Well, in the way that you were hired
18 on and brought over from Metro, and you're
19 being paid a certain amount of money from day
20 one when you were brought over from Metro
21 because you had a certain license, correct?
22    A. Correct.
23    Q. And that as an operator, that status
24 with the company, you're required to maintain

Page 240

1  your licenses. I mean, there's no question
2  about that, correct?
3     A. Correct.
4     Q. You knew that?
5     A. Yes.
6     Q. There's no hidden agenda here.
7        And you got the pay amount in the
8  contract based upon the license that you held,
9  correct?
10       MR. ORLOVE: Objection. They're
11 asking this witness to do a contract
12 construction evaluation. He's not authorized
13 to do that. Contract's in evidence. And he
14 doesn't -- no foundation is laid for him to
15 make an interpretation of how the contract is
16 applied.
17       ARBITRATOR MALIN: Mr. Potter?
18       MR. POTTER: Well, I think, you know,
19 he's been working for the company for a number
20 of years. It's cross-examination. I've got a
21 right to figure out what he does know and the
22 basis for that. He can --
23       ARBITRATOR MALIN: I agree. I'll
24 allow the question.

Page 241

1  BY MR. POTTER:
2     Q. I'm going to show you the Collective
3  Bargaining Agreement that applies for your
4  group of employees, Joint Exhibit 1 is how we
5  refer to it. On the backside, Dan, there is an
6  appendix or an addition. Are you familiar with
7  this appendix?
8     A. Yes.
9     Q. So you know that under the wage scale,
10 or I hope you do anyway in terms of knowing
11 what your wages are, that under a certain
12 operator level you get paid different levels of
13 pay, correct?
14    A. Correct.
15    Q. So an Operator I with a license --
16 Class A license or an S1 license get paid
17 higher than an operator II or an operator III,
18 correct?
19    A. Yes.
20    Q. And you knew that at the time that
21 your license lapsed, correct?
22    A. Yes.
23    Q. Okay. Again, no hidden agendas here.
24       MR. ORLOVE: Nobody suggested any.

Page 242

1  BY MR. POTTER:
2     Q. Okay. And again, your pay wasn't
3  reduced, correct?
4     A. Correct.
5     Q. You simply got the 15-day suspension,
6  correct?
7     A. Correct.
8     Q. Okay. Dan, let me show you what's
9  been marked as Company Exhibit 6. And I don't
10 know whether you've seen this before or not. I
11 was going to ask you that.
12       Do you have any recall of seeing
13 this document before today or what you're
14 reading here today?
15    A. Yes.
16    Q. Do you remember if you received it
17 about the time where it's dated, July 29, 2002?
18 Is that about when you think you received it?
19    A. Yes.
20    Q. Do you remember receiving this on or
21 about July 29th, 2002?
22    A. Yes.
23    Q. Okay. All right. And that gives you
24 the expiration date for your license; does it

Page 243

1  not?
2     A. Yes.
3     Q. And do you carry the wallet card with
4  you or do you keep that with you?
5     A. Yes.
6     Q. And it tells you your expiration date
7  on the wallet card too?
8     A. Yes.
9        MR. POTTER: That's all I have.
10       ARBITRATOR MALIN: Redirect?
11       MR. ORLOVE: Just a few questions.
12       REDIRECT EXAMINATION
13 BY MR. ORLOVE:
14    Q. Once you've taken the test and if you
15 timely renew, is there a requirement to take a
16 test again?
17    A. No.
18    Q. So you just renew and now currently
19 with CEU's, the required number of CEU's?
20    A. Yes.
21    Q. Mr. Potter asked you about the
22 substance of the test. Was there anything on
23 there that you hadn't been doing since 1983?
24    A. Only things that I don't work with.

Page 244

1  Some of the types of fluoride equipment we
2  don't use. You still have to be able to answer
3  the question on the test.
4      MR. ORLOVE: Nothing further.
5      MR. POTTER: Nothing further.
6      ARBITRATOR MALIN: The test you took
7  was to get your Class C license back?
8      THE WITNESS: Yes.
9      ARBITRATOR MALIN: Not the test to
10 upgrade to Class B?
11     THE WITNESS: No. I was told that I
12 had one chance to take the test; otherwise, I
13 didn't have the job. So I took the one I knew
14 I could pass.
15     ARBITRATOR MALIN: Any further inquiry
16 of this witness in light of my questions?
17     MR. ORLOVE: No.
18     MR. POTTER: No.
19     ARBITRATOR MALIN: Thank you very
20 much.
21     (Witness Excused)
22     MR. ORLOVE: Ken Nelson, next witness.
23     (The witness was duly sworn.)
24     ARBITRATOR MALIN: Mr. Orlove, when

Page 245

1  you're ready, you may proceed.
2      KENNETH NELSON,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6      DIRECT EXAMINATION
7  BY MR. ORLOVE:
8    Q. Ken, by whom are you employed?
9    A. Illinois American Water Company.
10   Q. And how long have you been employed by
11 them or previous predecessor companies?
12   A. Including the original company,
13 January 1st, 1969.
14   Q. '69?
15   A. Uh-huh.
16   Q. What is your job? Or what was your
17 job in 2006, and what is your job today?
18   A. They're both one in the same. I'm a
19 water treatment plant operator and also waste
20 water treatment.
21   Q. Directing your attention to
22 October 19th, were you called in to a meeting
23 with supervision?
24   A. Yes.

