Page 288

1  reporter --
2     A. Yes.
3     Q. -- otherwise, it gets confusing.
4        So I'm assuming then you're also
5  familiar with Appendix A of the Collective
6  Bargaining Agreement too about the wage
7  structure?
8     A. Yes.
9     Q. So that, for example, you have a Class
10 A license operator gets paid more than a Class
11 B, and a Class B gets paid more than a Class C,
12 correct?
13    A. Yes, I understand.
14    Q. And in fact, you were paid -- putting
15 aside the grandfather provision for a moment,
16 you were paid more for your services because
17 you held a Class A license, correct?
18    A. Yes.
19    Q. Okay.
20    A. But in addition to holding a Class A
21 license, I was being paid for the knowledge I
22 have up here.
23    Q. Right.
24    A. And I believe I proved that I have the

Page 289

1  Class A knowledge up here because I went and
2  retested and got my license from the state.
3  It's always been there.
4     Q. No one's disputing that.
5        MR. ORLOVE: Up here, the witness was
6  pointing to his head.
7        ARBITRATOR MALIN: The record may so
8  reflect.
9  BY MR. POTTER:
10    Q. So anyway, you knew that you should
11 have had the license to get the pay, bottom
12 line?
13    A. Yes.
14    Q. No question about that?
15    A. But I had no idea that the license was
16 expired. That's why I immediate -- I couldn't
17 get that license reinstated fast enough, to be
18 honest with you. I was shocked when I found
19 out it was expired.
20    Q. Okay. Let me show you too, Glenn, and
21 see if you know this or not. I don't even know
22 if you do or not, but let's cover it while
23 we're all here. Again, this is the Collective
24 Bargaining Agreement we just looked at in terms

Page 290

1  of the appendix for the wages. Next I want to
2  look at it in terms of a particular area
3  regarding continuing education credits to
4  maintain your license.
5     A. Uh-huh.
6     Q. And it's 26.2 on Page 37. Are you
7  familiar with this provision at all, 26.2?
8     A. I am. 26.2 was -- there was a new
9  print of this contract handed to me. I guess
10 it was -- I don't know when this went into
11 effect. But I just received -- when I was
12 suspended is when I received a new copy of this
13 contract.
14    Q. So you didn't realize this provision
15 26.6 even existed until your discipline
16 erupted over your lack of your license?
17    A. Right. I was aware that yes, you
18 needed CEU's to maintain your license.
19    Q. Okay. That you knew?
20    A. Yes.
21    Q. You didn't have to have the contract
22 to tell you that?
23    A. Right.
24    Q. Okay. Thanks.

Page 291

1     A. I did not know it was in our contract.
2     Q. Right. But you knew from common
3  sense.
4     A. (No Audible Response)
5     Q. Okay. And when you were first
6  disciplined, offered the last-chance agreement,
7  the union filed a grievance on your behalf; do
8  you remember that? Let me show you Union
9  Exhibits 8 and 9, Glenn. Are you familiar with
10 either one of these documents? Have you ever
11 seen the grievance itself?
12    A. No. I was out on suspension for six
13 weeks effective that date, both of those.
14    Q. So you weren't aware of the content of
15 either one of the grievances?
16    A. No. I didn't come back until
17 December 19th.
18    Q. I didn't know how much of this was
19 explained to you by your union.
20    A. I wasn't aware of it.
21    Q. All right. And let me just ask you
22 this. You weren't aware then that the union's
23 position on your discipline was that they felt
24 your punishment is too severe and the lack of

Page 292

1 reduction. You weren't aware of that being the
2 union's position?
3    A. No.
4    Q. Okay. And you were talking about
5 having a conversation with Wayne Clavio in
6 February of this year about signing or not
7 signing the --
8    A. It was just days prior to -- I believe
9 it was on a Tuesday or a Wednesday prior to the
10 Friday, March the 2nd.
11    Q. Okay. And I guess the only real
12 question I have for you in that area is did --
13 let me strike that. Let me start over.
14       You had a conversation with Wayne,
15 let's go back to that, in February or right
16 before your March 2nd termination. Did you or
17 Wayne discuss other possible options in terms
18 of the repayment plan?
19    A. No.
20    Q. Didn't consider coming back and
21 talking to the company with some sort of
22 counter-offer?
23    A. No.
24    Q. And when you had your meeting where

Page 293

1 the last-chance agreement was provided to
2 you -- here. Let's make sure we're all clear.
3 Union Exhibit 1, Glenn, when you had your
4 meeting over this, you indicated that you
5 signed it because you were confused over the
6 intent?
7    A. I believe there was two -- I believe
8 this is the format I received it in. There was
9 this on top --
10    Q. There was a letter and then the actual
11 last-chance agreement itself behind it?
12    A. Yeah. There was disciplinary
13 suspension last-chance agreement. And then --
14 so one was on top of the other. And what I did
15 was I went through and -- I mean, I didn't read
16 it word for word. I fast read it. I scanned
17 it. I saw that I was being suspended for 30
18 workdays. I scanned it. Where it says, Your
19 signature is intended to only acknowledge
20 receipt of the notice. It does not imply
21 agreement. So I signed what I was being asked
22 to sign here. I didn't --
23    Q. But you signed twice, right?
24    A. Yeah.

Page 294

1    Q. There was a second signature on Page 2
2 of the actual last-chance agreement, right? So
3 it was a different signature line on Page 2,
4 the last-chance agreement versus your --
5    A. I just -- I didn't have time to digest
6 all this.
7    Q. Did you ask for time?
8    A. I did take -- like I said, I took a
9 minute or two, I think, just to quick -- I
10 scanned through it. I didn't -- like I said, I
11 didn't read it word for word.
12    Q. I'm going back, I guess, to my
13 question of well, did you ask for more time?
14 Say hey, this is a big deal. Can I have, you
15 know, some more time to look at this?
16    A. No, I didn't.
17    Q. And you're a former union steward?
18    A. I was, yeah.
19    Q. How long were you a union steward?
20    A. About ten years.
21    Q. Ten years. Okay. And did -- who was
22 your steward who was present during this time
23 for you, during this meeting over the
24 last-chance agreement; is that Chris Martens?

Page 295

1    A. Chris Martens was there on the 7th,
2 November the 7th.
3    Q. Did you have any discussion with Chris
4 about hey, maybe we should grab a telephone and
5 talk to somebody at the union about this?
6    A. No.
7    Q. Okay.
8    A. I believe Ray was on vacation when
9 this took place.
10    Q. And what about Wayne, do you have a
11 number to get ahold of him normally?
12    A. I did not at the time.
13    Q. Did you ask Chris whether he had a
14 phone number for Wayne?
15    A. I didn't know until this -- I didn't
16 know my union officials real well until this.
17    Q. Got you. Which is normally good news.
18       In terms of -- I mean, did Chris
19 suggest anything to you about let's take some
20 more time with this?
21    A. No.
22    Q. Okay.
23    A. I mean, basically Steve said come back
24 on December 19th. And so I left the building.

