UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | |
| UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1546 | ) ) | CASE No. 08 C 1411 |
| | ) | |
| Plaintiff, | ) ) | Judge Conlon Magistrate Judge Valdez |
| | ) | |
| v. | ) ) | |
| | ) | |
| ILLINOIS AMERICAN WATER COMPANY[1] | ) ) | |
| | ) | |
| Defendant. | ) | |

ILLINOIS AMERICAN WATER'S
**APPLICATION TO VACATE AN ARBITRATION AWARD**

Comes now Defendant, Illinois-American Water Company ("Illinois American Water"), by and through the undersigned attorney, and brings this Application to Vacate an Arbitration Award against United Food and Commercial Workers Local 1546 (hereinafter "the Union"). In support thereof, Illinois American Water alleges as follows:

A.    **Jurisdiction and Venue**

Illinois American Water brings this Application to Vacate the Arbitration Award issued by Arbitrator Martin H. Malin on February 21, 2008. Jurisdiction is conferred on this Court pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §10. Venue is proper because the Arbitrator's Award was made within the district of the United States District Court for the Northern District of Illinois. 9 U.S.C. §10.

---

[1]    The caption in Plaintiff's Application to Confirm an Arbitrator's Award improperly identifies Defendant's legal name. The correct legal name for Defendant is Illinois-American Water Company.

**EXHIBIT**
tablies
1

**B.    Factual Background**

At all times relevant to this dispute, Illinois American Water and the Union were parties

to a Collective Bargaining Agreement, entered into pursuant to the provisions of the LMRA, 29

U.S.C. §141 *et seq*. The Collective Bargaining Agreement between Illinois  American Water

and the Union was made and entered into on May 11, 2006. A true copy of this Collective

Bargaining Agreement is attached hereto as Exhibit A and incorporated herein. Glenn Williams

("Williams") was employed by Illinois American Water at the Company's Chicago, Illinois

location and was an employee member of the Union. According to the Collective Bargaining

Agreement between the Union and American Water, Williams was required to maintain a water

license from the Illinois Environmental Protection Agency. In October 2006, Illinois American

Water learned that Williams failed to maintain his water license in violation of the Collective

Bargaining Agreement and that his license had expired almost 10 years prior, in 1997.

Williams' failure to maintain his license was a violation of Offense Number 12 of the

Employees' Guide for Conduct ("neglect of assigned duty"). Only a few months earlier,

Williams had been disciplined under Offense Number 12 for another instance of neglect of duty.

The Employees' Guide for Conduct calls for termination for a second violation of Offense

Number 12. Although termination was appropriate, Williams was offered a Last Chance

Agreement, in lieu of termination, subject to certain conditions: 1) he would be suspended for

thirty (30) workdays without pay and admit the suspension was based on just cause; 2) he would

agree to reimburse Illinois American Water for overpayment of wages (up to one year of

overpayment) that he received based on his representation that he maintained a Class "A" license

when he did not; and 3) he would obtain at least a Class "B" level license. A true copy of the

Last Chance Agreement is attached hereto as Exhibit B and incorporated herein.

Under the second condition, the Last Chance Agreement specified that as a condition of remaining employed by the Company, Williams was responsible for arranging a repayment schedule with the Company within two weeks of signing the Last Chance Agreement. Williams was represented by the Union when the Last Chance Agreement was presented, and both he and his Union representative signed the Last Chance Agreement and agreed to the stated conditions. The Last Chance Agreement specifically states that it reflects the parties' entire agreement and merges all agreements, representations, and understandings among the parties. The Last Chance Agreement also states that it supersedes any conflicting provision or right under the parties' Collective Bargaining Agreement. Williams failed to arrange a repayment schedule with the Company within two weeks of signing the Last Chance Agreement as required by the Last Chance Agreement. The Company made several attempts to have Williams enter into a repayment schedule. On March 2, 2007, nearly four months after the Last Chance Agreement was executed, Illinois American Water offered Williams one final opportunity to sign a repayment schedule, but Williams refused. Williams was subsequently discharged for violating the Last Chance Agreement.

Williams grieved both his suspension and his discharge in accordance with procedures set forth in the Collective Bargaining Agreement. The Last Chance Agreement governed both of those grievances inasmuch as it acted as a release and settlement of any possible grievances related to Williams' suspension, and, it provided that Williams expressly waived any right to grieve his discharge if he was terminated for violating the Last Chance Agreement. The only exception for grievances provided in the Last Chance Agreement was that Williams could grieve whether the conduct (i.e. the violation of the Last Chance Agreement) occurred. With regard to

any subsequent arbitration on the discharge, the Last Chance Agreement states: "If the conduct occurred, an Arbitrator will not have any authority to modify the discharge to a lesser penalty."

The parties proceeded to arbitration over the issue of whether the Company had cause to terminate Williams on March 2, 2007. A hearing was held before Arbitrator Martin H. Malin at which time the parties presented testimony and documentary evidence. The parties also filed post-hearing briefs with the Arbitrator. On February 21, 2008, Arbitrator Malin issued an Award finding that the Last Chance Agreement executed by Williams was valid and enforceable and that Williams, the Union, and the Company are all bound by the terms of the Last Chance Agreement. A true copy of the Award is attached hereto as Exhibit C and incorporated herein.

Notwithstanding, the Arbitrator also found that the Company violated the Last Chance Agreement when it discharged Williams because, according to the Arbitrator, "*the Last Chance Agreement does not permit the discharge of Williams for failure to comply with a provision of the Agreement while the validity of that provision is subject to a proper, good faith, non-frivolous challenge.*" In so finding, the Arbitrator noted that he was interpreting the Last Chance Agreement in order to avoid an unreasonable result rather than following the unambiguous language and terms of the Last Chance Agreement.

The Last Chance Agreement makes no mention of prohibiting discharge because "the validity of one of its provisions is subject to a proper, good faith, non-frivolous challenge." To the contrary, it expressly states that if a violation of the Last Chance Agreement occurs, the arbitrator will not have authority to modify the penalty. Arbitrator Malin specifically found Williams violated the Last Chance Agreement by not entering into the repayment schedule. Nevertheless, he did not enforce the terms of the Last Chance Agreement. Instead, Arbitrator Malin ignored the clear and unambiguous language of the parties' Last Chance Agreement and

substituted his own brand of industrial justice by imposing new terms into the Last Chance Agreement. Accordingly, the Award issued by Arbitrator Malin is improper and must be vacated for the following reasons:

      a.      The arbitrator exceeded his powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made.

      b.      The Arbitrator manifested an infidelity to his obligation to apply the Last Chance Agreement and issue an award that drew its essence from the Last Chance Agreement.

      c.      The Arbitrator dispensed his own brand of industrial justice.

      d.      The Arbitrator exceeded the scope of authority and jurisdiction vested upon him by consent of the parties.

      e.      The Arbitrator's Award is internally contradictory to the factual findings of the Arbitrator and contradicts the testimonial and documentary evidence presented at the hearing.

      f.      The Arbitrator exceeded his authority by ignoring the plain and unambiguous language of the Last Chance Agreement and by altering the Last Chance Agreement by interpreting unambiguous language of the Last Chance Agreement in a way contrary to its plain meaning.

      g.      The Arbitrator exceeded his authority by imposing new obligations on Illinois American Water that are not required under the terms of the parties' Last Chance Agreement or Collective Bargaining Agreement.

      h.      The Arbitrator's Award lacks fundamental rationality.

WHEREFORE, Illinois American Water requests:

(1)     That this Court issue judgment vacating the February 21, 2008 Award of Arbitrator Martin H. Malin;

(2)     That this Court enforce the terms of the Last Chance Agreement and issue an Order upholding the termination of Williams; and

·  (3)     That this Court grant such other and further relief as the Court deems just, equitable and proper.

Respectfully submitted,

HUSCH BLACKWELL SANDERS LLP

/s/ Terry L. Potter
Terry L. Potter #3129064
720 Olive Street – Suite 2400
St. Louis, Missouri 63101
(314) 345-6000
(314) 345-6060 (facsimile)
Terry.Potter@huschblackwell.com

Counsel for Defendant Illinois-American Water Company

# COLLECTIVE BARGAINING AGREEMENT

**Between**

## ILLINOIS-AMERICAN WATER COMPANY

**and**

## UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1546

**Effective May 11, 2006 through April 30, 2009**

**EXHIBIT**

tabbies

A

## TABLE OF CONTENTS

PREAMBLE................................................................................................................ 6

ARTICLE I - RECOGNITION
    Section 1.1.   General Recognition ........................................................ 6
    Section 1.2.   Temporary Employees ...................................................... 7
    Section 1.3.   Miscellaneous ................................................................. 7
        (A)    Employee Work and Responsibility................................. 7
        (B)    Subcontracting or Other Assignment of Work.................. 8
        (C)    Temporary Job Assignments ........................................... 8
        (D)    Supervisors Working ...................................................... 9
        (E)    Working Foreman............................................................ 9
        (F)    Change in Job Reporting Locations.................................. 9
        (G)    Discrimination ...............................................................10
        (H)    Employee Work Responsibility .......................................10
        (I)    Productivity....................................................................10

ARTICLE II - MANAGEMENT RIGHTS
    Section 2.1.   Generally.......................................................................10
    Section 2.2.   Job Descriptions ............................................................11

ARTICLE III - UNION SECURITY
    Section 3.1.   Tendering of Dues and Fees............................................11
    Section 3.2.   Membership Defined.......................................................11
    Section 3.3.   Dues Deduction..............................................................11
    Section 3.4.   Indemnification...............................................................12

ARTICLE IV - WORK WEEK
    Section 4.1.   Regular Work Week........................................................12
    Section 4.2.   Saturday or Sunday Work................................................13
    Section 4.3.   Time Clocks ...................................................................13

ARTICLE V - OVERTIME ASSIGNMENTS
    Section 5.1.   Lists ..............................................................................13
    Section 5.2.   List Rotation .................................................................13
    Section 5.3.   Six-Month Sign-Up ........................................................13
    Section 5.4.   New Employees..............................................................13
    Section 5.5.   New Overtime Lists.........................................................14
    Section 5.6.   Notice of Overtime Work ...............................................14
    Section 5.7.   Emergency Overtime ......................................................15
    Section 5.8.   Continuation of Overtime Work.......................................15
    Section 5.9.   Overtime Penalty Hour Assessments ..............................15
    Section 5.10.  Review of Overtime System ...........................................15

ARTICLE VI – AFTER HOURS ON-CALL RESPONSE SYSTEM
    Section 6.1.   Introduction...................................................................15
    Section 6.2.   Weekly Designation........................................................15

Section 6.3.  Selection, Coverage and Responsibilities.........................................16
Section 6.4.  Substitutes..................................................................................18
Section 6.5.  Payment ....................................................................................18

ARTICLE VII - STARTING TIME.............................................................................18

ARTICLE VIII - SENIORITY
Section 8.1.  Seniority Defined........................................................................19
Section 8.2.  Layoff and Recall........................................................................19
Section 8.3.  Probationary Period ....................................................................20
Section 8.4.  Seniority Rights Broken................................................................20

ARTICLE IX - TOOLS ..........................................................................................20

ARTICLE X - UNIFORMS
Section 10.1. ................................................................................................21
Section 10.2 .................................................................................................21

ARTICLE XI - HOLIDAYS .....................................................................................21

ARTICLE XII - VACATIONS
Section 12.1. Amount of Vacation ....................................................................22
Section 12.2. Payment ...................................................................................23
Section 12.3. Eligibility....................................................................................23
Section 12.4. Scheduling and Accrual ..............................................................24
Section 12.5. Emergencies..............................................................................24

ARTICLE XIII - STEWARDS
Section 13.1. Designation ...............................................................................25
Section 13.2. Authority....................................................................................25

ARTICLE XIV - GRIEVANCE AND ARBITRATION
Section 14.1. Grievance Defined ......................................................................25
Section 14.2. Procedure..................................................................................25
Section 14.3. Time Limit..................................................................................27

ARTICLE XV - DISCIPLINE AND DISCHARGE
Section 15.1. Discipline for Cause.....................................................................27

ARTICLE XVI - TEMPORARY SHIFT TRANSFERS
Section 16.1. General Policy ............................................................................27
Section 16.2. Volunteers..................................................................................28
Section 16.3. Notification ................................................................................28
Section 16.4. Assignment Procedure.................................................................28
Section 16.5. Selection and Payment for Flushing Operations...............................28
        (A)  Selection for Flushing .....................................................................28
        (B)  Payment ......................................................................................28

ARTICLE XVII - JOB BIDDING PROCEDURE
Section 17.1.   Vacancies ........................................................................28
Section 17.2.   Awarding of Positions ...........................................................29
Section 17.3.   Probationary Bidding Period ...................................................29
Section 17.4.   Return to Former Position ......................................................29
Section 17.5.   No Qualified Unit Applicant ...................................................29

ARTICLE XVIII - SICK LEAVE
Section 18.1.   Days Earned ......................................................................30
Section 18.2.   Accumulation .....................................................................30
Section 18.3.   Rate of Payment .................................................................30
Section 18.4.   Notification .....................................................................30
Section 18.5.   Medical Examination .............................................................30
Section 18.6.   Abuse of Sick Leave .............................................................30
Section 18.7.   Union Cooperation ...............................................................30
Section 18.8.   Multiple Benefits ...............................................................30
Section 18.9.   Individual Sick Leave Bonus Program .........................................31
      (A)       Perfect Record ..................................................................31
      (B)       Only One Day Taken ..............................................................31
Section 18.10.  Group Sick Leave Bonus Program ...............................................31

ARTICLE XIX - FITNESS FOR DUTY .....................................................................31

ARTICLE XX - FUNERAL LEAVE, MILITARY RESERVE LEAVE FAMILY/MEDICAL
LEAVE, AND DISCRETIONARY LEAVES OF ABSENCE
Section 20.1.   Funeral Leave ...................................................................32
Section 20.2.   Military Reserve Leave ..........................................................33
Section 20.3.   Discretionary Leave of Absence ................................................33

ARTICLE XXI - JURY DUTY ............................................................................33

ARTICLE XXII - MEALS
Section 22.1.   ...................................................................................34
Section 22.2.   ...................................................................................34
Section 22.3.   ...................................................................................34

ARTICLE XXIII - NO STRIKE OR LOCKOUT
Section 23.1.   Strike Prohibited ...............................................................34
Section 23.2.   Lockouts Prohibited .............................................................35

ARTICLE XXIV - SAFETY
Section 24.1.   Safety Conditions ...............................................................35
Section 24.2.   Safety Committee ................................................................35
Section 24.3    Group Safety Reward Program ...................................................35

ARTICLE XXV - EMERGENCY MEDICAL LOCATIONS
Section 25.1.   ...................................................................................36
Section 25.2.   ...................................................................................36

ARTICLE XXVI - HEALTH, WELFARE, PENSION AND 401(k) PLAN
     Section 26.1.  Pension Plan ......................................................................36
     Section 26.2  Continuing Education ........................................................37

ARTICLE XXVII - WAGE RATES
     Section 27.1.  Minimum Rates ................................................................37
     Section 27.2  Wage Increases..................................................................37
     Section 27.3.  Lead Position.....................................................................37
     Section 27.4.  Operator Licenses.............................................................37
     Section 27.5.  Merit Increases .................................................................39
     Section 27.6.  Minimum Call Back Pay ...................................................38
     Section 27.7.  Shift Premiums ..................................................................38

ARTICLE XXVIII – PERSONNEL SURETY.................................................39

ARTICLE XXIX –OPERATIONS CONSOLE – 24/7 OPERATIONS ....................................39

ARTICLE XXX- AMENDMENTS .................................................................41

ARTICLE XXXI - DURATION .......................................................................41

APPENDIX A – WAGES ................................................................................43

# A G R E E M E N T
## PREAMBLE

This Agreement is made and entered into as of the 11th day of May 2006, by and between Illinois-American Water Company, hereinafter referred to as the "Company," and the United Food and Commercial Workers International Union, Local 1546, hereinafter referred to as the "Union."

