1

AMERICAN ARBITRATION ASSOCIATION

2

3    IN THE MATTER OF THE    )
                             )
4    ARBITRATION BETWEEN:    )
                             )
5                            )
     UFCW LOCAL 1546,        )No. 51 300 0021407
6                            )
         and                )
7                            )
     ILLINOIS AMERICAN       )
8                            )
     WATER COMPANY,          )

9

10

11

            Volume II - Pages 83 to 352

12

13            REPORT OF PROCEEDINGS had at 1000
14   International Parkway, Woodridge, Illinois, on
15   November 20, 2007, at the hour of 9:00 a.m.
16   before MARTIN MALIN, the Arbitrator to whom the
17   matter in difference between the parties has
18   been submitted for settlement.

19

20

21

22

23

24

EXHIBIT

tabbies

3

17086b9a-99e3-4c02-b8d8-0a34a317d803

1   APPEARANCES:

2           JACOBS, BURNS, ORLOVE,

3           STANTON & HERNANDEZ

4           BY:  MR. CHARLES ORLOVE

5           122 South Michigan Avenue

6           Suite 1720

7           Chicago, Illinois 60603

8           (312) 372-1646

9                   Appeared on behalf of the

10                  Union;

11

12          BLACKWELL, SANDERS, PEPER, MARTIN, LLP

13          BY:  MR. TERRY L. POTTER

14          720 Olive Street

15          Suite 2400

16          St. Louis, Missouri 63101

17          (314) 345-6438

18                  Appeared on behalf of the

19                  Company.

20

21  ALSO PRESENT:

22  STEPHEN J. PHILLIPS, WAYNE A. CLAVIO, DAN

23  LEPPERT, RAY ROSSA, GLENN WILLIAMS, JOHN STEIN,

24  MICHAEL JACKSON, KEN NELSON

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 85

```
                           INDEX
 1
 2   WITNESS:                                   PAGE:
 3
     STEPHEN       DIRECT EXAMINATION            107
 4   PHILLIPS      BY MR. POTTER
                   CROSS-EXAMINATION             169
 5                 BY MR. ORLOVE
                   REDIRECT EXAMINATION          194
 6                 BY MR. POTTER
     MICHAEL       DIRECT EXAMINATION            200
 7   JACKSON       BY MR. POTTER
                   CROSS-EXAMINATION             217
 8                 BY MR. ORLOVE
     DANIEL        DIRECT EXAMINATION            223
 9   LEPPERT       BY MR. ORLOVE
                   CROSS-EXAMINATION             236
10                 BY MR. POTTER
                   REDIRECT EXAMINATION          243
11                 BY MR. ORLOVE
     KENNETH       DIRECT EXAMINATION            245
12   NELSON        BY MR. ORLOVE
                   CROSS-EXAMINATION             254
13                 BY MR. POTTER
                   REDIRECT EXAMINATION          263
14                 BY MR. ORLOVE
     GLENN         DIRECT EXAMINATION            265
15   WILLIAMS      BY MR. ORLOVE
                   CROSS-EXAMINATION             285
16                 BY MR. POTTER
     CHRIS         DIRECT EXAMINATION            300
17   MARTENS       BY MR. ORLOVE
                   CROSS-EXAMINATION             304
18                 BY MR. POTTER
                   REDIRECT EXAMINATION          310
19                 BY MR. ORLOVE
                   RECROSS-EXAMINATION           310
20                 BY MR. POTTER
     RAY ROSSA     DIRECT EXAMINATION            314
21                 BY MR. ORLOVE
                   CROSS-EXAMINATION             323
22                 BY MR. POTTER
                   REDIRECT EXAMINATION          329
23                 BY MR. ORLOVE
     WAYNE         DIRECT EXAMINATION            329
24   CLAVIO        BY MR. ORLOVE
                   CROSS-EXAMINATION             340
```

17086b9a-99e3-4c02-b8d8-0a34a317d803

1                      BY MR. POTTER
                       REDIRECT EXAMINATION      343
2                      BY MR. ORLOVE
    STEPHEN            REDIRECT EXAMINATION      345
3   PHILLIPS           BY MR. POTTER
                       RECROSS-EXAMINATION       349
4                      BY MR. ORLOVE
5                          * * * * *
6                                             Rec'd
7   Joint Exhibit Nos. 4, 5, 6, 7               89
    Company Exhibit No. 2                       113
8   Company Exhibit No. 3                       115
    Company Exhibit No. 4                       121
9   Company Exhibit No. 5                       124
    Company Exhibit No. 6                       127
10  Company Exhibit No. 7                       129
    Company Exhibit No. 8                       137
11  Company Exhibit No. 10                      149
    Company Exhibit No. 11                      160
12  Company Exhibit No. 12                      166
    Union Exhibit No. 16                        235
13
                           * * * * *
14
15
16
17
18
19
20
21
22
23
24

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    ARBITRATOR MALIN:  Let's go on the

2  record.  This is the continuation of the

3  hearing between the United Food and Commercial

4  Workers Local 1546 and Illinois American Water

5  Company.  This was formerly American

6  Arbitration Association Case Number 51 300

7  0021407.  For the record, Mr. Potter, would you

8  identify yourself and those present for the

9  company?

10    MR. POTTER:  Terry Potter from the law

11  firm of Blackwell Sanders located in St. Louis,

12  Missouri.  And the two witnesses -- three

13  witnesses potentially we'll have today, John

14  Phillips, Mike Jackson, and John Stein.

15    ARBITRATOR MALIN:  Thank you.  And

16  Mr. Orlove, would you do the same for the

17  union, please.

18    MR. ORLOVE:  Sure.  My name is Charles

19  Orlove of the firm of Jacobs, Burnes, Orlove,

20  Stanton & Hernandez in Chicago.  And with me

21  are, and they will be witnesses as well, Dan

22  Leppert, Ken Nelson, Glenn Williams.  The three

23  of them are the employees who are the subject

24  of the grievances.  Ray Rossa, the chief

17086b9a-99e3-4c02-b8d8-0a34a317d803

1 steward, Chris Martens, who is not in the room,

2 but he's in the building doing other things.

3 And he's also a union steward.  And Wayne

4 Clavio, who is an officer of Local 1546.

5          ARBITRATOR MALIN:  Thank you.

6          MR. POTTER:  Just so the record is

7 clear, apparently I've been advised I misspoke.

8 I said John Phillips, who is actually a partner

9 of mine in the firm.  He's not here.  But Steve

10 Phillips is.

11          ARBITRATOR MALIN:  Thank you for that

12 correction.

13          The record should reflect in an

14 off-the-record discussion among counsel and the

15 Arbitrator that counsel have tendered four

16 additional joint exhibits.  Joint Exhibit

17 Number 4 being a charge dated January 18th,

18 2007 filed by the company against the union

19 with the National Labor Relations Board.  Joint

20 Exhibit 5, a letter from the National Labor

21 Relations Board regional director Joseph Barker

22 to Mr. Orlove and Ms. Elzemeyer,

23 E-L-Z-E-M-E-Y-E-R, corporate counsel for the

24 company, deferring that charge which now gets

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 89

1  the number of 13-CB-18585 deferring that matter

2  to arbitration.

3            Joint Exhibit 6 being National

4  Labor Relations Board Charge 13-CA-44221, a

5  charge filed by the union against the company

6  dated August 20th, 2007.  And Joint Exhibit 7,

7  a letter from Mr. Barker to Mr. Potter and

8  Mr. Orlove deferring that charge to

9  arbitration.

10            For the record, counsel, do you

11  concur with the admission of those joint

12  exhibits?

13            MR. ORLOVE:  For the union, yes.

14            MR. POTTER:  And for the employer,

15  yes.

16            ARBITRATOR MALIN:  Joint Exhibits 4,

17  5, 6, and 7 are admitted.

18                    (Joint Exhibit Nos. 4, 5, 6, 7

19                    received.)

20            ARBITRATOR MALIN:  Counsel, I

21  understand you also have some stipulations you

22  wish to enter at this time.

23            MR. ORLOVE:  Yes.  Mr. Potter and I

24  have agreed and I propose for stipulation that

1   all conditions preceding this arbitration have

2   either been met or waived, and this matter is

3   properly before the Arbitrator for decision.

4   Perhaps I can stop here and we can take each

5   one separately.

6            ARBITRATOR MALIN:  Mr. Potter, for the

7   record, do you concur with that?

8            MR. POTTER:  So stipulated.

9            ARBITRATOR MALIN:  Thank you.  That

10  stipulation is received.

11           MR. ORLOVE:  We also agree that the

12  Arbitrator may retain jurisdiction to determine

13  any issues which may arise over the

14  implementation of the remedy, including the

15  calculation of backpay, if any, after the

16  parties have exhausted good-faith efforts to

17  resolve same.

18           ARBITRATOR MALIN:  Mr. Potter?

19           MR. POTTER:  So stipulated.

20           ARBITRATOR MALIN:  That stipulation is

21  received.

22           MR. ORLOVE:  I propose for the issues

23  three of them.  The first two, I believe,

24  are -- we are in agreement.  Whether the

1  company had cause, and I'll just mention cause

2  is the word used in Section 2.1 of the

3  contract.  Whether the company had cause to

4  discipline employees Dan Leppert, Ken Nelson,

5  and Glenn Williams in November 2006.

6              MR. POTTER:  So stipulated.

7              MR. ORLOVE:  And the thought just

8  occurred to me, but perhaps we could clear it

9  up as the case goes along.

10                 Mr. Williams was given a reduction

11  in pay in October, among other acts of

12  discipline.  So I would like to make it clear

13  that that issue will include discipline given

14  to Mr. Williams in October --

15              MR. POTTER:  Sure.

16              MR. ORLOVE:  -- as well as November.

17              MR. POTTER:  It would be the whole

18  ball of wax, so to speak.  We had a number of

19  items.  We had the actual suspensions, we had

20  the restitution element for two of them, and we

21  had the change in pay status.

22              MR. ORLOVE:  Okay.  Thank you.  So

23  would you want to amend this statement of the

24  issue from November 2006 to in October and

Page 92

1   November 2006?

2           MR. ORLOVE:   October and

3   November 2006.

4           ARBITRATOR MALIN:   Is that acceptable?

5           MR. POTTER:   That's fine.

6           MR. ORLOVE:   Secondly, whether the

7   company had cause to terminate Glenn Williams

8   on March 2, 2007.

9           MR. POTTER:   So stipulated.

10          MR. ORLOVE:   And thirdly, whether the

11  extent or the amount of discipline administered

12  or given to employees Leppert, Nelson, and

13  Williams in October and November of 2006 was

14  appropriate under the circumstances of this

15  case.

16          MR. POTTER:   And we're not willing to

17  stipulate to that.   We believe the just cause

18  standard is the standard to be applied.

19          MR. ORLOVE:   That concludes our

20  stipulations.

21          ARBITRATOR MALIN:   Thank you.   Those

22  stipulations are received.   And I do note the

23  company's not in agreement on the statement of

24  the third issue as presented by the union.