Page 246

1    Q. And who was present?
2    A. Steve Phillips, John Stein, Ray Rossa,
3  and myself.
4    Q. Tell us everything you can recall
5  being said at that meeting.
6    A. Steve said -- he asked me first if I
7  was aware that my license had expired, and I
8  said yes. I was informed by Jewel Brand of the
9  Illinois EPA on October 11th. She had given me
10 a call telling me that.
11   Q. October 11th of 2006?
12   A. Yes.
13   Q. Okay.
14   A. She informed me that she had gotten
15 one of the sheets for the credits, but that she
16 couldn't apply it to my license because it had
17 expired.
18   Q. What had expired?
19   A. My license had expired. My water
20 treatment license.
21   Q. And you got a sheet for credit; is
22 that the CEU?
23   A. The CEU sheet that she had received
24 couldn't be applied because of that.

Page 247

1    Q. And are you telling us what you told
2  the company?
3    A. Yes.
4    Q. Okay. Please continue.
5    A. At that point Steve said that they
6  were conducting an investigation, which was
7  ongoing at that point. And that there would be
8  another meeting, and they were on a
9  fact-finding thing, and that I would be called
10 back.
11   Q. Anything else that you can recall?
12   A. No. Basically that was it.
13   Q. And tell the Arbitrator why or how it
14 happened that your license had lapsed.
15   A. Well, it was -- why it had expired?
16   Q. Yes.
17   A. I made a mistake. I didn't keep up
18 with it.
19   Q. What if anything was said or done at
20 that meeting as far as your ability or
21 qualifications to continue on your job?
22   A. What was the question?
23   Q. By the company. Did the company
24 change your job in any way?

Page 248

1　A. No. My job wasn't changed at all.
2　Q. Did you return to your job?
3　A. Yes. I returned to my job right after
4　the meeting.
5　Q. Was anything said to you by EPA about
6　your qualifications to continue working at the
7　company?
8　A. No.
9　Q. Do you sign off on official reports
10　for the company?
11　A. No, I don't.
12　Q. Have you ever?
13　A. No. Not with Citizens or Illinois
14　American.
15　Q. Who does?
16　A. The supervisors, Mike Walsh for one.
17　Q. Okay. Directing your attention to
18　October 24, were you called in to a meeting
19　that day concerning your expired license?
20　A. Yes, I was.
21　Q. And as of October 24 what was the
22　status of your license?
23　A. It was expired. And --
24　Q. Who was present at this meeting?

Page 249

1　A. Steve Phillips, John Stein. I believe
2　Chris Martens was at that meeting, and myself.
3　Q. Tell us everything you can remember
4　being said.
5　A. Well, I was told that because of the
6　fact that I had let the license lapse, that I
7　would receive 15 days off, and I had to
8　reimburse the company for wages I received for
9　the license that I currently did not hold.
10　Q. Ken, let me interrupt you for a
11　moment. As I understood it, there were three
12　meetings on this subject. And I'm asking you
13　about the second meeting. But was there a
14　second meeting? Or if you don't remember,
15　that's --
16　A. I don't recall. It seemed like there
17　were two. There could have been three.
18　Q. Okay. But let me show you what's
19　marked Union Exhibit 2, which is a letter to
20　you dated November 7. Did you get that letter
21　on that day?
22　A. Yes. That would have been the last
23　meeting.
24　Q. Okay. And are you now telling us or

Page 250

1　you're about to tell us everything that
2　happened at that November 7 meeting?
3　A. Yes.
4　Q. Okay. Please continue.
5　A. Okay. I was told that my license had
6　been expired since July of 2004. And in the
7　process of the investigation, it was clear that
8　I allowed my license to expire. And that
9　because of that, I would be given 15 days off
10　and also required to pay back 10,000 some
11　dollars in repayment.
12　Q. And were you given that letter, Union
13　Exhibit 2?
14　A. Yes.
15　Q. Okay. I can take that back from you.
16　A. Okay.
17　Q. What if anything did you do to restore
18　or reinstate your license after this was first
19　brought to your attention?
20　A. Well, I had been in contact with Jewel
21　Brand who had called me originally to inform me
22　that my license had expired. So I called her
23　back to find out what I needed to do, and she
24　told me I needed a letter of referral from the

Page 251

1　company, which they gave me. And then I
2　applied for the reexamination and took that
3　same exam February 5th, I believe it was, of
4　this year.
5　Q. In your conversations with Ms. Brand
6　at the IEPA, tell us whether you made it known
7　to her that you were still working at Illinois
8　American Water.
9　A. Yes. I told her I was still there,
10　that I would get my letter of recommendation
11　and mail it off to her, and she would send me
12　the correspondence I needed, which she did.
13　Q. And when did you -- or did you get
14　your license renewed?
15　A. Yes. I got it renewed -- it was
16　either February 4th or 5th.
17　Q. So for what period of time did you
18　work without a license?
19　A. Well, from the time it expired,
20　July 2004 until February of 2007.
21　Q. And during that period of time you
22　continued to work for the company of course?
23　A. Yes.
24　Q. Were your duties, responsibilities,