Page 296

1  I was told to leave the building right away.
2      Q. When was it that you had a change of
3  heart over what you signed?
4      A. Over what?
5      Q. When did you have the change of heart
6  regarding what you signed?
7      MR. ORLOVE: That's assuming a fact
8  that hasn't been established here.
9      THE WITNESS: I never had a change of
10 heart over --
11     ARBITRATOR MALIN: There's an
12 objection pending. You can rephrase the
13 question.
14 BY MR. POTTER:
15     Q. Why have you taken a position now that
16 you're grieving your discipline?
17     MR. ORLOVE: I object. I don't
18 understand the question based on the facts we
19 have in the record.
20     MR. POTTER: I'm not sure I understand
21 the objection.
22     ARBITRATOR MALIN: I do. I thought
23 this witness testified that the grievance was
24 filed while he was on suspension and he didn't

Page 297

1  know about it. They were filed by the union,
2  not by...
3  BY MR. POTTER:
4      Q. Well, as you sit here now, you
5  understand the basis for your grievance?
6      MR. ORLOVE: Frankly, it's -- we're
7  going to put into evidence to this effect that
8  it's the union's grievance.
9      MR. POTTER: Okay. Well, I think I
10 still have the right to ask him what his intent
11 was, just as our --
12     MR. ORLOVE: You do, but it's not his
13 grievance.
14     ARBITRATOR MALIN: Rephrase the
15 question.
16 BY MR. POTTER:
17     Q. Yeah. I mean, do you understand,
18 Glenn, what this arbitration proceeding is
19 about?
20     A. I do.
21     Q. And in your mind, what is it about?
22     A. It's about the disciplinary action
23 that went on during the -- from the time I --
24 you know, all the disciplinary action.

Page 298

1      Q. Over the loss of your license?
2      A. Over the loss of my license, over the
3  loss of my job, over the loss of my wages.
4      Q. And when you went into the meeting
5  with your shop steward and you were handed the
6  disciplinary suspension and last-chance
7  agreement, you had already had two
8  conversations with the company about this,
9  correct?
10     MR. ORLOVE: About what? What is
11 this?
12 BY MR. POTTER:
13     Q. Well, about your lapse in your
14 license, in particular. You had two meetings,
15 one on the 19th and one on the 24th?
16     A. Yes.
17     Q. With Steve Phillips and --
18     A. Those were investigations that Steve
19 was conducting.
20     Q. Right. Steve and John Stein was
21 present and Ray Rossa?
22     A. Yes.
23     Q. And Steve told you in the first
24 meeting it was a very serious matter, correct?

Page 299

1      A. Yes.
2      Q. And had you been in conversations with
3  your union representatives about the possible
4  outcomes as a result of the investigation?
5      A. When I received the November 7th? I
6  mean, I had no idea -- no, I had no idea what
7  was going to happen.
8      Q. Were you fearful you might lose your
9  job?
10     A. The thought occurred to me, yes.
11     Q. Were you fearful -- okay. Strike
12 that.
13     MR. POTTER: Nothing further.
14     ARBITRATOR MALIN: Redirect?
15     MR. ORLOVE: No redirect.
16     ARBITRATOR MALIN: Okay. Thank you
17 very much, Mr. Williams.
18          (Witness Excused.)
19     MR. ORLOVE: Chris Martens, please.
20          (The witness was duly sworn.)
21     ARBITRATOR MALIN: Have a seat.
22 Please proceed whenever you're ready,
23 Mr. Orlove.
24     CHRIS MARTENS,

Page 300

1  called as a witness herein, having been first
2  duly sworn, was examined and testified as
3  follows:
4              DIRECT EXAMINATION
5  BY MR. ORLOVE:
6      Q. Give us your name, please.
7      A. Chris Martens.
8      Q. And by whom are you employed?
9      A. Illinois American Water.
10     Q. How long have you worked for them or
11 any predecessor company?
12     A. June 12, 1989.
13     Q. And what is your job?
14     A. Plant maintenance technician.
15     Q. Directing your attention to the month
16 of November of 2006, what if any position did
17 you occupy on behalf of the union?
18     A. I was a steward.
19     Q. And will you explain the steward
20 structure at that time with this company.
21     A. We had two stewards, a chief steward.
22 And a steward's job was to investigate
23 grievances and file grievances and stuff.
24     Q. What area did you cover?

Page 301

1      A. I was just a plain old steward.
2      Q. What if any authority did you have at
3  that time to agree to or to negotiate
4  company-administered discipline?
5      A. None.
6      Q. What authority did you have at that
7  time to agree to or negotiate last-chance
8  agreements?
9      A. None.
10     Q. Directing your attention to
11 November 7, were you called into a meeting
12 concerning Glenn Williams?
13     A. Yes.
14     Q. And who among the stewards usually
15 handles meetings that may result in discipline
16 or discharge?
17     A. Discipline, you know, that's always
18 stewards and stuff. And depending on the
19 severity, they might pull in the chief steward.
20     Q. Can you tell us why you were called in
21 for the meeting with Glenn Williams?
22     A. I was the only one available.
23     Q. Tell us what happened at that meeting.
24     A. Well, they pulled all the guys in

Page 302

1  separately, but Glenn was the last one. It was
2  me, Glenn, John Stein, and Steve. Steve sat
3  down, explained the severity, went through,
4  gave us copies of the punishment and stuff.
5  Walked through it, told us, you know, he will
6  be suspended for 30 days, loss of pay. He had
7  to pay back money.
8              And you know, we looked through
9  it. You know, he told us we had to pretty much
10 sign it or Glenn was going to be terminated.
11     Q. Now, I'm asking you and I think you're
12 answering about the meeting with Glenn
13 Williams, right?
14     A. Correct.
15     Q. And can you explain to the Arbitrator
16 why is it that you signed this?
17     A. Well, Glenn's a friend and --
18     Q. Here it is. It's -- the union exhibit
19 is Exhibit Number 1. I'm showing it to you.
20     A. I mean, Glenn's a friend. He's a
21 fellow union member. I didn't want to see him
22 get fired. I figured we'd sign it, and then
23 we'd file a grievance and deal with it later.
24     Q. And was a grievance filed?

Page 303

1      A. Yes, it was.
2      Q. And who filed that?
3      A. I did.
4      Q. And in terms of time, when was it
5  filed?
6      A. I think we had five days. I believe I
7  filed it within the five days, five working
8  days.
9      Q. Let me show you what is in evidence as
10 Union Exhibit 8 and ask you if you recognize
11 that. Tell us what it is.
12     A. Yes, I do. It's a Step 1 grievance.
13     Q. And who filled that out?
14     A. I filled it out and gave it to John
15 Stein.
16     Q. And when did you do that?
17     A. I filled it out on November 10,
18 three days after the meeting, the suspension.
19     MR. ORLOVE: That's all we have for
20 Mr. Martens.
21     ARBITRATOR MALIN: You may
22 cross-examine.
23
24