The general purpose of the Agreement is to promote the mutual interests of the Company, its customers and its employees and to provide for that operation of the Company's business which will further, to the fullest extent possible, the safety of the employees, economy and efficiency of operation, elimination of waste, realization of maximum quantity and quality of service, cleanliness, protection of property, and avoidance of service interruptions. This Agreement is further entered into with the understanding of both parties that Illinois-American Water Company, being a public utility, has an obligation to the citizens of the communities which it serves to provide efficient and safe waste disposal and potable water at all times. The Union and the Company agree to promote to the fullest extent possible the Company's ability to fulfill these obligations and, in doing so, agree as follows:

## ARTICLE I
## RECOGNITION

**Section 1.1. General Recognition.** The Company recognizes the Union as the exclusive collective bargaining representative for all water plant operators, wastewater treatment plant operators, maintenance men, meter readers, chemists, lab technicians, and all other servicepersons of the Employer at its various locations in Cook, Will and DuPage Counties, Illinois, excluding office clerical employees, guards and supervisors.

The parties specifically recognize that most of the non- economic (recognition, union security, grievance procedure, no-strike clause, labor-management meetings) provisions of this agreement also apply to employees of any utility system acquired in Kendall, McHenry, Grundy, and Kane Counties, Illinois, to the extent permitted by law. The Company does agree to meet and discuss with the Union the economic aspects and/or applicability of the remaining portions of this contract to the employees of any acquired new utility system in Kendall, McHenry, Grundy, and

Kane Counties within six (6) months of the date of acquisition, to the extent permitted by law. The Union recognizes that because of operational differences, the Company may need temporary leeway during the six (6) months period after acquisition before all operational provisions of the contract can be fully met.

**Section 1.2. Temporary Employees.** It is agreed that the Company may hire up to ten (10) temporary employees at its discretion who will start at a minimum pay of $6.00 per hour. The minimum pay rate shall increase to $6.25 per hour for those employees in their second year as a temporary employee with the Company. After thirty (30) days, these employees will pay a $25.00 initiation fee and regular union dues. The period covered by this clause will be from the first Monday in March through the last Friday in October of each year covered by this contract. These employees will receive no benefits except holiday pay. They will not be entitled to bid on any job during their temporary work period. If they return at a later date to work full-time for the Company, they will pay the remaining $100.00 initiation fee after their probationary period. These employees will not be utilized on excavations dug with backhoe equipment. The duties of these employees shall, among others, consist of the following at the Employer's discretion: (1) grass cutting and site restoration; (2) fire hydrant repair; (3) B-box location and repair; (4) valve box location and repair; (5) manhole rehabilitation; (6) painting; (7) cleaning of drying beds; and other similar part-time seasonally-related duties. The Company will immediately investigate complaints received from the Union concerning the work duties of temporary employees. No temporary employee would be requested to work overtime unless no regular employee is available. The Company shall not utilize temporary employees under this Section where the use of such persons will cause the layoff, discharge or reduction in the normal work day of bargaining unit employees.

**Section 1.3. Miscellaneous.**

(A) Employee Work and Responsibility. The employees covered by this Agreement shall be responsible for and shall operate and maintain in good order all machinery, equipment and facilities for which they are responsible. Except as otherwise herein set forth, at the direction of management, they shall perform any and all work for which these employees have traditionally and historically been responsible. At the discretion of management, they shall perform any other

7

type of work necessary within the framework of their job classification to maintain the integrity of the systems and service to the customers.

(B) Subcontracting or Other Assignment of Work. The Union recognizes the right of the Company to require and permit employees not covered by this Agreement to perform work traditionally and historically performed by employees covered by the Agreement under circumstances including the training of new employees, and instances which have traditionally been recognized as emergency situations such as storms, floods, water outages, main breaks and the like. The Union recognizes the right of the Company to assign employees to work outside of their job classification in the event of emergency and as provided below under "temporary assignments." The Union also recognizes the right of the Company to subcontract work to outside contractors where such subcontract will not result in the layoff, discharge or reduction in the normal workday of bargaining unit employees. The Company may also subcontract, upon fourteen (14) days notice, where the Company does not have the necessary equipment, or the employees the necessary skills, to perform the work in question. When the Company must make substantial capital investment for equipment to continue a particular operation and this work could be performed at considerable savings by subcontracting, the Company and the Union will meet promptly to discuss the problem. Under no circumstances could this clause affect more than four (4) employees over the term of this Agreement. Any employee affected will be entitled to contractual layoff rights.

(C) Temporary Job Assignments. The parties recognize that the Company's operations require that the Company have flexibility in the utilization of its employees and the assignment of their work. The parties agree that the Company's past practice of having skilled employees perform sporadic work duties outside their normal job classification may continue. The parties further agree that unskilled employees may be assigned duties generally associated with another classification or job on an irregular or temporary basis as the needs of the Company require. Employees performing work generally associated with a higher rated job classification for two (2) consecutive hours or more (excluding lunch breaks) shall be paid the higher rate for each hour spent performing such duties.   In such situations where two (2) or more equally qualified employees are present at the site of the higher rated work activity (except for training), or when

<u>8</u>

longer term work activities are available for assignment, the Company shall first offer the work assignment to the most senior employee. The normal temporary assignment shall not be longer than sixty (60) days.

(D) <u>Supervisors Working.</u> No Supervisor or other non-unit persons may perform work normally performed by regular employees in Cook, Will, and DuPage Counties, and service areas existing in McHenry, Kane, Kendall, and Grundy Counties, Illinois. However, in the event of emergencies, the training of new personnel, and the absence of regular employees where no replacement is available in Cook, Will and DuPage Counties, and service areas existing in McHenry, Kane, Kendall, and Grundy Counties, Illinois, such work shall be permitted.

(E) <u>Working Foreman.</u> The Company may establish and utilize a position of working foreman. This position, which shall remain in the bargaining unit, shall have the job duties, responsibilities and authorities as determined by the Company. This position shall be voluntary. Failure to perform the duties of the position shall result in the volunteer reassuming his or her previous position. This position shall be paid a $1.00 per hour increase over the prevailing wage in the respective classification.

(F) <u>Change in Job Reporting Locations.</u> The Company has the right to make assignments or changes in job reporting locations. If a change in an employee's reporting location is likely to result in a significant economic detriment or benefit to the employee, the Company will meet with the Union and the employee to attempt to arrive at an acceptable economic compromise before the change is made. If an acceptable compromise cannot be reached, the Company will treat the change in job reporting location as a new job opening and bid the position as per Article XVII, Job Bidding Procedure. The displaced incumbent employee will then be free to bump to another position for which the employee is presently qualified, under Article VIII, Section 2, Layoff and Recall.

In those situations, where the Company may require employees to report to an alternate location on a temporary basis, such employees shall be compensated by receiving the next higher wage grade step during each workday they report to the alternate location. In addition, employees will be entitled to receive mileage compensation when the additional daily round-trip mileage from their home to the alternate reporting location is twenty (20) miles or more.

(G) Discrimination. It is the continuing policy of the Company and the Union that the provisions of this Agreement shall be applied to all covered employees without regard to race, color, creed, religion, age, national origin, sex, non-disqualifying physical or mental disability, status as a disabled and/or Vietnam Era veteran, or marital status.

(H) Employee Work Responsibility. The parties recognize that sound customer service is a responsibility of any regulated utility and that the manner in which employees interface with customers is of primary importance to the success of the enterprise. Indeed, it is recognized that extra effort and concern on behalf of the employee is frequently a factor making the difference in a customer's perception of the Company's service being mediocre or of high quality. For this reason, the parties recognize that each and every employee has the responsibility of being of positive assistance to the customer, of presenting a positive image of the Company to customers and the public, and of following Company guidelines and policies.

(I) Productivity. The parties, recognizing that their industry has a special duty to provide a high level of service in the most cost-efficient manner, hereby mutually pledge their best efforts to increase the productivity of the Company and its employees. In addition to encouraging productivity efforts and improvements, the parties hereby create a special productivity committee. This committee, consisting of two (2) representatives from the Company under the direction of the Company's General Manager, and two (2) from the Union, shall meet as needed at agreeable times to review and consider ideas, concepts and suggestions to improve and further embrace the Company's productivity.

## ARTICLE II
## MANAGEMENT RIGHTS

**Section 2.1. Generally.** Subject to the provisions of this Agreement and its grievance procedure, the Company may exercise its own discretion in any or all of the following matters: to decide on all machines, tools, materials, and equipment to be used; to move or remove any plant or office or any of its parts to other areas; to determine the work schedules and assignments of employees; to determine the processes for wastewater and water treatment; to maintain order and efficiency in its plants and operations; to hire, lay off, assign, transfer, and promote employees; to determine job content and pay classifications independently of any state or local licensing

arrangement; to determine starting and quitting times; to determine the number of hours to be worked; to establish such reasonable rules and regulations, not in conflict with this Agreement, as it may from time to time deem best for the purposes of maintaining order, safety and effective operation of its plants, and after advance notice thereof to the Union and other employees, to require compliance therewith by employees, and discipline and discharge post probationary employees for cause subject to the grievance procedure.

**Section 2.2. Job Descriptions.** The Company shall furnish a list of job classifications and job descriptions to the Union and any new job classifications and descriptions that may be subsequently established.

### ARTICLE III
### UNION SECURITY

**Section 3.1. Tendering of Dues and Fees.** Employees covered by this Agreement at the time it becomes effective and who are members of the Union at that time shall be required, as a condition of continued employment, to maintain membership in the Union for the duration of this Agreement. Employees covered by this Agreement who are not members of the Union and employees newly hired into the bargaining unit described in Article I, Section 1 of this Agreement shall become and remain, as a condition of continued employment, members of the Union on the 31st day following the effective date of this Agreement or on the 31st day following their hiring date, whichever is later.

**Section 3.2. Membership Defined.** Any employee who shall tender the initiation fee and periodic dues uniformly required as a condition of acquiring or retaining membership shall be deemed to have met the requirement of membership.

**Section 3.3. Dues Deduction.** The Company agrees to accept and honor from each employee a voluntary irrevocable wage assignment authorizing the Company during the life of this Agreement to deduct membership dues and initiation fees, if any, from the wages of each such employee in accordance with the provisions of the authorization card submitted to the Company. Such dues and initiation fees shall be deducted from the first paycheck of each month beginning after the 30th day of employment and shall be remitted by the Company to the Treasurer of the

Union within ten (10) days of its collection. It shall be accompanied by an appropriate list indicating the credits to the individual employees.

**Section 3.4. Indemnification.** The Union shall indemnify, defend and save the Company harmless against any and all claims, demands, suits or other forms of liability (monetary or otherwise) and for all legal costs that shall arise out of or by reason of action taken or not taken by the Company in complying with the provisions of this Section. If an improper deduction is made, the Union shall refund directly to the employee any such amount.

## ARTICLE IV
## WORK WEEK

**Section 4.1. Regular Work Week.** The regular workweek shall consist of five (5) consecutive days. All hours worked in excess of forty (40) or of eight (8) in any one day or on a holiday (in addition to holiday pay), shall be paid for at time and one-half (1-1/2). All time worked on the seventh (7th) consecutive day shall be paid at two (2) times the employee's straight-time rate of pay, provided the employee specifically notifies his supervisor or designee at the time he is requested to work that it will be the employee's seventh or eighth consecutive day of work. If the employee's seventh day or beyond occurs during the employee's normal workweek, such day shall not qualify for double-time pay. Overtime shall not be paid for more than once for the same hours worked with the exception of Stand-by employee call outs as defined in Article VI, Section 6.5(B). Employees shall not be required to take compensatory time off to avoid payment of overtime. Hours paid are to be considered hours worked.

Where an employee's work week is temporarily changed to handle special, short-term projects, that employee's regular workweek period will be used as the basis upon which overtime is calculated. For such special, short-term projects, the least senior employee capable of performing the work will be the one selected for the work week change when selection of personnel is conducted on a non-voluntary basis.

Work activities that start two (2) hours or less before midnight are to be reported on the following day. Likewise, carry-over hours from a prior day's activities of less than two (2) hours should be reported with the former day.

**Section 4.2. Saturday or Sunday Work.** Except in emergency situations as described in Article I, Section 1.3(B), the Company will not schedule any employee for seven (7) consecutive days of work. No employee shall have a schedule of work including both Saturday and Sunday.

**Section 4.3. Time Clocks.** The Company may uniformly institute time clocks at various reporting locations. The Company has the right to institute reasonable rules and regulations pertaining to such time clocks, as well as the right to discipline for failure to comply with reasonable time clock requirements.

## ARTICLE V
## OVERTIME ASSIGNMENTS

**Section 5.1. Lists.** There will be two (2) lists for which persons may sign up as being available and qualified for overtime purposes. They are the Operations List and the Field Services Common.

**Section 5.2. List Rotation.** At the beginning of each payroll year, the rotation within each list will be started in the same order as that of the final list of the prior payroll year. Subsequent lists will state the rotation, within each list, on the basis of the least accumulated overtime hours plus penalty hours year-to-date. All overtime hours earned by employees while on weekly stand-by assignment established in Article VI will not be included in the accumulated overtime total.

**Section 5.3. Six-Month Sign-Up.** After six (6) months, employees will be given a new opportunity to sign up or to be dropped from the list or lists for which they are qualified. It will be mandatory for all employees to be placed on at least one overtime list. Operations employees will automatically be placed on the Operations list.

**Section 5.4. New Employees.** New employees, and those added to a list during the year, shall be assigned a "handicap" equal to the highest number of hours of any person presently on that list. Employees shall be given one week to sign up at the beginning of any period. In those situations where an employee returns to work after an extended absence of thirty (30) days or more, he or she shall be assigned a "handicap" equal to five (5) hours for every overtime opportunity that would have been available to him or her during the period of absence.

**Section 5.5. New Overtime Lists.** New lists shall be prepared at the close of each payroll period, and shall be posted at all employees reporting locations. The Company shall provide to the

Union's Stewards copies of the Superintendent's call out sheets every payroll period. If the Company fails to provide such sheets to the appropriate Stewards, the Stewards shall request such sheets in writing and the Company shall not thereafter fail to provide such call out sheets.

**Section 5.6. Notice of Overtime Work.** When the Company has notice to schedule overtime work, the supervisor, or other management employee assigning overtime, will start at the top of each list, and contact the employees who are qualified to perform the work, in the order of list rotation. In the event that the list is exhausted, the Company may then require the least senior qualified employee available on the list to perform the work. For every hour of such assigned overtime worked, the employee's accumulated overtime hours, less penalty hours, will be reduced by such hour(s).

In order to avoid disruption and to maintain efficiency, the supervisor has the right to bypass those employees whose normal reporting location is different from the expected reporting location for the work in question if selection of that employee would have an adverse affect on his (her) next scheduled work shift or cause unnecessary delays or other problems in scheduling or completing the work. It may be necessary for one member of a work crew to be from the district where the work is to be performed.

For all overtime, the employee shall report to the designated reporting location for the work involved, unless otherwise directed by management. If this location is different from the employee's normal reporting location, he or she is expected to report equipped "ready for work." Where overtime is scheduled in advance, "ready for work" means in uniform, with hard hat, rain gear, and boots. If the employee chooses not to carry these items with him, he can stop at his normal reporting location to pick them up and continue to the district where he is needed. In those situations, he neither takes a Company vehicle nor is paid until he reaches the reporting location in the district the work is located.

In those situations where extended, special overtime needs arise, the Company will attempt to divide the work requirements equitably on a voluntary basis among the particular group of employees affected. In the event that an employee is qualified but intentionally bypassed for overtime for reasons other than avoiding payment of double overtime, or as noted above, such

employee shall receive payment for the amount of time that was worked on the single day in question.

**Section 5.7. Emergency Overtime.** In an emergency, the supervisor shall attempt to assign the work to the qualified employees available on the top of the list, though all employees are subject to the requirement to work overtime during emergencies. For overtime needs that arise late in the day when employees are "back in the shop", the supervisor will seek volunteers through the overtime list process unless that procedure would unreasonably delay completing that particular work requirement.