1        Anything further before we move to
2   opening statements?
3        MR. POTTER:  I don't believe so.
4        ARBITRATOR MALIN:  Well, Mr. Potter,
5   if you have an opening statement on behalf of
6   the company, I'd be pleased to receive it.
7        MR. POTTER:  Sure.  Just to kind of
8   refresh everybody's memory, as much as
9   anything, on why we're here, although I'm sure
10  everybody knows, this is the second part of an
11  arbitration involving three operators for the
12  company, Mr. Nelson, Mr. Leppert, and
13  Mr. Williams, who were disciplined, as we've
14  discussed earlier, for not maintaining their
15  license as required under the Collective
16  Bargaining Agreement, 26.2 in particular.
17       These operators are the most
18  highly paid union employees for the company for
19  good reason.  They have a great deal of
20  responsibility.  And consistent with that
21  responsibility we pay them a very nice wage.
22       What you'll also note that their
23  wage is tied into the license that they hold in
24  their respective positions.  Under the Illinois

17086b9a-99e3-4c02-b8d8-0a34a317d803

1  EPA regulations, an operator can have a

2  hierarchy of licenses, in this situation, an A,

3  B, or C license.  And whether or not -- what

4  level you hold a license determines your pay

5  rate.  And you'll note that also in the

6  Collective Bargaining Agreement in the

7  appendix, so that much is abundantly clear.

8           In any event, these three

9  operators again were subject to discipline

10  because they didn't maintain their license.

11  And what is important here is that the licenses

12  for these three individuals lapsed.  Again

13  they're required to maintain their license, but

14  they didn't.  Nelson, Mr. Nelson, for two years

15  approximately; Mr. Williams for ten years, and

16  Mr. Leppert for approximately 18 months.

17           And frankly, there was no reason

18  for this to occur.  Each operator who maintains

19  a license under the state receives timely

20  notice in advance of the possible lapsing of

21  their license.  In addition to which, each is

22  issued what they call a wallet card when they

23  receive their license from the State that they

24  can carry on their person which identifies the

1  expiration date for their license.  So in any

2  event, there's just really no reason for this

3  to have occurred in the first place.

4            The license requires training to

5  make sure these individuals are up to speed

6  regarding the latest regulations in particular.

7  And receive, if you hold an A or a B license,

8  30 hours of training every three years, and a C

9  or D License, it's 15 hours.

10            And again, the Collective

11  Bargaining Agreement provides that it's the

12  responsibility of the employees to make sure

13  that they have the required education to

14  maintain their license, again set forth in

15  26.2.  About as clear as you're going to get.

16            There are approximately 35

17  operators in the Chicago metropolitan system.

18  To the company's knowledge, these three are the

19  first ones who have failed to maintain their

20  licenses.  We're unaware of anyone else in the

21  system who has ever failed to maintain their

22  license.  And there's a long history of these

23  operators being in the system.

24            We became aware of their lapse

1    because frankly, Mr. Williams approached one of

2    his supervisors with the information.  And

3    accordingly, the company began an investigation

4    regarding who else might have an issue along

5    these lines.  And hence, we became aware of not

6    only Mr. Williams, but Mr. Leppert and

7    Mr. Nelson's situation.

8                We interviewed them regarding the

9    situation.  There really wasn't any mitigating

10   circumstances that would warrant discipline not

11   issuing.  And so in terms of Mr. Nelson and

12   Mr. Leppert, they were subject to a 15-day

13   suspension.

14               Mr. Williams was further

15   complicated by the fact that just a few months

16   prior he had been subject to a suspension.  And

17   it was under the Guide for Conduct.  And it was

18   rule or offense 12.  So this was the second

19   suspension.  We also cited Rule 12 for all

20   these three individuals too.  Neglect of duties

21   as the basis for the discipline.

22               Under the Guide for Conduct, at

23   this point Mr. Williams was subject to

24   termination.  So that didn't hold well for

1  Mr. Williams.

2              The company did not take that

3  approach.  Looking at the situation and his

4  tenure, they were trying to salvage this

5  employee, quite frankly, and offered a

6  last-chance agreement with a 30-day suspension

7  and restitution.

8              The company met with all three

9  individuals and issued the discipline for each.

10  What's interesting is frankly, if you look at

11  the Guide for Conduct, I think the company was

12  very lenient in their interpretation of what

13  occurred here in terms of potential offenses

14  because Offense Number 1 was probably the most

15  applicable offense that could have applied

16  here, falsification or misrepresentation.  And

17  that cause -- and that is a cause for immediate

18  discharge.  They didn't go that route.  Again,

19  they chose an Offense Number 12, and in an

20  attempt again to try to take a reasonable

21  approach in this situation.

22              What's interesting in this case in

23  particular, as you know, is that Mr. Williams

24  signed with his steward present, and both

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    Mr. Williams and the steward signed off on the

2    last-chance agreement.  Obviously allowed to

3    review it, and didn't have any substantive

4    questions, didn't question its content.

5             And then lo and behold the company

6    was surprised when a grievance was actually

7    filed over his discipline, which obviously was

8    in breach of the last-chance agreement.

9             The union's position throughout

10   the grievance arbitration proceedings has been

11   that the steward didn't have authority to enter

12   into the agreement, therefore, it wasn't

13   binding, which is contrary to past practice and

14   also the contract.  Because in particular, in

15   Steps 1 and 2 of the grievance arbitration

16   proceedings, stewards are involved in the

17   process, identified as such, and are identified

18   -- one of their functions in that process is an

19   attempt to resolve the grievances.  So saying

20   the steward didn't have authority just doesn't

21   apply.

22             Even though Mr. Williams filed a

23   grievance and breached his last-chance

24   agreement, the parties processed the matter

1    through the grievance arbitration procedure,

2    didn't immediately discharge Mr. Williams.

3    They were attempting to reach a middle ground

4    in the situation.

5               There were a number of discussions

6    between the parties, but ultimately, it was

7    clear by March of this year that Mr. Williams

8    was not going to act consistent with the

9    last-chance agreement.

10              There were some modifications to

11   the restitution element that were offered, and

12   again they were rejected.  So the company felt

13   it had no choice at that point but to terminate

14   Mr. Williams.

15              The union's never really contested

16   that misconduct had happened here, but really

17   what you see in the grievance documents

18   themselves, they simply find that the

19   discipline was excessive.  So they admit that

20   there was misconduct.  And I'd think anybody

21   would have to in this situation.  Obviously the

22   licenses weren't maintained, and the employees

23   screwed up, quite frankly.

24              So yes, there was misconduct.  But

17086b9a-99e3-4c02-b8d8-0a34a317d803

1  I think that again, the company was extremely

2  reasonable and just in this situation by not

3  utilizing Offense Number 1 in the Guide for

4  Conduct, which they could have, and discharge

5  all three.

6           They could have easily discharged

7  Mr. Williams because under the Guide for

8  Conduct upon a second suspension or offense

9  under Rule 12 he should have been discharged.

10      Q.   So if anyone acted reasonably, I think

11  it was the employer in this situation.  And its

12  actions should be upheld in these proceedings.

13  And that's our opening statement.

14           ARBITRATOR MALIN:  Thank you.

15  Mr. Orlove, would you care to make or reserve

16  your opening statement?

17           MR. ORLOVE:  No, I'd like to make it

18  now.  Thank you.

19           ARBITRATOR MALIN:  I'd be pleased to

20  receive it.

21           MR. ORLOVE:  You're going to see soon

22  on that the company's case is riddled with

23  inconsistencies, illogic, unfairness, and

24  disparate treatment.  Worst of all, you're

17086b9a-99e3-4c02-b8d8-0a34a317d803

1   going to see disciplinary action here more than

2   without cause, but with respect to Mr. Williams

3   in particular, outrageously without cause.

4           You're going to see that discharge

5   is prohibited by anti-union discrimination laws

6   under the NLRB, and you'll also see that the

7   pressure that the company was putting on him

8   and then forced -- and then under the threat of

9   discharge and ultimate discharge is contrary to

10  the public policy of Illinois requiring people

11  to make deductions out of their pay without

12  their permission.

13          The discipline of these employees

14  over a failure to renew their water treatment

15  license, contrary to what the company says is

16  required by Section 26.2 of the contract is not

17  the case.  We'll put on evidence of what the

18  intendment was of Section 26.2.

19          When I first was approached by

20  this case, I thought it was simply over the

21  amount of the discipline, as Mr. Potter just

22  said.  But as I got into the facts, it became

23  clear to me that there is no cause for

24  discipline at all.  And that's why we

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    stipulated that issue.  But we're in

2    disagreement over the issue of the amount of

3    discipline.

4              You'll hear that the requirement

5    for licenses supported by continuing education

6    is a relatively new procedure in Illinois.  The

7    IPEA, who knows about this, took no action

8    against the employees.  The IPEA, that's the

9    Illinois Environmental Protection Agency,

10   IEPA -- I'm saying it wrong -- Environmental

11   Protection Agency of Illinois took no action

12   against the employees.  The IEPA took no action

13   against the employer.

14             The act of renewing licenses has

15   been and appears to be purely a ministerial

16   act, including the taking of exams and the

17   taking of tests.

18             It can't be that serious because

19   the company doesn't even keep records of

20   licenses of employees.  And it can't be that

21   serious because you'll hear that when it came

22   to the company's attention that they didn't

23   have their licenses, they merry well went on

24   their way asking them to continue working -- or

1    instructing them to continue working without

2    their license except that they reduced their

3    pay, which has no logic at all.

4            And there are no rules in the code

5    of conduct other than the general catchall of

6    being a good employee.  There are no rules

7    assessing a penalty for the lapse of a license.

8    And you'd think that if a license were that

9    important or that critical to the operation of

10   the company, and I repeat to the operation of

11   the company, it would have taken the men out of

12   service.  But they didn't.

13           They knowingly allowed them to

14   continue working without a license as long as

15   they took steps with the IEPA to renew their

16   licenses.

17           All of this notwithstanding, the

18   company not only overreacted to the fact --

19   which the employees brought it to their

20   attention, that they didn't have their

21   licenses, and they're going to take steps to

22   perfect their licenses.  The company not only

23   overreacted to this, but exploded irrationally,

24   suspending employees without pay, reducing

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 104

1    their pay for the very same work that they had

2    been doing, demanding a payback of wages that

3    they earned while they were without a license,

4    and then insisting on a repayment of the wages

5    which we contend is not discipline at all, but

6    it's a penalty, unanimously forbidden in

7    arbitral -- almost unanimously forbidden in

8    arbitral authorities.  And it comes to be an

9    unjust enrichment to the company to ask the

10   people to pay back for the work they've been

11   doing.

12              But it gets worse.  If one can

13   imagine that it gets worse, it does.  One

14   employee was required to restore his license in

15   six months or be fired.  He didn't, and he was

16   excused.  Another employee was ordered to pay

17   back part of his earned wages.  He failed to do

18   so and yet no action has been taken with

19   respect to him.

20              The other employee, Mr. Williams,

21   a 34-year employee, a lead man, and but for the

22   earlier suspension, an employee without blemish

23   for 34 years refused to sign a check-off to pay

24   back part of his wages, despite the company's

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 105

1    threats that they'll fire him if he doesn't

2    authorize a check-off of his wages.  Now, that

3    right to have your wages intact and not taken

4    by your employer without your permission is a

5    right protected by Illinois law.

6              And he was so advised by the union

7    not to sign the check-off because, in addition

8    to everything else I've said, the matter was

9    pending in arbitration then and there in March.

10   And it made no sense to insist that he give up

11   what you'll hear amounts to well over half his

12   wages via check-off while the whole issue of

13   whether that was appropriate at all is pending

14   before you.  Yet the company fired him for

15   failing to authorize a deduction in his wages.

16   These actions, we submit, were not just without

17   cause.  They were mindless, they're illogical,

18   they're manifestly unfair, and obviously

19   without cause.