Page 252

1  supervision changed in any way?
2      A. In no way, no. Same duties.
3      Q. Was any action taken against you by
4  the IEPA by reason of your license having
5  expired?
6      A. No.
7      Q. Or any action taken against you
8  because you were working without a license?
9      A. No.
10     Q. Now, the letter of suspension that you
11 just looked at says quote: You will be
12 required to reimburse the company for
13 overpayment of wages for a license you did not
14 have.
15         And going on, a different sentence
16 at the bottom of Exhibit 2, the first page:
17 You are hereby required to pay this difference
18 back to the company within a one-year period
19 from the date of this letter, and to -- and
20 will have to arrange a payment schedule.
21 Failure to make payments will result in further
22 discipline. Close quote.
23         Did you pay back as required by
24 this letter?

Page 253

1      A. No, I did not.
2      Q. Was that brought -- and we're now
3  beyond one year of this letter. Was that
4  brought to your attention in any way?
5      A. Yes. While I was on suspension, I
6  received a letter at home through the mail
7  stating that -- well, the facts and figures,
8  how much I had to pay every payday, and that I
9  was required to sign that or I would be
10 terminated. And I didn't act on that.
11     Q. And have you suffered any further
12 discipline or discharge as a result of not
13 acting on that?
14     A. No.
15     Q. Has that been brought to your
16 attention since that time?
17     A. No.
18     Q. And have you paid the money back?
19     A. No, I have not.
20     Q. How much was it that they wanted you
21 to pay?
22     A. $10,562, right in there.
23         MR. ORLOVE: Okay. Nothing further.
24

Page 254

1           CROSS-EXAMINATION
2  BY MR. POTTER:
3      Q. Bear with me, Ken. I'm trying to find
4  my copy of Union 2. Before we get there, let
5  me ask you this, Ken.
6          We're going to look at Company
7  Exhibit 5. And I don't know. Just tell me
8  whether or not you've ever seen that exhibit
9  before?
10     A. Yes. Steve Phillips gave that to me.
11     Q. When was that?
12     A. It was in one of our -- one of our --
13 well, the first or the second meeting. I
14 believe it was the second meeting.
15     Q. So it was part of this
16 investigation --
17     A. Yes.
18     Q. -- leading up to your discipline?
19     A. Yes.
20     Q. But prior to that you don't have any
21 recall of receiving this?
22     A. No.
23     Q. Is that your address at 306 Long
24 Avenue, North Aurora, Illinois?

Page 255

1      A. Yes, it is.
2      Q. All right. But you don't have any
3  recall of receiving it?
4      A. No.
5      Q. You just remember Steve Phillips
6  approaching you about it during the
7  investigation?
8      A. Yes.
9      Q. But you told Steve the same thing that
10 you just --
11     A. Yes, sir.
12     Q. Didn't have any prior knowledge?
13     A. No.
14     Q. Okay.
15        ARBITRATOR MALIN: Mr. Nelson, let him
16 finish the question first, because our court
17 reporter can only take one person down at a
18 time.
19        THE WITNESS: All right.
20 BY MR. POTTER:
21     Q. And again, Ken, you've made it clear
22 you understand you fouled up. You should have
23 maintained your license?
24     A. Yes.

Page 256

1    Q. And that under the Collective
2  Bargaining Agreement you get paid based upon
3  the license you hold. You're aware of that
4  language in the --
5    A. I wasn't aware of that at the time,
6  the different pay rates and everything. But
7  Steve did point that out to me.
8    Q. Okay. Okay.
9    A. You have to understand, I come from a
10 smaller company where we weren't paid on -- you
11 know, like this. We were just paid according
12 to what we did.
13   Q. Based upon your job classification
14 versus license held?
15   A. Correct.
16   Q. Okay. Union Exhibit 2, which was your
17 discipline letter.
18     MR. ORLOVE: You want mine?
19     MR. POTTER: Yes, thank you.
20 BY MR. POTTER:
21   Q. Ken, this is your discipline letter
22 you received on November 7th of '06. Is there
23 anything in this letter which you believe to be
24 untrue? I'm not asking you to address the

Page 257

1  discipline you received. I'm understanding
2  you're contesting that. But factually the
3  content of the letters or anything in there
4  that you disagree with? Just take your time to
5  read through it.
6     MR. ORLOVE: Well, I really object to
7  that. If there's something -- the company
8  wrote the letter, and I object to having the
9  witness just approve or disapprove of how the
10 company characterized the facts. If there's
11 something in the nature of facts that he needs
12 to be asked, of course he's here and he can be
13 asked.
14     ARBITRATOR MALIN: Mr. Potter?
15     MR. POTTER: Well, I think that we're
16 here trying to determine whether or not we had
17 just cause for the discipline. And I think one
18 of the factors is whether or not we were -- had
19 the correct facts at hand when we made the
20 disciplinary action. And if this person's
21 being disciplined based upon certain facts in
22 the letter, I have a right to ask him whether
23 he thinks the content of that letter is
24 factually correct.