Page 304

1      CROSS-EXAMINATION
2  BY MR. POTTER:
3     Q. All right. Let's look at Union
4  Exhibit 1, which you signed. And did you read
5  through the last-chance agreement at all?
6     A. Yes, I did.
7     Q. Okay. So Chris, I'm assuming you saw
8  in Paragraph 2 the provision, pointing it out
9  to you: The union and employee expressly waive
10 any right to file a grievance or any other
11 claim regarding employee's discharge under this
12 agreement.
13    A. Yes. I see that.
14    Q. All right. So did you understand that
15 you were waiving a right to file any claim with
16 respect to the discipline that was taking
17 place?
18    A. If I thought right though, somewhere
19 in here there's something that says that both
20 parties agree they can talk about it.
21    Q. Okay.
22    A. I may have misunderstood something.
23 Right here. Any dispute regarding the meaning
24 of this agreement will be resolved solely

Page 305

1  through the parties' Collective Bargaining
2  Agreement grievance arbitration procedure.
3     Q. So you felt like if -- notwithstanding
4  signing this, if there was a dispute, you
5  could go ahead and --
6     A. Yes.
7     Q. -- file a grievance?
8     A. That's correct.
9     Q. And did you have any doubts when you
10 signed this agreement in terms of your ability
11 to sign off on it on behalf of the union?
12    A. Yes and no. I mean, I knew we had --
13 I had the right to -- for discipline and stuff.
14 This -- I'd never dealt with this. I wasn't a
15 steward that long. Maybe two years,
16 three years or something. I'd never come
17 across this. I figured by reading some of
18 that, I figured, you know what? Sign it, keep
19 the guy's job, we'll fight it out later on.
20    Q. And did you address this or flush it
21 out with Steve Phillips or anyone else on
22 behalf of management in the course of that
23 meeting just to make it clear what your intent
24 was?

Page 306

1     A. What, that I was going to grieve it?
2     Q. Yeah.
3     A. No. No. That's usually standard
4  operating procedure.
5     Q. I mean, did you ask Steve the
6  question, hey, you know, we're probably going
7  to grieve this, you know?
8     A. No.
9     Q. Any statement of that nature?
10    A. The only thing I asked him was what
11 would Glenn -- if Glenn got his license back,
12 what pay would he get, and would he become an
13 operator in charge again.
14    Q. Okay. And again, let's go to
15 Paragraph 4, you read that to yourself why
16 don't you, for a minute, and then I'll ask you
17 a question about it.
18       Okay? You read it through?
19    A. Yep.
20    Q. Did that cause you to pause in terms
21 of not being able to file a grievance?
22    A. Yeah, but then you read here --
23    Q. Going back to Paragraph 6 again?
24    A. Yeah. Keep reading down.

Page 307

1     Q. Okay. And did you suggest at any time
2  to Glenn Williams that perhaps, you know, we
3  should make a phone call to somebody else
4  higher up with the union to make sure if this
5  is something we both want to sign?
6     A. No.
7     Q. So you were confident enough to not
8  make that phone call?
9     A. No, not really confident enough.
10 Just, you know, had that article and I -- you
11 know, I never came across something like this.
12 It's kind of a whole lot, you know, three
13 grievances in one day, so...
14    Q. And you said at the time you signed
15 this you had been a steward for two or three
16 years?
17    A. Yeah. Something like that.
18    Q. And so how many grievances do you
19 think you handled while a steward in that time
20 frame, ballpark?
21    A. Oh, 10, 15.
22    Q. Were you able to resolve any of those
23 grievances?
24    A. Maybe two or three.

Page 308

1  Q. You personally resolved them?
2  A. Yeah.
3  Q. All right. Without Ray's help?
4  A. No, they went through -- some of them
5  went through the third step of grievance.
6  Q. I'm talking about -- just to make it
7  clear, there was a grievance filed and Ray
8  wasn't involved and Wayne wasn't involved. It
9  was just something -- a grievance that you
10 resolved on your own?
11 A. Two.
12 Q. Two?
13 A. Two that I can think of.
14 Q. You remember the nature of the issues?
15 A. One was Wally Topar's truck on fire
16 and no fire extinguisher.
17 Q. And was he disciplined or something?
18 A. Yes.
19 Q. Do you remember the level of
20 discipline?
21 A. Written warning.
22 Q. And what was the other one you can
23 remember?
24 A. Oh, something about pay for on-call

Page 309

1  guys.
2  Q. A contract interpretation issue?
3  A. Yes.
4  Q. And what happened?
5  A. We got the money.
6  Q. Okay.
7  A. I didn't have to file a grievance. I
8  was able to talk it through without --
9  Q. In the first step basically?
10 A. Right.
11 Q. And who did you deal with management
12 on that?
13 A. Dan McGloon with that one and then the
14 first one was Kevin Hillen.
15 Q. Who is Kevin Hillen?
16 A. He is in charge of network. He is
17 like the equivalent of Steve.
18 Q. On the network side?
19 A. Correct.
20 Q. And I'm sorry. For the other
21 grievance?
22 A. Dan McGloon. He's in charge of
23 maintenance, field maintenance.
24 Q. And he works under Steve?

Page 310

1  A. No. Under Kevin.
2  Q. Under Kevin? Okay.
3      MR. POTTER: That's all I have.
4      ARBITRATOR MALIN: Redirect?
5      REDIRECT EXAMINATION
6  BY MR. ORLOVE:
7  Q. When Mr. Phillips presented these
8  papers to you and --
9      ARBITRATOR MALIN: These papers, are
10 you referring to Union Exhibit 1?
11     MR. ORLOVE: Union Exhibit 1. Thank
12 you.
13 BY MR. ORLOVE:
14 Q. To you and Glenn Williams, what were
15 the options in front of you?
16 A. Pretty much you had to sign them or he
17 was going to be terminated that day.
18     MR. ORLOVE: That's all.
19     ARBITRATOR MALIN: Anything further of
20 this witness?
21     MR. POTTER: Yeah.
22     RECROSS-EXAMINATION
23 BY MR. POTTER:
24 Q. Chris, since you had been the steward

Page 311

1  at that point in time for two or three years,
2  I'm assuming when somebody in management was
3  suggesting something was going to happen, did
4  you ever make a counteroffer in terms of other
5  alternatives versus what management was
6  proposing?
7  A. No, because usually I don't ask a lot
8  of questions when I'm doing that. I just
9  listen to it, take it, and I sit there and I
10 file the grievances, and we deal with it that
11 way.
12 Q. Deal with it later?
13 A. Yeah, because it never works --
14 Q. Okay.
15 A. -- right away, so...
16 Q. Well, in the course of -- in your
17 experience as a steward, oftentimes are there
18 resolutions based upon the parties coming to
19 some middle ground versus what was originally
20 proposed by management?
21 A. Not in that step, no.
22 Q. What do you mean that step?
23 A. No. When you go in there for your
24 punishment you don't --

Page 312

1 Q. No, no. I don't mean in that initial
2 meeting. I mean in the course of your
3 experience as a steward in getting issues
4 resolved no matter what they are at whatever
5 level, first, second, or third --
6 A. It's rare.
7 Q. But there are normally -- when you go
8 through the grievance arbitration process, you
9 have Step 1, and Step 2 and Step 3. When the
10 parties meet, aren't they attempting to try to
11 resolve it through some middle ground?
12 A. Yeah, we do.
13 Q. Right. And oftentimes you propose an
14 alternative position to the company in an
15 attempt to resolve it?
16 A. It depends on what it -- sometimes.
17 Depends on what the -- what the punishment is
18 being thrown out.
19 Q. Okay. Or what about it's a contract
20 interpretation matter? I mean, the company has
21 a certain way of looking at things. Obviously
22 you won your case with the maintenance
23 supervisor. You had a different perspective
24 and you made your point to him and you won,