**Section 5.8. Continuation of Overtime Work.** The person or crew on any job initiated during regular working hours is expected to remain on the job until relieved, which relief, when requested, will not be unreasonably withheld.

**Section 5.9. Overtime Penalty Hour Assessments.** For the purpose of maintaining equality in the overtime lists, an employee should be penalized ten (10) hours for each overtime opportunity he or she refuses or is unavailable to take advantage of. Employees will not be penalized when they are unable to take advantage of an overtime opportunity as a result of being on paid leave.

**Section 5.10.  Review of Overtime System.** Management will monitor the application of this Article and will review, at least annually, with Union leadership, the effectiveness and fairness of these overtime procedures and will discuss any needed adjustment.

## ARTICLE VI
## AFTER HOURS ON-CALL RESPONSE SYSTEM

**Section 6.1. Introduction.** In order to improve responsiveness of service for customers under emergency conditions after normal working hours, the parties adopt the following agreement on the use of the After Hours On-Call Response System.

**Section 6.2. Weekly Designation.** A minimum of five (5) employees shall be placed on stand-by status for a one-week period. The Company may increase or decrease the number above the minimum at any time based on need with a seven (7) day notice when possible.  These employees shall be qualified and assigned to respond to after-hours overtime needs that arise in one of the following areas: Operations (two Operators that are paired up at Management's

discretion according to its service needs after discussing the matter with the Union), Field Maintenance, Equipment Operation and Laborer.

   **Section 6.3. Selection, Coverage and Responsibilities.** Qualified personnel will be selected as described below, to be continually available for call-in under the conditions listed below:

   a.  Each stand-by period will be for a full seven-day (one week) term, unless the Company and Union agree in writing to split the stand-by period, and will run from Wednesday at 8:00 a.m. through the following Wednesday at 8:00 a.m.

   b.  Call-in assignments are at the discretion of the management designee, but generally operations and other system related calls would be directed to the appropriate Operations stand-by employee, while the balance of the non-Equipment Operator related calls would be directed to the Field Maintenance stand-by employee. Although calls directed to the Equipment Operation stand-by employee will normally be those requiring the operation of equipment employees are normally responsible for in that classification, he or she may be assigned other calls as the need arises.

   c.  Stand-by employees will be furnished with a pager and a telephone for business use while on call for company business.

   d.  Stand-by employees will be furnished with an I-Pass or credit card for use on the Illinois Toll Way System while on call.

   e.  In the event of no telephone service, the pager must be responded to within fifteen (15) minutes of being paged.

   f.  Lists will be as follows: (1) Operations; (2) Field Maintenance; (3) Equipment Operation; (4) Laborer. Previously qualified employees will volunteer to be placed on a rotating list for every twenty-four (24) to thirty-two (32) week period. Field Maintenance and Laborer lists will contain a minimum of four (4) employees, the Operations list will have a minimum of eight (8) employees and the Equipment Operation list which will have a minimum of five (5) employees. In the event there are not enough volunteers, management shall assign employees on the basis of qualifications and reverse seniority to bring the list(s) up to the minimum complement, after discussing the matter with the Union. The

Operations list(s) may continue as in the prior contract until management is able timely to make the change.

g.  The rotation lists of qualified personnel will be drawn sixty (60) days in advance for a minimum 24 to 32 week periods and will be reasonably balanced and equitable among employees. Lists will be scheduled in such a way as to disallow an employee from being on duty simultaneously on more than one on-call list.   The Company will endeavor to distribute Holiday assignments equally among the employees on call.

h.  Stand-by employees, upon notification by management designee shall, if so assigned, proceed directly to the scene of the job assignment from his home. The Company will assign a truck for each stand-by employee for the stand-by period. Such vehicle is to be used only for Company business.

i.  Qualifications for stand-by employee(s) shall, initially, be reviewed by a joint committee representing Union and Management, which will make recommendations to the General Manager. Qualifications shall be based, among other things, upon the following:

1.  They should live within a reasonable response time to assigned service districts.

2.  Operations stand-by employees must have a general working knowledge of lift stations, water pump stations, wellhouses, and the like, within their district.

3.  Field Maintenance stand-by employees must have a general working knowledge of the assigned distribution and collection systems within the service district and should be familiar with emergency maintenance procedures and customer service procedures and policies.

4.  Equipment Operations stand-by employees must be able to operate backhoes, hi-velocity sewer cleaners, heavy trucks, and other heavy equipment in a safe and proper manner.

5.  Laborer stand-by employees must have the general working knowledge and physical capabilities to work as a member of a team to repair water and wastewater system facilities.

6.  They should have a valid driver's license.

7. They should have good judgment under emergency conditions and have the ability to report and communicate to the Duty Supervisor or Manager.

8. They should have the ability to read system maps and plans.

**Section 6.4. Substitutes.** If a substitute or replacement stand-by employee is needed, the assigned stand-by employee shall be responsible for obtaining a qualified substitute or replacement by trading assignments with another employee and shall notify the Company of the substitute as soon as possible. If no such substitute or replacement is obtained, the originally assigned stand-by employee shall serve for the assigned period. In cases of incidents of illness or injury, if no substitute or replacement is obtained, the least senior qualified stand-by employee shall serve the assigned period.

**Section 6.5. Payment.** Payment for stand-by employees shall be as stated below:

A.     Six (6) hours of time as overtime shall be awarded each week during which each Operations, Field Maintenance, Equipment Operation and Laborer placed on stand-by. In the event that the Company and Union agree to split the stand-by work as outlined in Article VI, Section 6.3a, then the hours awarded shall be split in half.

B.     A minimum of three (3) hours of time as overtime shall be awarded for each call-in incident away from the employee's home to which Operations, Field Maintenance, Equipment Operation and Laborer stand-by employees are required to respond. All stand-by employees shall be paid from the time they leave their home until the time they return home and shall record such times on the appropriate log sheets provided for that purpose.

C.     One and one-half (1 ½) hours overtime shall be awarded for each occasion that an employee handles a call without leaving his home (non laptop).

**ARTICLE VII**

**STARTING TIME**

Regular starting time shall be as determined by the Company at one-half (½) hour intervals between 6:00 a.m. and 8:30 a.m. Customer Service and/or Field Operations personnel at any point in time may be assigned a starting time up to 10:00 a.m., although qualified volunteers will be

sought before such assignments are made. The second shift operations will start between 12:00 p.m. and 3:30 p.m. at one-half (½) hour intervals. Customer Service and/or Field Operations personnel at any point in time may be assigned a starting time up to 4:30 p.m., although qualified volunteers will be sought before such assignments are made. The third shift operations will start between 10:00 p.m. and 12:30 a.m. at one-half (½) hour intervals.

Regular starting time for the Custodian position shall be as determined by the Company at one-half (½) hour intervals between 12:00 p.m. and 1:30 p.m. Such person shall receive the second shift premium of sixty cents ($0.60) per hour for all hours worked on such shift.

One Customer Service Person may be assigned to a work shift beginning at one-half (½) hour intervals between 10:30 a.m. and 12:00 p.m. Such person shall receive the second shift premium for all hours worked on such shift. No existing employee will be forced to work this shift or be laid off in the event the Company elects to hire from the outside to fill this shift.

The Company is willing to allow summer hours, which are from 7:00 a.m. to 3:30 p.m. from May 30 to September 1 for the Field Services and Maintenance Tech personnel, excluding Customer Service, Meter Readers and J.U.L.I.E. personnel. Other classifications may be considered upon request and conditioned upon operational needs.

## ARTICLE VIII
### SENIORITY

**Section 8.1. Seniority Defined.** Upon completion of ninety (90) days of employment, all employees shall hold seniority as of their most recent date of hire in a bargaining unit position.

**Section 8.2. Layoff and Recall.** In the event of a layoff, the employee with the least seniority in the Job Classification affected shall be the first laid off. Such laid-off employee may then exercise his seniority and displace an employee with less seniority subject to his skill and ability to perform the job. Recall shall be in reverse order of layoff before any new employee may be hired. Upon recall, an employee shall respond to the Company's written notice of recall within a five (5) day period. The Company shall provide one (1) week's advance notice or the equivalent of one (1) week's pay to any employee who is scheduled to be laid off.

**Section 8.3. Probationary Period.** Employees shall be deemed "probationary" during the first ninety (90) days of their employment. Any employee terminated during his probationary period shall not have access or be subject to the grievance and arbitration provisions of this Agreement regarding his continued employment.

**Section 8.4. Seniority Rights Broken.** Seniority rights shall be broken by:

(1)     discharge for cause;

(2)     voluntary resignation;

(3)     layoff exceeding two (2) years;

(4)     failure to report for work for three (3) consecutive days without notice to the Company;

(5)     failure to report for work at the end of a leave of absence or extension thereof;

(6)     absence becaue of sickness or accident in excess of 12 months;

(7)     accepting other work while on leave of absence; or

(8)     failure to report for work within seven (7) days after receipt of notice of recall.

# ARTICLE IX
## TOOLS

The Company shall supply all tools to the employees. Each employee assigned tools shall execute a proper receipt and shall be responsible for the maintenance of all assigned tools.

In the event a tool is lost, broken or stolen, the employee shall report the loss to the Company within five (5) work days. In the event of a shortage of tools assigned to the employee, except for those reasonably explained to the Company, the employee shall be responsible for the cost of replacing lost tools within thirty (30) days of invoice.

The Union recognizes the right of the Company to take inventories of employee's tools at its discretion.

## ARTICLE X
## UNIFORMS

**Section 10.1.** The Company shall provide an inventory of eleven (11) sets of uniforms and shall be responsible for the cleaning of such uniforms. The Company shall also provide four (4) tee shirts per calendar year, and it shall be obligatory for all employees, during working hours, to wear uniforms and/or tee shirts as directed and carry identification cards furnished by the Company.

**Section 10.2.** An allowance for work gear, which includes safety boots, will be $150 per year in accordance with policy.

## ARTICLE XI
## HOLIDAYS

There shall be twelve (12) paid holidays for employees having one year or more of continuous service with the Company. Employees qualifying for paid holidays shall be paid eight (8) hours at their regular, straight-time rate of pay for each paid holiday. Seven (7) of the paid holidays shall be fixed, Company-wide holidays.

The following days, or the days on which they are legally observed, shall be observed as fixed, Company-wide holidays:

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Memorial Day | The Day After Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

The balance of the holidays shall be individually scheduled by each employee in accordance with the employee's wishes and the operating needs of the Company. Such days shall be selected with due regard for seniority and, if possible, upon seven (7) days written notification to the Company, except that the Company may waive this notice in cases of emergency. However, once an employee has requested an individual holiday and such preference is noted on a "holiday/vacation" sheet to be posted by the Company, then another employee may exercise seniority and bump for that day off only if such bumping occurs within a period of fourteen (14) calendar days from the date a lower seniority employee indicates his or her individual holiday

**21**

preference date. Requests for individual holidays will be denied only where the Company cannot, with reasonable diligence, find a replacement or otherwise cover for the employee without incurring a significant reduction or loss of customer service in a particular area. Employees will be allowed to carry over, from one calendar year to the next, up to two (2) unused individual, floating holidays where requested in writing and upon written permission from the Company. Such day(s) carried over must be taken within the first six (6) months of the following year or will be forever lost. Holidays shall not be taken in increments of less than eight (8) hours. During their first year of employment, employees shall receive all seven (7) fixed holidays. New employees, in their first year of employment, may take floating holidays in accordance with the following schedule:

Five floating holidays if hired from January 1 through February 29

Four floating holidays if hired from March 1 through April 30

Three floating holidays if hired from May 1 through June 30

Two floating holidays if hired from July 1 through August 31

One floating holiday if hired from September 1 through October 31

No floating holidays if hired from November 1 through December 31

## ARTICLE XII
## VACATIONS

**Section 12.1. Amount of Vacation.** Vacation will be based on a calendar year. Employees will be entitled to vacations based on the following schedule:

| Continuous Years of Service | Vacation Time |
|---|---|
| Less than on year prorated to max 6 days | |
| 1 | 6 days |
| 2 | 12 days |
| 3 | 12 days |
| 4 | 12 days |
| 5 | 12 days |
| 6 | 13 days |
| 7 | 14 days |
| 8 | 15 days |
| 9 | 16 days |
| 10 | 17 days |

| | |
|---|---|
| 11 | 17 days |
| 12 | 17 days |
| 13 | 20 days |
| 14 | 20 days |
| 15 | 20 days |
| 16 | 20 days |
| 17 | 20 days |
| 18 | 20 days |
| 19 | 20 days |
| 20 | 20 days |
| 21 | 20 days |
| 22 and up | 25 days |

**Section 12.2. Payment.** For a full-time employee, a week of vacation shall consist of forty (40) hours pay at the employees straight-time hourly rate. An employee who has been in the service of the Company continuously for one (1) year or more, and whose employment is thereafter terminated, shall be paid for his accrued vacation, if not already taken, and shall receive that portion of the following year's vacation which he has accrued to the date of termination.

**Section 12.3. Eligibility.** An employee must have worked or received regular wages from the Company for at least seventeen hundred fifty (1750) hours during any prior vacation year to be eligible for the full amount (100%) of vacation time as stated herein. If an employee works or receives regular wages from the Company for less than seventeen hundred fifty (1750) hours in such period, vacation shall be compiled by applying the ratio of hours, which the employee worked or received regular wages from the Company divided by seventeen hundred fifty (1750). Whenever a fraction of one (1) day results from applying the ratio, the next full day will be allowed. An employee who on January 1 of the year under consideration has less than one years' accumulated seniority shall be entitled to a pro-rated vacation. The pro-rated vacation shall be computed by applying the ratio obtained of actual days employee worked or received regular wages from the Company divided by seventeen hundred fifty (1750). Whenever a fraction of one (1) day results from applying the ratio, the next full day will be allowed.

For purposes of determing pro-rated vacation, payment of regular wages includes contractually paid time off for the following: vacation, holidays, approved sick leave, funeral leave or jury duty.

**Section 12.4. Scheduling and Accrual.** Employees shall be awarded their vacation time by the Company in accordance with its service needs on the basis of seniority. Vacation schedules will be posted in a defined location, and employees will only be allowed to exercise seniority to bump within a period of fourteen (14) calendar days from the date a lower seniority employee indicates his or her vacation preference.

All vacation days must be used during the calendar year, except one week may be carrried over to the end of the next calendar year. Those employees who had vacation banked will be allowed to maintain that accrual bank until it is exhausted.

Two (2) weeks of earned vacation must be taken in forty (40) hour increments. Vacation days in excess of two (2) weeks can be taken individually or may be used to extend the employee's regular vacation, where approved by the immediate supervisor, and whereby their replacement, if needed, will not result in another employee receiving overtime pay. However, an employee, regularly scheduled to work on Saturday or Sunday, may use up to two (2) individual vacation days, five (5) floating days, and a maximum of one (1) day from the company reward programs, annually, on Saturday or Sunday, even though such use will result in another employee receiving overtime pay. The Company may, upon request and for good cause shown, allow the employee to utilize vacation leave in one-half (½) day increments except on Saturdays or Sundays.

**Section 12.5. Emergencies.** Where a vacation day is needed for emergency reasons, such as unexpected family illness, the employee will notify the Company as soon as possible of such need. If the Company is able to arrange suitable coverage for the employee's work, the employee will be given the requested day(s) off as a vacation day(s), provided the employee has the requisite number of accrued vacation day(s) available.

## ARTICLE XIII
## STEWARDS

**Section 13.1. Designation.** The Company recognizes the right of the Union to designate two (2) Stewards and a Chief Steward, from its membership list. The Union shall provide the

**24**

Company with the names of the Stewards and the Chief Steward. In the event of the inability of any Steward of the Union to act, or if a change in a Steward is made, the Union shall designate in writing to the Company the employee who is to be substituted for such Steward.