20             So we're going to ask you to

21   sustain the grievances, order the company to

22   reinstate Mr. Williams and -- with a make-whole

23   remedy, order the company to restore the

24   employees' wage rates that they unilaterally

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 106

1  cut, order the company to pay the difference

2  between the prediscipline wage rate and the

3  rate to which they were reduced, order interest

4  thereon.

5            And lastly, I'm going to renew a

6  claim you denied earlier for attorneys' fees.

7  And I realize you denied that claim, and I must

8  say it's not a claim that I routinely make.

9  It's a claim that I think deserves -- it's an

10  extraordinary remedy, but I believe it's

11  warranted here.  Because when all the facts are

12  presented to you, you will see that they are so

13  devoid -- the company's action was so devoid of

14  reason and fairness that it cries out for

15  something more than reinstatement and the

16  recovery of lost wages.  Thank you.

17            ARBITRATOR MALIN:  Thank you.

18  Mr. Potter, are you ready to proceed with the

19  company's case in chief?

20            MR. POTTER:  I am.

21            ARBITRATOR MALIN:  Go off the record

22  for a moment.

23            (Brief Pause)

24            ARBITRATOR MALIN:  Back on the record.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1              (The witness was duly sworn.)

2          ARBITRATOR MALIN:  Mr. Potter, proceed

3   whenever you're ready.

4              STEPHEN PHILLIPS,

5   called as a witness herein, having been first

6   duly sworn, was examined and testified as

7   follows:

8              DIRECT EXAMINATION

9   BY MR. POTTER:

10      Q.  Steve, can you state your name for the

11  record?

12      A.  Stephen Phillips.

13      Q.  And what is your position with the

14  company?

15      A.  Superintendent over production.

16      Q.  And how long have you held that

17  position with the company?

18      A.  Roughly three years, four years.

19      Q.  And how long have you been -- what

20  other positions have you held with the company?

21      A.  Manager of operations.  Prior to that,

22  supervisory positions.  Prior to that, going

23  way back, field positions.

24      Q.  What are your present duties and

1    responsibilities?

2        A.   Responsible for the oversight of the

3    production.

4        Q.   Okay.  And the three grievants

5    involved in this case, what is your role in

6    terms of their job duties and functions?

7        A.   The oversight.

8        Q.   And who do you report to?

9        A.   I report to Michael Jackson.

10       Q.   And who is Mike Jackson?

11       A.   He is the manager over production.

12       Q.   Okay.  And generally speaking, what

13   was your role in terms of the discipline with

14   respect to these three gentlemen, just in

15   general?

16       A.   The oversight of the investigation.

17       Q.   And were you involved in the actual

18   distribution of the discipline in each case?

19       A.   Yes, I was.

20       Q.   And also in the grievance arbitration

21   process?

22       A.   Yes.

23       Q.   We'll go into that in more detail, but

24   I just kind of wanted to lay that foundation.

1        So Mr. Williams and Mr. Nelson and

2   Mr. Leppert were employed as operators?

3        A.   That's correct.

4        Q.   Can you tell the Arbitrator what an

5   arbitrator (sic) does with the company?

6        A.   An operator?

7        Q.   Yeah.

8        A.   Basically they're operating our water

9   and waste water facilities.

10       Q.   And let me show you company exhibit

11  which -- bear with me here.  I'm trying to get

12  my references.  We are at...

13       ARBITRATOR MALIN:  We're up to Company

14  2.

15       MR. POTTER:  2?

16  BY MR. POTTER:

17       Q.   Hand you Company Exhibit 2, Steve.

18  Can you tell the Arbitrator what that document

19  is?

20       A.   It's basically a job description of an

21  operator's position.

22       Q.   Okay.  And these are the operator

23  positions for the three individuals --

24       A.   Yes.

1    Q.   -- involved here?

2         And under Qualifications, Minimum

3    Requirements, is there a reference to

4    licensing?

5    A.   Yes, there is.

6    Q.   And what does it provide?

7    A.   Stating for licensing in waste and

8    water and waste water.

9    Q.   And what's it specify though?  What's

10   it tell you?

11   A.   That --

12        MR. ORLOVE:  Excuse me.  If it's

13   stated in here, then it speaks for itself.

14   Maybe you can just identify where it is.  I'm

15   trying to find it.

16        THE WITNESS:  It's under Minimum

17   Requirements.  Qualifications.

18        ARBITRATOR MALIN:  Bottom half of the

19   document.

20        MR. ORLOVE:  I see.

21        MR. POTTER:  Just trying to get some

22   explanation, some foundation.

23        ARBITRATOR MALIN:  Sure.  It does

24   speak for itself, but you can -- by way of

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 111

1   background, if you want to highlight something,

2   that's fine.

3   BY MR. POTTER:

4       Q.   So certain minimum requirements are

5   required in terms of licensing?

6       A.   Yes.

7       Q.   And a Class C water license in

8   particular?

9       A.   Yes.

10      Q.   Okay.  And I notice there's a date at

11  the top, 4/30/90?

12      A.   Yes.

13      Q.   What does that tell us?

14      A.   That's the day of the job description.

15      Q.   Okay.  Now, are these job descriptions

16  known to the union or to the employees?

17      A.   Yes.

18      Q.   And how is that?

19      A.   They're made available as part of the

20  Collective Bargaining Agreement.

21      Q.   Okay.  And this particular job

22  description has been in effect since 1990 --

23      A.   That's correct.

24      Q.   -- the date noted?

Page 112

1      A.   Yes.

2      Q.   And it would apply to the -- again,

3  the three operators in question here?

4      A.   Yes.

5           MR. POTTER:  All right.  Move for

6  admission of Company 2.

7           ARBITRATOR MALIN:  Any objection?

8           MR. ORLOVE:  No objection now.  I

9  could either voir dire now or later.

10          ARBITRATOR MALIN:  It's your choice.

11          MR. ORLOVE:  Let me just ask a few

12  questions.

13          ARBITRATOR MALIN:  Sure.  You may have

14  voir dire.

15  BY MR. ORLOVE:

16     Q.   You mentioned that it's made available

17  to employees in the Collective Bargaining

18  Agreement.  I'm trying to find where that is in

19  the Collective Bargaining Agreement.

20     A.   It's always been available to

21  everybody.  I know we've made them available to

22  them -- the union in the past.

23     Q.   Okay.  How do you do that, just when

24  somebody asks for it or --

17086b9a-99e3-4c02-b8d8-0a34a317d803

1      A.   It's common knowledge.

2      Q.   -- do you automatically give it to

3   them?

4      A.   It's common knowledge.

5      Q.   Okay.

6           MR. ORLOVE:   No objection.

7           ARBITRATOR MALIN:   Okay.   Company

8   Exhibit 2 is admitted.

9                    (Company Exhibit No. 2

10                    received.)

11   BY MR. POTTER:

12      Q.   And just for clarification, Steve, let

13   me show Joint Exhibit 1 under Section 2.2 of

14   the Collective Bargaining Agreement.   Does that

15   address job descriptions?

16      A.   Yeah.   It states that the company

17   shall furnish a list of job classification and

18   job descriptions to the union and any new job

19   classifications and descriptions.

20   BY MR. POTTER:

21      Q.   All right.   Thank you.   Let me show

22   you Company Exhibit 3, Steve.   Can you tell the

23   Arbitrator what that document is?

24      A.   This is a listing.   This was last

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 114

1    revised May 16th of all of our licensed

2    operators, both on the water and waste water

3    side.

4         Q.   And what does this chart tell us?

5         A.   It tells us which employees or

6    operators hold which licensing or which

7    licenses.

8         Q.   Is this something you maintain in your

9    system?

10        A.   Yes.

11        Q.   Okay.  And it looks like there's -- at

12   least in May of '06 approximately 30 -- or were

13   35 individuals with licenses?

14        A.   Approximately, yes.

15        Q.   Is this the general number that you

16   normally have on board maintaining licenses in

17   the Metro system?

18        A.   Yes.

19        Q.   And prior to the events leading up to

20   the discipline of the three individuals

21   involved here were you aware of any operator

22   not maintaining their license?

23        A.   No.

24             MR. POTTER:  Move for admission of

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 115

1   Company Exhibit 3.

2          MR. ORLOVE:  No objection on that

3   score.  I'll question him on Cross-Examination.

4          ARBITRATOR MALIN:  That's fine.

5   Company 3 is admitted.

6                    (Company Exhibit No. 3

7                    received.)

8   BY MR. POTTER:

9      Q.  So the minimum qualifications we now

10  have assessed in the job description saying you

11  have to have at least a Class S-3 for waste

12  water and Class C for water plant operator, and

13  Company Exhibit 3 indicates there are a number

14  of individuals who have licenses above and

15  beyond that, correct?

16     A.  Yes.

17     Q.  And each one of these individuals in

18  the past operators who held these multiple

19  license ever been allowed to have their license

20  lapse?

21     A.  No.  Not to my knowledge.

22     Q.  And in particular, turning to the

23  Collective Bargaining Agreement, 26.2, which

24  we've referred to in the past, the first

17086b9a-99e3-4c02-b8d8-0a34a317d803

1   sentence, does it not require employees to

2   maintain sufficient education credits so that

3   they maintain their license?

4           MR. ORLOVE:  Objection.

5           THE WITNESS:  Yes.

6           MR. ORLOVE:  Objection to the leading

7   nature of the question.

8   BY MR. POTTER:

9       Q.  Okay.  Well, tell the Arbitrator how

10  the company interprets 26.2.

11      A.  It's the understanding the employees

12  will be responsible to require enough CE

13  credits to maintain their license.

14      Q.  And that's how it's been applied by --

15      A.  Yes.

16      Q.  -- the company?

17      A.  Yes.

18      Q.  Have you historically been involved in

19  negotiating Joint Exhibit 1?

20      A.  Yes.

21      Q.  Do you know the history in terms of

22  the development of that language 26.2?

23      A.  Yes.

24      Q.  Okay.  Can you tell the Arbitrator how

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 117

1  that language came into being?

2      A.  It was a proposal at the time of

3  negotiations.

4      Q.  Whose proposal?

5      A.  Union proposal.

6      Q.  Okay.  And did it morph into the

7  current language?  Was that the proposal, or

8  how exactly do we get there?

9      A.  It ended up that language.

10     Q.  And do you remember the background in

11 terms of how it got from Point A to Point B?

12     A.  Yes.  I believe the union proposal was

13 they were looking for reimbursement for time

14 spent for training.

15     Q.  So we ended up with the language now

16 in 26.6?

17     A.  That's correct.

18     Q.  And why is that?  How did we get to

19 26.2?

20     A.  Because of the requirement the

21 operators are responsible to acquire the

22 necessary CEU's to maintain the license.

23     Q.  So the other aspect of that under 26.2

24 is originally the union, you were saying,

Page 118

1  wanted compensation for training.  What was the

2  second part, the second paragraph?

3      A.  Yes.  The company shall endeavor to

4  provide assistance through on-line courses and

5  in-house training.

6      Q.  Let's also turn to the contract to the

7  Appendix A.  And can you inform the Arbitrator

8  how the pay structure is made for operators?

9      A.  Yes.  There's different

10  classifications for licensing that is held

11  ranging from operator in training all the way

12  up to central control operator.

13      Q.  So they get paid as a function of the

14  level of license held?