Page 258

1     ARBITRATOR MALIN: Well, I agree with
2  that, but I think Mr. Orlove's objection as to
3  the form is appropriate. I think you can take
4  him through the letter and say is this
5  factually accurate? Do you disagree with that?
6        But just handing him the letter
7  and saying tell me if there's anything in there
8  you disagree with is -- that's going to produce
9  ambiguous testimony, if anything.
10       So I think it will be more helpful
11 to me if you focus his attention on specific
12 allegations in the letter, then ask if he
13 agrees or disagrees.
14 BY MR. POTTER:
15   Q. Okay. Let's just go through again,
16 and I think most of this you're going to agree
17 with.
18       But in the second paragraph it
19 says, In the process of our investigation or
20 interview with you, it was clear that you
21 allowed your license to expire and made no
22 effort to keep track of your license or contact
23 the IEPA to check the status of your license,
24 at least for the past several years. That's

Page 259

1  correct?
2    A. Yes.
3    Q. Okay. And it was also clear that you
4  had not maintained the necessary training,
5  education hours, CEU's required to maintain
6  your water license in violation of the
7  Collective Bargaining Agreement, Section 26.2.
8      MR. ORLOVE: I object to that because
9  it requires the witness to make a judgment as
10 to the meaning and understanding of contract
11 term.
12     MR. POTTER: Okay. Well, let me
13 rephrase the question.
14     ARBITRATOR MALIN: Okay.
15 BY MR. POTTER:
16   Q. It was also clear that you have not
17 maintained the necessary training, education
18 hours or CEU's required to maintain your water
19 license?
20   A. At first I disagreed with that because
21 I had so many pieces of paper stating otherwise
22 that I thought I had more than enough. But
23 checking through them, I needed 30, and I only
24 had 22. So yes. That is correct.

Page 260

1  Q. Okay. Thank you. And let's see. And
2  with regard -- and just picking up "With
3  regard", continuing that same paragraph: With
4  regard to wages specifically, because you did
5  not advise the company that your water license
6  expired, you continued to receive pay at a
7  higher rate than you were -- at a higher rate
8  than you were entitled to under Appendix A of
9  the CBA since July 1, 2004?
10     MR. ORLOVE: I object to those
11 conclusions. Again, it asks him to make a
12 judgment on the application of the contract.
13     ARBITRATOR MALIN: As I understand the
14 dispute between the parties, that's an issue
15 that's being posed to me.
16     MR. POTTER: Well, and -- but he's
17 admitted that he understood that his license
18 was tied into his pay rate.
19     ARBITRATOR MALIN: That's correct.
20     MR. POTTER: Okay. And --
21     MR. ORLOVE: Actually, he didn't,
22 but --
23     THE WITNESS: No, I didn't.
24

Page 261

1  BY MR. POTTER:
2  Q. You don't believe your license is tied
3  into your pay --
4  A. I didn't understand it. Let's put it
5  that way.
6  Q. Okay. But you understand that now?
7  A. Now, I do, yeah. Yeah. I did say
8  Steve brought that to my attention.
9  Q. Right. Right. I understand that.
10     So you understand now then knowing
11 what you know now --
12 A. Yes.
13 Q. -- that you were paid at the rate for
14 holding a -- I'm sorry. A B license, was it?
15 A. B, yes.
16 Q. B license. But there was a certain
17 point in time you didn't have that license?
18 A. Correct.
19 Q. So you didn't meet the requirements
20 for that pay rate?
21 A. Yes.
22     MR. POTTER: Okay. That's all I have
23 on that letter, I believe.
24     MR. ORLOVE: May I have it back?

Page 262

1     MR. POTTER: Yeah. Got to keep track
2  of it.
3     MR. ORLOVE: After this letter, at
4  what rate --
5     ARBITRATOR MALIN: Had you concluded
6  your cross-examination?
7     MR. ORLOVE: Oh, I'm sorry.
8     MR. POTTER: I think I may be.
9     ARBITRATOR MALIN: He said that's all
10 I have on that letter.
11    MR. ORLOVE: I'm sorry. I apologize.
12    ARBITRATOR MALIN: Could be
13 interpreted as the end of cross or I've got
14 stuff on other -- that's why I was --
15    MR. POTTER: Give me a thought here.
16 BY MR. POTTER:
17 Q. Since we're all kind of landing on
18 this one provision in the contract, I may as
19 ask what your knowledge is on that. And again,
20 Ken, I don't know whether you're aware of this
21 or not. This is the Collective Bargaining
22 Agreement for your bargaining unit, Joint
23 Exhibit 1. And have you ever looked at this
24 agreement?

Page 263

1  A. Not really, no, no.
2  Q. Let me follow up with one question and
3  end it at that.
4     On Page 37 of that agreement it
5  addresses continuing education units to
6  maintain your license. Were you familiar with
7  26.2 at all before today?
8  A. No.
9     MR. POTTER: All right. That's all I
10 have. That's all.
11    ARBITRATOR MALIN: Okay. Redirect?
12    MR. ORLOVE: Yes.
13          REDIRECT EXAMINATION
14 BY MR. ORLOVE:
15 Q. The letter of disciplinary suspension
16 also indicates that your pay was reduced to an
17 operator in training --
18 A. That's correct.
19 Q. -- is that correct?
20 A. Yes.
21 Q. And how long were you paid as an
22 operator in training?
23 A. I believe it started the first of
24 November and lasted until my license was