Page 313

1 correct?
2 A. Yeah. Providing your deal doesn't
3 counter the contract.
4 Q. Right, right, sure.
5 A. Correct.
6 Q. Sure. So there's always room for
7 negotiation?
8 A. Yes, if possible.
9     MR. POTTER: Thank you.
10    ARBITRATOR MALIN: Anything further of
11 this witness?
12    MR. ORLOVE: Nothing further.
13    ARBITRATOR MALIN: Thank you very
14 much, Mr. Martens.
15    (Witness Excused.)
16    MR. ORLOVE: Ray Rossa.
17    (The witness was duly sworn.)
18    ARBITRATOR MALIN: Thank you. Have a
19 seat, please. You may proceed whenever you're
20 ready, Mr. Orlove.
21    RAY ROSSA,
22 called as a witness herein, having been first
23 duly sworn, was examined and testified as
24 follows:

Page 314

1    DIRECT EXAMINATION
2 BY MR. ORLOVE:
3 Q. State your name.
4 A. Ray Rossa.
5 Q. And by whom are you employed?
6 A. Illinois American Water Company.
7 Q. And how long have you worked for them
8 or a predecessor company?
9 A. 14 years.
10 Q. And what is your job?
11 A. My job is a waste water operator.
12 Q. Directing your attention to the month
13 of November of 2006, what if any position did
14 you occupy on behalf of the union?
15 A. At the time I was chief union steward.
16 Q. And -- well, I'll just ask it this
17 way.
18    Tell us what the stewardship
19 structure is at this company.
20 A. As previously mentioned by Chris
21 Martens, we have two stewards and then a chief
22 steward.
23 Q. And what are your duties as chief
24 steward?

Page 315

1 A. My duties are generally to process the
2 grievances after the first and second step
3 unless a member of the union approaches me
4 first about filing a grievance initially.
5 Q. What if any authority do you or any of
6 the other stewards have to agree to or
7 negotiate company-administered discipline?
8 A. We don't have authority to do that.
9 Q. What if any authority do you or any
10 other stewards have to negotiate or agree to
11 last-chance agreements?
12 A. None.
13 Q. Directing your attention to
14 November 7th, 2006, the day that the three
15 employees were called in in connection with
16 their expired water supply licenses, were you
17 at work that day?
18 A. No, I was not.
19 Q. Were you previously aware of those
20 pending issues?
21 A. Yes.
22 Q. What if any procedure does the company
23 follow if an employee is about to be
24 disciplined?

Page 316

1  A. Can you repeat the question?
2  Q. What is the procedure that the company
3  follows, as what do they do if they're going to
4  call an employee in to be disciplined?
5  A. Generally what they'll do is they'll
6  do an investigation into the facts of the
7  matter. They usually ask for one of the
8  stewards to be present during that
9  investigation.
10      Then once they reach a conclusion
11  by whatever means that they do that at the
12  discipline hearing or discipline sentencing,
13  however you want to phrase it, they'll ask one
14  of the stewards generally to come into that
15  while the discipline is being administered to
16  the employee.
17  Q. And what's the steward's function at
18  that time?
19  A. Basically we serve there to listen to
20  what the company has to say, listen to the
21  discipline that's being handed down. And then
22  we may also ask questions at that.
23  Q. And what is the procedure if, for
24  example -- strike that.

Page 317

1      Who would occupy that role if you
2  were absent?
3  A. Whoever steward is currently
4  available.
5  Q. How long have you been chief steward?
6  A. It's been approximately ten years.
7  Q. In that period of time, will you
8  estimate for us the number of grievances that
9  arose on average per year?
10  A. I would estimate anywhere from 10 to
11  15 grievances a year.
12  Q. And during that period of time, on
13  average, how many grievances are resolved at
14  Step 1 or Step 2 of the grievance procedure?
15  A. Very few, if any.
16  Q. And have any been resolved at Step 1
17  or Step 2 that involve discipline or discharge?
18  A. Not that I can recall, no.
19  Q. Let me show you what the company has
20  put in evidence as Company Exhibit 11, which
21  indicates a grievance settlement which you
22  signed. Is that correct?
23  A. Yes.
24  Q. Tell us whether or not you consulted

Page 318

1  with anyone else before signing that.
2  A. Yes. This one I contacted Wayne
3  Clavio on and got his input onto that.
4  Q. And tell us whether or not Wayne
5  agreed or disagreed with what has been signed
6  off on?
7  A. Yeah. He said it was fine to go ahead
8  and sign that, yes.
9  Q. And showing you Company Exhibit 12,
10  which bears your signature, tell us whether or
11  not you entered into that on your own or with
12  anyone else on behalf of the union?
13  A. No. This was another one that Wayne
14  Clavio also was involved in. His name's on top
15  of that.
16  Q. And it bears your signature on the
17  printed line Chief Steward's Signature. Tell
18  us why you signed it.
19  A. That is just indicating that we have
20  resolved this at Step 3. Basically signed it
21  for Wayne Clavio. He was involved in that.
22  Q. Would you have had the authority to
23  sign off on these without Wayne's knowledge or
24  approval?

Page 319

1  A. No.
2  Q. Directing your attention to
3  Article 26.2 of the contract, were you present
4  during the negotiations that gave rise to that?
5  A. 26.2, is that the continuing
6  education?
7  Q. I'm going to show it to you right now.
8  Showing you that.
9  A. Yes, I was.
10  Q. Okay. And which negotiations were --
11  did that first come up?
12  A. That would have been our last contract
13  negotiations in 2006.
14  Q. Were you present at those
15  negotiations?
16  A. Yes.
17  Q. Tell us how it came about that this
18  language was agreed to and put into the
19  Collective Bargaining Agreement.
20  A. The union made a proposal asking the
21  company if we can obtain our CEU credits during
22  company time because that's how most
23  municipalities' operations work.
24      That language that we originally

Page 320

1  proposed was changed, and it was countered by
2  the company. And that language there
3  ultimately ended up the way it is from the
4  company's counterproposal.
5     Q. Had the company proposed anything in
6  connection with continuing education before
7  those negotiation -- or during those -- strike
8  that.
9        But for the union's proposal for
10 performing CEU credits on company time, had the
11 company any proposal in that regard?
12    A. No. We proposed that.
13    Q. In the course of negotiating with the
14 company over 26.2, was anything said about
15 employees failing to maintain their license
16 would be grounds for discipline?
17    A. No.
18    Q. Or that discipline would result from
19 that at all?
20    A. No.
21    Q. What was the union's intendment or
22 intention in proposing 26.2?
23    A. Again, the intent of that article was
24 to ask the company for help in obtaining CEU's

Page 321

1  during company time. And they countered a
2  proposal with that they would endeavor to help
3  us in-house, meaning training here at the
4  Woodridge facility with those CEU credits.
5     Q. In the course of negotiating this back
6  and forth, did the company express any
7  different intention?
8     A. No.
9     Q. You are a water -- you hold a water
10 treatment license?
11    A. Yes.
12    Q. Have you worked in any pay grade other
13 than the license which you occupied at that
14 time?
15    A. I'm sorry. I don't understand the
16 question.
17    Q. Okay. Have you ever been paid a pay
18 grade other than the license which you
19 occupied?
20    A. Yes.
21    Q. And explain that to the Arbitrator,
22 please.
23    A. As far as the previous pay grade?
24    Q. Yes.