**Section 13.2. Authority.** The authority of Stewards and Chief Steward shall be limited to the following activities:

The investigation and presentation of grievances to the Company as provided herein. The Stewards shall accept and present grievances, except for emergency situations, the first thing in the morning before leaving for the job site after obtaining approval from their immediate supervisor or his or her designated replacement. Reasonable time necessary for processing or investigating such grievances will be during regular work hours and shall be paid for by the Company.

## ARTICLE XIV
## GRIEVANCE AND ARBITRATION

**Section 14.1. Grievance Defined.** Complaints, disputes or claims arising under and during the term of this Agreement shall be deemed grievances. All grievances shall be settled by the accredited representatives of each party. Grievances shall be limited to matters of interpretation or application of express provisions of the Agreement. Grievances shall be handled in the following manner:

**Section 14.2. Procedure.**

Step 1: If any employee has a grievance, the employee and/or his/her Union Steward shall, within five (5) working days of its occurrence, present it verbally to his or her immediate supervisor, and the two parties shall endeavor to settle it. If the grievance is not resolved within five (5) working days of its filing, then within five (5) working days...

Step 2: The appropriate Steward shall reduce the grievance to writing and present it to the head of the functional area. The parties shall at that time set a meeting to discuss the grievance within forty-eight (48) hours or a reasonable time agreed upon by

the parties. The grievance shall be discussed by the appropriate Steward and the department head or his/her designee. The grievant will be allowed to attend this second step meeting if his or her presence will significantly assist in the resolution of the grievance. If the grievance is not satisfactorily resolved within five (5) working days of its filing at this Step 2, then within five (5) working days...

Step 3: The Chief Steward shall notify the functional area manager in writing of the Union's intent to proceed into the third step of the grievance procedure. The parties shall at that time set up a meeting to discuss the grievance within forty-eight (48) hours or a reasonable time agreed upon by the parties. The grievance shall be discussed with the Chief Steward, the appropriate steward and the designated agent of the Union, and the Division Manager and or his/her designee. If the matter is not resolved within five (5) working days of its filing at this Step 3 then...

Step 4: The Union and the Company within 60 working days after the third step meeting may appoint an arbitrator to hear and decide the case. In the event they cannot agree on an arbitrator, the arbitrator shall be selected by requesting a list of seven (7) qualified arbitrators from the American Arbitration Association, and the parties shall alternately strike the names of individuals on such list until one (1) remains. That individual shall hear the case and shall be empowered to decide the matter. The arbitration shall be conducted under the rules as the parties shall agree, or in event of their failure to agree, in accordance with the rules of the American Arbitration Association. The decision of the arbitrator shall be final and binding upon the Company and the Union; provided, however, that the arbitrator shall have no right to add to or detract from, or modify any of the provisions of this Agreement. Each of the parties shall have the right to representation by legal counsel during the arbitration. The Union and the Company shall jointly bear the expenses of the arbitration exclusive of attorney's fees.

For purposes of this Article, work days will consist of Monday through Friday.

**Section 14.3. Time Limit.** No grievance shall be entertained or processed unless it is submitted at Step 1 within five (5) working days after the occurrence of the event giving rise to the grievance or after the employee, through the use of reasonable diligence, should have obtained knowledge of the occurrence of the event giving rise to the grievance. If a grievance is not presented within the time limits set forth above, it shall be considered "waived". If a grievance is not appealed to the next step within the specified time limit or any agreed extension thereof, it shall be considered settled on the basis of the Company's last answer. If the Company does not answer a grievance or an appeal thereof within the specified time limits, the aggrieved employee and/or the Union shall treat the grievance as denied at that Step and may appeal the grievance to the next Step.

## ARTICLE XV
## DISCIPLINE AND DISCHARGE

**Section 15.1. Discipline for Cause.** The right to discipline or discharge an employee for cause shall be vested solely in the Company. The Union shall have the right in such cases to investigate the reasons therefore and to protest such discipline or discharge through the grievance procedure.

## ARTICLE XVI
## TEMPORARY SHIFT TRANSFERS

**Section 16.1. General Policy.** Personnel may have to be temporarily transferred from one shift to another for special, short-term projects such as flushing, or to fill in for employees who are unable to perform duties during a particular shift. To avoid arbitrary or capricious handling of such assignments, the procedures in this Article will be followed for such temporary shift transfers.

**Section 16.2. Volunteers.** Volunteers will be requested from among those qualified and who can reasonably be made available for work. Such availability shall mean those employees who can be reassigned from their present tasks without unreasonably disrupting normal operations, and that their normally assigned work can be suspended for the period of time of such

temporary shift transfer. Of course, adequate levels of qualified force will have to be maintained in their assignments to assure continuing priority work needs.

**Section 16.3. Notification.** Where reasonably possible a minimum of seven (7) days notification should be given.

**Section 16.4. Assignment Procedure.** When sufficient qualified manpower is not available through the use of qualified volunteers, then employees who are qualified and available and whose selection will not disrupt the workforce will be appointed in the order of their reverse seniority.

**Section 16.5. Selection and Payment for Flushing Operations.**

(A) Selection for Flushing. The procedure contained in Sections 16.2 and 16.4 shall be followed, except that as for Operators only, if an Operator is required for flushing and insufficient volunteers are available, then the Operator shall be selected through a rotation process by reverse seniority. There shall be no rotation of assignments for any other employees for this selection process.

(B) Payment. A special compensation arrangement shall be in effect for payment for temporary shift transfer duties pertaining to the Company's flushing operations. For such operations, employees shall be paid a premium of ninety cents ($0.90) per hour for each hour spent on flushing duties during the Company's third shift.

## ARTICLE XVII
## JOB BIDDING PROCEDURE

**Section 17.1. Vacancies.** In the event of a vacancy in any classification, the Company will post a notice of the vacancy upon Company bulletin boards for a period of time of not less than fourteen (14) calendar days, stating the reporting location or area, the work shift and the minimum qualifications. Any employee desiring to fill said vacancy shall individually or through their Stewards, in writing, inform the local management. The Company shall post a notice advising all employees of the disposition of a vacancy within fourteen (14) calendar days of the end of the posting period.

**Section 17.2. Awarding of Positions.** Positions will be awarded on the basis of seniority, skill and ability, and the employee's work history. Where seniority, in conjunction with the other

**28**

criteria, is not followed in the job award, the reasons therefor will be discussed with the Union. If no bidders are able to qualify for the job within the Company, the Company may hire from the outside. The standards for job selection outlined above will be subject to the grievance procedure.

An employee awared a job bid shall be transferred in a timely manner.

An employee previously transferred out of a like position from one location to another shall have the opportunity to override the above-stated procedure and exercise first option rights to fill the vacant position.

**Section 17.3. Probationary Bidding Period.** The first sixty (60) days will be considered a probationary period for the Company to judge the capabilities of the person selected. During the sixty (60) day period, the selected employee will remain at his former rate of pay for the first fourteen (14) days. Should the Company decide that the employee is not qualified during their probationary period, that employee will be returned to his/her former position.

**Section 17.4. Return to Former Position.** An employee may, at his option, be returned to his former job classification without loss of seniority, if the employee so requests during the initial fourteen (14) days of the probationary period.

**Section 17.5. No Qualified Unit Applicant.** In cases where a vacancy occurs and no qualified person can be found in the bargaining unit, the following procedure will be followed: The Company will go outside the bargaining unit to find a qualified employee. Failing that, the Company may at its option return to the bargaining unit and post the vacancy again and request that any interested person may apply for the position; the Company may thereafter select a person from that list to fill the position on an "in-training" basis. Notwithstanding any training that a person may receive for the position, the Company may find the employee not qualified and return him to his former position at no loss in seniority, provided that no person placed in the position will stay "in-training" for a period exceeding six (6) months.

### ARTICLE XVIII
### SICK LEAVE

**Section 18.1. Days Earned.** Upon completion of three (3) months of service a regular, full-time employee shall be entitled to sick leave with pay when incapacitated due to sickness or

injury. Such sick leave shall be at the rate of one (1) working day period each two (2) months of continuous employment.

**Section 18.2. Accumulation.** Unused sick leave will be allowed to accumulate, except to employees hired after May 1, 2003. Such employees hired after May 1, 2003, will not be covered by Section 18.9 and 18.10 of this article.

**Section 18.3. Rate of Payment.** Employees shall be paid eight (8) hours at one hundred percent (100%) of their regular, straight-time rate of pay for each day of sick leave. Five (5) days of sick leave can be taken in ½ day increments.

**Section 18.4. Notification.** Notification of absence due to sickness shall be given to the employee's immediate supervisor or designated replacement as soon as possible on the first day of such absence.

**Section 18.5. Medical Examination.** The Company may, at its discretion, require an employee seeking to utilize sick leave to submit at any time during such leave to an examination by a doctor or nurse designated by the Company, at the Company's expense, except that any required examination of the employee during the period the employee is sick shall, if so requested by the employee, be at the employee's residence if the employee is too sick to travel.

**Section 18.6. Abuse of Sick Leave.** Abuse of sick leave is a serious matter. If proper notification is not given, or abuse is observed, any absence may be charged as leave without pay and/or may constitute cause for discipline up to and including discharge for a repeated occurrence at the discretion of the Company.

**Section 18.7. Union Cooperation.** The Union agrees that abuse of sick leave is a serious matter and the Union shall join the Company in locating and reporting abuse of sick leave whenever or wherever it may occur.

**Section 18.8. Multiple Benefits.** Sick leave is intended for use in cases of actual illness or injury. In case of any illness or injury which is covered by the State Industrial Insurance Act or any other State or federal act whereby benefits are paid to an employee for sickness or injury, sick benefits herein provided shall apply; provided, however, that in no case shall the total of all such benefits exceed the employee's scheduled straight-time pay.

**Section 18.9. Individual Sick Leave Bonus Program.**

(A)     <u>Perfect Record.</u> Four (4) additional sick days will be added to an employee's bank for each full year during which an individual employee has a perfect sick leave record.

(B)     <u>Only One Day Taken.</u>  Employee will receive two (2) additional sick days to be placed in employee sick leave bank accumulation for each full year worked during which an employee utilizes only one (1) sick day per year.

**Section 18.10. Group Sick Leave Bonus Program.** One (1) additional sick day for every employee each year in which the entire bargaining unit's sick leave record averages less than two (2) days per employee per year. Reward days will be put in the employee's sick leave bank.

## ARTICLE XIX
## FITNESS FOR DUTY

The Company requires that all employees' report to duty in a condition "fit" to perform his/her job. Employees are expected to be healthy and alert in order to perform their work duties. Physical impairments, illness, emotional upheaval, or drug dependency may impair an employee's ability to perform his/her job.

In cases of physical impairments and/or illness, a physician may be consulted to determine the extent of the problem and the likelihood of adequate job performance, given the impairment/ illness.

In cases of emotional upheaval, the employee is responsible for receiving appropriate assistance; either on his/her own or through the Company sponsored Employee Assistance Program.

The Company strictly prohibits the use of alcohol or illegal drugs during duty hours, either on or off company premises. "Duty hours" shall mean between the beginning and end of all regular and overtime work shifts, including breaks and lunch. Furthermore, alcoholic beverages and illegal drugs may not be stored on Company premises; premises include all buildings and grounds owned by the Company, including parking lots. Reporting to work under the influence of alcohol or illegal drugs is also prohibited. Being under the influence of alcohol or drugs adversely affects the safety and productivity of the work environment and is detrimental to the safety of other employees.

Where there is reasonable suspicion that an employee is violating this Article or is using controlled substances, the Company may require the employee to undergo drug or alcohol testing.

The Company shall take no adverse employment action against any employee who voluntarily seeks treatment, counseling, or other support for an alcohol or drug related problem, other than the Company may require reassignment of the employee with pay if he/she is unfit for duty in his/her current assignment, but fit to handle an alternate assignment. The foregoing is conditioned upon:

(a) The employee agreeing to appropriate treatment as determined by the physician(s) involved;

(b) The employee discontinues his use of illegal drugs or abuse of alcohol;

(c) The employee completes the course of treatment prescribed, including an "after-care" group for a period of up to twelve (12) months; and

(d) The employee agrees to submit to random testing during hours of work during the period of "after-care".

Violators of this Company policy are subject to immediate disciplinary action, including dismissal.

## ARTICLE XX

### FUNERAL LEAVE, MILITARY RESERVE LEAVE, FAMILY/MEDICAL LEAVE, AND DISCRETIONARY LEAVES OF ABSENCE

**Section 20.1. Funeral Leave.** The Company agrees to pay employees covered by this Agreement for necessary absence on account of death in the employee's or spouse's immediate family up to and including a maximum of three (3) scheduled work days to be paid at the applicable straight-time hourly rates provided the employee attends the funeral. Where the employee does not attend the funeral, the employee shall be entitled to two (2) days paid leave from work. The term "immediate family" shall mean parent, child, brother, sister, current spouse and grandparents. For death of a parent, child or spouse, an employee may elect to utilize two (2) accumulated sick leave days, if available, to extend funeral leave in those situations where the employee has no individual holidays or vacation benefits remaining.

**Section 20.2. Military Reserve Leave.** Where an employee is called for military reserve for periods of four (4) weeks or less the Company agrees to pay the difference in this pay and the regular workweek of the affected employee to the extent required by law.

**Section 20.3. Discretionary Leave of Absence.** In the event of a request for leave due to the birth of, adoption of or receiving for foster care a child, or for serious illness of a spouse, parent, child, relative who is a dependent of the employee, or the employee, subject to the terms of this Article, the employee will be entitled to leave up to 16 weeks in a twelve month period. This time shall run concurrently with any other leave granted in conjunction with this Article and may also run concurrently with any vacation or sick leave to which the employee may be entitled. Any leave granted in accordance with this provision shall also be subject to the then current provisions of the Family and Medical Leave Act of 1993 and any applicable laws of the State of Illinois.

**ARTICLE XXI**

**JURY DUTY**

An employee who is called for jury duty from which he has not been exempt, shall, as soon as possible, report such call to management. For each day of jury service an employee who otherwise would have worked shall present proof of such jury service to management in order to receive compensation from the Company, not exceeding six (6) weeks, eight (8) hours per day.

An employee released from jury duty before mid-shift (4 hours) on any day that such employee would otherwise be scheduled for work, shall report to work promptly. Failure to so report shall relieve the Company of its obligation to pay for the jury duty for such day.

An employee assinged to a shift other than the day shift will not be required to report to work in the 24-hour calendar period that includes the compulsory jury duty.

## ARTICLE XXII
## MEALS

**Section 22.1.** Regular meal periods of employees may be advanced or delayed when required by emergency work, or as necessary to preserve job progress where special conditions require work continuity.

**Section 22.2.** When an employee is required to work a total of three (3) hours or more beyond his normal work period, or eleven (11) hours or more on a normal day off, the Company will, effective upon the date of signature of this Agreement, provide the sum of seven dollars and no cents ($7.00) for an appropriate meal, which shall be eaten on his own time, and for which he shall execute a voucher. The employee shall in all cases provide his own mid-period meal.

**Section 22.3.** Unpaid lunch periods of thirty (30) minutes shall be taken at or near the midpoint of the shift as directed by the Company. This 30-minute lunch period shall begin when the employee stops work and shall end when the employee resumes work. Travel time shall be considered part of the 30-minute lunch period. Taking time in excess of the 30-minute lunch period is considered by both parties to be a serious offense. The Company and the Union will take all reasonable efforts to insure that abuse does not occur.

## ARTICLE XXIII
## NO STRIKE OR LOCKOUT

**Section 23.1. Strike Prohibited.** Under no circumstances will the Union cause, or permit its members to cause, nor will any member of the bargaining unit take part in, any strike, sit-down, stay-in, slowdown, or sympathy strike at any location owned or leased by the Company, or any curtailment of work or restriction of production, or interference with the operations of the Company, or any picketing or patrolling during the term of this Agreement. In the event of a violation of this Section, the Company shall not be required to negotiate on the merits of the dispute which gave rise to the stoppage or curtailment until the same has ceased, and the Union shall immediately instruct the involved employees in writing that their conduct is in violation of the Agreement, that they may be disciplined up to and including discharge, and will instruct all

such persons to quit the offending conduct. The Company shall have the right to discipline up to and including discharge any employee who participates in any activity herein prohibited.