15      A.  That's correct.  Yes.

16      Q.  And how long has that language, that

17  tie in, license level to pay been in existence?

18      A.  As far as the different license --

19      Q.  Uh-huh.

20      A.  It's for many years.

21      Q.  Let me show you Company Exhibit 4.  I

22  show you Company Exhibit 4, Steve.  Are you

23  familiar with that document?

24      A.  Yes, I am.

1    Q.  And in fact, if we look at the end of

2  that document -- actually, the next to last

3  page, is that your signature on the right

4  second from the top?

5    A.  Yes, it is.

6    Q.  Okay.  That's probably worse than my

7  signature.

8         All right.  Can you tell the

9  Arbitrator in general what this document's all

10  about?

11    A.  Basically this was an acquisition,

12  what we refer to as a Metro acquisition going

13  back to '94, and this is where we were taking

14  in Metro employees and merging them into, at

15  that time, Citizens Utilities.

16    Q.  And the attachment on that, the very

17  final page sets out wage information with this

18  takeover operations, correct?

19    A.  Yes.

20    Q.  And in particular, Mr. Nelson and

21  Mr. Leppert were part of this takeover?

22    A.  That's correct.

23    Q.  And again, consistent with the

24  language in the current contract, they were

1    paid more based upon the license held, correct?

2         A.   That's correct.

3         Q.   And this was a document that goes back

4    to 1994?

5         A.   That's correct.

6         Q.   Now, also going back to the signature

7    page in this document --

8         A.   Uh-huh.

9         Q.   -- on the union side, is that the

10   grievant Mr. Williams's signature on the

11   left-hand side second from the top?

12        A.   Yes, it is.

13        Q.   And was Mr. Williams a steward for the

14   union at this point in time?

15        A.   Yes, he was.

16        Q.   And so he would have been intimately

17   familiar with this agreement?

18             MR. ORLOVE:   Objection to --

19             THE WITNESS:   Yes, he was.

20             MR. ORLOVE:   Objection.

21             ARBITRATOR MALIN:   Sustained.

22   BY MR. POTTER:

23        Q.   Mr. Williams would have been aware of

24   this agreement?

Page 121

1          MR. ORLOVE:  Objection.

2          THE WITNESS:  Yes.

3          ARBITRATOR MALIN:  Sustained.  You can

4    ask him if Williams evidenced it, but he can't

5    read his mind.

6          MR. POTTER:  All right.

7    BY MR. POTTER:

8      Q.  That is Mr. Williams's signature,

9    correct?

10     A.  Yes, it is.

11         MR. POTTER:  Move for admission of

12   Company Exhibit 4.

13         ARBITRATOR MALIN:  Any objection?

14         MR. ORLOVE:  Give me a moment.

15         ARBITRATOR MALIN:  Sure.

16                (Brief Pause)

17         MR. ORLOVE:  I don't have a chance to

18   read the whole thing, but based on the

19   questions that were asked and if this is put in

20   for that purpose, we have no objection.

21         ARBITRATOR MALIN:  Company 4 is

22   admitted.

23                (Company Exhibit No. 4

24                received.)

Page 122

BY MR. POTTER:

    Q.  Okay.  This is Company Exhibit 5. Steve, I'm going to show you Company Exhibit 5. Can you tell me what that document is?

    A.  This is a training summary from the State of Illinois, the IEPA, outlining CEU hours for training that was taken.

    Q.  And it's in reference to who?

    A.  Ken Nelson.

    Q.  And how did the company obtain this document?

    A.  I'm not -- to be honest, I'm not certain.  If this was provided to a supervisor, I'm not certain.

    Q.  All right.  But as a reference to Mr. Nelson, it's dated 11/3/03 at the top, correct?

    A.  That's correct, yes.

    Q.  And it's an update regarding his training credit, correct?

    A.  Yes.

    Q.  And it gives a certificate expiration date on the right-hand side, 7/1/2004?

    A.  Yes.

1    Q.   To your knowledge, is that

2  Mr. Nelson's correct home address?

3    A.   I believe so.

4    Q.   Do you have any information to believe

5  that Mr. Nelson wouldn't have received this?

6    A.   No.

7        MR. ORLOVE:   Objection.   He doesn't

8  know.

9        MR. POTTER:   To the best of his

10  knowledge.

11        MR. ORLOVE:   But he has no knowledge.

12  I object.

13        ARBITRATOR MALIN:   Overruled.

14        MR. POTTER:   Move for admission of

15  Company Exhibit 5.

16        ARBITRATOR MALIN:   Any objection?

17        MR. ORLOVE:   Yes.   But I'll cover it

18  on cross.

19        ARBITRATOR MALIN:   I don't understand.

20  Is there any objection to admission of the

21  document?   You may cross-examine him about the

22  document at the appropriate time, of course.

23        MR. ORLOVE:   Yes, of course.   But he

24  couldn't identify how he got it.   And what's

Page 124

1  critical here, I think, is when it came into

2  his knowledge.  I don't question the

3  authenticity of the document, if that's what

4  you're asking.  If you want to admit it for

5  that purpose, and I'll cross-examine him on it

6  later.

7          MR. POTTER:  That's fine.

8          ARBITRATOR MALIN:  We'll admit Company

9  Exhibit 5.

10                  (Company Exhibit No. 5

11                  received.)

12  BY MR. POTTER:

13      Q.  All right.  Let's go with Company

14  Exhibit 6.  Steve, I'm going to show you

15  Company Exhibit 6.  Can you tell the Arbitrator

16  what that document is?

17      A.  It's a drinking water operator's

18  certificate of competency renewal receipt, and

19  it's from the Illinois EPA.

20      Q.  Right.  And it's dated what?

21      A.  Dated July 29th, 2002.

22      Q.  And it's to who?

23      A.  It's directed to Dan Leppert.

24      Q.  And does it provide information to him

Page 125

1  regarding when his license will expire?

2       A.   Yes.

3       Q.   And where does it provide that?

4       A.   It's in the boxed-in area.

5  Certificate expiration date.

6       Q.   7/1/2005?

7       A.   That's correct.

8       Q.   To the best of your knowledge, is that

9  Mr. Leppert's home address?

10      A.   To the best of my knowledge, that is,

11 yes.

12      Q.   And also I notice on the bottom right

13 of this document there's a reference to a

14 wallet card?

15      A.   That's correct.

16      Q.   First of all, do you maintain a

17 license with the Illinois --

18      A.   Yes, I do.

19      Q.   -- EPA?  So you're familiar with these

20 documents?

21      A.   Yes.

22      Q.   And a wallet card serves what purpose?

23      A.   Just for the purpose showing that you

24 have a license and it also shows when your

Page 126

1   license expires.

2          MR. POTTER:   We move for admission of

3   Company Exhibit 6.

4          MR. ORLOVE:   The problem I'm having

5   with it, and I hope I'm not sounding

6   hyper-technical, and I'll cross-examine the

7   witness on it, but it's being put in out of

8   order.

9              You'll learn as the case goes

10  along that there's no question that their

11  licenses lapsed.   But how the company knew

12  about it, when they knew about it, this is

13  being put in as if -- strike that.

14             He seems to be speaking for the

15  IPEA who issued this.   He has no authority to

16  speak for the IPEA.   He can speak for the

17  company.   What the company knew, when they knew

18  it.   That's what's critical here.   That's

19  what's important.

20             So I don't want to hold us up with

21  that, but I want the record to indicate that

22  the case is being put in sort of to give an

23  impression that isn't really accurate.

24             To the extent that these are

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    records of the IEPA, it appears to be accurate

2    to me.  But that's not what's at issue in this

3    case.  So as to the authenticity of the

4    document, I don't object.  As to its relevance

5    or its meaningfulness in this proceeding, I do

6    object.  Does that seem to make sense?

7         ARBITRATOR MALIN:  I think so.

8         MR. POTTER:  Yeah.  We just want to

9    also establish that there were mechanisms in

10   place for these three individuals to be put on

11   notice when their license was going to expire.

12   Simple as that.  That's all it amounts to.

13        ARBITRATOR MALIN:  I'm going to admit

14   Company Exhibit 6.  As with all documents,

15   they're of course subject to each party's

16   arguments and its theory of the case.

17             (Company Exhibit No. 6

18              received.)

19   BY MR. POTTER:

20        Q.  All right.  Now we have Company

21   Exhibit 7.  Steve, let me show you Company

22   Exhibit 7.  Can you tell the Arbitrator what

23   that document is?

24        A.  It's another notice from the IEPA

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 128

1  pertaining to Glenn Williams dated April 24th,

2  1997 stating that his license, his Class A

3  license is due up for renewal.  You must

4  complete this form by July 31, 1997 to renew

5  your certificate.

6      Q.  And to the best of your knowledge was

7  that an accurate address for Mr. Williams back

8  in '97?

9      A.  Yes.

10      MR. POTTER:  I move for admission of

11  Company Exhibit 7.

12      ARBITRATOR MALIN:  Would you like a

13  standing line of objection?

14      MR. ORLOVE:  Yes.  But in this case I

15  want to ask him a question.

16      ARBITRATOR MALIN:  Voir dire.  Okay.

17  BY MR. ORLOVE:

18      Q.  How do you know that's his address?

19      A.  To the best of my knowledge it is, at

20  the time.  This is back in 1997.

21      MR. ORLOVE:  Didn't he in fact tell

22  you he moved?

23      THE WITNESS:  This dates back to 1997.

24      MR. ORLOVE:  I'm asking you though.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 129

1    Didn't he in fact tell you that he had moved?

2          THE WITNESS:  Recently, in recent

3    years, but again, this is 1997.

4          MR. ORLOVE:  You're swearing you know

5    that this is his address; is that right?

6          THE WITNESS:  To the best of my

7    knowledge.

8          MR. ORLOVE:  And what is your

9    knowledge?

10         THE WITNESS:  I know he's moved.  I

11   know he lived in Bloomingdale.  It's to the

12   best of my knowledge.

13         MR. ORLOVE:  Same standing objection.

14         ARBITRATOR MALIN:  You may have that

15   standing line of objection.

16         MR. ORLOVE:  Thank you.

17         ARBITRATOR MALIN:  All documentation

18   from the IEPA related to any of the grievants'

19   licenses, expirations, thereof, et cetera.

20   Company Exhibit 7 is admitted.

21               (Company Exhibit No. 7

22               received.)

23         MR. POTTER:  This is company

24   Exhibit 8.

Page 130

1    BY MR. POTTER:

2        Q.  I'm going to hand you Company

3    Exhibit 8, Steve, and tell the Arbitrator what

4    this document is.

5        A.  This is an Employee Guide for Conduct.

6            MR. ORLOVE:  There won't be any issue

7    over this.

8            MR. POTTER:  Okay.  I'm just going to

9    review it in general.

10   BY MR. POTTER:

11       Q.  And was this in effect at the time of

12   the discipline in issue here?

13       A.  Yes.

14       Q.  Okay.  And do you know how long this

15   guide for conduct's been in place?

16       A.  Ever since we became Illinois American

17   Water.

18       Q.  Which was about when?

19       A.  January 2002, I believe.

20       Q.  Okay.  And just looking, knowing that

21   these individuals were disciplined under

22   Offense Number 12, that's on the second page.

23       A.  Yes.

24       Q.  And again, just to give the format for

1    the Arbitrator so we can understand this.    On

2    the first page you've got the levels of

3    discipline by a numerical reference.    So 1,

4    counseling or warning; 2, is a suspension up to

5    five days; 3 is a suspension from 5 to 30, and

6    4 is discharge?