Page 264

1 renewed, which was in February.
2    Q. During that period of time, what if
3 any changes in your work supervision or duties
4 was there while you worked as an operator in
5 training?
6    A. No changes.
7    Q. What if any training other than
8 routine training everyone goes through were you
9 given while you were an operator in training --
10 while you were paid at an operator in training?
11    A. None.
12       MR. ORLOVE: That's all.
13       MR. POTTER: Nothing further.
14       ARBITRATOR MALIN: Thank you,
15 Mr. Nelson. You're excused.
16          (Witness Excused.)
17       MR. ORLOVE: Glenn Williams is our
18 next witness.
19          (The witness was duly sworn.)
20       ARBITRATOR MALIN: Proceed whenever
21 you're ready, Mr. Orlove.
22       MR. POTTER: I notice the witness has
23 a bunch of exhibits with him. Perhaps we
24 could -- I would rather he not have those in

Page 265

1 his possession while he testifies.
2       MR. ORLOVE: Yeah. You can put them
3 down on the floor.
4       MR. POTTER: Thank you.
5       GLENN WILLIAMS,
6 called as a witness herein, having been first
7 duly sworn, was examined and testified as
8 follows:
9          DIRECT EXAMINATION
10 BY MR. ORLOVE:
11    Q. Are you the Glenn Williams who was
12 discharged by Illinois American Water?
13    A. Yes.
14    Q. When did you begin there?
15    A. At American Water?
16    Q. Yep -- no. At the American Water or
17 any predecessor company.
18    A. Originally October of 1974.
19    Q. And what has been your work for those
20 predecessor companies and Illinois American
21 Water?
22    A. Operator. I started as a meter reader
23 and progressively moved up through the
24 different job positions. About the last

Page 266

1 20 years I've been an operator.
2    Q. Directing your attention to October 10
3 of last year, 2006, what if anything came to
4 your attention concerning the status of your
5 water supply license?
6    A. I received a call from Jewel at the
7 EPA. She informed me that she attempted to
8 credit my account with CEU's I had earned, and
9 she wasn't even able to find me. She did
10 locate me on an inactive list. She said that
11 she was sorry, that it was not good news, that
12 my license was expired and -- over a year, and
13 that I would have to retest.
14    Q. You recall anything further between
15 you and she being said at that time?
16    A. No.
17    Q. And at that time what was the license
18 you had which had expired?
19    A. Class A.
20    Q. What if anything did you do to bring
21 that to the attention of the company?
22    A. I believe I got that news on a Friday.
23 My workweek at the time was Tuesday through
24 Saturday. I was off Sunday, Monday. Tuesday

Page 267

1 when I got to work I notified my supervisor,
2 John Stein, what I had found out.
3    Q. And what did you tell him? Tell us
4 everything you recall saying to him and what he
5 said to you.
6    A. I informed him that I found out my
7 license had expired. That because it was over
8 a year, I would need to retest. I asked him if
9 he could provide me with a letter of entrance.
10 He said he would do that.
11    Q. Anything else said between you and
12 Mr. Stein?
13    A. Not that I recall, no.
14    Q. Directing your attention to about a
15 week later, October 19th, were you called into
16 a meeting with supervision?
17    A. I was, yes.
18    Q. And who was present?
19    A. Steve Phillips, Ray Rossa, John Stein,
20 and myself.
21    Q. Tell us everything that you can recall
22 being said.
23    A. Steve informed me that he was still
24 investigating, that this was a very serious

Page 268

1  matter. He asked me why I hadn't brought this
2  to his attention sooner. I informed him:
3  Steve, I informed you or John Stein as soon as
4  I found out. He told me, you know, it was an
5  open, ongoing investigation, and that's all I
6  recall from that meeting.
7     Q. Was there any discussion as to whether
8  or not you had gotten notice from EPA?
9     A. Yes. He asked me if I had received a
10 renewal or anything like that, and I told him
11 no. Informed him I had moved in 1995 and again
12 in 2004.
13    Q. Tell the Arbitrator why or how it
14 happened that your license did expire, why you
15 weren't able to keep up with it.
16    A. Well, what I basically found out later
17 was it had expired in '97, but I moved from
18 that address in 1995. So they didn't forward
19 at the time for two years or -- so I never got
20 the notice forwarded to me. I earned the
21 license in 1994. So actually, I never -- I
22 never did a renewal on it.
23    Q. You were aware that renewal was
24 necessary?

Page 269

1     A. Yes.
2     Q. Can you explain why is it that it went
3  for that period of time without you attending
4  to a renewal?
5     A. I don't know how that much time could
6  have gotten away that it could be expired that
7  long.
8     Q. Was there anything happening in your
9  personal life that would have distracted you
10 from it?
11    A. There were many things going on at the
12 time, yes.
13    Q. Tell us what.
14    A. Well, I had lost an adult son to
15 suicide and... Excuse me. And a year later my
16 wife was diagnosed with breast cancer.
17    Q. If you want, we can take a break or we
18 can continue.
19    A. No, I'm fine.
20    Q. Okay. Was this brought to the
21 company's attention?
22    A. Steve was aware of it. He came to my
23 son's wake. And I know I had conversations.
24 He was aware of my wife's situation as well