Page 322

1     A. I was an operator in training for four
2  years.
3     Q. And what were -- at what level were
4  you paid?
5     A. I was paid at an operator in training
6  level.
7     Q. And what license did you have at that
8  time?
9     A. I had an A water license and a 3 sewer
10 license.
11    Q. But you were paid at an operator in
12 training?
13    A. Yes.
14    Q. Okay. Are you aware of any others who
15 were paid at a pay level other than the license
16 or classification that they occupied?
17    A. There was at one time, but I can't
18 recall who it was now.
19    Q. In the ten-year period that you've
20 been chief steward, with what frequency are
21 grievances resolved at the first or second
22 step?
23    A. Very few, if any.
24    Q. And of those that -- the few that may

Page 323

1  be, have any of them involved, in your
2  experience, discharge or discipline?
3     A. No.
4        MR. ORLOVE: Nothing further.
5        ARBITRATOR MALIN: You may
6  cross-examine.
7           CROSS-EXAMINATION
8  BY MR. POTTER:
9     Q. Have you ever informed the company or
10 has anyone to your knowledge with the union
11 informed the company that a steward, be it
12 chief steward or a standard steward, doesn't
13 have the authority to resolve grievances
14 resulting in discipline or discharge?
15    A. No. It's in our Collective Bargaining
16 Agreement, the language.
17    Q. But I'm asking you have you ever
18 informed anyone with management or are you
19 aware of anyone with the union informing anyone
20 in management that a steward or a chief steward
21 doesn't have the power to resolve grievances
22 regarding discipline or discharge?
23    A. No. That's in our agreement.
24    Q. So your answer is no, that's never

Page 324

1  been communicated to the company?
2      A. It's in the agreement.
3      Q. Outside of the agreement, has it ever
4  been communicated by the company by you or
5  any --
6      A. Not that I'm aware of.
7      Q. And you sat here and you heard Chris
8  Martens indicate that he had resolved a
9  disciplinary matter while he was a steward,
10 correct?
11     A. Apparently he did.
12     Q. And in fact, I mean you look at the
13 grievance arbitration procedures, Ray, if you
14 look at Step 1 on Page 25, it indicates that
15 the union steward will present it verbally, and
16 the two parties will endeavor to settle it,
17 correct?
18     A. That's what it says there, yes.
19     Q. And on Step 2, again, the appropriate
20 steward shall reduce the grievance in writing,
21 and then the parties shall meet to discuss the
22 grievance, correct?
23     A. I'm sorry. Can I see that?
24     Q. Yeah. I'm sorry.

Page 325

1      A. Yes.
2      Q. Okay. Let's see. And again, it talks
3  about in the last sentence on Step 3: If a
4  grievance is not satisfactorily resolved within
5  five working days of the filing at the Step 2,
6  then within five working days it goes to Step
7  3, correct?
8      A. Yeah. You started off by saying Step
9  3, but that's Step 2 --
10     Q. I'm sorry. Step 2. Step 2 it says,
11 if it's not resolved, at this point the person
12 handling it is the steward, the appropriate
13 steward, correct, at Step 2?
14     A. I'm sorry. Can you repeat your
15 question?
16     Q. Yeah. I'm just trying to establish
17 that in Step 2 in the language in the contract
18 it says the grievance will be discussed by the
19 appropriate steward and the department head or
20 his designee. And then if the grievance is not
21 satisfactorily resolved within five working
22 days of its filing at the Step 2 then it goes
23 to Step 3, correct?
24     A. Well, you have five days to file, and

Page 326

1  then the company has five days to answer.
2      Q. Right.
3      A. And then it would go to a Step 3.
4  That's correct.
5      Q. But it's resolved with a steward being
6  involved, correct?
7      A. We rarely resolve anything at Step 2,
8  but...
9      Q. At least in the language of the
10 contract?
11     A. Right.
12     Q. Okay. All right. And then Step 3,
13 you address it in terms of the chief steward
14 becoming involved, correct?
15     A. Correct.
16     Q. All right. And if that matter is not
17 resolved, it goes to the fourth step, correct?
18     A. Eventually, if it's not resolved at
19 Step 3, correct.
20     Q. And again, the chief steward's in
21 charge of Step 3, correct?
22     A. Correct.
23     Q. For the union. Okay.
24     A. Can you repeat that last question?

Page 327

1      Q. Yeah. The chief steward is in charge
2  of the Step 3 processing on behalf of the
3  union?
4         MR. ORLOVE: That's a
5  mischaracterization of the language.
6         THE WITNESS: Yeah. Step 3, we
7  usually involve the business agent --
8         ARBITRATOR MALIN: There's an
9  objection pending.
10 BY MR. POTTER:
11     Q. I'm sorry. The Collective Bargaining
12 Agreement starts out with saying, The chief
13 steward shall notify the functional area
14 manager in writing of the union's intent to
15 proceed to the third step, correct?
16     A. Yes.
17     Q. And then the parties will set up a
18 meeting date, correct?
19     A. That's when our business agent gets
20 involved, yes.
21     Q. So there's no reference to the
22 business agent in Step 3 in terms of what's in
23 the Collective Bargaining Agreement, correct?
24        MR. ORLOVE: That's not the correct

Page 328

1 characterization of the language in the
2 contract. It says and the designated agent of
3 the union.
4 BY MR. POTTER:
5     Q. But my question is is there a
6 reference to business agent or business
7 representative in that language regarding Step
8 3?
9     A. The business agent's always involved
10 in Step 3.
11     Q. But is there language expressing that
12 in Step 3? No, it's not, is there?
13         MR. ORLOVE: It says what it says.
14         THE WITNESS: Well, it does say and a
15 designated agent.
16 BY MR. POTTER:
17     Q. Well, I'm just saying those terms,
18 business agent --
19         ARBITRATOR MALIN: We can all read it,
20 Mr. Potter. Your point's been made.
21         MR. POTTER: Okay. Nothing further.
22         ARBITRATOR MALIN: Redirect?
23
24

Page 329

1         REDIRECT EXAMINATION
2 BY MR. ORLOVE:
3     Q. In Step 3 of the contract, who by
4 practice in the union has been the quote,
5 designated agent of the union?
6     A. That's typically been our business
7 agent, which would be currently Wayne Clavio.
8         MR. ORLOVE: Nothing further.
9         ARBITRATOR MALIN: Anything further of
10 this witness?
11         MR. POTTER: No.
12         ARBITRATOR MALIN: Thank you,
13 Mr. Rossa. You're excused.
14         MR. ORLOVE: Wayne Clavio is our next
15 and last witness.
16         (The witness was duly sworn.)
17         ARBITRATOR MALIN: Have a seat.
18 Whenever you're ready, Mr. Orlove.
19         WAYNE CLAVIO,
20 called as a witness herein, having been first
21 duly sworn, was examined and testified as
22 follows:
23         DIRECT EXAMINATION
24 BY MR. ORLOVE:

Page 330

1     Q. State your name.
2     A. Wayne Clavio.
3     Q. To shorten this, Wayne, you've
4 previously testified that you are a full-time
5 officer of UFCW Local 1546?
6     A. That's correct.
7     Q. And you've serviced this unit for
8 about three years and that you get involved at
9 the third step of the grievance procedure?
10     A. Correct.
11     Q. I'm just stating what you previously
12 testified.
13         ARBITRATOR MALIN: Back in April,
14 correct.
15 BY MR. ORLOVE:
16     Q. Are those facts correct as of today?
17     A. Agree as stated, yes.
18     Q. Are you familiar with the contract
19 language of Section 13.2, that is the authority
20 of stewards in the Collective Bargaining
21 Agreement?
22     A. 13.2?
23     Q. Let me show it to you. 13.2 of the
24 contract.

Page 331

1     A. Yes, I am.
2     Q. And do stewards have the authority to
3 negotiate or agree to discipline including
4 discharge of employees?
5         MR. POTTER: Well, I'd object because
6 I'll use Chuck's objection in the past that
7 contract speaks for itself. So I'll use his
8 own objection back at him here.
9         MR. ORLOVE: So stipulated.
10 BY MR. ORLOVE:
11     Q. Directing your attention to
12 Article 26.2 of the Collective Bargaining
13 Agreement, were you involved in the
14 negotiations that occurred giving rise to this
15 current agreement?
16     A. Yes, I was.
17     Q. And were you involved in the
18 negotiations of 26.2?
19     A. Yes, I was.
20     Q. And to shorten this, unless Mr. Potter
21 objects, and certainly he can cross-examine,
22 were you present during the testimony given by
23 Ray Rossa?
24     A. Yes, I was.

Page 332

1   Q. And do you have anything to add or
2   change in connection with what he testified to
3   about the bargaining history of Article 26.2?
4   A. No, sir.
5   Q. Directing your attention to the case
6   of Glenn Williams, when did that first come to
7   your attention?
8   A. I'm not sure who it was that first
9   called me. It was shortly -- it was either
10  Chris Martens shortly after his meeting where
11  Glenn was suspended, or it was Ray the week
12  following that.
13  Q. Ray Rossa?
14  A. Ray Rossa, yes.
15  Q. Let me show you what is in evidence as
16  Joint Exhibit 4, which is an unfair labor
17  practice charge against the union.
18      Was that charge referred to you
19  for handling internally in the union?
20  A. Yes, it was.
21  Q. And what did you understand the
22  company's claim to be in connection with that
23  charge?
24  A. They felt we had a signed agreement in

Page 333

1   regards to the restitution that was supposed to
2   be paid by Glenn Williams and that we had
3   reneged on the agreement.
4   Q. And what was the union's position in
5   connection with that charge?
6   A. By this point in time, we had gone all
7   the way -- I believe we had already had the
8   third-step grievance meeting. And we had --
9   the company agreed, first of all, to hear the
10  third-step grievance meeting, okay? And
11  Michael Jackson had actually responded to me
12  and was trying to negotiate a settlement.
13  Q. And in connection with this charge,
14  tell us whether or not the union brought to the
15  attention of the Labor Board Article 13.2, that
16  is the authority of stewards?
17  A. Yes, we did.
18  Q. And I believe you have just said it,
19  but to make it clear, were you involved in the
20  third-step meeting with respect to the
21  grievance of Glenn Williams?
22  A. Yes, I was.
23  Q. That is his -- there were two
24  third-step meetings. Let me make it clear.

Page 334

1   Were you involved in the first
2   third-step meeting involving Glenn Williams
3   with respect to his reduction in pay, the
4   payback requirements, and et cetera?
5   A. Yes. The first third-step grievance
6   meeting not only involved Glenn Williams, but
7   it involved the other two gentlemen here.
8   Q. Involved them as well?
9   A. Yes, it did.
10  Q. Okay. And you were involved in that?
11  A. Yes, I was.
12  Q. During the period of time that
13  followed that first third-step meeting, were
14  you in touch with Mr. Williams or he with you
15  about what to do with respect to the repayment
16  requirement that the company was insisting on?
17  A. Can you restate the question?
18  Q. I'm sorry. I didn't say it that well
19  to begin with. In fact, let me put that off to
20  the side for a moment. Well, no. Let me
21  restate it.
22      After that first third-step
23  meeting, which -- can you identify the date of
24  that, or do you recall the date of it?

Page 335

1   A. Off the top of my head, I do not
2   recall the exact date. I believe it was in
3   October of 2006.
4   Q. Let me show you what we have put in
5   evidence the first hearing which is a redacted
6   copy of the company's third-step answer which
7   is addressed to you. But you may want to make
8   reference to the date up at the top.
9   A. Uh-huh.
10  Q. Would that refresh your memory as to
11  when the third-step meeting -- the first
12  third-step meeting was?
13  A. Yes, sir. The first third-step
14  grievance meeting was on December 8th, 2006.
15  Q. From that time, December 8, 2006, and
16  through to February, were there any
17  conversations between you and Glenn Williams on
18  the subject of the company's demand that he
19  sign an authorization to pay back money?
20  A. Prior to the end of February, no,
21  there was not.
22  Q. Directing your attention to about the
23  end of February, tell us if you had any
24  communications with the company over that

Page 336

1  issue, that is the issue of him paying back
2  wages?
3     A. At the end of February?
4     Q. Yes.
5     A. Yes. Michael Jackson and I had had a
6  phone conversation. He was requesting a
7  meeting, an immediate meeting that week. And I
8  had just flown out of town to some pension
9  meetings that I was scheduled to be at through
10 that Friday night, Friday the second of March,
11 2007.
12    Q. And was a meeting held on that subject
13 or was there communications on that subject?
14    A. Michael and I talked at least twice
15 that week. I believe we had two initial phone
16 calls, and then we had a conference call that
17 was on -- I believe it would have been on
18 Wednesday, February 28th.
19    Q. Okay. Let me direct your attention to
20 that conference call. I gather by conference
21 call it was conducted by phone?
22    A. Yes, it was.
23    Q. And who participated in that
24 conference call?