**Section 23.2. Lockouts Prohibited.** The Company will not lock out any employees during the term of this Agreement.

**ARTICLE XXIV**

**SAFETY**

**Section 24.1. Safety Conditions.** The Company agrees to provide safe working conditions and equipment for the employees. The Company agrees to abide by lawful OSHA regulations in regard to safety, as such regulations may be adopted, changed or amended from time to time. An employee shall normally not work more than sixteen (16) consecutive hours. An employee will have available, on a voluntary basis in conformance with any applicable OSHA requirements, a minimum of six (6) hours of rest prior to starting her/his shift. When an employee is required to work more than 16 hours in a 24-hour period to complete an emergency job, he shall, at the completion of this extended work period, be granted an 8-hour consecutive rest period. Should such rest period overlap any part of his regularly scheduled work period, he shall not suffer any loss of pay for that part of the work period which is overlapped by the rest period; provided, however, that he report for work at the termination of his 8-hour rest period if the rest period terminates during his regularly scheduled work period.

Employees shall not be required to work under conditions or with equipment, which is a safety hazard and represent a danger to life and limb.

Grievances of a serious nature relating to safety shall be given immediate attention, including bypassing the first and second steps of the procedure. Such grievances may be instituted at the third step in the grievance procedure.

**Section 24.2. Safety Committee.** There shall be a Safety Committee consisting of equal representation from the Union and Management. The Committee shall meet a minimum of once every other month. A written agenda of the subjects to be discussed shall be distributed in advance of meetings to all committee members.

**Section 24.3. Group Safety Reward Program** Each employee who works a calendar year without a preventable accident or injury will receive one additional vacation day in any year

35

in which the entire bargaining unit reaches the targeted safety goal established by the Company. Reward days may be used for vacation days on Saturday and Sunday.

ARTICLE XXV
EMERGENCY MEDICAL LOCATIONS

**Section 25.1.** The Company shall provide all employees with the location of medical service facilities in each of the various service areas in Cook, DuPage, Grundy, Kane, Kendall, McHenry and Will Counties at which the employees can secure medical treatment for injuries sustained on the job. Critical injuries requiring immediate treatment can and should -- where possible -- be treated at the closest available emergency room.

**Section 25.2.** The Company will provide each employee with the name, address and telephone number of each medical facility. Employees injured on the job and unable to work as certified by the Employer's physician shall receive their regular hourly rate of pay, as scheduled, up to three (3) calendar days. The employee must, however, sign over to the Company any checks received from any insurance company or concern for worker's compensation coverage during the first three (3) calendar days of injury.

ARTICLE XXVI
HEALTH, WELFARE, PENSION AND 401(K) PLANS

**Section 26.1.**    The Medical, Vision, Prescription Drug, Dental, Flexible Spending Account, Group Term Life Insurance, Employee Assistance Program, Short Term Disability, Defined Benefit Pension, 401(k) and Education Assistance Plans describes the full set of benefits provided employees covered by this Agreement.  These benefits shall be continued for Company employees covered by this Agreement.  These benefits shall be continued for Company employees during the term of this Agreement: however, the Company reserves the right to unilaterally make any changes, additions, or deletions to these plans, and the Company may drop or add plans, as the Company in its sole discretion deems appropriate.

It is further understood that with respect to the Medical, Dental and Life Insurance plans and the Pension Plan, any change of a plan does not effectively leave employees without coverage.  Should the Company, in the exercise of its rights under this Article, increase the employee's medical contribution covered by this Article, the Company will provide the Union and

36

the employees two (2) calendar weeks' notice of such increase. The increase will not exceed 26% in premium contribution per year for each of the next three (3) years. Should the Company offer the employees more than one plan, any employee choosing one of the optional plans will pay the full contribution amount for that plan with no cap.

**Section 26.2 Continuing Education.** It is understood the employee will be responsible to aquire enough CEU credits to maintain their license. The Company shall endeavor to provide assistance through online courses and in house training.

## ARTICLE XXVII
## WAGE RATES

**Section 27.1. Minimum Rates.** After ratification of this agreement, effective May 11, 2006, May 1, 2007, and May 1, 2008, all employees on the payroll shall receive, at a minimum, the wage rates for their classifications set forth in Appendix A attached hereto. Nothing in this Agreement shall be construed to require the Company to fill or maintain any given number of employees assigned to any of the classifications listed in Appendix A. Except for the position of Working Foreman, Lead and In-Charge positions, no rate of pay shall exceed the highest wage grade shown on Appendix A.

**Section 27.2. Wage Increases.** The following general wage increases will take effect: May 11, 2006, 3.0%; May 1, 2007, 3.0%; and May 1, 2008, 3.0%.

**Section 27.3. Lead Position.** When the Company designates an employee as a "Lead" person, the employee so designated will be compensated with an hourly premium of 40 cents per hour.

**Section 27.4.** Operator Licenses. When the Company, at its sole discretion, appoints an employee Operator-in-Charge of a plant or a system, or group of systems, that employee shall be sole unit employee in responsible operational charge of that facility or system(s), under the direction of Company supervision. He or she shall be compensated with an hourly premium of 80 cents per hour. Since the Company has the right to determine the appropriate number of employees assigned to any classification, mere length of service, the filling of a shift, or the obtaining of a license, shall not qualify an employee for the positions of Operator-in-Charge, Operator, or Operator-in-Training.

Wage grade increases for license upgrading shall be at the discretion of the Company according to its needs.

Where an employee holds both an "S-3" or better sewer operator license and a "C" or better water license, the Company may award an additional pay grade where such dual licenses are deemed to its advantage.

The progress from Operator-in-Training to Operator to Operator-in-Charge is not subject to the normal job bidding process, but is based on the Company's need and the licenses held as shown on Appendix A.

**Section 27.5. Merit Increases.** Periodic evaluations may be made by the Company of the work performance of employees covered by this Agreement. Those evaluations may serve as the basis for a merit increase(s) as deemed appropriate by the Company. Employees shall become eligible for merit increases after they have been employed by the Company in a bargaining unit position for twenty-seven (27) months. The appropriate Steward will be advised when a merit increase is granted to an employee. Decisions under this Section shall be subject to the grievance procedure. However, any decision of the Company to grant a merit increase shall not be reversed unless arbitrary, capricious or made for a discriminatory purpose which would violate Article I (F). Decisions of the Company may be disallowed, but an arbitrator shall have no authority to grant a monetary award or merit increase to any person.

**Section 27.6. Minimum Call Back Pay.** A minimum of three (3) hours pay shall be provided when an employee is called back to work by the Company after having left the work place at the end of his or her regular work shift where such call back is for purposes of performing work other than as a Stand-by employee.

**Section 27.7. Shift Premiums.** Employees assigned to the second and third shift operations described in Article VII will receive a shift differential premium of sixty cents ($0.60) per hour for each hour worked on such special shift. Employees who work on Sundays, as part of their normal workweek will receive a premium of twenty-five cents ($0.25) per hour for each hour worked on such Sundays. Beginning May 1, 1998, employees who work on Saturdays, as part of their normal workweek will receive a premium of twenty-five cents ($0.25) per hour for each hour worked on such Saturdays.

## ARTICLE XXVIII

### **PERSONNEL SURETY**

It is understood and agreed to by and between the parties that the security of the Company's water supplies, and the safety of its employees, facilities and customers are matters of utmost importance. In light of the events of September 11, 2001, and in order to adequately protect the Company's water supplies, employees, facilities and customers, the parties further agree that the area of personnel surety is of paramount concern and needs to be appropriately addressed. Because the parties do not desire to unnecessarily delay the current contract negotiations and understand that the value of the implementation of a personnel surety program, they agree to be bound by any agreement regarding such issue that is reached at the national level by and between representatives of the Utility Workers of America, AFL-CIO and American Water.

## ARTICLE XXIX

### **OPERATIONS CONSOLE-24/7 OPERATIONS**

The Company and the Union mutually agree to the establishment of 24/7 operations at the Company's operations center. The establishment of 24/7 operations will enhance the company's ability to monitor and operate security systems and operations of Company facilities along with related activities to enhance response time and to better serve the customers.

Initial schedule for the 24/7 operations will include 3-8 hours shift every day. This may include an employee working both a Saturday and Sunday in the same week. A team of highly qualified operations personnel will work together to cover the required shifts with the ability to monitor and operate facilities and security systems throughout the Company's service areas.

If operations personnel covering the required shifts can mutually agree on a change in work shifts, then such change will be entertained and discussed by the Company and Union.

The following paragraphs regarding Holidays, Vacations, and Daylight Savings time are unique to the 24/7 operations and these paragraphs will supercede other related sections of the contract to the extent that they are different.

**Holidays**

It is understood that console operators are required to work on holidays that fall within their normal shift. When such holiday falls on a day which is a regularly scheduled work day, such employees shall, in addition to their regular pay, receive a holiday pay equal to one and one-half (1 ½) times their straight time rate of pay for the number of hours worked on any of the above-named holidays, it being understood and agreed all holidays are to be observed on the calendar day.

When any of the aforesaid holidays fall on an employee's scheduled day off, he shall be paid at his straight time rate for that day, provided the employee has worked his most recently scheduled shift before, and his first scheduled shift after said holiday. Absence from any regularly scheduled shift because of a bona fide disability or vacation shall not disqualify any employee for holiday pay.

In the event an employee is called from home to work on a holiday without having been given notification that such work would be required not later than the end of their last regularly scheduled shift, they shall be paid one and one-half (1 ½) times the regular hourly rate for all hours worked.

It is agreed, however, that both daily and weekly overtime and holiday pay shall not be paid for the same hours.

When any of the aforesaid holidays occur during an employee's vacation period, that employee shall be paid for the holiday. A holiday will not eliminate a vacation day.

The following holidays are recognized as fixed holidays for the purpose of this discussion.

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Memorial Day | Day after Thanksgiving |
| Independence Day | Labor Day |
| Christmas Day | |

**Vacations**

Vacations may be taken in periods of not less than one (1) week provided no overtime or interference with plant operations occur. Vacations shall not be accumulated from year to year. Five (5) days of an employee's vacation can be taken on (1) day at a time.

**Daylight Savings Time**

During the year when the time changes from Central Standard Time to Daylight Savings Time, the shift employee scheduled to work on the midnight to 8 a.m. shift will work 7 hours on the employee's shift and be paid for 8 hours at the employee's basic straight-time rate of pay.

During the year when the time changes from Daylight Savings Time to Central Standard Time, the midnight to 8 a.m. shift will work a total of 9 hours during the employee's shift and will be paid 8 hours at the employee's basic straight time rate and 1 hour at one and one-half (1 ½) times the employee's basic straight-time rate of pay.

### ARTICLE XXX
### AMENDMENTS

This Agreement may be opened and amended in all or any of its provisions by the mutual consent of the parties, but this Article shall not be subject to the grievance and arbitration provisions of this Agreement. Further, it is agreed by and between the parties that the No Strike or Lockout provision contained in Article XXIII shall apply to this provision of the Agreement.

### ARTICLE XXXI
### DURATION

This Agreement shall commence the day after it is ratified and signed by both parties and shall continue in full force and effect until midnight April 30, 2009, when it shall terminate. If either party desires to renegotiate this Agreement, he/she shall give the other party written notice to that effect not less than sixty (60) nor more than ninety (90) days prior to April 30, 2009. In any event, this Agreement shall not be executed beyond April 30, 2009 except by written consent of the parties.

FOR THE UNION:                          FOR THE COMPANY:

_____              _____
Wayne Clavio                           Kevin Hillen

_____              _____
Ray Rossa                              Michael Jackson

_____              _____
Gerald Rosenwinkel                     Dennis Federle

_____              _____
Chris Martens                          Stephen Phillips

_____
Aaron Holden

**42**

## **Appendix A – Wages**

Employees who are paid above the prevailing wage rates are grand-fathered in at their current base rate as they remain in their current position, and will receive all normal yearly increases. The only exception to this is the former Auto Mechanics who will have their wages frozen until such time as they reach the prevailing wage for their new classification.

Grand-fathered employees, as described above, who bid out their current position will be subject to the established prevailing wage for the classification they are bidding into.

Wage increases for the next three (3) years will be three (3) percent each year.

APPENDIX A

CLASSIFICATION

| Classification | | Wage 5/11/2006 | Wage 5/1/2007 | Wage 5/1/2008 |
|---|---|---|---|---|
| Central Control Operator | | $26.38 | $27.17 | $27.99 |
| Operator 1 | S-1 & Class A | $25.01 | $25.76 | $26.53 |
| Operator 2 | S-2 & Class B | $24.05 | $24.77 | $25.51 |
| Operator 3*** | S-3 & Class C | $23.07 | $23.76 | $24.47 |
| Operator in Training** | S-4 & Class D | $19.38 | $19.96 | $20.56 |
| Maintenance/Relief Operator | | $25.28 | $26.04 | $26.82 |
| Maintenance Technician | | $24.15 | $24.87 | $25.62 |
| Equipment Operator | | $23.57 | $24.28 | $25.01 |
| Sewer Jet/Semi Equipment Operator | | $22.85 | $23.54 | $24.25 |
| Field Service Technician* | | $19.10 | $19.67 | $20.26 |

Working Foreman Add-on                                          $1.00

All new hires covered by this agreement shall be paid
$2.00 dollars per hour less than the regularly
hourly rates as show above.  Thereafter, in increments
of twelve (12) months, the employee's wage shall
increase one ($1.00) dollar per hour until the top
hourly rate is reached for that classification.

* 2 branches – Customer Service which contains Customer
Service, Meter Reader, Inventory and Meter Repair, and Water
Distribution which includes Laborer and Field Maintenance and
JULIE locates.

** Operator in Training includes the position Lab Tech.
*** Quality Control Analyst included.

**Illinois American Water**®

## LAST CHANCE AGREEMENT

This Agreement is between Glen Williams (Employee), Illinois-American Water Company (Company) and UFCW Local #1547 (Union).

1.    On August 18, 2006 and November 7, 2006, the Company issued letters citing the Employee for two separate violations of the Code of Conduct Number 12 – Neglect of Assigned Duties. Under the Code of Conduct, the Employee normally would be subject to termination for a second violation of that provision. Because of circumstances in this case, the parties desire to give the Employee an opportunity to continue his employment, on a last chance basis, subject to the following conditions:

- The Employee will be suspended for thirty (30) days without pay effective November 7, 2006. The Employee acknowledges that the Company had just cause to issue this suspension.
- The Employee will make restitution for the overpayment (difference in pay between his Operator pay rate and the Operator in Training pay rate) for not having his IEPA Class A Water License from 1/1/06 through the most recent date Employee received payment at the higher rate. The Employee will arrange a payment schedule with the Company within two weeks after he signs this Agreement. Restitution will be completed within a 12 month period.
- The Employee will obtain an IEPA Water License, at least at a Class "B" level, within six months from the signing of this Agreement.

2.    Failure to comply with any of these conditions will result in immediate termination. Further, any future violation of Company policy or procedures, including the Code of Ethics, the Safety Code or the Code of Conduct, will result in the Employee's immediate termination. The Union and the Employee expressly waive any right to file a grievance or other claim regarding Employee's discharge under this Agreement, except to contest the fact of what occurred. If the conduct occurred, an Arbitrator will not have any authority to modify the discharge to a lesser penalty.

3.    The Employee and the Union agree not to disclose the terms and conditions of this Agreement or the negotiations leading up to this Agreement to any third party unless authorized to do so by the Company or required by law.

4.    In consideration for this Agreement, the Employee agrees to release the Company (and all related persons and entities) and the Union (and all related persons and entities) from all claims, actions, demands or liabilities for injuries or damages or other remedy, whether known or unknown, regarding the suspension of his employment and the effects of the suspension. Employee's release includes all claims under the law and all grievances under the Collective Bargaining Agreement.