7        A.    That's correct.

8        Q.    So in the codes on the right under

9    Penalty for the various offenses --

10       A.    Yes.

11       Q.    -- lines up with that reference,

12   right?

13       A.    Yes.

14       Q.    So that, going to 12, the first

15   offense is a 3, meaning normally it's a

16   suspension between five and 30 days, correct?

17       A.    That is correct.

18       Q.    And a second offense is a 4, which

19   means discharge, correct?

20       A.    That's correct.

21       Q.    In your role and involvement in the

22   discipline issued in these cases, and let's

23   talk about the initial discipline first, the

24   last-chance agreement and for Mr. Williams the

Page 132

1   two suspensions for 15 days for the individuals

2   Mr. Nelson and Mr. Leppert, was this document

3   reviewed?

4       A.  Yes, it was.

5       Q.  Tell us about that process.  Tell us

6   about what came into play in terms of

7   determining what discipline would issue for

8   them?

9       A.  Any time there is an investigation or

10  a potential discipline matter --

11          MR. ORLOVE:  Excuse me.  May I just

12  ask that a foundation be laid for that?  I

13  don't know whether he's giving his mental

14  processes, whether it is discussed with

15  employees or discussed with anyone else.

16          MR. POTTER:  We're getting there.

17  Just give us a chance.

18          ARBITRATOR MALIN:  I'll give you some

19  leeway.  Some time frame would also be helpful

20  for my understanding of the witness's

21  testimony.

22  BY MR. POTTER:

23      Q.  So you were involved in discipline of

24  these three employees?

Page 133

1    A.  Yes.

2    Q.  And as a result, you had interaction

3  with who?

4    A.  John Stein, the direct supervisor,

5  along with the three individuals.  Are you

6  talking about within the company?

7    Q.  Yes.

8    A.  Okay.  That would be HR, my boss,

9  Michael Jackson.  That's who the interaction

10  was with?

11    Q.  And who in HR were you dealing with?

12    A.  Dennis Federle.

13    Q.  And who is Dennis Federle?

14    A.  He was the manager.

15    Q.  For HR?

16    A.  Yes.

17    Q.  And who else?

18    A.  Maxine Mitch had involvement.

19    Q.  And who is Maxine Mitch?

20    A.  She is the director over HR.

21    Q.  For this area?

22    A.  Yes.

23    Q.  And who else did you have a role with?

24    A.  Mike Jackson.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    Q.  And was this one meeting, several

2  meetings, what took place?

3    A.  It was several calls, several

4  meetings, lot of discussion.

5    Q.  Okay.  And what were you discussing?

6    A.  We were discussing the case and how

7  best to handle it.  Any time there's a

8  discipline issue, it's just not one person

9  that's not internally here making a decision.

10  It's a team, group, everybody gets input

11  because it's viewed very seriously.  And we

12  just want to make sure we're doing the --

13  outcome is the best and fair.

14    Q.  Okay.

15    A.  To the employee.

16    Q.  And in terms of the level of

17  discipline, was that discussed?

18    A.  Yes.

19    Q.  Who with?

20    A.  All parties.

21    Q.  How many times?

22    A.  Several times.  Several phone calls.

23    Q.  Can you just elaborate here and kind

24  give us a big picture?

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 135

1    A.   It probably went on for a week, two
2  weeks.  I mean, it went on for a while.  We
3  brought back the people involved and questioned
4  them a number of times to make sure we had all
5  the facts.
6    Q.   And then you reported back.  What was
7  your role in that investigation?
8    A.   Reporting back --
9    Q.   To?
10    A.   -- what was found to everybody
11  involved, as I mentioned.  My boss, HR.  We had
12  several calls in.
13    Q.   And again, you were referring to the
14  Guide for Conduct at times?
15    A.   Yes.
16    Q.   And what were you discussing in terms
17  of the Guide for Conduct?
18    A.   The appropriate discipline.
19    Q.   And what was discussed in terms of the
20  appropriate discipline?
21    A.   The extent, the nature of it.  There
22  was some past history with one individual.
23    Q.   What options were you considering?
24    A.   We were considering termination of one

1    employee.

2        Q.   And who was that?

3        A.   Glenn Williams.

4        Q.   Okay.  And why was that?

5        A.   Based on a recent prior suspension.

6        Q.   And how does that fit into the Guide

7    for Conduct?

8        A.   For the guide of conduct under Number

9    12, second offense would be discharge.

10       Q.   So Mr. Williams had a prior offense

11   under 12?

12       A.   Yes.

13       Q.   Okay.  And the decision was made not

14   to discharge?

15       A.   That's correct.

16       Q.   And why was that?

17       A.   Because he was a long-term employee.

18   We wanted to resolve the issue.  We wanted to

19   get him his license reinstated, and we wanted

20   to try to work through it.

21       Q.   And so we'll address that in a minute.

22            Were there other levels of

23   discipline in the Guide for Conduct that you

24   looked at that could have resulted in discharge

1  for all three individuals?

2      A.  Yes.  We looked at them all.  The

3  first one, falsifying personal or other company

4  records, we looked at that one hard.

5      Q.  And what was the result of discipline

6  for that breach?

7      A.  That indicates a discharge.

8      Q.  Okay.  Were there others that you

9  looked at as possible sources for discipline?

10     A.  That's the one that pops to mind.

11 There were a couple others as we went through

12 this, but we focused on -- we ended up with 12.

13         MR. POTTER:  Move for admission of

14 Company Exhibit 8.

15         MR. ORLOVE:  No objection.

16         ARBITRATOR MALIN:  Company 8 is

17 admitted.

18                 (Company Exhibit No. 8

19                 received.)

20 BY MR. POTTER:

21     Q.  So how did the company find out that

22 these licenses had lapsed?

23     A.  I believe Glenn Williams brought it to

24 his supervisor's attention.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    Q.   And who was his supervisor?

2    A.   John Stein.

3    Q.   And what resulted from that

4    conversation?

5    A.   Resulted from that conversation?

6    Q.   What next steps took place?

7    A.   We checked with the state.

8    Q.   Okay.  And?

9    A.   It was determined that there was two

10   other people as well that had expired licenses.

11   Q.   And those two were?

12   A.   Dan Leppert and Ken Nelson.

13   Q.   And so what was the next step in that

14   process?

15   A.   To investigate them.

16   Q.   And how did you go about investigating

17   it?

18   A.   Same process.

19   Q.   Meaning?

20   A.   All parties involved, made sure

21   everybody -- there was a group discussion.  And

22   there was investigation.  Couple times we

23   pulled them in, made sure we had all the facts.

24   Q.   So you pulled in the three

Page 139

1    individuals?

2        A.   Yes.

3        Q.   Were you party to those interviews?

4        A.   Yes.

5        Q.   And do you remember when those

6    interviews took place?

7        A.   October of '06.

8        Q.   And who else was present during those

9    interviews?

10       A.   John Stein.

11       Q.   And you say you brought them in twice

12   or once.  Do you remember how many times you

13   brought them in?

14       A.   I believe it was twice.

15       Q.   All right.  And was it just you and

16   Mr. Stein on both occasions?

17       A.   Yes.

18       Q.   And where did the interviews take

19   place at?

20       A.   In my office.

21       Q.   Here at --

22       A.   Here at the --

23       Q.   Here at the facilities?

24       A.   Yes.

Page 140

1    Q.  Anyone else present?

2    A.  No.  Well, there was union reps, yes.

3    Q.  And who was the union rep?

4    A.  I believe -- I don't recall.  It was

5  either Ray Rossa or Chris Martens.

6    Q.  And who are those individuals?

7    A.  Union stewards.

8    Q.  And let's go through each.  So you

9  interviewed Mr. Nelson, correct?

10    A.  Yes.

11    Q.  And what did you ask Mr. Nelson and

12  what were his responses?

13    A.  Basically questioning his license, if

14  he had knowledge of it.

15    Q.  Uh-huh.

16    A.  And he had indicated yes.

17    Q.  He indicated yes what?

18    A.  That his license was expired.

19    Q.  That he was aware of it?

20    A.  Yes.

21    Q.  What else did you ask him?

22    A.  How long he had knowledge.  We had a

23  series of questions that we'd had answered --

24  we would ask him.

Page 141

1      Q.   And how long did he say he had

2  knowledge?

3      A.   I believe, if I recall correctly --

4  I'd have to refer back to the document.

5      Q.   Okay.  This was Mr. Nelson now?

6      A.   That's correct.

7      Q.   And so he didn't deny that he was

8  aware his license had lapsed?

9      A.   No.  He was fully aware of it.

10      Q.   And did he have any -- were any

11  mitigating factors presented to you as to why

12  he had not maintained his license?

13      A.   I'd have to refer back to the

14  document.

15      Q.   Okay.

16          ARBITRATOR MALIN:  Do you need a quick

17  recess to run some more copies?

18          MR. POTTER:  Sure.  Why don't we.

19          ARBITRATOR MALIN:  Sure.  We'll take a

20  short recess.

21                (Recess Taken)

22          ARBITRATOR MALIN:  Back on the record.

23  BY MR. POTTER:

24      Q.   Steve, let me show you Company

Page 142

1    Exhibit 9 and tell us what that is.

2        A.    This is when we interviewed Ken

3    Nelson.

4        Q.    Okay.

5        A.    During our investigation.

6        Q.    And on what date?

7        A.    This was on October 24th.

8        Q.    Okay.  And this are -- whose notes are

9    these?

10       A.    These are John Stein's.

11       Q.    Well, you were present --

12       A.    I was present, John Stein and myself.

13       Q.    So you reviewed these notes?

14       A.    Yes.

15       Q.    After they were typed up?

16       A.    Yes.

17       Q.    And they were accurate?

18       A.    Yes.

19       Q.    And again, let's go back to what took

20   place on 10/24 with Mr. Nelson.  It was you,

21   John Stein, Ray Rossa?

22             MR. ORLOVE:  I would ask if you're

23   going to ask the witness to recite from memory

24   what happened that he not have the company's

1   recordation of what happened in front of him.

2           MR. POTTER:  Just trying to expedite

3   things, but that's fine.

4           MR. ORLOVE:  Well, no.  I objected.

5           ARBITRATOR MALIN:  And Mr. Potter has

6   agreed.  He's taking the document away from the

7   witness.  So let's proceed.

8   BY MR. ORLOVE:

9       Q.  You had meeting on the 24th?

10      A.  Yes.

11      Q.  Rossa is there as a steward?

12      A.  Correct.

13      Q.  John Stein is there--

14      A.  Correct.

15      Q.  -- his immediate supervisor?  You're

16  there, correct?

17      A.  Right.

18      Q.  Mr. Nelson's there?

19      A.  Right.

20      Q.  And the meeting's held in your office?

21      A.  Yes.

22      Q.  And what's the purpose of the meeting?

23      A.  To investigate, make sure we're

24  getting all the facts, make sure that we

Page 144

1    haven't missed anything, making sure that we're

2    being thorough.

3        Q.   And was there a meeting prior to the

4    24th?

5        A.   Yes.  I believe on October 19th.

6        Q.   Okay.  And who was present for that

7    meeting?

8        A.   Same parties, same people.

9        Q.   And what was the purpose behind that

10   meeting?

11       A.   Same purpose, getting the facts,

12   making sure we're not missing anything.

13       Q.   Was there anything that came out in

14   that meeting that made you think that

15   discipline wouldn't be appropriate here?