Page 270

1  too.
2     Q. At the first meeting was anything said
3  to you one way or another about your ability to
4  continue working on the job?
5     A. No.
6     Q. And did your job duties change after
7  this meeting?
8     A. No.
9     Q. Was there a -- directing your
10 attention to a meeting on October 27th, were
11 you called into a meeting on that day?
12    A. Yes.
13    Q. And who was present at that meeting?
14    A. Steve Phillips, John Stein, myself,
15 and Ray Rossa.
16    Q. And tell us everything you can recall
17 taking place at that meeting?
18    A. Steve had given me a copy of a renewal
19 that he had received from the EPA for my water
20 license. And when I looked at it, I explained
21 to him that I had moved from 265 Durham Lane to
22 210 Circle Avenue in Medina two years prior to
23 that. That was why I never received the
24 renewal. He said didn't it dawn on you that

Page 271

1  your license needed to be renewed? And I said
2  if I had received a renewal notice, I would
3  have certainly put a $10 check in the mail and
4  mailed it to them.
5     Q. Did you explain to him why that could
6  have gotten behind you or --
7     A. I believe -- yes, I mentioned that to
8  him, that I had a lot on my plate over the last
9  time...
10    Q. I know you brought some papers up.
11 Are those papers having to deal with your move?
12    A. Yes.
13    Q. Okay. So if there's any question by
14 Mr. Potter about when you moved, you're able to
15 show him the documentation?
16    A. Yes. I have a copy of the renewal
17 that Steve provided me with, and I have a copy
18 of some closing papers that have a County seal
19 and date substantiating that I was gone from
20 that address two years.
21    Q. And those are the papers you brought
22 up which are now sitting on the floor?
23    A. Yes.
24    Q. Okay. Directing your attention to

Page 272

1  November 7th, were you called into a meeting on
2  that day?
3     A. Yes.
4     Q. And who was present at that time?
5     A. Steve Phillips, John Stein, myself,
6  and Chris Martens.
7     Q. Let me show you what is already in
8  evidence as Union Exhibit 1 and ask you if that
9  was given to you at that meeting?
10    A. Yes.
11    Q. Tell the Arbitrator everything that
12 you can recall being said at that time or in
13 that meeting.
14    A. Steve told me that I had to sign these
15 or basically I would be terminated on that day.
16 He gave me a few minutes. He handed this to me
17 and told me to take my time and look it over.
18 I didn't -- I basically quickly scanned it. I
19 didn't -- I didn't read it word for word. I
20 picked up that there was 30 workdays without
21 pay. It's six weeks without a paycheck.
22       Also noted what they were
23 requiring that -- they wanted me to get at
24 least a Class B level water license. They

Page 273

1  informed me that they were cutting my wages
2  from about $7 an hour to operator in training.
3     Q. Again, what did he say about signing
4  this or what?
5     A. He said basically you have the option
6  of signing it or being terminated.
7     Q. And did you sign this as its indicated
8  on Union Exhibit 1, which is the letter itself
9  and what's called the last-chance agreement?
10    A. Yes. It's my signature.
11    Q. Why did you sign it?
12    A. When I went through this the first
13 time I noticed it said, Your signature is
14 intended to acknowledge receipt of this notice.
15 It does not imply agreement or disagreement
16 with the notice itself. And I figured there's
17 no harm in signing this. I was simply signing
18 to acknowledge receipt of it.
19       This is a high-stress,
20 high-anxiety moment, so I actually needed more
21 time to digest this, to be honest with you.
22    Q. What if anything did his statement
23 sign it or be fired have to do with your
24 signing it?

Page 274

1     A. I didn't want to be terminated, so I
2  signed it, sure.
3     Q. When did your suspension begin?
4     A. Immediately. On November 7th.
5     Q. And when did you return to work?
6     A. He asked me to return on December
7  the 17th.
8     Q. When did it first come to your
9  attention that your pay had been reduced?
10    A. October 24th. I was reduced to
11 operator in training. About $7-an-hour cut.
12    Q. When did you learn that? Did you
13 learn it on that day or when you got your
14 paycheck?
15    A. He informed me that my wages were
16 being cut immediately.
17    Q. And do you recall what you were
18 earning at that time before the reduction?
19    A. I believe it was 26.38.
20    Q. And what did your pay come to after
21 the reduction?
22    A. I believe it was 19.31.
23    Q. At the time that you -- before the
24 reduction, what status were you in for pay

Page 275

1  purposes?
2     A. I was being paid as a Class A
3  operator.
4     Q. There's something in the contract with
5  respect to grandfather's clause. Did that
6  apply to you?
7     A. I believe when we were purchased by
8  American Water there was an attempt to mesh the
9  two pay grades together. So this was something
10 they did for some of us that were long-term
11 employees that were at the higher wage rates.
12 They called it grandfathering.
13    Q. And do you know if you were
14 grandfathered or not?
15    A. Yes, I was.
16    Q. And while I'm on that subject, when
17 your pay rate was eventually restored after you
18 got your license, did they continue paying you
19 at the grandfather rate?
20    A. No. They -- I took the license test.
21 I had the application prepared. When I left
22 that meeting, Steve also handed me a notice of
23 entrance to exam with the EPA.
24       So while I was on suspension, I