Page 337

1     A. I believe -- well, I know Michael
2  Jackson and myself were on the line. I believe
3  Steve was on the line. And --
4     Q. Steve Phillips?
5     A. Steve Phillips and Chris Martens.
6     Q. Okay.
7     A. No, it wasn't Chris Martens. It
8  was...
9     Q. Another steward?
10    A. Another steward, and his name is
11 escaping me at this second. Erin Holden.
12    Q. Erin Holden.
13       MR. ORLOVE: And just for the record,
14 if it's necessary, Erin Holden is here or at
15 least reachable, but I'm -- and if the company
16 wishes, we can make arrangements to call him.
17 But I had made those arrangements. But I just
18 wanted to explain his absence and that he's
19 available if someone wishes it.
20 BY MR. ORLOVE:
21    Q. Tell us what happened during that
22 phone conversation, that conference call.
23    A. Mike stated that -- Michael Jackson
24 stated that we had talked earlier in the week,

Page 338

1  and was I aware that either Glenn was going to
2  sign a repayment agreement with the company or
3  he would be terminated by the end of the week?
4       And I said yes, I was aware of our
5  conversations, and I was advising Glenn not to
6  sign the repayment agreement because it wasn't
7  reasonable. I also stated that this was
8  already set to go to arbitration. Why not just
9  let the arbitrator make that decision. And
10 something this extreme didn't need to be
11 handled at this time.
12      Michael said if we did not get
13 that agreement signed by the end of the week,
14 that Glenn would be terminated. And I asked
15 him -- in fact, I know I asked him more than
16 once what did Glenn do between the time he
17 returned from his suspension and now to warrant
18 termination? And he said nothing. He just
19 hasn't paid the money back, hasn't agreed to
20 pay the money back.
21    Q. Anything else?
22    A. I think I said to him, Do you realize
23 the liability you're opening up the company for
24 in regards to backpay by doing this? And he

Page 339

1  says yes, we do realize that, and we've
2  discussed that, and we decided if he did not
3  sign it that we will terminate him anyway.
4     Q. Okay. Have you told us everything you
5  can recall of that conversation?
6     A. Yes, sir.
7     Q. Did it come to your attention that
8  Mr. Williams was terminated?
9     A. Yes. I received calls immediately on
10 Friday.
11    Q. And what, if anything, did the union
12 do in connection with that termination?
13    A. First of all, it was shock over the
14 fact that they did it. I didn't believe that
15 they did that to a 34-year employee. Secondly,
16 got in touch with Ray Rossa, the chief steward,
17 on Monday following to make sure that
18 grievances had been filed.
19    Q. Did the union take any legal action?
20 I'll show you what's in evidence as Joint
21 Exhibit 6.
22    A. I did call your office for legal
23 advice on this issue. Okay.
24    Q. Well, did you authorize the filing of

Page 340

1  an unfair labor practice charge?
2      A. Yes, I did.
3      Q. And showing you Joint Exhibit 7, is
4  that the regional -- NLRB regional office's
5  disposition of that charge?
6      A. Yes, it is.
7      MR. ORLOVE: Thank you. No further
8  questions.
9         CROSS-EXAMINATION
10 BY MR. POTTER:
11     Q. Well, turning back to Union
12 Exhibit 14, which was previously submitted in
13 the prior arbitration hearing, at the bottom of
14 that letter to you, Wayne, from Mike Jackson,
15 number one, it's dated December 21, 2006,
16 correct?
17     A. Yes, it is.
18     Q. So that was way before this meeting at
19 the end of February, right, the conference
20 call?
21     A. Yes, it was.
22     Q. Okay. And in there the company was
23 providing until only December 29 to get the
24 matter resolved, correct?

Page 341

1      A. They wanted an answer by the 29th.
2      Q. So again, we're going back -- way back
3  to the 29th when we were putting the union on
4  notice that the company was pressing forward
5  with this matter, correct?
6      A. But if you read that completely, it
7  said, If they don't hear by the 29th, the
8  company will assume the matter will proceed
9  under the grievance arbitration procedure.
10     Q. And that these grievances will be
11 considered denied by the company at the third
12 step, correct?
13     A. Right.
14     Q. So the next step being arbitration?
15     A. Correct.
16     Q. Okay. And this -- actually, this
17 communication between you and Mr. Jackson going
18 back to December was an attempt to resolve
19 these outstanding issues on the repayment plan
20 in particular, correct?
21     A. That was one part of it, yes.
22     Q. Right. Okay. And did the union offer
23 any sort of counterproposal to what was
24 submitted by Mr. Clavio -- by Mr. Jackson to

Page 342

1  you in December?
2      MR. ORLOVE: Well, I'll object to any,
3  quote, settlement discussions.
4      ARBITRATOR MALIN: I'll allow the
5  question as to whether a counterproposal was
6  offered, but I will sustain an objection if the
7  next question is what was offered.
8      MR. POTTER: No, no, no, no.
9      ARBITRATOR MALIN: Proceed.
10 BY MR. POTTER:
11     Q. Was there a counterproposal made by
12 the union in response to Mr. Jackson's
13 communication to you?
14     A. Michael and I did discuss it, yes.
15     Q. Did you make a counterproposal though?
16     A. I don't believe I did.
17     Q. Okay. In fact, from that point --
18 from December, this correspondence with
19 Mr. Jackson on December 21st through the
20 discharge of Mr. Williams, the union never
21 presented any counterproposal?
22     A. I don't --
23     MR. ORLOVE: Objection just on
24 relevance.

Page 343

1      ARBITRATOR MALIN: That's overruled.
2      THE WITNESS: I don't believe so.
3  BY MR. POTTER:
4      Q. Okay.
5      A. Not that I can recall.
6      Q. Now is your time to recall.
7      A. I know I did not respond in writing
8  with a counterproposal. It may have been
9  something discussed verbally. I do not recall.
10     MR. POTTER: That's all.
11     ARBITRATOR MALIN: Anything further?
12     MR. ORLOVE: Briefly.
13         REDIRECT EXAMINATION
14 BY MR. ORLOVE:
15     Q. Just to keep the time lines current in
16 our respective minds, although it is in the
17 record, let me show you Joint Exhibit 2 and ask
18 you if you authorized these matters to be
19 forwarded to arbitration as indicated on
20 Joint 2?
21     A. Absolutely, yes.
22     Q. And that's dated February 7, 2007?
23     A. Correct.
24     Q. So in early February the union was

Page 344

1  demanding arbitration, and shortly thereafter
2  the company was demanding Mr. Williams'
3  discharge?
4      A. Correct.
5         MR. ORLOVE: That's all I have.
6         ARBITRATOR MALIN: Anything further of
7  this witness?
8         MR. POTTER: No.
9         ARBITRATOR MALIN: Thank you,
10 Mr. Clavio.
11            (Witness Excused)
12        MR. ORLOVE: And the union rests.
13        ARBITRATOR MALIN: Any rebuttal from
14 the company?
15        MR. POTTER: Just a short one so we
16 can all get out of here.
17        ARBITRATOR MALIN: You ready or do you
18 need a minute?
19        MR. POTTER: Give me a minute.
20        ARBITRATOR MALIN: Sure.
21           (Break Taken)
22        ARBITRATOR MALIN: Mr. Phillips,
23 welcome back. Just a reminder, the oath that
24 you took earlier continues.