5.    This Agreement reflects the parties' entire agreement, and it merges all agreements, representations, and understandings among the parties, whether oral or written, or both. As to Employee, this Agreement supersedes any conflicting provision or right under the parties' collective bargaining agreement. This Agreement may only be changed by a writing signed by all of the parties.



EXHIBIT

B



RWE Group

6.    Any disputes regarding the meaning of this Agreement will be resolved solely through the parties' collective bargaining agreement grievance-arbitration procedure.

7.    The parties agree to each provision and term of this Agreement. Any invalid provision or term shall not invalidate the remaining provisions and terms.

8.    The Employee understands the meaning of this Agreement and the Employee's responsibilities under this Agreement. The Employee voluntarily agrees to these terms because they are in the Employee's best interest and waives any right to further advice regarding the Agreement or further time to consider the Agreement.

9.    This Agreement is made on a non-precedent setting basis. That is, it shall neither be used nor referred to in the case of any other employee.

IN WITNESS WHEREOF, the parties have executed this Last Chance Agreement.


_____  11/7/06
EMPLOYEE                          Date


_____  11/7/06
FOR THE UNION                     Date


_____  11/7/06
FOR THE COMPANY                   Date

In The Matter of the Arbitration Between        )
                                                )
United Food and Commercial Workers Local 1546   )
                                                )
and                                             )
                                                )
Illinois-American Water Company                 )
                                                )
No. 51 300 00214 07[1]                          )

## OPINION AND AWARD

The hearing in the above captioned matter was held on November 20, 2007, at the Company's facility in Woodridge, Illinois, before Martin H. Malin, serving as the sole impartial arbitrator by selection of the parties. The Union was represented by Mr. Charles Orlove, its attorney. The Company was represented by Mr. Terry Potter, its attorney. The hearing was held pursuant to a collective bargaining agreement between the parties effective May 11, 2006 – April 30, 2009 (Jt. Ex. 1).

At the hearing, both parties were afforded full opportunity to call, examine and cross-examine witnesses, introduce documentary evidence and present arguments. A verbatim record of the proceedings was maintained and a transcript prepared. Both parties filed post-hearing briefs.

### The Issues

The parties stipulated that the issues before me include (Tr. 91-92):

1.   Whether the Company had cause to discipline Dan Leppert, Ken Nelson, and Glenn Williams in October and November of 2006?

2.   Whether the Company had cause to terminate Glenn Williams on March 2, 2007?

The Union proposes the following additional issue, which the Company contends is more properly analyzed as part of the just cause inquiry:

3.   Whether the extent or amount of discipline administered or given to employees Leppert, Nelson and Williams in October and November 2006 was appropriate under the circumstances of this case?

---

[1]This matter was initially filed with the American Arbitration Association which assigned the case number. On March 1, 2007, pursuant to the parties' agreement, AAA terminated its administration of this matter.

**EXHIBIT**

C

I agree with the Company that the Union's proposed third issue is already encompassed within the two stipulated issues.

**The Contract**

The following provisions of the collective bargaining agreement have been cited as relevant to the instant proceedings:[2]

Article II, Management Rights, provides:

**Section 2.1. Generally.**  Subject to the provisions of this Agreement and its grievance procedure, the Company may exercise its own discretion in any or all of the following matters: to decide on all machines, tools, materials, and equipment to be used; to move or remove any plant or office or any of its parts to other areas; to determine the work schedules and assignments of employees; to determine the process for wastewater and water treatment; to maintain order and efficiency in its plants and operations; to hire, lay off, assign, transfer, and promote employees; to determine job content and pay classifications independently of any state or local licensing arrangement; to determine starting and quitting times; to determine the number of hours to be worked; to establish such reasonable rules and regulations, not in conflict with this Agreement, as it may from time to time deem best for the purposes of maintaining order, safety and effective operation of its plants, and after advance notice thereof to the Union and other employees, to require compliance therewith by employees, and discipline and discharge post probationary employees for cause subject to the grievance procedure.

. . . . .

Article XIII, Stewards, provides:

. . . . .

**Section 13.2. Authority.**

The authority of Stewards and Chief Steward shall be limited to the following activities:

The investigation and presentation of grievances to the Company as provided herein.  The Stewards shall accept and present grievances, except for emergency situations, the first thing in the morning before leaving for the job site after obtaining approval from their immediate supervisor or his or her designated replacement.

---

[2]For purposes of brevity, I have not reproduced all of the contract provisions cited by the parties.  I wish to assure the parties that I have considered every provision they have cited, even though I may not have reproduced all of them.

Reasonable time necessary for processing or investigating such grievances will be during regular work hours and shall be paid for by the Company.

Article XIV,  Grievance and Arbitration, provides:

. . . . .

### Section 14.2.  Procedure.

Step 1:  If any employee has a grievance, the employee and/or his/her Union Steward shall, within five (5) working days of its occurrence, present it verbally to his or her immediate supervisor, and the two parties shall endeavor to settle it.  If the grievance is not resolved within five (5) working days of its filing, then within five (5) working days...

Step 2:  The appropriate Steward shall reduce the grievance to writing and present it to the head of the functional area.  The parties shall at that time set a meeting to discuss the grievance within forty-eight (48) hours or a reasonable time agreed upon by the parties.  The grievance shall be discussed by the appropriate Steward and the department head and/or his/her designee.  The grievant will be allowed to attend this second step meeting if his or her presence will significantly assist in the resolution of the grievance. If the grievance is not satisfactorily resolved within five (5) working days of its filing at this Step 2, then within five (5) working days...

. . . . .

Article XV Discipline and Discharge, provides:

**Section 15.1.  Discipline for Cause.**  The right to discipline or discharge an employee for cause shall be vested solely in the Company.  The Union shall have the right in such cases to investigate the reasons therefore and to protest such discipline or discharge through the grievance procedure.

Article 26 Health, Welfare, Pension and 401(K) Plans, provides:

. . . . .

**Section 26.2. Continuing Education**.  It is understood the employee will be responsible to aquire (sic) enough CEU credits to maintain their license.  The Company shall endeavor to provide assistance through online courses and in house training.

**Background**

The instant grievances concern the discipline of Glenn Williams, Dan Leppert and Ken Nelson by the Company and the subsequent discharge of Glenn Williams. The expiration of the water licenses issued by the Illinois Environmental Protection Agency (IEPA) to each of these employees precipitated the disciplinary actions and the discharge.

The Company provides water and wastewater services in Illinois. The Grievants have all been employed by the Company as operators whose job descriptions include responsibility for the operation, routine servicing and care of plant equipment for wastewater treatment and/or water treatment processes (Co. Ex. 2). The minimum requirements for the position of operator include, among other things, state licensing as either a Class S-3 Wastewater Treatment Plant Operator or a Class C Water Plant Operator (Id.). Such operator licenses are issued by the IEPA to the operators and must be renewed every three years. Prior to 2003, renewal of a license was accomplished by payment of a renewal fee. As of 2003, the IEPA required continuing education to renew and maintain operator licenses. Holders of Class C water plant operator licenses must receive 15 units of continuing education every three-year period in order to renew their licenses. Holders of Class A or B water plant operator licenses must receive 30 units of continuing education to renew their licenses.

The Company has issued an "Employees' Guide for Conduct" (Co. Ex. 8). The Guide provides:

> In instances where acts are committed which are judged to be detrimental to fellow employees, the Company, and/or the public, disciplinary action is necessary. This policy is intended to insure impartial treatment in such instances. Disciplinary actions are to be taken as they relate to the offense specified. The Company does not waive the right to impose disciplinary action for an act not specifically enumerated in this Guide, nor does the Company waive its right to impose more or less severe discipline than specified, should circumstances so warrant.

The Guide provides four levels of discipline: 1, counseling and warning; 2, one to five days suspension; 3, more than five up to a maximum of thirty days suspension; and 4, discharge. The enumerated offenses include, "12. Neglect of assigned duty (including sleeping on the job during working hours)," which is indicated as a level 3 for a first offense and a level 4 for a second offense.

Mr. Williams testified that he has been employed by the Company or its predecessors since 1974 and that his most recent position had been that of operator (Tr. 265). On August 18, 2006, Mr. Williams received a five workday suspension for neglect of duty in violation of Offense number 12. The notice indicated that Mr. Williams was disciplined for failing to respond promptly to a water main break and two other emergencies on July 22, 2006, after indicating to the Central Control Operator that he would respond (Co. Ex. 10).

Mr. Williams testified that he had held a Class A water license (Tr. 266). Mr. Williams related that he received a telephone call on October 10, 2006, from an IEPA representative who informed him that his license had expired and that he would be required to retest in order to receive a new license (Tr. 266). Several days later, Mr. Williams notified his supervisor, John Stein, that his license had expired and requested Mr. Stein to provide him with a "letter of entrance" so that he could take the examination for a license (Tr. 267).

Stephen Phillips, the Company's production superintendent, testified that, after Mr. Williams had notified his supervisor of the expiration of his water license, the Company contacted the IEPA to determine whether the licenses of any of its other employees had expired (Tr. 137-38). Mr. Phillips testified that the Company learned that the licenses of Dan Leppert and Ken Nelson had also expired (Tr. 138). Mr. Phillips related that he and Mr. Stein interviewed each of the three employees in separate meetings on October 19, 2006, and interviewed each of them a second time on October 24, 2006, to investigate the circumstances regarding the expiration of their water licenses (Tr. 137-46). Chief Steward Ray Rossa accompanied each of the Grievants in the meetings on October 19 (Tr. 224, 246, 267) and either Mr. Rossa or Steward Chris Martens attended the meetings on October 24 (Tr. 140, 143, 248-49, 270).

Mr. Phillips testified that he met with each of the Grievants again on November 7, 2006, to present them with the Company's determination of discipline. Mr., Phillips testified that Mr. Stein again accompanied him in each of these meetings on November 7, and that Steward Chris Martens attended the meetings along with the Grievants.

Mr. Phillips and Mr. Stein delivered a written notice of discipline to Dan Leppert dated November 7, 2006, (Un. Ex. 3) pursuant to which Mr. Leppert was suspended for 15 workdays without pay for allowing his Water License to expire, which the Company considered as neglect of assigned duty; Offense Number 12 of the Employees' Guide For Conduct. The notice of discipline also informed Mr. Leppert that "you will remain at your current pay rate based on the Waste Water License you have maintained; however we expect you to obtain a Water License as well." (Un. Ex. 3). Mr. Leppert was granted six months from the date of that notice to reinstate his Class C Water License (*Id.*).

Mr. Phillips and Mr. Stein delivered a written notice of discipline to Ken Nelson dated November 7, 2006, (Un. Ex. 2) pursuant to which Mr. Nelson was also suspended for 15 workdays without pay. In addition, the Company required Mr. Nelson to repay the difference between the hourly rate of an Operator in Training and the hourly rate that he had received for the entire year of 2006. In that written notice, the Company asserted that it had relied on Mr. Nelson's representation that he had and maintained a Class B Water License and that he had been overpaid since his license expired on July 1, 2004. The notice stated that Mr. Nelson's failure to make the repayment within a one-year period would result in further discipline. Mr. Nelson was also informed that he would have six months within which to reinstate his Water License, at which time he would be reinstated to the Operator pay rate. Upon such reinstatement, however,

he would be paid at the standard Operator rate pursuant to the Collective Bargaining Agreement, and that the higher rate at which he had been grandfathered since the Company's predecessor acquired Metro Utility Company in 1994 would no longer apply.

Mr. Phillips and Mr. Stein also delivered a written notice of discipline to Glenn Williams dated November 7, 2006, together with a two-page Last Chance Agreement attached thereto (Un. Ex. 1). The notice recited that Mr. Williams's Water License had been expired for over nine years, since July 31, 1997. The notice further referred to Mr. Williams's 2006 five-day suspension for Offense Number 12 and that the Guide recommends termination for a second such offense. The notice related that because Mr. Williams brought the lapse of his license to the Company's attention, the Company was willing to forego termination and offer a Last Chance Agreement. As set forth in the notice of November 7, the Company suspended Mr. Williams for 30 workdays without pay, required reimbursement of the difference between the pay rate of an Operator in training and the rate that Mr. Williams had received during 2006 (predicated upon the Company's reliance on the representation of Mr. Williams that he had maintained his Class A Water License), and allowed Mr. Williams to be reinstated to the Operator rate upon successfully reinstating his Water License within six months, but that the higher rate at which he had been grandfathered since 1994 would no longer apply.

The Last Chance Agreement referenced the two violations of Code of Conduct Number 12 and stated, "Under the Code of Conduct, the Employee normally would be subject to termination for a second violation of that provision. Because of the circumstances in this case, the parties desire to give the Employee an opportunity to continue his employment, on a last chance basis, subject to the following conditions . . ." (Un. Ex. 1). The conditions specified that Mr. Williams would be suspended for 30 days and acknowledged that the Company has just cause to issue the suspension; Mr. Williams would make restitution for the difference in pay between his Operator pay rate and the Operator in Training rate for 2006 and arrange a repayment schedule within two weeks providing for repayment within 12 months; and Mr. Williams would obtain an IEPA Water License at least at a Class B level within six months. It further provided, "Failure to comply with any of these conditions will result in immediate termination," that Mr. Williams released all claims under the law and all grievances under the contract, and, "This Agreement reflects the parties' entire agreement, and it merges all agreements, representations, and understandings among the parties, whether oral or written, or both."

Mr. Phillips testified that he and Mr. Stein presented the disciplinary suspension and Last Chance Agreement to Mr. Williams and Mr. Martens on November 7, 2006, and explained the suspension and agreement to them (Tr. 154-55). Mr. Phillips testified that Mr. Williams and Mr. Martens read the agreement, "they took some time to go through it, they signed it, then there was really no questions." (Tr. 155). In his testimony, Mr. Williams acknowledged signing the Last Chance Agreement but stated, "I basically quickly scanned it. I didn't – I didn't read it word for word." (Tr. 272). "This is a high-stress, high-anxiety moment, so I actually needed more time to digest this, to be honest with you." (Tr. 273). Mr. Williams testified that he did not ask for more

time to review the agreement or discuss the need for more time with Mr. Martens (Tr. 294-95). Mr. Martens testified that he did not want to see Mr. Williams get fired and he "figured we'd sign it, and then we'd file a grievance and deal with it later." (Tr. 302).

At Step 1 of the grievance procedure, Mr. Martens, presented verbal grievances to Mr. Stein on behalf of all three Grievants, essentially contending that the discipline administered by the Company had been too severe in each instance. (Un. Ex. 8 (Williams), Un. Ex. 10 (Nelson) and Un. Ex. 12 (Leppert)). Mr. Stein denied those Step 1 grievances. Mr. Martens and Mr.Phillips participated in Step 2 Meetings on November 16, 2006, and the Company again denied the grievances (Un. Ex. 9 (Williams), Un. Ex. 11 (Nelson), Un. Ex. 13 (Leppert)). Step 3 meetings were conducted on December 8, 2006, concerning the grievances of each of the three employees. Mike Jackson, the Company's production manager, testified that he and Union Vice President and Business Representative Wayne Clavio participated in those Step 3 meetings, along with Mr. Phillips, Mr. Rossa and Mr. Martens (Tr. 214). The grievances remained unresolved and this arbitration ensued.

Mr. Leppert testified that he had been an employee of the Company or its predecessors since 1983, but that he had not signed any documents or reports to the IEPA as a licensed operator or "responsible charge" for the water systems since Citizen's Utilities, the immediate predecessor to the Company, acquired Metro Utility in 1994 (Tr. 224-26). Mr. Leppert also testified that, after the Company learned of the expiration of his Water License and reduced his pay rate to that of an Operator in Training, his duties, responsibilities and supervision did not change in any way (Tr. 229). In addition, Mr. Leppert testified, the IEPA took no action against him on account of his license having expired or his having worked without a license (Tr. 235). Mr. Leppert also testified that the Water License test could only be taken on the first Monday of every month and that he was unable to take the test until June 4, 2007, which was beyond the six month period within which the Company had required him to obtain reinstatement of his license (Tr. 233-34). Mr. Leppert testified that the Company did not fire him or otherwise discipline him for having failed to comply with the six month deadline for reinstating his license, but instead issued a letter to him dated May 30, 2007, requiring him to obtain reinstatement within 60 days of the date of that letter or be terminated (Un. Ex. 16, Tr. 234).