16       A.   No.  No.  Again, it was just

17   reassuring ourselves we haven't missed

18   something.

19           ARBITRATOR MALIN:  By that meeting are

20   you referring to the 24th, the 19th, or both of

21   them?

22           MR. POTTER:  Both of them.  I'm sorry.

23   Thank you.

24   BY MR. POTTER:

Page 145

1      Q.   19th or 24th meetings, Steve, was

2  there anything that came out of those meetings

3  that --

4      A.   No.  Neither meeting.

5      Q.   Any explanation by Mr. Nelson as to

6  why his license expired?

7      A.   Just he wasn't tracking it.  He

8  just -- he first became aware of it, I believe,

9  within a few weeks of this prior.

10     Q.   But there was nothing that came out of

11 those meetings --

12     A.   No.

13     Q.   -- either meeting indicating that

14 there was some mitigation in terms of

15 discipline?

16     A.   No.

17     Q.   And did you have a meeting with

18 Mr. Leppert?

19     A.   Yes.

20     Q.   And what dates or date did you have a

21 meeting with Mr. Leppert?

22     A.   The same dates, same situation.

23 Again, investigation, fact finding, making sure

24 that we haven't missed anything, that we've

1  covered everything.

2      Q.   So same parties present?

3      A.   Same parties present.

4      Q.   Same MO?

5      A.   Yes.   Same MO.

6      Q.   And again, anything come out of that

7  meeting that would mitigate --

8      A.   No.

9      Q.   -- discipline?

10     A.   No.

11     Q.   And what about Mr. Williams; have a

12  meeting with Mr. Williams?

13     A.   Yes.

14     Q.   Was it an interview much like

15  Mr. Nelson and Mr. Leppert?

16     A.   Yes.

17     Q.   Same parties present?

18     A.   Yes.

19     Q.   What dates?

20     A.   Same dates.

21     Q.   Okay.   Again, same procedure?

22     A.   Yes.

23     Q.   Was there anything that came out of

24  those meetings that would mitigate discipline

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 147

1   in Mr. Williams's situation?

2        A.   No.

3             MR. POTTER:   At this point I will go

4   ahead and withdraw Company Exhibit 9, just so

5   the record's clear.

6   BY MR. POTTER:

7        Q.   Now, with respect to Mr. Williams,

8   we've already indicated he had an active

9   discipline earlier that year?

10       A.   Yes.

11            MR. POTTER:   Even though I've

12  withdrawn 9, just be consistent, let's mark

13  this 10.

14            ARBITRATOR MALIN:   That's fine.

15  BY MR. POTTER:

16       Q.   And you were aware of that discipline?

17       A.   Yes.

18       Q.   Let me show you Company Exhibit 10.

19  Is that your signature on the second page?

20       A.   Yes, it is.

21       Q.   And what is Company Exhibit 10?

22       A.   This is a disciplinary suspension for

23  not responding to a main break.

24       Q.   And for how many days was the

1   suspension?

2       A.   The suspension was for five days, I

3   believe.

4       Q.   And it refers to what section of the

5   Guide for Conduct?

6       A.   Item Number 12.

7       Q.   And where is that noted?   The last

8   paragraph?

9       A.   The last paragraph, first page.

10      Q.   All right.   Again, we've talked about

11  in the Guide for Conduct, the first offense is

12  a suspension and the second offense results in

13  what?

14      A.   Termination.

15      Q.   Okay.   Now, was this matter grieved?

16      A.   This matter, it was grieved.

17      Q.   And what was the ultimate resolution?

18      A.   It was denied.   Was not timely.

19      Q.   And so did it go beyond the third

20  step?

21      A.   No.

22           MR. POTTER:   And then we've already

23  previously entered into evidence from the prior

24  hearing the last-chance agreement for

Page 149

1    Mr. Nelson -- I mean for Mr. Williams, as well

2    as the disciplinary suspensions for Mr. Nelson

3    and Mr. Leppert.

4              ARBITRATOR MALIN:  The last chance is

5    Union 1?

6              MR. POTTER:  Right.

7              ARBITRATOR MALIN:  The suspensions are

8    Union 2 and 3?

9              MR. POTTER:  Right.

10             ARBITRATOR MALIN:  Are you offering

11   Company 10, by the way?

12             MR. POTTER:  I am.  I'm sorry.

13             ARBITRATOR MALIN:  Is there any

14   objection to Company 10?

15             MR. ORLOVE:  No.

16             ARBITRATOR MALIN:  Company 10 is

17   admitted.

18                  (Company Exhibit No. 10

19                   received.)

20   BY MR. POTTER:

21      Q.  What role did you play in terms of the

22   disciplinary suspension for Mr. Nelson?

23   Looking at Union Exhibit 2, Steve, is that your

24   signature on the second page?

Page 150

1      A.   Yes, it is.

2      Q.   So you were the author of that

3   discipline, correct?

4      A.   Yes.

5      Q.   All right.  And were you involved in

6   the decision making in terms of the level of

7   discipline?

8      A.   Yes.

9      Q.   And the level of discipline in this

10  case was a 15-day suspension, correct?

11     A.   That's correct.

12     Q.   And a reduced pay status?

13     A.   Yes.  That's correct.

14     Q.   Okay.  And also restitution, correct?

15     A.   Yes.

16     Q.   Let's talk about those.  The

17  discharge -- not discharge.  The discipline in

18  this case for Mr. Nelson was a 15-day

19  suspension, and that was pursuant to the Guide

20  for Conduct?

21     A.   That's correct.

22     Q.   Again, neglect of duty gives you the

23  option, to a certain extent, regarding the

24  level of suspension, correct?

1    A.   That's correct.

2    Q.   Now, we also had a reduced pay status

3  and restitution.  Kind of explain to the

4  Arbitrator the thought process for the company

5  in terms of reducing the pay status to begin

6  with.

7    A.   Well, the reduction in pay status was

8  the fact that he did not hold a current license

9  that he had prior to this.  So we brought him

10  down to the level of operator in training.

11    Q.   And why an operator in training?

12    A.   He did not have the proper licensing

13  for operator.

14    Q.   And were you also -- did you also

15  request for them to reinstate the license?

16    A.   Yes, yes.

17    Q.   And that's set forth in the exhibit?

18    A.   Yes.

19    Q.   All right.  And so why then

20  restitution?

21    A.   Because we just were looking for him

22  to reinstate his license.

23    Q.   No.  I'm sorry.  Restitution -- I'm

24  sorry.  The payback, the moneys.

Page 152

1    A.   The payback.  Simply because he did

2    not hold a license for that period in time, so

3    therefore, we felt that the restitution was

4    merited.

5    Q.   Okay.

6    A.   Simply because he didn't hold a

7    license.

8    Q.   And his pay was a function of?

9    A.   Of his job duties.

10    Q.   Of his license?

11    A.   His license, yes.

12    Q.   So he didn't hold the license for a

13    period of time?

14    A.   Yes, that's right.

15    Q.   Okay.  And for Mr. Nelson,

16    approximately how long had his license lapsed

17    at that point?

18    A.   His license had lapsed over two years.

19    Q.   All right.  And then we have

20    Mr. Leppert, which was Union Exhibit 3.  Let's

21    review that for a minute.  Mr. Leppert also had

22    a 15-day suspension?

23    A.   Yes.

24    Q.   Same as Mr. Nelson?

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    A.   Yes.

2    Q.   And he didn't have his pay status

3  reduced or restitution, correct?

4    A.   No, he didn't.

5    Q.   And why was that?

6    A.   Because he currently held a waste

7  water license equal to the level of his water

8  license.

9    Q.   So he met that requirement?

10    A.   Yes.

11    Q.   So why give him a 15-day suspension if

12  he already had a waste water license?

13    A.   Because he did not -- he's operating

14  water facilities, and he did not maintain his

15  water license.

16    Q.   Pursuant to 26.2?

17    A.   Yes.

18    Q.   All right.  Were you involved -- and

19  Mr. Leppert was also asked as part of his

20  discipline to obtain his license and get

21  reinstated, correct?

22    A.   Yes.

23    Q.   And that's all noted in the exhibit,

24  correct?

Page 154

1      A.   Yes.

2      Q.   All right.  And then Mr. Williams, you

3   met with him regarding the last-chance

4   agreement?

5      A.   Yes.

6      Q.   Let's back up for a minute.  When you

7   introduced a discipline for Mr. Nelson and

8   Mr. Leppert who was present?

9      A.   John Stein and the shop steward.

10      Q.   And yourself?

11      A.   And myself.

12      Q.   For each?

13      A.   For each.

14      Q.   And then you met with Mr. Williams,

15   and who was present for that discussion?

16      A.   John Stein, shop steward, myself.

17      Q.   And who was the shop steward?

18      A.   For Mr. Williams, Chris Martens.

19      Q.   And just review what took place in the

20   course of that discussion with Mr. Williams.

21      A.   We presented the disciplinary

22   suspension.

23      Q.   For the last-chance agreement?

24      A.   Yes.

1    Q.   So Union Exhibit 1?

2    A.   Yes.

3    Q.   Okay.

4    A.   Explained to them the suspension and

5  then the last-chance agreement, that we could

6  have terminated, but we're going to a

7  last-chance agreement, looking to work this

8  out.  I guess if they'd take the time to read

9  it, go through it.  If they have any questions,

10  please ask and to please sign.

11    Q.   And what happened as a result of that

12  comment by you?

13    A.   As a result of that they read it, they

14  took some time to go through it, they signed

15  it, then there was really no questions.

16    Q.   No objections?

17    A.   No objections.

18    Q.   No questions?

19    A.   None.

20    Q.   And then again, and that -- part of

21  that process, that last-chance agreement, they

22  were to -- he was to obtain a 30-day

23  suspension, correct?

24    A.   That's correct.

1    Q.   Plus restitution?

2    A.   Yes.

3    Q.   Plus reinstate his license?

4    A.   Yes.

5    Q.   And a reduced pay grade?

6    A.   Yes.

7    Q.   All right.  Did the steward ever

8    indicate to you or anyone present in the room

9    he didn't have the authority to sign that

10   agreement?

11   A.   No.

12   Q.   I'm assuming in terms of processing

13   grievances at the company that you play a role

14   in terms of the processing of grievances?

15   A.   Yes.

16   Q.   And you're familiar with the contract

17   and the grievance arbitration procedure?

18   A.   Uh-huh.

19   Q.   Yes?

20   A.   Yes.

21   Q.   Okay.  Let me -- Page 25 of the

22   agreement, in particular, Sections 14.2, the

23   first two steps.  Who is involved from the --

24   in that procedure, in the first two steps in

Page 157

1   terms of resolving the grievance?

2       A.   The first step is presented to the

3   supervisor.   Shop steward normally presents

4   those.

5       Q.   And the contract specifies that?

6       A.   Yes.

7       Q.   And Step 2?

8       A.   Step 2 is the same.   It goes -- if

9   it's not resolved at the first step, it goes to

10  the second step.

11      Q.   And as part of that process, does the

12  contract not -- does it not state that the

13  parties will endeavor to settle the grievance?

14      A.   Yes, it does.

15      Q.   And again, the party involved in both

16  those first two steps is the shop steward,

17  correct?

18      A.   Yes.   That's correct.

19      Q.   As a matter of practice, are

20  grievances resolved in the first two steps?

21      A.   I'm sorry?

22      Q.   As a matter of practice, are

23  grievances resolved in the first two steps?