Page 276

1  tested and got my license reinstated. And when
2  I got those results in the mail, I faxed a copy
3  of the license into my supervisor, John Stein.
4      And then when I came back to work,
5  I was paid for a Class A license, but at the
6  new pay rate, which was 25.10.
7      Q. With or without the grandfather
8  provision?
9      A. Without the grandfather provision.
10     Q. When you were being -- were you at any
11 time paid as an operator in training?
12     A. Yes. From, I believe, October 24th
13 when he informed me that they were cutting my
14 wages to the time that -- December 19th when I
15 came back to work.
16     Q. And while you were working and being
17 paid as an operator in training, were your
18 duties or supervision any different than
19 before?
20     A. No, sir.
21     Q. And did you have any conversation with
22 Mr. Stein when you faxed him your renewed
23 license?
24     A. Oh, I called him -- I actually faxed

Page 277

1  it in on a Saturday, as soon as I got the
2  results. There was a console operator here. I
3  faxed it in to him and I said please put this
4  in John Stein's in-basket.
5      And then I called John on Monday
6  to confirm that he had received it, and he said
7  he did and that he was impressed that I was
8  able to get it that quickly.
9      Q. Are you telling us what he told you?
10     A. Yes.
11     Q. During the period that you worked for
12 this company without a license, when your
13 license had expired, was any action ever taken
14 against you by the licensing authority because
15 your license had lapsed?
16     A. No.
17     Q. Was any action taken against you by
18 the licensing authority because you were
19 working without a license?
20     A. No.
21     Q. To your knowledge, was any action
22 taken against the company because your license
23 had lapsed?
24     A. No.

Page 278

1      Q. Did anyone ever explain to you why you
2  were not restored at your grandfathered rate?
3      A. I had a conversation with Steve where
4  I just mentioned the operator in charge, and he
5  said well, that's not the direction the
6  company's going. I said okay.
7      Q. Did you receive vacation pay for the
8  time you worked in 2006?
9      A. I did, but I had six weeks of
10 accumulated vacation when I was terminated, and
11 they paid me at the $19 wage rate.
12     Q. The operator in training rate?
13     A. Yes, sir.
14     Q. For the six weeks you accumulated for
15 vacation?
16     A. Plus the personal days I had coming.
17     Q. After the November 7th meeting, what
18 if anything occurred in connection with the
19 demand by the company that you sign a repayment
20 plan that's called for in your suspension
21 letter?
22     A. I had a meeting March 2nd, '07 with
23 Steve that -- that was the day I was
24 terminated.

Page 279

1      Q. Were there any conversations about
2  that before that time?
3      A. I received two calls while I was on
4  suspension. One from Steve and one from John
5  Stein saying that if I had received a copy of
6  the repayment plan, that they would -- if I
7  would sign it, they would come and pick it up.
8      But what happened was corporate
9  had the right address to send my pay vouchers
10 and all that to my house, but they hadn't
11 updated my address here. So it turned out that
12 the stuff was going to the wrong address again.
13 I had updated that address with the company,
14 but it never got changed in this facility.
15     Q. So they called you while you were on
16 suspension about that?
17     A. Yes. About me signing and they would
18 come and pick it up.
19     Q. Okay. What if anything did you say
20 about signing it?
21     A. I never -- it was on the answering
22 machine. I never spoke to them.
23     Q. And from the time you were on
24 suspension until late February, were there any

**Page 280**

1  calls made to you to resign a repayment plan?
2     A. No. It was quiet.
3     Q. Or any conversations, demands upon you
4  to sign a repayment plan?
5     A. No.
6     Q. After your return from your suspension
7  did the subject come up at all?
8     A. No.
9     Q. Had you seen the repayment plan?
10    A. I did.
11    Q. What would it have required of you in
12 dollars and cents?
13    A. They were requesting $13,000. They
14 wanted backpay -- they wanted it paid back
15 within 12 months, and they were requesting $549
16 per pay period. So it was $1,100 a month.
17    Q. How much were you earning per month or
18 per pay period?
19    A. Not enough to cover another mortgage.
20    Q. Okay. What was your net take-home
21 during that period of time?
22    A. $19 an hour, 19 something.
23    Q. Well, after your license was renewed
24 in December, then what were you making?

**Page 281**

1     A. 25.10.
2     Q. Okay. So what was your -- roughly
3  your average net income after proper deductions
4  per month after your license was renewed?
5     A. I think I would have had to live on
6  about $250 a pay period. It was...
7     Q. After their repayment plan?
8     A. Yes. So about $125 per week is what I
9  would have had left to live on.
10    Q. If you complied with their repayment
11 plan?
12    A. Yes.
13    Q. Directing your attention to February
14 of this year, 2007, did you have a conversation
15 with Wayne Clavio from the union about the
16 repayment plan?
17    A. Yes.
18    Q. What did you and he discuss?
19    A. He called me, I believe it was on a
20 Tuesday. He said, Glenn, the company is going
21 to call you in on Friday, and they're going to
22 ask you to sign the reimbursement contract.
23 And our position is that you should not sign
24 it. If you don't sign it, they're going to