Page 345

1         THE WITNESS: Okay.
2            REDIRECT EXAMINATION
3  BY MR. POTTER:
4      Q. Couple of things that Ray Rossa
5  brought up in his testimony I wanted to cover
6  with you, Steve, in particular. One was this
7  item that Ray mentioned that there were others
8  in the workforce who were paid at a rate
9  different than the license occupied, as he put
10 it.
11         For example, he had -- he was an
12 operator in training and has a B license but
13 isn't paid at the B level. Can you explain
14 that to the Arbitrator why that is?
15     A. Yes. When we bid positions -- there's
16 bid positions, whether it's operator in
17 training or a Class 2. When we bid a position,
18 that's the rate of pay. That's what we're
19 paying them for, is that operator in training
20 level.
21         If we bid a Class 2 waste water
22 license, that's the position we're bidding for.
23 That's the rate of pay we'll pay regardless of
24 obtaining a higher license.

Page 346

1      Q. So the classification controls over
2  the license?
3      A. The job bid.
4      Q. In terms of pay rate?
5      A. Uh-huh.
6      Q. Okay. And Ray also discussed under
7  26.2, going back to negotiations, which I know
8  you testified you were involved in, 26.2, the
9  continuing education requirement in the
10 contract, I want to address that in terms of
11 the company's intent in terms of negotiations
12 on that language.
13         The final format was the company's
14 language for the first sentence?
15     A. Yes.
16     Q. Okay.
17     A. Yes.
18     Q. And what was the company's intent if
19 the employees did not maintain their CEU
20 credits?
21     A. Well, the intent or the reason we put
22 the language in is it's mandatory. The EPA
23 states that, you show, you need 15 hours or
24 30 hours to maintain your license. We wanted

Page 347

1  to make that loud and clear. It's very very
2  important that operators maintain and get the
3  training, the refresher training, just to keep
4  them up to speed on new events, new
5  technologies because you guys are handling it.
6  You're touching it. You're actually putting
7  that end product in the system. You're dealing
8  with chemicals. You're dealing with the new
9  technology.
10         There's new regulation out there
11 as well. And it's -- public health and safety
12 is very very important, particularly with the
13 new regulations now. And it's just -- we felt
14 it was imperative that that needs to be
15 maintained. It's continuing education for all
16 of us, myself included.
17     Q. And if they fail to maintain their
18 license?
19     A. They fail to maintain it, that's...
20     Q. The company's intent was what?
21        MR. ORLOVE: Well, are we talking
22 about the contract, or are we talking about
23 failing to maintain licenses? I'm...
24        MR. POTTER: The language in the

Page 348

1 contract. I mean, the company's intention in
2 drafting this language was that if the employee
3 failed to maintain the license, what would
4 happen?
5      MR. ORLOVE: That's not what it says.
6 That's not what the language says.
7      ARBITRATOR MALIN: Mr. Orlove, you may
8 cross-examine on this.
9      THE WITNESS: The intent is we have an
10 issue. We have a serious issue.
11 BY MR. POTTER:
12   Q. That might result...
13   A. In discipline, definite discipline.
14   Q. Which is where we're at here?
15   A. Exactly.
16   Q. The union's counsel repeatedly in the
17 testimony for his witnesses established that
18 the grievants in these matters pending return
19 of their license operated as operators in
20 training and basically performed the same job
21 functions they did before and yet didn't get
22 paid in the same level. And what's the
23 company's response to why that action was
24 taken?

Page 349

1   A. It was simply number one, they didn't
2 maintain -- they didn't maintain and get their
3 required CEU hours that were required to
4 maintain that license. We view that as part of
5 the job. Staying current with a refresher
6 training, new technologies, new regulations,
7 that's all a part of it, continuing education.
8 Very very important that our operators are up
9 to speed.
10   Q. Why? I mean, does Illinois EPA care?
11   A. Yes.
12   Q. Why?
13   A. You're dealing with the public health
14 and safety. It's water. We're dealing with
15 water.
16   Q. And in terms of the employees working
17 as an operator in training and receiving --
18 strike that.
19      MR. POTTER: That's all.
20      ARBITRATOR MALIN: You may cross.
21           RECROSS-EXAMINATION
22 BY MR. ORLOVE:
23   Q. Let's revisit Section 26.2 again. The
24 subject arose by the union; is that correct?

Page 350

1   A. That's correct.
2   Q. The company had no initial proposals
3 with respect to the subject of maintaining
4 licenses; is that correct?
5   A. That's correct.
6   Q. Okay. You told us what the company
7 intended -- strike that.
8      MR. ORLOVE: Nothing further.
9      ARBITRATOR MALIN: Anything further of
10 this witness?
11      MR. POTTER: No.
12      ARBITRATOR MALIN: Okay. Thank you
13 very much, Mr. Phillips. You're excused.
14 Anything further in rebuttal?
15      MR. POTTER: No.
16      ARBITRATOR MALIN: Anything further
17 from the union?
18      MR. ORLOVE: No, sir.
19      ARBITRATOR MALIN: Okay. Both parties
20 rest. Let's go off the record.
21      (Discussion off the Record.)
22      ARBITRATOR MALIN: The record should
23 reflect in the off-the-record discussions among
24 counsel and the Arbitrator, counsel have agreed

Page 351

1 to file briefs in this matter. We've agreed
2 the briefs will be due 30 days following
3 receipt of the transcript. When I receive my
4 copy of the transcript, I will e-mail counsel
5 advising the date of receipt. The 30 days will
6 run from that date. Briefs will be filed with
7 the Arbitrator via e-mail and will be exchanged
8 by the Arbitrator via e-mail. Gentlemen,
9 anything further before we adjourn?
10      MR. POTTER: I don't believe so.
11      MR. ORLOVE: The union has nothing.
12      ARBITRATOR MALIN: Thank you. We are
13 adjourned.
14      (Which were all the
15       proceedings had in the
16       above-entitled cause this
17       date and time.)

```
                                         Page 352
 1   STATE OF ILLINOIS  )
                        ) SS.
 2   COUNTY OF COOK     )
 3
 4          PAMELA A. STAFFORD, being first
 5   duly sworn on oath says that she is a court
 6   reporter doing business in the City of Chicago
 7   and that she reported in shorthand the
 8   proceedings of said hearing and that the
 9   foregoing is a true and correct transcript of
10   her shorthand notes so taken as aforesaid and
11   contains the proceedings given at said hearing.
12
13
14
                _____
15              Notary Public, Cook County
                Illinois,
16              My Commission expires 5/31/2010
17
18
19
20
21
22
23
24
```

```
1    STATE OF ILLINOIS    )
                          ) SS.
2    COUNTY OF COOK       )

3

4              PAMELA A. STAFFORD, being first
5    duly sworn on oath says that she is a court
6    reporter doing business in the City of Chicago
7    and that she reported in shorthand the
8    proceedings of said hearing and that the
9    foregoing is a true and correct transcript of
10   her shorthand notes so taken as aforesaid and
11   contains the proceedings given at said hearing.
12
13
14            [signature: Pamela A. Stafford]
15            Notary Public, Cook County
              Illinois,
16            My Commission expires 5/31/2010
17
18
19
20            "OFFICIAL SEAL"
              Pamela A. Stafford
              Notary Public, State of Illinois
              My Commission Exp. 05/31/2010
21
22
23
24
```

MAYLEEN MENDELSON COURT REPORTING
(773) 761-0449