Mr. Nelson testified that he had been an employee of the Company or its predecessors since 1969, but that, like Mr. Leppert, he had not signed documents or reports to the IEPA as a licensed operator since the acquisition from Metro Utility in 1994 (Tr. 248). Mr. Nelson also testified that his duties, responsibilities and supervision did not change during the period in which his license was expired (Tr. 251-52) or the time for which he was paid at the rate of an Operator in Training (Tr. 264). Mr. Nelson also testified that the IEPA took no action against him as a result of his license expiration or because he was working without a license (Tr. 252). In addition, Mr. Nelson testified that, during his suspension, he received a letter from the Company regarding payroll deductions for the amount that he was required to repay the Company, but that he did not sign that letter and never paid any amounts to the Company as required by the disciplinary suspension notice of November 7, 2006 (Tr. 252-53). Despite his

failure to make such payment, Mr. Nelson testified, he did not suffer any further discipline or discharge by the Company (Tr. 255).

Mr. Williams testified that he had obtained his water license in 1994 and that it expired in 1997, but that he never received the renewal notice because he had moved to a new residence in 1995 (Tr. 269). Mr. Williams also testified that while his license was expired and he was being paid at the rate of an Operator in Training, there was no change in his duties or supervision (Tr. 276). Mr. Williams also testified that the IEPA took no action against him because his license had expired or because he had been working without a license (Tr. 277). Mr. Williams testified that, while he was on suspension, he received telephone messages from Messrs. Phillips and Stein concerning the repayment agreement that the Company wanted him to sign, but that the Company mailed the agreement to the wrong address (Tr. 278-79). Mr. Williams testified that he received a telephone call from Mr. Clavio in late February 2007, informing him that the Company was going to call him in to sign a repayment agreement, but that the Union was advising him not to sign it, even if that would result in his termination (Tr. 281). Mr. Williams testified that he attended a meeting on March 2, 2007, with Messrs. Phillips, Stein and Martens, that Mr. Phillips gave him an opportunity to sign a repayment agreement but that Mr. Williams followed Mr. Clavio's recommendation and declined to do so (Tr. 282-83). At that time, Mr. Phillips delivered a notice dated March 2, 2007, to Mr. Williams that referenced the union's position concerning the repayment requirement and terminated the employment of Mr. Williams (Un. Ex. 5, Tr. 282-84). Shortly thereafter, the union initiated a grievance protesting Mr. Williams' termination, which grievance is also the subject of this arbitration.

Mr. Phillips testified that one of the minimum requirements for the position of Operator at the Company is to have either a water license or a wastewater license from the state (Tr. 109-11). Mr. Phillips also testified that Appendix A to the Collective Bargaining Agreement sets forth "different classifications for licensing that is held ranging from operator in training all the way up to central control operator" so that the operators get paid as a function of the level of license they hold (Tr. 118). With respect to Mr. Nelson, Mr. Phillips testified that the Company reduced his pay status to that of an Operator in Training because he no longer held the proper licensing for his operator (Tr. 151). Mr. Phillips initially testified that Mr. Nelson's pay was a function of his job duties but when prompted by counsel corrected himself, stating that it was a function of Mr. Nelson's license (Tr. 152). With respect to Mr. Leppert, Mr. Phillips testified that his pay level remained the same because he had maintained a waste water license; nevertheless he was suspended because he was operating water facilities and did not maintain his water license (Tr. 153). Mr. Phillips acknowledged that all three of the employees continued working without licenses and that their duties and supervision remained unchanged during that time (Tr. 186-87). Mr. Phillips also testified that IEPA knew that the employees' licenses had expired but did not instruct the Company to take those employees out of service (Tr. 190). Mr. Phillips also acknowledged that the IEPA took no action against either the Company or the three employees as a result of the expiration of their licenses (Tr. 178-79).

Mr. Jackson, the production manager, testified that the payment of wages is "based on

their licensing and what their particular job is." (Tr. 222). On cross-examination, Mr. Leppert testified that different levels of operators received different levels of pay pursuant to Appendix A of the Collective Bargaining Agreement (Tr. 241). Mr. Nelson testified that Mr. Phillips had pointed out to him the relationship between licenses and pay levels in the Collective Bargaining Agreement, but that he had understood that wages were based upon job classification rather than licenses (Tr. 256, 260-61). Mr. Williams testified that he understood that a Class A license operator gets paid more than a Class B, but that he was being paid for the knowledge in his head as well as the license that he held (Tr. 288). Mr. Rossa, the Chief Steward, testified that he had been paid at the level of an Operator in Training for a period of three years although he held a Class A Water License and a Class 3 Sewer (Waste Water) license at the time (Tr. 322). Mr. Phillips testified in rebuttal that when the Company bids a particular position or job classification, the level of pay is determined by that job level without regard to whether the particular employee has a higher level of license (Tr. 345-46).

Mr. Phillips testified that, pursuant to the grievance procedure under the Collective Bargaining Agreement, the shop steward normally presents grievances at Steps 1 and 2 to the supervisor and that, as a matter of practice, grievances are resolved in those first two steps (Tr. 156-57). The Company introduced records of a grievance resolved at a Step 2 meeting by Mr. Rossa (Co. Ex. 11). More generally, Mr. Phillips testified that, from time to time, a steward is able to resolve a grievance at the first or second step of the procedure (Tr. 167). He also stated that, while stewards may be able to resolve 25 percent of grievances at the first or second step, their goal is to resolve 100 percent of such grievances (Tr. 168). On cross-examination, Mr. Phillips acknowledged that all discharge or discipline cases end up at Step 3 of the grievance procedure and are not resolved at the first or second steps (Tr. 170).

Mr. Martens testified that he had no authority to agree to or negotiate company-administered discipline or last chance agreements (Tr. 300-01). He also testified that Stewards always handle meetings that may result in discipline or discharge, "and depending on the severity, they might pull in the chief steward." (Tr. 301). When asked on cross-examination about his ability to sign the Last Chance Agreement on behalf of the Union, he responded (Tr. 305):

> Yes and no. I mean, I knew we had – I had the right to – for discipline and stuff. This – I'd never dealt with this. I wasn't a steward that long. Maybe two years, three years or something. I'd never come across this. I figured by reading some of that, I figured you know what? Sign it, keep the guy's job, we'll fight it out later on.

Mr. Martens also testified that of the ten or fifteen grievances that he had handled as a steward, he had been able to resolve two on his own without the involvement of the chief steward (Tr. 307-08). Mr. Martens testified that when the parties meet, whether at Step 1, Step 2 or Step 3 of the grievance procedure, they are normally attempting to resolve the matter through some middle ground (Tr. 312).

Mr. Rossa also testified that stewards have no authority to agree to or negotiate company-administered discipline or last chance agreements (Tr. 315). Mr. Rossa testified that he could not recall any grievances involving discipline or discharge that were resolved at either Step 1 or Step 2 of the procedure (Tr. 317). With regard to the grievance settlement introduced by the Company, Mr. Rossa testified that he had consulted with Mr. Clavio who approved Mr. Rossa's signing the settlement (Tr. 317-19). On cross-examination, Mr. Rossa testified that, other than what the Collective Bargaining Agreement might say regarding the matter, he was not aware that the Union had ever informed the Company that a steward does not have the authority to resolve grievances over discipline or discharge (Tr. 323-24).

Mr. Rossa testified that Article 26.2 of the contract was negotiated in the 2006 bargaining. He related that the Union proposed that the Company allow employees to obtain their CEU credits on Company time. According to Mr. Rossa, the language in Article 26.2 resulted from the Company's counter-proposal. Nothing was said about discipline for failing to maintain a license or failing to obtain the CLUs necessary to renew a license (Tr. 319-21). Mr. Clavio agreed with Mr. Rossa's testimony concerning the negotiation of Article 26.2 (Tr. 331-32).

Mr. Phillips testified as to the Company's intent as follows (Tr. 346-47):

Well, the intent or the reason we put the language in is its mandatory. The EPA states that, you show, you need 15 hours or 30 hours to maintain your license. We wanted to make that loud and clear. It's very very important that operators maintain and get the training, the refresher training, just to keep them up to speed on new events, new technologies because you are handling it. You're touching it. You're actually putting that end product in the system. You're dealing with chemicals. You're dealing with the new technology.

On cross-examination, Mr. Phillips agreed that the subject of Article 26.2 was raised by the Union and that the Company had no initial proposals with respect to maintaining licenses (Tr. 349-50).

**Company's Position**

The Company contends that it had just cause to discipline Mr. Leppert after it had discovered that his Class C water license had been expired for over one year. The Company maintains that Section 26.2 of the Collective Bargaining Agreement expressly required Mr. Leppert to accumulate enough CEUs to maintain his license and that his failure to do so was properly classified as a "neglect of an assigned duty" pursuant to the Guide for Employee Conduct. The Company argues that the issuance of a 15-day suspension was consistent with the penalty indicated in the Guide for such an offense: "more than five (5) days off without pay, up to a maximum of thirty (30) work days." The Company emphasizes the public health issues at stake in connection with the education and expertise of water treatment plant operators and

argues that the failure of Mr. Leppert to maintain his license was a serious violation of Company policy that justified a 15-day suspension.

The Company argues similarly that it had just cause to administer a 15-day suspension to Mr. Nelson when the Company discovered that his Class B water license had been expired for over two years. The Company also contends that it was reasonable and appropriate for the Company to reduce Mr. Nelson's pay level to that of an Operator in Training until he renewed his license and to demand the repayment of approximately $10,500, representing the value of that pay differential over the course of one year, because Mr. Nelson had received an "overpayment" under "false pretenses" by failing to inform the Company that his license had expired. The Company argues that such repayment is "merely restitution for a fraud, however innocent the fraud may have been," and not disciplinary in nature. Alternatively, the Company contends that the overpayment was due to Mr. Nelson's mistake, and that the Company had a right to recoup overpaid wages when the mistake was not its fault. The Company maintains that without such repayment, Mr. Nelson would be unjustly enriched by his own negligence and mistake and that it would be unfair to other employees who maintained their licenses.

The Company argues that the Last Chance Agreement with Mr. Williams is valid and enforceable, that Mr. Williams was not coerced into signing it, and that Mr. Martens had authority, whether actual or apparent, to enter into that agreement. The Company points to past practice between the parties wherein Stewards have exercised authority to settle grievances. The Company argues that, based upon such past practice, it reasonably believed that Mr. Martens had authority to enter into the Last Chance Agreement. The Company also argues that the Last Chance Agreement acts as a modification to the Collective Bargaining Agreement so as to replace the just cause provision with respect to Mr. Williams. According to the Company, the only issue for arbitration is whether Mr. Williams violated the terms of the Last Chance Agreement.

Alternatively, assuming that the just cause analysis applies to Mr. Williams, the Company contends that it has satisfied that standard. Mr. Williams had allowed his license to be expired for over nine years. Importantly, in the Company's view, Mr. Williams had received a five-day suspension for a prior "neglect of duty" violation less than three months prior to the discovery of the expiration of his water license. The Guide for Employee Conduct indicates discharge as the penalty for a second Offense Number 12. In lieu of discharge, however, the Company offered Mr. Williams the opportunity to retain his job after serving a thirty-day suspension. In addition, the Company required a repayment schedule for the repayment of only one year's worth of excess wages. The Company maintains that it appropriately dealt with Mr. Williams as a repeat offender in accordance with accepted principles of progressive discipline so as to easily satisfy the just cause standard.

Finally, the Company argues that it had cause to terminate Mr. Williams for violating the Last Chance Agreement by failing to arrange a repayment schedule. The Company refers to paragraph 2 of that agreement which provides, "The Union and the Employee expressly waive

-11-

any right to file a grievance or other claim regarding Employee's discharge under this Agreement, except to contest the fact of what occurred. If the conduct occurred, an Arbitrator will not have any authority to modify the discharge to a lesser penalty." The Company contends that it had cause to discharge Mr. Williams under the Last Chance Agreement because he failed to arrange a repayment schedule as required by the agreement. If the agreement were to be determined to be invalid, however, the Company contends that the discharge is still justified under a "just cause" analysis because Mr. Williams had two offenses of Number 12 of the Guide for Employee Conduct in less than three months and the Guide indicates discharge as the stated penalty for such a second offense.

## Union's Position

The Union argues that the issuance, retention and expiration of licenses is regulated by the IEPA, which took no action against these employees whose licenses had expired, and should have been of no concern to the Company. The Union contends that the Company had no policy to check on the status of employee licenses and did not suffer one wit by reason of any failure to renew them in a timely manner. The Union points out that the Guide for Employee Conduct does not contain any rule with respect to maintaining a license. The Union argues that Section 26.2 of the Collective Bargaining Agreement merely determined whether continuing education would be undertaken on Company time or on the employees' own time, that the Agreement contained no provision regarding the maintenance of licenses before the current contract, and that Section 26.2 is not mentioned in any of the disciplinary letters. The Union further contends that the failure to maintain a license cannot constitute a "neglect of assigned duty" in violation of Rule 12 because the Company had never assigned such a duty to the employees. In addition, the Union argues that it is irrational and outrageous for the Company to knowingly and deliberately continue to utilize these employees with expired licenses while punishing them for failing to have maintained their licenses.

The Union contends that the Company's interest in its employees' licenses, and its discipline for any failure to maintain those licenses, should be no greater than that of the IEPA which issues and regulates such licenses but did not take any action against these employees whose licenses had been expired. If any discipline is warranted, the Union maintains, a warning without time off would have been sufficient under these circumstances. The Union emphasizes a number of factors that it believes would support such a limited discipline, including: the IEPA sanctioned neither the Company nor the employees; the Company failed to monitor the status of the licenses; Section 26.2 did not require licensing; there is no evidence of any willful misrepresentation or fraud; Mr. Williams alerted the Company to the expiration of his license; the Company continued to use unlicensed employees without any change in duties or supervision; early IEPA procedures required only a ten dollar renewal fee; and the long tenures of satisfactory performance by these employees. The Union argues that a fifteen or thirty day suspension is excessive and unjustified, given the range of not less than five or more than thirty days indicated in the Guide, especially when the governmental licensing authority treated the matter in a mechanical or automatic fashion.

The Union argues that it was grossly unfair for the Company to reduce the Grievants' wages on the basis of the expiration of their licenses, as employees are to be paid on the basis of the jobs that they do and these employees continued to perform the same functions without modification. The Union also maintains that the Company received the benefit of that labor and had no legitimate basis for the reduction of the employees' pay during that time period.

The Union argues that, as any reduction in wages was unjustified, the Company's demand for the repayment of a significant portion of the 2006 wages of Mr. Nelson and Mr. Williams was outrageous. The Union contends that, in the absence of any evidence of fraud or deceit, arbitrators will not order a return of wages previously earned and paid based on a mistake or oversight. The Union also argues that the Company acted disparately among the three employees. It did not require any repayment by Mr. Leppert because he held a license other than the one he was supposed to have. It failed to enforce its demand for repayment from Mr. Nelson, while at the same time terminated Mr. Williams for his refusal to agree to a repayment schedule while his grievance was pending. According to the Union, the employees were not unjustly enriched by any payment of wages for services performed, but the Company would be unjustly enriched by any reduction or repayment of those wages.

The Union also contends that the elimination of the grandfathered wage rates that had applied to Mr. Nelson and Mr. Williams constituted an additional loss of pay for which there is no basis. The Union argues that these grandfathered employees should not lose their status because they continued to perform the same duties in the same positions at the Company.

The Union argues that the Last Chance Agreement regarding Mr. Williams is null and void. The Union maintains that Mr. Williams signed the agreement in order to avoid termination, and that he thought he was signing to acknowledge receipt of the documents. The Union also maintains that Mr. Martens signed the agreement intending to grieve the matter, which he did soon thereafter. The Union argues that the Last Chance Agreement was misused in these circumstances that amounted to coercion, that it should be deemed unenforceable, and patently unfair.