24      A.   Yes.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 158

1      Q.   And resolved by stewards?

2      A.   That's correct, yes.

3           MR. POTTER:  We're at Company 11?

4           ARBITRATOR MALIN:   Correct.

5   BY MR. POTTER:

6      Q.   Let me show you, Steve, Company

7   Exhibit 11.  Tell the Arbitrator what that is,

8   please.

9      A.   This is a second step grievance here.

10     Q.   It was a first and second, summarizing

11  first and second steps?

12     A.   Yes.  Second step that came to me,

13  yes.

14     Q.   And you were involved in the second

15  step?

16     A.   Yes.  Uh-huh.

17     Q.   And who were you dealing with?

18     A.   Ray Rossa.

19     Q.   With the union?

20     A.   Yes.

21     Q.   And what is his title?

22     A.   Ray Rossa's title?

23     Q.   Yeah.

24     A.   He's union shop steward.

Page 159

1    Q.  And this matter was resolved at a

2  second step?

3    A.  That's correct.

4    Q.  And there's an attachment to this

5  actually on the second page in terms of the

6  resolution?

7    A.  Yes, there is.

8    MR. POTTER:  Move for admission of

9  Company Exhibit 11.

10    MR. ORLOVE:  It's authentic, but it's

11  not relevant.

12    ARBITRATOR MALIN:  Do you want to

13  elaborate?

14    MR. ORLOVE:  Yeah.  We'll get into it

15  in our case.  But apparently, the company is

16  resting on the fact that a steward was present

17  when somebody is to be discharged and

18  disciplined.

19    This has nothing to do with

20  discharge and discipline, and we'll have

21  testimony about what stewards' functions are.

22    MR. POTTER:  We'll go through

23  authority obviously in terms of resolving

24  matters.  That's the key point.

Page 160

1          MR. ORLOVE:  And the fact that a

2  steward was present when Mr. Williams was given

3  a last-chance agreement doesn't mean that that

4  represents the union's agreement, as the

5  contract states.  But that was overlooked.  So

6  I'll get into that on cross-examination.

7               I'm not going to -- to move it

8  along, I'm not going to question that this is

9  an authentic document.  It just doesn't mean

10  anything in this case.

11          ARBITRATOR MALIN:  Mr. Potter, I'm

12  inferring that you're trying to develop a case

13  of apparent authority?

14          MR. POTTER:  You got it.

15          ARBITRATOR MALIN:  It's clearly

16  relevant to the company's theory of the case.

17  I realize the union disagrees with that theory

18  of the case.

19          MR. ORLOVE:  Yes.

20          ARBITRATOR MALIN:  So I'll admit

21  Company Exhibit 11.

22               (Company Exhibit No. 11

23                    received.)

24

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 161

1          MR. POTTER:  Now, this will be Company

2     Exhibit 12.

3          ARBITRATOR MALIN:  Can we go off the

4     record for a moment?

5               (Discussion off the Record.)

6          ARBITRATOR MALIN:  Back on the record.

7     BY MR. POTTER:

8     Q.   Company Exhibit 12.  Handing you that,

9     Steve.  Can you tell the Arbitrator what that

10    is?

11    A.   This is another grievance right here,

12    a third-step level grievance that was resolved

13    at the third step.

14    Q.   And who was involved for both parties?

15    A.   Reed Shepman, the general manager at

16    the time, and Ray Rossa, the chief union

17    steward.

18    Q.   This is a third-step level?

19    A.   Yes, it is.

20         MR. POTTER:  Move for admission of

21    Company Exhibit 12.

22         MR. ORLOVE:  I object to this in

23    particular because it doesn't involve stewards.

24    It involves the business agent of the union.

Page 162

1   And as we'll go into the contract, you'll see

2   that at Step 3 the business agent gets

3   involved, and he has authority to make

4   settlements, but not -- but our position is

5   stewards do not.

6   BY MR. POTTER:

7        Q.  Was it your testimony that Ray Rossa

8   was involved in the resolution; is that his

9   signature?

10       A.  Yes, uh-huh.

11       Q.  And Wayne Clavio was the business

12  agent, correct?

13       A.  At the time -- this is in '04?  I'm

14  not certain when he was --

15       Q.  Well, just fundamentally, who resolved

16  this?  To the best of your knowledge, it was

17  Ray Rossa?

18       A.  That's correct.

19       Q.  Not the business agent?

20       A.  I don't see his name on here, no.

21            MR. POTTER:  Okay.  Thank you.

22            MR. ORLOVE:  You don't see his name on

23  there.  Okay.

24            MR. POTTER:  So move for admission of

Page 163

1    Company Exhibit 12.

2              MR. ORLOVE:  Well, his name is on

3    there, and it says that it was presented --

4              ARBITRATOR MALIN:  Would you like voir

5    dire?

6              MR. ORLOVE:  Yes.

7              ARBITRATOR MALIN:  Proceed.

8    BY MR. ORLOVE:

9         Q.  You see the third line?  You see that

10   it was presented to the HR manager by Wayne

11   Clavio?

12        A.  I see that.  I'm sorry.  I mis --

13        Q.  And were you involved in this?  Were

14   you involved in this grievance?

15        A.  I'd have to look back.  I do not

16   recall.

17        Q.  You can't tell us you were or were

18   not; is that right?

19        A.  No, I can't.

20        Q.  But in any case, this was a resolution

21   of -- will you agree with me that this was a

22   resolution of the third-step grievance

23   involving Mr. Clavio who you know to be officer

24   of the union?

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 164

1     A.   I don't recall being involved.  I
2  don't know that he was present.  I can't speak
3  to that.
4          MR. ORLOVE:  We object to this.  If
5  it's intended to show authority of stewards, it
6  doesn't, and I object to it.
7  BY MR. POTTER:
8     Q.   Okay, Steve.  Let's go through this.
9     A.   Okay.
10    Q.   The process is on the second half of
11 the grievance form, if it's resolved, it's a
12 check mark or an X by Matter Resolved, correct?
13    A.   That's correct.
14    Q.   And here, this one apparently resolved
15 at Step 3, correct?
16    A.   That's correct.
17    Q.   And the chief steward's signature is
18 Ray Rossa's; is that correct?
19    A.   That's correct.
20    Q.   And Mr. Wayne Clavio's signature
21 doesn't appear anywhere on this document?
22    A.   That's correct.
23    Q.   There's a reference to Mr. Clavio at
24 the top, correct?

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 165

1      A.   Yes.

2      Q.   There is no other indication that

3 Mr. Clavio was involved in a resolution of this

4 grievance?

5           MR. ORLOVE:   I object.   He testified

6 he doesn't have a recollection of it.

7           ARBITRATOR MALIN:   He testified he

8 doesn't recall being involved in it.   You know,

9 I'll admit the document just -- you can make

10 your argument, but at this point I don't see

11 any foundation to provide -- to give this

12 particular exhibit any probative value at all.

13 This witness says he doesn't recall being

14 involved in it.   So the document is whatever

15 the document is.

16           MR. POTTER:   Okay.   Fair enough.

17           ARBITRATOR MALIN:   If you want it

18 admitted, I'll admit it but --

19           MR. POTTER:   Okay.   That's fine.

20           ARBITRATOR MALIN:   -- with that

21 warning that at this point I don't have any

22 foundation to give it any probative value.   So

23 just for the record, we'll, admit Company 12

24 but...

17086b9a-99e3-4c02-b8d8-0a34a317d803

1              (Company Exhibit No. 12

2              received.)

3         MR. ORLOVE:  Company 12 is admitted?

4         ARBITRATOR MALIN:  It's admitted.  But

5    as I just indicated, without any further

6    foundation, I don't see any basis for giving it

7    any probative value, since this witness wasn't

8    involved and can't testify from personal

9    knowledge as to what it represents in terms of

10   what actually happened in the settlement.

11   BY MR. POTTER:

12        Q.  Well, then let's just turn our

13   attention to Company Exhibit 11.  Let's go back

14   to that, Steve, for a moment.

15        A.  Okay.

16        Q.  And this was the grievance which you

17   were personally involved in --

18        A.  That's correct, yes.

19        Q.  -- in resolving?

20             And again, you play a role in

21   resolving grievances --

22        A.  Yes.

23        Q.  -- for the company?

24             And to your knowledge, how often

Page 167

1    does a steward get involved in terms of

2    resolving grievances at any step level?

3        A.  It's reviewed as we go through first,

4    second, and step.  I mean, there's always the

5    opportunity to resolve them.  That's the goal.

6            MR. ORLOVE:  Well, I guess the answer

7    will stand, but it's not responsive to the

8    question.

9            MR. POTTER:  I'm following up on that.

10           ARBITRATOR MALIN:  Proceed.

11           MR. POTTER:  Give me time.

12   BY MR. POTTER:

13       Q.  And in your experience, how often does

14   it occur that a steward is able to resolve the

15   matter at a first or second step?

16       A.  Rephrase the question again.

17       Q.  How often, in your experience, has a

18   steward been able to resolve the matter at the

19   first and second step?

20       A.  How often?  It happens from time to

21   time.

22       Q.  So what percentage of the grievances

23   do you think get resolved by stewards in the

24   first and second step, ballpark?

Page 168

1    A.   25 percent.

2    Q.   Okay.  And when the stewards go into

3  grievances, in your experience, how often do

4  they attempt to resolve on behalf of the union,

5  just attempt?

6    A.   25 percent.

7    Q.   No.  They're attempting.  You're

8  telling me 75 percent they're not going in and

9  trying to attempt to resolve the grievance?

10    A.   Yes, yes.  They are.  I'm sorry.

11    Q.   So they're going in every time to

12  resolve the grievance; are they not?

13    A.   Yes.

14    Q.   So 100 percent of the time?

15    A.   Yes.

16    Q.   So that's their goal pursuant to the

17  Collective Bargaining Agreement, correct?

18    A.   Yes.

19    Q.   Okay.  Let me just take a moment here,

20  make sure I've covered everything with this

21  witness.

22                    (Brief Pause)

23        MR. POTTER:  Nothing further of this

24  witness.

MAYLEEN MENDELSON   (773) 761-0449

17086b9a-99e3-4c02-b8d8-0a34a317d803

1          ARBITRATOR MALIN:  You may

2   cross-examine.

3                CROSS-EXAMINATION

4   BY MR. ORLOVE:

5        Q.  I guess I'll start with the end first.

6             Every time a grievance is filed,

7   wouldn't it indicate to you the union wants a

8   certain resolution?

9        A.  Yes, yes.

10       Q.  So they want to resolve 100 percent of

11  what they file?

12       A.  Yes.  Yes, I'm sorry.

13       Q.  25 percent maybe --

14       A.  I'm just a little nervous here.  I

15  apologize.

16       Q.  Don't be nervous.  We've never given

17  the electric chair to any witness.

18             But when a grievance is filed,

19  you're just a functionary to process them,

20  right?

21       A.  Not necessarily, no.

22       Q.  Do you send them all up to HR?

23       A.  Yes.  But there's an attempt to try to

24  resolve them.

Page 170

1    Q.  And do you get directions from HR how

2  to handle these?

3    A.  Not necessary.  If we feel we can

4  resolve them amongst ourselves, we do.  That's

5  the goal.

6    Q.  Isn't it a fact that never has any

7  discipline or discharge case been resolved at

8  the first or second step?