**Page 282**

1  terminate it -- terminate you.
2     Q. And what did you say about whether you
3  would sign it or not?
4     A. I couldn't -- I can't pay my bills on
5  $125 a week. I took Wayne's recommendation and
6  did what he recommended.
7     Q. Directing your attention to March 2nd,
8  was there a meeting on that day?
9     A. Yes. That was the day I was
10 terminated.
11    Q. Let me show you what is in evidence as
12 Union Exhibit 5 and ask you if you got that on
13 or about March 2nd.
14    A. Yes, sir. That's the...
15    Q. And tell us what happened at that
16 time.
17    A. I got a call from John Stein. I
18 believe it was about noon. I was working out
19 in the Village of Gilberts. He asked me to be
20 in by early afternoon about 2:00 p.m., that
21 there was a meeting with Steve.
22    Q. And what happened at that meeting?
23 Who was present at the meeting?
24    A. Myself, Chris Martens, Steve Phillips,

**Page 283**

1  and John Stein.
2     Q. Tell us what happened at the meeting.
3     A. Basically Steve said you didn't live
4  up to the terms -- or no. He said, I'll give
5  you an opportunity to sign the repayment
6  schedule, or we're going to terminate you.
7       I said, Well, I can't sign that.
8  There was -- if I remember reading it, there
9  was -- even if I resigned or was terminated or
10 died, I was liable to repay the company that
11 money.
12    Q. Is that what you said?
13    A. No. But it was -- I mean, I'm not an
14 attorney, but it's what I -- what I read from
15 the notice, that it was binding. That money
16 had to be repaid.
17    Q. Okay. Anything else said?
18    A. I said, I can't -- I can't sign that
19 contract. Then he pulled out another -- he had
20 several different types of paperwork prepared
21 depending on which way I guess I -- which way
22 my decision went. And he said okay. We're
23 going to have to terminate me and gave me the
24 paperwork to sign.

Page 284

1  Q. And he gave you that letter that you
2  just looked at?
3  A. Yes.
4     MR. ORLOVE: Okay. Nothing further.
5     ARBITRATOR MALIN: Mr. Potter, before
6  you do your cross, why don't we take a short
7  recess so people can stretch, use the restroom.
8     MR. POTTER: Sure.
9        (Break Taken)
10    ARBITRATOR MALIN: Back on the record.
11 Mr. Orlove you may continue.
12    MR. ORLOVE: Thank you.
13 BY MR. ORLOVE:
14 Q. Glenn, I should have asked you this at
15 the outset, but you've worked there for quite a
16 long period of time. There is in the record an
17 incident that -- for which -- in 2006 for which
18 you were given a five-day suspension. And then
19 the facts that we just brought out.
20        Now, other than what you've just
21 testified about, what has your record been for
22 the 34 years of employment there?
23 A. Basically squeaky clean.
24    MR. ORLOVE: Okay. That's all.

Page 285

1     ARBITRATOR MALIN: You may
2  cross-examine.
3     MR. POTTER: Okay.
4        CROSS-EXAMINATION
5  BY MR. POTTER:
6  Q. You've been an operator for like
7  20 years with the company?
8  A. Yes.
9  Q. So you have had to maintain a Class A
10 license for how many of those years?
11 A. I received my Class A license in '94.
12 Q. '94?
13 A. Prior to that I had a Class C license.
14 Q. Okay. And so in terms of your Class C
15 license, did you have to take a test or how did
16 you obtain a Class C license?
17 A. I took a class and then progressively
18 took the test, yes.
19 Q. So you have had a Class C license
20 since when?
21 A. I don't recall when I received the
22 Class C. I may have only had it for a year,
23 and then I progressively -- when I had the time
24 and I took the A.

Page 286

1  Q. Okay. So maybe you only had the Class
2  C a year before your A?
3  A. A year or two.
4  Q. And let me show you Company Exhibit 7.
5  And is that a document you've seen before
6  today?
7  A. Yes. This is a document that Steve
8  provided me with.
9  Q. And when was that again, Glenn? What
10 meeting; do you remember?
11 A. I believe it was either the 19th or
12 the 24th. I think it was --
13 Q. One of those?
14 A. Yes.
15 Q. Early on in the investigation?
16 A. Yes.
17 Q. And did you have any recall of ever
18 receiving that document?
19 A. I never did receive this because
20 that's why I brought the documentation that I
21 had moved from 265 Durham Lane, Bloomingdale,
22 to 6N210 Circle Medina in 1995, and they sent
23 this to my old address in April of 1997. I was
24 gone from there two years already.

Page 287

1  Q. Okay. And you told Steve that during
2  your meeting then about the address change?
3  A. Yes. I believe it came up.
4  Q. All right. And did you make any
5  inquiry to the Illinois Environmental
6  Protection Agency at any time during this
7  ten-year lapse about your license?
8  A. I did not. In fact, I had sent them
9  an application preparing to take a waste water
10 license, but not with regard to my water
11 license, no.
12 Q. And you're familiar that there's like
13 a wallet card that often is part of your
14 license that you obtain?
15 A. When I received my license in 1994, I
16 did not receive a wallet card. I received a
17 wall certificate.
18 Q. And pursuant to the -- and again, you
19 were talking about having the grandfather
20 clause and being grandfathered in the
21 Collective Bargaining Agreement, having a
22 little higher wage because of that, right?
23 A. Yes.
24 Q. You got to say yes or no for the court