The Union also argues that Mr. Martens had no authority to enter into the Last Chance Agreement, or any agreements with the Company. The Union contends that Section 13.2 of the Collective Bargaining Agreement limits the authority of Stewards and precludes them from entering into such agreements. Moreover, the Union argues, the agreement was not entered into as a settlement of a grievance because no grievance was yet pending at that point in time. The Union also contends that because the agreement has no termination date, its endless potential for discharge is enough to strike it down. The Union urges that the agreement arose from "individual bargaining" that attempted to bypass the Union rather than bargaining with the Union in good faith.

The Union contends that, at the time the Company terminated Mr. Williams, his grievance had proceeded through all three steps and arbitration had already been invoked.

Moreover, Mr. Clavio had advised Mr. Williams not to sign any repayment agreement while the matter was going to arbitration, and had informed the Company of its position and its advice to the employee. The Union argues that the Company's termination of Mr. Williams at such time and under such circumstances violated both his and the Union's rights under the National Labor Relations Act. The Union also contends that the discharge violated Illinois statutory law requiring employee consent to deductions from wages. Finally, the Union argues, the discharge of Mr. Williams constitutes unfair, disparate treatment in view of the fact that the Company did not discipline Mr. Nelson for his failure to agree to arrangements for a similar repayment, and granted Mr. Leppert an extension of time within which to renew his license rather than discharge him.

## Discussion

The arbitrator has considered the transcript and his notes of the hearing, the exhibits, the parties' briefs and arguments and all authority cited therein. Based on that review, I have concluded that the grievances must be sustained in part and denied in part.

All three Grievants neglected to maintain their water treatment licenses. That is undisputed. The Union seeks to minimize the significance of the expiration of these licenses, while the Company relies in part on Article 26.2 of the Collective Bargaining Agreement in urging that the Grievants' failure to maintain their licenses constituted neglect of duty. The Union argues that the prior contract had no provision relating to licenses comparable to Article 26.2, and that the current provision arose from a proposal by the Union to have the Company pay for the continuing education requirements recently established by IEPA, which proposal was rejected by the Company. Although the Union contends that the provision is nothing more than an agreement by the parties that the employees would be responsible for the costs of the new continuing education requirements, the very fact that the union raised the issue of who would pay for continuing education indicates that the Union recognized that employees with IEPA licenses were expected to maintain them and would now face an additional cost of doing so. Indeed, the job description for the position of Operator expressly states that either a water license or a waste water license is a minimum requirement for that job classification. Accordingly, an employee's failure to maintain his license is not simply a technicality that would warrant no discipline beyond a mere reprimand.

The grievances of Messrs. Nelson and Leppert raise the question whether a failure to maintain a license warrants a fifteen day suspension. Unlike some contracts, the instant Collective Bargaining Agreement does not set forth any express schedule of progressive discipline, but provides only that discipline shall be for cause. In the absence of an express discipline schedule, the requirement of cause affords the Company a reasonable range of discretion within which to exercise its disciplinary authority. Nevertheless, the contractual requirement of cause mandates that the discipline imposed be reasonably proportionate to the offense at issue, and that it be consistent with the discipline imposed in the bargaining unit generally.

-14-

The requirement of reasonable proportionality and consistency is, of course, bargaining unit specific. The requirement of cause is contractual and it is the available evidence of the parties' intent and practices that informs interpretation of the contract. The 15-day suspensions are consistent with the Guide for Employee Conduct, which calls for a suspension of more than five days but no more than thirty days for first offenses of this nature, but there is no evidence that the parties have actually followed this guideline. On the contrary, for his prior violation of Offense 12, Mr. Williams received a five-day suspension. Indeed, the prior offense of Mr. Williams appears to have been at least as serious as the offenses of Mr. Leppert and Mr. Nelson. Mr. Williams's prior offense consisted of a failure to respond promptly to three emergency calls even though he advised the Central Control Operator that he would respond. In contrast, the failure by Messrs. Nelson and Leppert to maintain their water licenses did not disrupt production or discipline. The evidence is uncontroverted that the actual work they performed did not require an IEPA license as both Mr. Leppert and Mr. Nelson continued to perform the same duties while their licenses were expired and neither they nor the Company were subjected to any penalties or other action by IEPA. The failures of Mr. Leppert and Mr. Nelson to maintain their licenses were first offenses for both employees. Considering all of the objective evidence in the record, it is apparent that the imposition of fifteen day suspensions on these Grievants was not reasonably proportionate to their offenses or consistent with prior disciplinary practice. I find that the Company has established cause for five-day suspensions but has not established cause for fifteen-day suspensions. Accordingly, the suspensions must be reduced to five days each and the Grievants made whole for the difference between the fifteen day suspensions administered to them and the five day suspensions justified under the contract.

In addition to the suspension, the Company reduced Mr. Nelson's pay level to that of an Operator in Training until he obtained the renewal of his license, and demanded repayment of the difference in pay levels for the year 2006. Contrary to the contentions of the Company, there is no showing of any deceit or fraud on the Grievant's part that would support a finding that he received wages under false pretenses. Moreover, the evidence establishes that the wage rate is based upon the job that is performed by the employee, not upon the license that he holds. For example, although the Company did not reduce the pay level of Mr. Leppert because he had maintained a sewer license, there was no showing that his sewer license was in any way relevant to or necessary for the job that he performed. Both Mr. Leppert and Mr. Nelson continued to perform the same work that they had performed prior to the discovery of the expiration of their water licenses and no temporary vacancy in those positions was declared. I find that the reduction of the pay level at which Mr. Nelson was to be compensated was unjustified and, therefore, the demand for repayment of compensation from 2006 was improper. Since the repayment for 2006 was never made and the Company has taken no steps to collect it, no make whole relief from that Company demand is necessary; however, to the extent that the Company continues to carry that demand "on the books," it must be cancelled. Additionally, Mr. Nelson must be made whole for the reduced wage rate that he suffered until his license was restored.

In addition, the elimination of the higher rate structure into which Mr. Nelson had been grandfathered was similarly unjustified as Mr. Nelson continued to perform the same job

functions. Although Appendix A to the Collective Bargaining Agreement suggests that grandfathered employees maintain that status so long as they "remain in their current position," that appendix expressly provides that such grandfathered employees become subject to the prevailing wage when they bid into a new classification and out of their current position. Mr. Nelson did not bid for a new position and is contractually entitled to be paid at his grandfathered rate. The Company must restore his grandfathered rate and make him whole for all losses he suffered by virtue of the Company's failure to pay him at the grandfathered rate.

Mr. Williams's grievances raise a threshold issue of the validity of the Last Chance Agreement. The Union attacks the Last Chance Agreement on the ground that Mr. Martens had no authority to enter into that agreement on behalf of the Union. Section 14.2 of the Collective Bargaining Agreement expressly provides that stewards shall present grievances to the Company and that two parties shall attempt to settle and resolve such grievances. Accordingly, if the Company had fired Mr. Williams and the Steward had grieved that discharge, it would certainly be consistent with the contract for the Steward to settle that grievance by agreeing to reinstatement subject to a Last Chance Agreement. Notwithstanding the Union's contentions regarding the limited authority of Stewards and the participation and approval of settlements by Mr. Clavio, there is no evidence that the Union ever informed the Company of any such limitation on the authority of stewards to enter into settlements. Based upon the grievance procedure established by the Collective Bargaining Agreement and the evidence concerning the past practices of the Union in settling grievances with the Company, Mr. Martens certainly would have had apparent authority to enter into the Last Chance Agreement in settlement of a grievance over Mr. Williams's discharge. I see no principled distinction between entering into a Last Chance Agreement to resolve a grievance over a discharge and entering into a Last Chance Agreement in lieu of a proposed discharge and thereby avoid the need for a grievance. The Company acted reasonably in its belief that Mr. Martens had authority to bind the Union to the agreement. Thus, at a minimum, Mr. Martens had apparent authority to enter into the agreement and the Union may not avoid the agreement on the ground of lack of authority.

The Union also argues that the Company coerced Mr. Williams into signing the Last Chance Agreement by threat of discharge if he did not sign it. If such circumstances are deemed to constitute duress, however, no last chance agreement in lieu of discharge could ever be valid or enforceable. Mr. Williams did have an alternative to signing the agreement. He could have refused to do so, and if the Company had discharged him, grieved his discharge. The Union has made no showing that the Company's position that it had cause to fire Mr. Williams was taken in bad faith. Such aggravating circumstances as Mr. Williams' prior suspension for neglect of duty and the length of time for which his license had been expired might arguably provide support for the Company's position that it had cause for discharge. The Union would assert various arguments to the contrary, such as Mr. Williams' length of service and the severity of the instant offense. Whatever the outcome of such arguments might have been, there has been no showing that the Company's threat to discharge Mr. Williams for his failure to maintain his license was made in bad faith or as a baseless threat simply to coerce him into signing the Last Chance Agreement. Accordingly, I find the Last Chance Agreement to be valid and enforceable and

binding upon Mr. Williams and the Union.

Under the Last Chance Agreement, Mr. Williams and the Union agreed that his thirty-day suspension was for cause, that he would restore his water license within six months and that he would "make restitution for the overpayment (difference in pay between his Operator pay rate and the Operator in Training pay rate) for not having his IEPA Class A Water License from 1/1/06 through the most recent date Employee received payment at the higher rate." Implicit within the recognition of an "overpayment" is recognition that Mr. Williams's pay rate would be reduced to Operator in Training until he restored his water license. Thus, in accordance with the Last Change Agreement, to the extent that Mr. Williams's November 10, 2006 grievance (Un. Ex. 8) attacks the suspension, repayment obligation and reduction in wage rate, it must be denied. However, nowhere does the Last Chance Agreement indicate that when Mr. Williams's license was restored he would be restored only to the standard Operator pay rate rather than his grandfathered rate. Furthermore, the Last Chance Agreement expressly provides that it "reflects the parties' entire agreement, and it merges all agreements, representations, and understandings among the parties, whether oral or written, or both." Thus, the Last Chance Agreement did not justify the Company's failure to restore Mr. Williams to his grandfathered rate. I have already found, in resolving Mr. Nelson's grievance, that the contract mandated that Grievants be restored to their grandfathered contractual rates. Consequently, to the extent that Mr. Williams' November 10, 2006, grievance challenged the Company's failure to restore him to his grandfathered rate following the reinstatement of his license, the grievance must be sustained and Mr. Williams made whole.

Subsequent to the execution of the Last Chance Agreement and Mr. Williams' thirty-day suspension and return therefrom, the Company discharged Mr. Williams for his refusal to enter into a repayment plan as required by that Last Chance Agreement. At that time, the Union's grievance was pending with respect to Mr. Williams' suspension, pay reduction and repayment of wages from 2006. Moreover, the Union had advised Mr. Williams not to enter into any repayment plan with the Company so long as the grievance was pending, and informed the Company of its position as well. Nevertheless, the Company defends the discharge on the ground that the Last Chance Agreement provided, "Failure to comply with any of these conditions will result in immediate termination." The question thus presented is whether this provision of the Last Chance Agreement justified discharge for failure to enter a repayment plan while a challenge to the validity of the agreement was unresolved. I hold that it did not.

Initially, I note that although I have rejected the Union's challenge to the validity of the Last Chance Agreement, there was considerable substance to the Union's arguments. It is clear that the Union's challenge was undertaken in good faith and was far from frivolous. Second, that the Company unilaterally drafted the Last Chance Agreement counsels that ambiguities, overt or latent, should be resolved against the Company as drafter. Third, the act of grieving the suspension and repayment obligation and, thereby, challenging the validity of the Last Chance Agreement was an act of concerted activity for mutual aid and protection under Section 7 of the National Labor Relations Act, *See, e.g., NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822

-17-

(1984), and the Last Chance Agreement should be interpreted in a manner that renders it consistent with the NLRA. Finally, it would be grossly unreasonable to allow for discharge of an employee for failure to comply with a provision of an agreement while the validity of that agreement was subject to good faith, non-frivolous attack. One should not infer that the parties intended such an unreasonable result in the absence of express and explicit agreement language mandating such a result.

Thus, considering generally accepted principles of contract interpretation; that contract language be interpreted against the drafter, that it be interpreted in harmony with external law, and that it be interpreted to avoid grossly unreasonable results; I find that the Last Chance Agreement does not permit the discharge of Mr. Williams for failure to comply with a provision of the Agreement while the validity of that provision is subject to a proper, good faith, non-frivolous challenge. Therefore, Mr. Williams's discharge violated the Last Chance Agreement. Although the Company argues that it had cause to discharge Mr. Williams independent of the Last Chance Agreement, I find such argument not properly before me. Just as Mr. Williams and the Union are bound by the Last Chance Agreement, so too is the Company. The validity of the discharge must be assessed under the Last Chance Agreement which by its own terms "supercedes any conflicting provision . . . under the parties' collective bargaining agreement." Accordingly, Mr. Williams is entitled to be reinstated to his position as an Operator, and to receive back pay dating to the time of his discharge, including the restoration of his grandfathered wage rate. Pursuant to the Last Chance Agreement, Mr. Williams is liable for "restitution for the overpayment (difference in pay between his Operator pay rate and the Operator in Training pay rate) for not having his IEPA Class A Water License from 1/1/06 through the most recent date Employee received payment at the higher rate," and the Company may set off that amount against the back pay that is owing to Mr. Williams.

The Union has reiterated its request for attorney fees which I rejected in my prior Award consolidating the four grievances for hearing. As in that proceeding, it is clear that, although I have rejected many of the Company's positions, its arguments had considerable substance and there is no evidence that the Company undertook its positions in bad faith. Accordingly, I reiterate my holding that the Union is not entitled to extraordinary relief, such as attorney fees.

The parties agreed that if I sustained the grievances and awarded make whole relief, I would remand the matter to them for calculation of the amount of monetary relief due the Grievants and retain jurisdiction to resolve any disputes concerning calculation of the remedy (Tr. 90). My Award below shall so provide.

# AWARD

1.   The Company did not have cause to suspend Dan Leppert for fifteen days but had cause to suspend him for a period of five working days. The Company shall make Mr. Leppert whole

for lost compensation for the period of his suspension in excess of five working days.

2.     The Company did not have cause to suspend Ken Nelson for fifteen days but had cause to suspend him for a period of five working days. The Company shall make Mr. Leppert whole for lost compensation for the period of his suspension in excess of five working days.

3.     The Company violated the Collective Bargaining Agreement when it reduced  Mr. Nelson's wage rate to Operator in Training and demanded repayment of wages paid in 2006 in excess of the Operator in Training rate.. The Company shall rescind its demand for repayment and shall make Mr. Nelson whole for the difference between the wage rates at which it paid Mr. Nelson and his grandfathered wage rate.

3.     The Last Chance Agreement executed by Mr. Williams and the Union is valid and enforceable. Mr. Williams's November 10, 2007, grievance is denied, except to the extent that the Company violated the contract when following the restoration of Mr. Williams's water license, it failed to restore him to his grandfathered wage rate.  The Company shall make Mr. Williams whole for the difference between the wag rate to which it restored him and his grandfathered wage rate.

4.     The Company violated the Last Chance Agreement when it discharged Mr. Williams. The Company shall reinstate Mr. Williams to his former position and make him whole for all compensation lost as a result of his discharge.

5.     The Company may offset Mr. Williams's obligation of repayment under the Last Chance Agreement against the make whole relief awarded herein.

6.     The Union's request for attorney fees is denied.

7.     The Arbitrator shall retain jurisdiction for sixty (60) days following the date of this Award to resolve any disputes that parties may have concerning the remedy, including the issue of monetary compensation. Either party may invoke the arbitrator's jurisdiction during this sixty-day period by written or e-mail notice to the other party and the Arbitrator. The parties may by mutual agreement extend the period of the Arbitrator's retained jurisdiction in thirty-day increments. The parties shall furnish written or e-mail notice of such agreed-on extension to the Arbitrator.

Chicago, Illinois

February 21, 2008          Martin H. Malin,  Arbitrator

-19-