9    A.  Discipline or discharge?

10    Q.  Isn't it a fact that when the company

11  has administered discipline or discharge, they

12  have never been resolved at the first or second

13  step; isn't that a fact?

14    A.  Not that I can recall.

15    Q.  You don't remember?

16    A.  Right, yes.

17    Q.  Saying it another way, all discharge

18  and discipline cases end up at Step 3 or

19  beyond, correct?

20    A.  For the most part, yes.

21    Q.  For the most part?

22    A.  Yes.

23    Q.  My question was all.  Yes or no?

24    A.  Yes.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 171

1    Q.   Yes.  And the third step -- and you

2  are familiar with the contract; are you not?

3    A.   Yes.

4    Q.   And you are familiar with what the

5  contract says about the authority of stewards

6  and chief steward?

7    A.   Uh-huh.

8    Q.   Is that yes?

9    A.   Yes.

10   Q.   That they have limited authority; you

11  would agree with that?

12   A.   I wouldn't agree with limited

13  authority, no.

14   Q.   Isn't that what the contract says,

15  that their authority is to simply investigate

16  and present grievances?

17   A.   Yes.

18      MR. POTTER:  Well, objection because

19  what part of the contract are you referring to?

20      MR. ORLOVE:  Well, Section 13.2,

21  Authority.

22  BY MR. ORLOVE:

23   Q.   Are you familiar with that?

24   A.   Yes.

1      Q.   Okay.   Having looked at it, do you

2   want to change your answer, or is your answer

3   still the same, you're familiar with that,

4   13.2?

5      A.   13.2, I'm familiar with that, yes.

6      Q.   The authority of stewards, correct?

7      A.   Uh-huh.

8      Q.   And -- yes or no, for the reporter's

9   sake.

10     A.   Yes.

11     Q.   And you were familiar with that back

12   in October and November of 2006; is that

13   correct?

14     A.   That's correct.

15     Q.   So isn't it a fact that the practice

16   of the company is that when you're going to

17   discharge or discipline someone, you routinely

18   call in a steward to witness that, correct?

19     A.   Yes.

20     Q.   And that's why stewards are called in,

21   correct?

22     A.   Correct, yes.

23     Q.   Looking at Company Exhibit 11, the

24   writing of which escapes me, although I have

Page 173

1   Mr. Rossa here to read his handwriting.  Is it

2   correct that Company Exhibit 11 is not a

3   discharge or a discipline case?

4        A.   That's correct.

5        Q.   Okay.  Thank you.  And I imagine you

6   were asked to comb the files and look for any

7   settlements you made at Steps 1 or 2 with

8   stewards; is that correct?

9        A.   Correct, yes.

10       Q.   And we found this one; is that

11  correct?

12       A.   Yes.

13       Q.   None other, correct?

14       A.   Correct.

15            MR. ORLOVE:  Give me a moment, please.

16                 (Brief Pause)

17  BY MR. ORLOVE:

18       Q.   Directing your attention to Company

19  Exhibit 3, which is a list of water licenses

20  per employees, do I understand correctly that

21  the company makes this record to identify what

22  water license it knows of an employee occupies?

23       A.   Yes.  That's correct.

24       Q.   This Company Exhibit 3, is it correct,

Page 174

1    is not intended to indicate dates of expiration

2    of licenses or whether they're up to date or

3    not?

4        A.   That's correct.

5        Q.   And as I understand the facts, the

6    company has no internal mechanism to keep track

7    of dates of licenses; is that correct?

8        A.   That's correct.

9        Q.   You do check drivers' licenses, right?

10       A.   Periodically, yes.

11       Q.   Okay.  But up until the facts of this

12   case, you haven't checked water licenses?

13       A.   That's correct.

14       Q.   Both are important, aren't they?

15       A.   Yes.

16       Q.   You don't want your employees driving

17   trucks without a driver's license?

18       A.   That's correct.

19       Q.   So that's why you check those,

20   correct?

21       A.   That's correct.

22       Q.   And you'd prefer your employees to not

23   operate water or waste water production -- I

24   hope I'm using the right word -- functions

17086b9a-99e3-4c02-b8d8-0a34a317d803

1  without the proper license?

2      A.   That's correct.

3      Q.   But you have no mechanism for checking

4  those, correct?

5      A.   We do now.

6      Q.   Thank you.  But how about in September

7  of '06?

8      A.   No.

9      Q.   No.   Okay.  Let's turn to the

10  contract, the provision you testified about,

11  Section 26.2.  It's on Page 37.  Were you

12  involved in these negotiations?

13      A.   Yes.

14      Q.   Were you involved in the negotiations

15  before this contract?

16      A.   Yes.

17      Q.   Is it correct that before this

18  contract there was no provision like continuing

19  education or 26.2?

20      A.   I believe that's correct.

21      Q.   Isn't it correct that before this

22  contract there was not any language that said

23  employees will be responsible to acquire CEU

24  credits?

Page 176

1    A.  I believe that's correct.

2    Q.  This provision came into being because

3   the union proposed the company financial

4   support for them to get CEU credits; is that

5   right?

6    A.  That's correct.

7    Q.  The company did not -- strike that.

8        Before negotiations began, the

9   company had no proposal such as Sentence 1 of

10  26.2, that it's understood employees will be

11  responsible?

12   A.  That's correct.

13   Q.  This first sentence of 26.2 came into

14  being only in response to the union's proposal

15  for economic support of acquiring CEU credits,

16  correct?

17   A.  Correct.

18   Q.  Now, we have in evidence Company

19  Exhibits 5, 6, and 7.  I'll take them up as a

20  group.  These are documents that the company

21  got from the EPA; is that correct?

22   A.  Yes, I believe so.

23   Q.  I'm looking at the fax indication at

24  the top of each one that indicates it was sent

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    or received on October 28, 2006, correct?

2        A.    October 20th?

3        Q.    20th.    Forgive me.    That's -- you're

4    correct.    I confused the zero with an eight.

5                    So it came to the company on

6    October 20th, 2006?

7        A.    I don't believe -- I don't recall

8    exactly how it came to us, to be honest with

9    you.

10       Q.    Well, how did the company get these?

11       A.    I'm not certain if the supervisor

12   obtained them.    To be honest with you, I don't

13   recall.

14       Q.    Looking at the fax identification date

15   up at the top, is it fair to say that prior to

16   October 20th you didn't have any knowledge of

17   these?

18       A.    That would be safe to say.

19       Q.    Who interacted for the company with --

20   strike that.

21                    And is it correct also that these

22   documents 5, 6, 7 came from the IPEA?

23       A.    It appears they did.

24       Q.    The IEPA --

17086b9a-99e3-4c02-b8d8-0a34a317d803

1      A.   EPA.

2      Q.   I don't know why I want to interchange

3   the letters.

4              And it's correct that these came

5   about or the inquiry was made to IEPA because

6   Williams brought to the company's attention

7   that his license had lapsed?

8      A.   That's possible, yes.

9      Q.   Possible.  Well, how did these get

10  into your hands?

11     A.   May have been through his supervisor.

12     Q.   Through John Stein?

13     A.   Yes.

14     Q.   Okay.  Is it correct that -- or strike

15  that.

16              May we assume from these documents

17  that IEPA knew that these men were working

18  without a license?

19     A.   Yes.

20     Q.   What action did -- is it correct --

21  strike that.

22              Is it correct that IEPA has taken

23  no action against the company?

24     A.   That's correct.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 179

1    Q.   And IPEA -- strike that.

2         And IEPA has taken no action

3    against the employees, other than to report

4    their status of holding or not holding a

5    license?

6    A.   Their action, they lost their license,

7    they expired.

8    Q.   That's what they said?  That's what

9    EPA said, as far as you know?

10   A.   It said it's expired, yes.

11   Q.   Any penalty attached to that?

12   A.   No.  Not that I'm aware of.

13   Q.   Any punishment by EPA against the

14   company or the employees?

15   A.   No, not that I'm aware of.

16   Q.   So but for Glenn Williams bringing

17   this to the company's attention, you would

18   never know about the status of these

19   individuals, correct?

20   A.   Probably not at the time, no.

21   Q.   Now, in connection with your

22   investigation, you -- I get the impression from

23   your testimony you reported that fact to

24   personnel at headquarters?

Page 180

1      A.   Yes.

2      Q.   That's in St. Louis?

3      A.   Yes.  Along with my boss, Michael

4   Jackson.

5      Q.   Is he located in St. Louis?

6      A.   Belleville.

7      Q.   Belleville...

8      A.   Illinois.

9      Q.   Up north?

10      A.   Down south.  Close to St. Louis.

11      Q.   Okay.  I'm getting my state mixed up.

12            And you reported to them

13   everything that you found out about --

14      A.   Yes.

15      Q.   -- the licenses?

16      A.   Yes.

17      Q.   Did you report to them what we just

18   discussed, that is that it came to your

19   attention only through Williams?

20      A.   Yes.

21      Q.   Did you report to them that no

22   punishment has been meted out by EPA against

23   the company?

24      A.   No.

Page 181

1    Q.  Or against the employees; did you
2  report that?
3    A.  No.
4    Q.  Did you report to them that if
5  Williams hadn't brought it to your attention,
6  nobody would have ever known about this?  Did
7  you report that to the superiors?
8    A.  We reported the facts as they --
9    Q.  Did you report that fact?
10    A.  That was apparent.  No.  I mean...
11    Q.  Okay.  He turned himself in, so to
12  speak, right?
13    A.  He needed a letter to -- the reason he
14  approached his supervisor is he needed a letter
15  to go back and take his license, to
16  reinstate -- he needed a letter of
17  recommendation to take the license again.
18  That's the reason he approached the supervisor.
19    Q.  Okay.
20    A.  He needed something from us.
21    Q.  And he got it.  He got it from you?
22    A.  Yes.
23    Q.  Issuing a letter to him means you'd
24  like him to continue -- you'd like him to get a

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 182

1   license so he can continue working for the

2   company?

3        A.   Absolutely.

4        Q.   And the letter was issued?

5        A.   Yes, it was.

6        Q.   And ultimately, we know he got his

7   license during his suspension, correct?

8        A.   Yes, he did.

9        Q.   Who in the company organization

10  actually determined what discipline would be

11  given to these three people?

12       A.   I think it was more -- it came out of

13  HR, but it was more -- it was a team, a group,

14  everybody had input.  Everything was looked at

15  very thoroughly.

16            I think based on all the input of

17  everybody, we all came to the common consensus

18  this was the direction we were going, based on

19  a lot of lengthy discussions, several phone

20  calls back and forth.  Just wanted to make sure

21  we were covering all the bases and doing the

22  right thing.

23       Q.   Now, in connection with Williams.

24  When the second offense indicates discharge

Page 183

1  it's true, it is not, that the company could

2  impose more or less discipline?

3        A.   That's true, yes.

4        Q.   So discharge is not automatic?

5        A.   No.

6        Q.   And in fact, he wasn't -- he was not

7  discharged?

8        A.   That's correct.

9        Q.   He was suspended, correct?

10       A.   Yes.

11       Q.   During his suspension he got his

12  license, correct?

13       A.   That's correct.

14       Q.   Would it be fair to say that this

15  34-year employee who was a lead man and

16  grandfathered at a higher rate is a rather

17  highly prized employee?

18       A.   34-year employee, yes.  That's a

19  long-term employee.

20       Q.   Lead man?

21       A.   Yes.

22       Q.   Grandfathered at a higher rate,

23  correct?

24       A.   Yes.