1    Q.  But for the earlier incident, I think

2  in August, a clean record?

3    A.  For the most part.

4    Q.  Was that all brought out to the

5  decision makers?

6    A.  Yes.  The prior discipline?  Yes.

7    Q.  And his longevity with the company?

8    A.  Yes.

9    Q.  His lead man status?

10    A.  Yes.

11    Q.  Okay.  His, for the most part, clean

12  record?

13    A.  For the most part.

14    Q.  Okay.

15    A.  I wouldn't say clean record.

16    Q.  Okay.  Were his personal problems that

17  he related to you also brought to the attention

18  of the decision makers?

19    A.  His personal problems?

20    Q.  You know that he lost an adult son?

21    A.  Yes, I do.

22    Q.  And that was somewhere in the time

23  frame that his license had lapsed?

24    A.  Going back many years, several years

1   ago.

2       Q.   Was that brought to the attention of

3   the decision makers?

4       A.   This was sometime ago, many years

5   back.  I can tell you, the decision makers, HR,

6   they've got a complete file on this individual.

7       Q.   No, I'm asking in connection with the

8   multiple phone calls and thoroughness that you

9   described with respect to determining

10  discipline, was it brought out in any of those

11  phone calls --

12      A.   No.

13      Q.   -- that he had some personal life

14  experiences like the --

15      A.   No.

16      Q.   -- death of an adult son?

17      A.   No, because it wasn't recent.  This is

18  going back many years ago.

19      Q.   Well, was it brought out again in

20  those conversations in connection with the

21  discipline given that his wife had cancer?  Was

22  that brought out?

23      A.   No.  This is all prior history, going

24  back many years ago.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 186

1    Q.  And while you were investigating the

2    three employees and the lapse of their

3    licenses, they continued working, correct?

4    A.  That's correct.

5    Q.  Were they put under any different

6    terms and conditions of employment other than

7    the reduction in pay?

8    A.  No.

9    Q.  Were they put under any supervision --

10   on any different supervision than they

11   previously had?

12   A.  They've always been over -- they've

13   always had supervision over them.

14   Q.  Any different supervision than they --

15   A.  No.

16   Q.  -- previously had?

17           When they were reduced to operator

18   in training, were you giving them training

19   during that period that they were, quote,

20   operators in training?

21   A.  No field training.

22   Q.  Or any training?

23   A.  There may have been safety training.

24   Q.  When they were working without a

1   license, when you knew they had no license,

2   were their duties changed in any way?

3        A.   Their field duties, no.

4        Q.   And I want to emphasize that is the

5   case when you knew they were working without a

6   license, correct?

7        A.   Yes.

8        Q.   You testified that you sought

9   restitution on the basis that the contract

10  calls for a pay rate based on the license they

11  hold?

12       A.   That's correct, yes.

13       Q.   But you did not seek restitution for

14  the entire period during which the license had

15  lapsed?

16       A.   That's correct.

17       Q.   Why?

18       A.   That was discussed at length.  Given

19  in the case of Williams, that would have

20  exceeded $100,000 in restitution.  We wanted to

21  be fair.  We wanted to resolve the matter.  We

22  wanted to see him get his license reinstated.

23  So we took the path, and we decided that we'd

24  only go back ten months.  And we're trying to

17086b9a-99e3-4c02-b8d8-0a34a317d803

1  be fair and we're trying to bring this to a

2  resolution.

3      Q.  To your knowledge, did anyone consult

4  with the Illinois statutes about getting

5  authority from an employee to make deductions

6  from his wages?

7      A.  Not to my knowledge.

8      Q.  To your knowledge, did anyone consult

9  with the IEPA about discipline or discharge of

10  employees who let their licenses lapse?

11      A.  Not to my knowledge.

12      Q.  Who in your organization actually

13  interacted with IEPA?

14      A.  I interacted with them.  I believe

15  John Stein interacted with them.

16      Q.  I mean, in connection with these three

17  men.

18      A.  There was interaction by myself and

19  John Stein.

20      Q.  When did you contact IEPA?

21      A.  Shortly after this came to our

22  knowledge.

23      Q.  Who did you speak with?

24      A.  I'd have to refer back to my notes.

1    Q.   Okay.  But you spoke to somebody?

2    A.   We spoke with somebody, yes.

3    Q.   Would this have been in the time frame

4  of October 2006?

5    A.   Yes.

6    Q.   How many times did you speak with

7  personnel from IEPA?

8    A.   I believe I spoke with them a couple

9  times.

10    Q.   Okay.  Give us your best recollection

11  of the conversation you had with them.

12    A.   Basically we were just looking to

13  generate a list of all the operators and

14  looking for their current status where they

15  were at.

16    Q.   Okay.

17    A.   As far as their licensing, whether we

18  had current licensed operators.

19    Q.   And you gave them the names of current

20  employees?

21    A.   Yes.

22    Q.   And they came back to you with

23  information of whether their licenses were in

24  effect or not?

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    A.   Yes.

2    Q.   So then they knew or IEPA knew that

3 employees -- certain employees of yours did not

4 have licenses?

5    A.   That's correct.

6    Q.   Were any instructions given to you by

7 IEPA that you were to take them out of service?

8    A.   No.

9    Q.   Who in your organization is

10 responsible for billing your customers?

11    A.   Billing our end user customers; is

12 that the question?

13    Q.   I mean, somebody pays your company for

14 its services?

15    A.   Uh-huh.

16    Q.   Yes, correct?

17    A.   Yes.

18    Q.   And do you oversee that as well?

19    A.   No.  You're talking about the end

20 user, our customers --

21    Q.   Right.

22    A.   -- who bills them?

23    Q.   Right?

24    A.   I don't oversee that at all.

1    Q.  Were they given a reduction in their

2  fees by reason of the reduction in the

3  employees' wages?  Did you pass that along to

4  them?

5    A.  No.  But down the road with tariffs

6  for the ICC, all of that's reflected when we go

7  for rate increases.

8    Q.  But whatever restitution you got or

9  will get from the employees, you haven't passed

10  that along to the customer; is that correct?

11    A.  It will affect the customer down the

12  road, yes.

13    Q.  Based on your wage levels?

14    A.  That's correct.

15    Q.  And if we're successful in this case,

16  that won't matter, correct?

17    A.  It's the end of the day what we paid

18  out, that's what's reviewed by the ICC.

19    Q.  When do those reviews take place?

20    A.  It varies.  Rate increase, the last

21  one was ten years ago.  And I believe it's been

22  five years, and we're up for another one.  So

23  that can vary --

24    Q.  You're up for another one tomorrow,

Page 192

1    next year, five years?

2        A.   Next year.

3        Q.   From your testimony I gather that

4    there's been no change in the fee structure to

5    customers based on the reduction in wages of

6    the employees?

7        A.   It will be impacted in the upcoming

8    increase or the --

9        Q.   It hasn't so far?

10       A.   -- proposed increase.   It hasn't so

11   far.   But there -- understand, there's always a

12   lag period.

13       Q.   You have been aware since November 7th

14   when the last-chance agreement and the other

15   discipline was grieved, you're aware that the

16   union objects to that discipline, correct?

17       A.   Correct.

18       Q.   And you've been aware of that

19   throughout these -- this time period involving

20   these proceedings?

21       A.   Now, can we back up?   You said the

22   last-chance agreement?

23       Q.   Yeah.

24       A.   We -- there was no objection

Page 193

1    initially, and there was no objection for some

2    time.

3        Q.   The union issued a grievance

4    immediately after the November 7th letter of

5    discipline, correct?

6        A.   Yeah.   That's correct.

7        Q.   And that grievance involved everything

8    in the November 7th letter of discipline,

9    didn't it?

10       A.   Yes.

11       Q.   Licenses to operate water equipment

12   are important, aren't they?

13       A.   Very important.

14       Q.   But for some reason, they're not in

15   the employee conduct material as such, correct?

16       A.   Correct.

17           MR. ORLOVE:  Can we take a few minutes

18   just to consult with my clients?

19           ARBITRATOR MALIN:  Sure.

20              (Brief Pause)

21           MR. ORLOVE:  No further

22   cross-examination.

23           ARBITRATOR MALIN:  Redirect?

24           MR. POTTER:  Yes.  A few questions.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 194

## REDIRECT EXAMINATION

BY MR. POTTER:

Q.  When you were being cross-examined by Chuck, he brought up the fact that the copy doesn't track operator's license, correct?

A.  That's correct.

Q.  And nor is there a contractual requirement to maintain your driver's license, correct?

A.  That's correct.

Q.  And yet there is a contractual requirement to maintain your operator's license, correct?

A.  That's correct, yes.

MR. ORLOVE:  Objection to the leading. It's also repetitive.

MR. POTTER:  Well, there is --

ARBITRATOR MALIN:  It is leading.  It is repetitive.

MR. POTTER:  Right.  Right.

ARBITRATOR MALIN:  You can take a hint when you see I'm not writing.

MR. POTTER:  I know.  I know.  I'm getting there.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    BY MR. POTTER:

2        Q.   In terms of Union Exhibit 5, which is

3    Mr. Williams's termination letter?

4        A.   Yes.

5        Q.   Okay.   It's your signature at the

6    bottom?

7        A.   Yes, it is.

8        Q.   So who was involved in the termination

9    associated with that letter to Mr. Williams?

10       A.   Myself and I believe John Stein.

11       Q.   Who was there for the union; do you

12   remember?

13       A.   I don't know if it was Ray Rossa.   I

14   don't recall.   It was one of the union

15   stewards.

16       Q.   But you presented that termination

17   letter to Mr. Williams?

18       A.   Yes, I did.

19       Q.   Okay.   And now at that point in time

20   did he relate to you any of his personal

21   problems that union's counsel referred to

22   earlier?

23       A.   No, he didn't.

24       Q.   At any time in the course of this

1     investigation did he --

2          A.   No.

3          Q.   -- relate to any -- let me finish my

4     question.   Did he relate to you any questions

5     regarding personal problems that might have

6     mitigated the circumstances here or his

7     actions?

8          A.   No, he didn't.

9          Q.   Okay.   And again, you were aware of

10    the death of his adult son in the past,

11    correct?

12         A.   Correct, yes.

13         Q.   And that was several years ago?

14         A.   Several years ago, yes.

15         Q.   And his wife contracting cancer also

16    was several years ago?

17         A.   Several years ago, yes.

18         Q.   When you presented the termination

19    letter to Mr. Williams, was that it?   I mean,

20    did you offer any -- did you, the company offer

21    anything besides termination?

22         A.   No, that's -- we also offered him one

23    last chance to sign the deduction, agree to a

24    deduction.   It was made clear that, you know,

Page 197

1    that was out there.  That was an option for

2    him.  And I opted -- he opted not to sign --

3    not to agree to it.

4              MR. ORLOVE:  You were examining on

5    Union Exhibit 5, the discharge?

6              MR. POTTER:  Right.  The termination,

7    yeah.

8              MR. ORLOVE:  Thank you.

9    BY MR. POTTER:

10       Q.  And counsel for the union also had

11   cross-examined you on your knowledge whether

12   anyone had consulted certain statutes regarding

13   the company's authority to obtain the wage

14   deduction.  And you weren't aware of anyone who

15   may have done that?

16       A.  Rephra -- I'm sorry.

17       Q.  Yeah.  On cross-examination he asked

18   you whether you were aware of anyone that's

19   investigated whether or not wage deductions

20   were appropriate under state law.

21       A.  Yeah, I'm not aware of, no.

22       Q.  And are you normally involved in that?

23       A.  No.  No.

24       Q.  All right.  And the same regarding

17086b9a-99e3-4c02-b8d8-0a34a317d803

1   whether or not anyone consulted the appropriate

2   regulations or statutes under the IEPA

3   regarding the impact of a license lapsing?

4        A.   Not aware of that, no.

5        Q.   I mean, this case isn't about a breach

6   of the Illinois EPA regulations, is it?

7        A.   No.

8             MR. ORLOVE:  Objection to closing

9   argument and leading questions.

10            ARBITRATOR MALIN:  Sustained.

11  BY MR. POTTER:

12       Q.   Okay.  And what was the basis for the

13  discipline here?

14       A.   Losing the licenses.

15       Q.   As a function of...  It was losing

16  their license pursuant to?

17       A.   Well, restitution, the repayment.

18       Q.   All right.  You disciplined these

19  three individuals because they -- obviously

20  their license lapsed, correct?

21       A.   That's right.

22            MR. ORLOVE:  Objection to leading.

23            MR. POTTER:  Well, that's kind of an

24  undisputed fact at this point, I would assume.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1          ARBITRATOR MALIN:  I think that's

2   undisputed.

3          MR. ORLOVE:  Well, we have the letters

4   that set forth --

5          ARBITRATOR MALIN:  The reasons for the

6   discipline.

7          MR. ORLOVE:  The reason for the

8   discipline.

9   BY MR. POTTER:

10      Q.  And the reasons for the discipline in

11   each of the letters reflects that it was done

12   because of?

13      A.  Expired licenses.

14      Q.  Right.  But let's go back to the

15   fundamentals here.

16          ARBITRATOR MALIN:  You're trying to

17   lead him, and he doesn't want to go where you

18   want to lead him to.  You might just want to

19   make your argument from the written record.

20          MR. POTTER:  Yeah, maybe that's the

21   easiest way of doing it.  Yeah.  We'll just do

22   it that way.  You're right.  I can take a hint.

23   Nothing further.

24          ARBITRATOR MALIN:  Anything further of

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 200

1    this witness?

2            MR. ORLOVE:  No.

3            ARBITRATOR MALIN:  Thank you very

4    much, Mr. Phillips.  You're excused.

5                    (Witness Excused.)

6            MR. POTTER:  You want to take a break?

7            ARBITRATOR MALIN:  Why don't we go off

8    the record.

9                    (Discussion off the Record.)

10                    (Break Taken)

11            ARBITRATOR MALIN:  We're back on the

12    record.

13                    (The witness was duly sworn.)

14            ARBITRATOR MALIN:  Proceed whenever

15    you're ready, Mr. Potter.

16                MICHAEL JACKSON,

17    called as a witness herein, having been first

18    duly sworn, was examined and testified as

19    follows:

20                DIRECT EXAMINATION

21    BY MR. POTTER:

22        Q.  Mike, can you state your name for the

23    record?

24        A.  Mike Jackson.

1    Q.   And you're employed by the company in

2  what capacity?

3    A.   I'm production manager for Illinois.

4    Q.   And in general, what the hell does

5  that mean?

6    A.   I manage the production operations for

7  the water plants in Illinois.  Operations and

8  maintenance of the plants and production

9  equipment.

10    Q.   Okay.  And what's your relationship to

11  the three grievants?

12    A.   I was involved with these grievances

13  and issues from when the folks up here brought

14  this issue to my attention, and we had to do

15  our investigation.  And I was part of the team

16  ultimately deciding what the outcome was.

17    Q.   And normally in terms of the grievance

18  process where do you get involved?

19    A.   Step 3.

20    Q.   And that's the step immediately before

21  arbitration?

22    A.   Uh-huh.

23    Q.   Yes?

24    A.   Yes.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 202

1    Q.   Okay.  And were you involved in the

2  Step 3 for each one of these individuals --

3    A.   Yes.

4    Q.   -- in their grievances?  Okay.

5         And who did you meet with -- who

6  was present in the Step 3 meeting for the

7  initial grievances involving before Mr. --

8  we'll cover Mr. Williams's Step 3 and his

9  termination.  But just for the initial

10  discipline for the three, who was involved in

11  that Step 3 meeting?

12    A.   To the best of my recollection, it's

13  myself, Steve Phillips, Wayne Clavio, Ray

14  Rossa.  I'm not sure Chris Martens may have

15  been there too, but I'm not sure of that.

16    Q.   And where was that Step 3 held?

17    A.   Here.

18    Q.   And was it limited to these three

19  individuals, I mean, the Step 3 meeting; do you

20  remember?  Not all that important, but just if

21  you remember.

22    A.   I believe the Step 3 meeting we talked

23  about some -- there were three issues, and the

24  Glenn Williams was the last issue that we

Page 203

1   talked about.  There was a couple meetings and

2   I'm -- you know, that we talked about it.

3        Q.  I'm talking about Step 3.  The Step 3

4   meeting, was it limited -- see, because

5   sometimes you have Step 3 meetings, do you not,

6   where you cover other grievances, a number of

7   action items, a number of different people.

8             Was this a meeting in which a

9   number of different grievances were discussed,

10  or just the three grievants in these

11  proceedings where their discipline was

12  discussed?  Don't remember?

13       A.  Yeah.  I'm...

14       Q.  Not important.  We'll move on.

15       A.  I want to make sure I get the answer

16  right here.

17       Q.  So you're talking about their

18  discipline.  What was discussed -- what was the

19  case made by the union in the Step 3?

20       A.  Well, we talked about --

21       Q.  What was the union's case?  What did

22  they say was the basis for their reaction?

23       A.  The union's case was the repayment of

24  the funds.  They didn't feel like that that was

1   -- should be -- should be there, repayment of

2   the restitution component.

3        Q.   Okay.

4        A.   Talked about, you know, the harshness

5   of -- that they felt the discipline was and how

6   much it was tough on the employees.  And

7   that's -- but the big thing was the restitution

8   component, that they were -- did not think that

9   they should have to -- that these employees

10  should have to pay that back.

11       Q.   What about the suspensions?

12       A.   The suspensions, it was -- you know,

13  it was in the conversation, but I remember the

14  suspensions were not the big component of the

15  conversation.

16       Q.   Okay.

17       A.   You know.  The situation where, you

18  know, there was a -- for whatever reason, the

19  licenses were not kept up to date, and this is

20  where we got to the level of discipline that

21  we're at.  And they were just upset with having

22  to pay the dollars back.

23       Q.   Okay.  What mitigating factors were

24  presented by the union as to why the discipline

Page 205

1    should be reduced?

2        A.    Why the discipline should be reduced?

3    Just of the fact -- just the comment that it

4    was too tough on the employees.  It was -- they

5    felt it was more than they felt it should be.

6    Other than...

7        Q.    Too tough how?  You keep using the

8    word too tough.

9        A.    Financially.  Financially and, you

10   know, the reduction back to operator in

11   training pay.  And compounded with needing to

12   pay the dollars back was going to be -- going

13   to put hardship on the employees.

14       Q.    Okay.  Do you remember anything else

15   being presented by the union in the third step

16   as a basis for reducing the discipline?

17       A.    The discussion of the work was getting

18   done was in the third-step meeting as well.

19   The union felt like the work -- these employees

20   had done the work.  And in their opinion, you

21   know, why should we be getting into this

22   discipline end of things?  And we let the union

23   know that these licenses are part of their job

24   title, job duties here, and that their pay is

Page 206

1    based on that.

2        Q.   Any other factors presented by the

3    union as a way of trying to reduce or mitigate

4    the discipline?

5        A.   I can't recall anything much else.

6        Q.   That was it?  Okay.

7             Did you submit a response as a

8    result of that third-step --

9        A.   Yes.

10       Q.   -- meeting?

11            MR. POTTER:  What are we at?

12            ARBITRATOR MALIN:   13.

13   BY MR. POTTER:

14       Q.   I'm going to show you Company

15   Exhibit 13.  Is that your signature on Company

16   Exhibit 13?

17       A.   Yes.

18       Q.   The last page?

19       A.   Yes.

20       Q.   And did you draft this response?

21       A.   Yes.

22       Q.   And on the date indicated,

23   December 21?

24       A.   That's the date that I sent it to

1  Wayne.

2      Q.   Okay.  And you did send it to Wayne

3  Clavio?

4      A.   Uh-huh.

5      Q.   And you sent it to him in what

6  meetings?

7      A.   I believe this was e-mailed to Wayne.

8      Q.   And without reading it, just

9  paraphrasing, what did you tell to Wayne in

10  this document?

11      A.   Well, I summarized what we talked

12  about at the third-step meetings.  We did make

13  a proposal out there to take care of the issue

14  along with some other documents that had a

15  memorandum of understanding, that the company

16  would consider this -- consider this

17  situation -- it was an offer for a settlement

18  on this particular letter.

19      Q.   Okay.  Let me show you Company

20  Exhibit 14.  You mentioned a memo of

21  understanding.  Is this the memo of

22  understanding that was attached to your

23  communication December 21st to Wayne Clavio?

24      A.   Yes.

1          MR. ORLOVE:  May I inquire as long as

2    the witness said these are settlement offers,

3    I'm unclear as to its admissibility as

4    settlement documents.

5          ARBITRATOR MALIN:  Mr. Potter?

6          MR. ORLOVE:  Which obviously didn't

7    happen.

8          MR. POTTER:  It's really a response --

9    you know, the process, as you know, in the

10   contract is a series of statements by the

11   union, then a response by the company to the

12   grievances.  And this is no more than what they

13   normally do in a third step.

14          Normally, this witness presents a

15   response of this nature trying to resolve

16   matters at the third step.  This is their

17   normal grievance response, which almost always

18   resolves in some sort of attempt to resolve or

19   settle.  So it's really part of the grievance

20   filing string more than a settlement outside

21   the context of that.

22          And so I think it's appropriate in

23   these circumstances.  Normally, I don't get

24   into settlement offers.  But here --

Page 209

1    ARBITRATOR MALIN:  Typically, we won't

2    want to chill the settlement process by having

3    offers that aren't accepted come back to bite

4    one of these --

5    MR. POTTER:  Exactly.

6    ARBITRATOR MALIN:  -- one party or the

7    other.

8    MR. POTTER:  Exactly.  But here it's a

9    little bit different because it's really part

10   of the grievant string of responses to the Step

11   1, Step 2, Step 3.  This is no more than the

12   standard Step 3 response that they have in

13   these proceedings.

14   ARBITRATOR MALIN:  So this is just

15   background or -- I mean, there's no dispute

16   that the prior steps of the grievance procedure

17   were complied with.

18   MR. POTTER:  Right.  Exactly.  And to

19   show the reasonableness of the company's

20   position in terms of what steps it took to

21   again respond to what the union was saying in

22   the Step 3 meeting.  So that their actions, you

23   know, were reasonable in this circumstance.

24   ARBITRATOR MALIN:  Mr. Orlove?

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    MR. ORLOVE: No, I object to this

2    going in. I mean, we know because we're here

3    that no settlement was reached. The document

4    speaks in terms of a settlement proposal. It's

5    not like a processing of a grievance where the

6    company says denied for this reason.

7    And when he was asking the witness

8    questions about what the union's position was,

9    I thought well, okay. Maybe they're going to

10   make some argument that the union is heavy on

11   this issue or waive that issue.

12   But now that I see that what he's

13   offering is settlement, I strongly object to

14   it. It has no place in this. And the only

15   purpose it can have is to prejudice the mind of

16   the Arbitrator.

17   ARBITRATOR MALIN: Anything further

18   before I rule?

19   MR. POTTER: Well, no, I think again

20   we're going to whether or not always in some

21   sense, even though it's a just-cause standard,

22   whether it's reasonable under the

23   circumstances, and what took place in terms of

24   trying to resolve the matter, be it in whatever

1   step in the process, in the grievance steps.  I

2   mean, that's always part of the joint exhibits

3   is this string that the -- the grievance

4   history that -- what took place.  And this is

5   the grievance history.

6               This is the company's response to

7   the third-step meeting.  And it's nothing more

8   than that.  And I think it's -- so I think it's

9   important that it become part of the record in

10  these proceedings.

11              ARBITRATOR MALIN:  Anything further?

12              MR. ORLOVE:  It's more than -- it's

13  not a response to the third-step meeting.  It's

14  an offer to settle, and that's more than a

15  response.

16              And the Arbitrator will recall

17  that in the first hearing when we took up the

18  issue of consolidation, I put this document

19  into evidence, but I put it in redacted,

20  leaving only those portions that say in order

21  to resolve these three cases or we heard these

22  three cases, wanting to argue that the three

23  cases were looked at together and considered

24  together.  I was careful not to put in any

1    settlement proposals.

2                    This, to me, is not the handling

3    of the grievance.  It is for some reason, which

4    I think is inappropriate -- which I really

5    consider highly inappropriate to somehow or

6    other offer a reduction in the suspension -- in

7    the -- offer a reduction in the discipline,

8    which I think is -- the only intention it could

9    have is to prejudice the Arbitrator.

10                   ARBITRATOR MALIN:  Anything further?

11                   MR. POTTER:  No.

12                   ARBITRATOR MALIN:  I'm going to

13    sustain the objection for a number of reasons.

14    First, there is no need to put in -- that I can

15    see to put in the grievant -- the record of

16    what was done at Step 3 to satisfy my

17    authority.  We've already stipulated the

18    matter's properly before me.

19                   Certainly -- you know, and I

20    assume Mr. Orlove would not object to this.

21    You can stipulate that offers of settlement

22    were made at Step 3 that were not accepted.

23    But I fail to -- two concerns.  One, I fail to

24    see the relevance that the company may have

Page 213

1    made some offers of settlement at Step 3 to the

2    question of whether there was just cause for

3    the suspensions and the rest of the

4    disciplinary package in the first instance.

5              And second, generally offers of

6    settlement are privileged, and there are very

7    strong reasons for that.  We usually presume

8    that the parties want to -- in their grievance

9    process to be able to make offers without

10   having them come into evidence later because

11   that may chill the making of offers in future

12   grievances.

13             So I'm very reluctant to put the

14   substance of settlement offers that were not

15   accepted into the record or to even look at

16   them.  I really don't see how they're relevant

17   to the issues presented to me.

18             MR. POTTER:  Okay.

19   BY MR. POTTER:

20        Q.  All right.  Let's turn to the separate

21   grievance and the separate Step 3 meeting that

22   was held regarding Mr. Williams's termination.

23   Were you involved in that Step 3 meeting?

24        A.  Step 3, yeah.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 214

1     Q.   And who was present for that Step 3,

2   the best that you can recall?

3     A.   Same group as the other --

4     Q.   Normally it's the same crew?

5     A.   Yeah.

6     Q.   So let's just repeat those just for

7   the record.   Who was present?

8     A.   Myself, Steve Phillips, Ray Rossa,

9   Wayne Clavio, Chris Martens, and there was one

10  other person I can't recall.

11    Q.   And what did the union present in the

12  way of facts to support some change in the

13  outcome regarding Mr. Williams's termination?

14    A.   Not really any other -- any other

15  facts to warrant or to make us change our mind.

16  It was just a conversation to again express

17  that they were uncomfortable with the harshness

18  of the penalty.   They talked about the

19  last-chance agreement.   That they didn't feel

20  like it was -- felt like that someone signed it

21  that should not -- didn't have the authority

22  to.   And that's -- I mean, that's about it.

23    Q.   Okay.   Let's back up, maybe get some

24  more details if we can, and maybe there isn't

Page 215

1    any more than that.

2              But in terms of the last-chance

3    agreement, their objection to that was simply

4    the steward didn't have authority?

5         A.   No.   That -- big thing about the

6    last-chance agreement was the restitution

7    money.   That was a very long part of the

8    conversation.

9         Q.   What about the authority -- you

10   mentioned the authority of stewards too though.

11   I'm confused.

12        A.   Yeah.   Of signing the last-chance

13   agreement.   It has a signature of Mr. Williams

14   and...

15        Q.   Whoever the steward was?

16        A.   Whoever the steward was.   But they

17   discussed that those stewards should not have

18   signed that particular paper.

19        Q.   Okay.   What was your response in terms

20   of their position on the steward not signing

21   the paper -- shouldn't have signed the paper?

22        A.   Stewards are a representative of the

23   bargaining unit, and the employee and the

24   steward signed it.   And it's a union

Page 216

1    representation is the way we saw it.

2         Q.  Did they present any grounds for

3    saying the steward didn't have authority to

4    sign it?

5         A.  I don't recall any grounds.  I do

6    recall a lot of conversation that the steward

7    should not have signed it.

8         Q.  That he shouldn't have?

9         A.  That he should not have.

10        Q.  But nothing in terms of why it was

11   signed?

12        A.  I don't recall any --

13        Q.  Specific grounds?

14        A.  Right.

15        Q.  And in terms of the last-chance

16   agreement, they were focusing on the

17   restitution only?

18        A.  Right.

19            MR. ORLOVE:  I object to leading.

20            MR. POTTER:  Just summarizing.

21   BY MR. POTTER:

22        Q.  And anything else in terms of the

23   last-chance agreement?

24            ARBITRATOR MALIN:  I don't think that

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 217

1    was an accurate summary.  My notes reflect that

2    he said that was a long part of the

3    conversation.  I don't think this witness said

4    that that was the only part of the

5    conversation.

6              MR. POTTER:  Okay.  Okay.

7    BY MR. POTTER:

8         Q.  So any other part of the conversation

9    in terms of what was important to the union

10    about the last-chance agreement that you

11    haven't already testified to?

12        A.  No.

13        Q.  Okay.  Was Mr. Williams present?

14        A.  No.

15             MR. POTTER:  That's all of this

16   witness.

17             ARBITRATOR MALIN:  Any cross-examine?

18                 CROSS-EXAMINATION

19   BY MR. ORLOVE:

20        Q.  I gather you are involved in steps of

21   a grievance procedure with other contracts,

22   correct?

23        A.  Yes.

24        Q.  And I imagine you have had a number of

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 218

1    final step grievance meetings with this unit

2    and other units?

3              A.    Yes.

4              Q.    From March until now?

5              A.    From March of what year?

6              Q.    March of this year until now.

7              A.    Third step March of this year till

8    now?  I can't recall of any other third step in

9    any other -- I'm just answering your question

10   first.  I am involved in that.

11             Q.    That's fine.  I get the impression

12   your memory is a little vague on exactly what

13   happened back in March at this third-step

14   meeting, the meeting over Glenn Williams.

15             A.    I'm giving you what I do remember.

16             Q.    Okay.  Thank you.  Do you recall the

17   union bringing to your attention -- well,

18   strike that.

19                   Are you aware that in this

20   Collective Bargaining Agreement there is a

21   provision that limits the authority of stewards

22   at this unit?

23             MR. POTTER:  Well, I object to the

24   question.  I think it mischaracterizes the --

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 219

1          ARBITRATOR MALIN:  I'm going to

2   sustain that.  You can refer him to that

3   specific provision.

4          MR. ORLOVE:  That's fine.

5   BY MR. ORLOVE:

6      Q.  Looking at the contract, Page 25.  At

7   the time these events occurred, that is in

8   October/November of 2006, were you then aware

9   of Section 13.2 of the contract?

10      A.  Repeat the question, please.

11      Q.  When these facts occurred with respect

12   to the three individuals, but particularly with

13   respect to Mr. Williams back in November

14   of 2006, at that time were you aware of

15   Section 13.2 of the contract which you're

16   looking at now?

17      A.  I can't say that I read that

18   specifically back at that time.

19      Q.  Okay.  A different subject.

20          You testified you were involved in

21   the decision-making process of the discipline

22   to administer in these cases, correct?

23      A.  Yes.

24      Q.  And HR personnel were also part of

Page 220

1  that?

2       A.   That's right.

3       Q.   And I heard testified by Mr. Phillips

4  that it was a team decision?

5       A.   Yes.

6       Q.   Would you agree with that

7  characterization?

8       A.   Yes, I would.

9       Q.   But then there is quarterbacks and

10 there's tackles, to use football expressions.

11            To what extent did HR -- to what

12 extent was the input from the HR given weight?

13      A.   It was a team decision.  Conference

14 calls, meetings, everyone weighing in on the

15 proper discipline to handle these situations.

16 I would not want to say that one had lots more

17 influence than any other group.

18            We had -- it's from the top

19 management of the central region, the human

20 resources group, legal group, and the

21 production group.

22      Q.   And except for the third-step

23 meetings, you were not involved in the

24 investigation of these grievances, correct?

1    A.   I was --

2    Q.   When I say involved, let me -- I may

3 have misspoke.

4              You were not present during the

5 investigation?

6    A.   I was not present during those

7 interviews, no.

8    Q.   So the source of your knowledge comes

9 from what was reported to you about what

10 happened at those interviews?

11    A.   Correct.

12    Q.   Okay.  And I guess the information

13 shared among the team would have been whatever

14 was reported to the team by Mr. Phillips or

15 Mr. Stein in connection with the interviews --

16    A.   Yes.

17    Q.   -- correct?

18    A.   Yes.

19    Q.   In connection with this contract and

20 the wage schedule, are you aware that there

21 are, at times, people who hold licenses but are

22 paid at a rate different than the licenses they

23 hold?

24    A.   The wage payment is taken care of here

Page 222

1    locally, based on their licensing and what

2    their particular job is.

3        Q.   Okay.

4        A.   I can't say that I'm aware of per se

5    your question.

6        Q.   Okay.  So you don't know whether a

7    person holding a particular license may be paid

8    at a rate other than that license?  You don't

9    know that?  I mean, you have no knowledge that

10   that may or may not be the case; is that so?

11       A.   Well, we follow the Collective

12   Bargaining Agreement to what a person's

13   position is and what their job duties are.

14       Q.   Okay.

15       A.   We follow the Appendix A for what a

16   person is doing and based on their license.

17       Q.   Thank you.

18                   (Brief Pause)

19       MR. ORLOVE:  Nothing further.

20       ARBITRATOR MALIN:  Anything further of

21   this witness?

22       MR. POTTER:  No.

23       ARBITRATOR MALIN:  Thank you very

24   much.  You're excused.

Page 223

1            (Witness Excused.)

2        ARBITRATOR MALIN:  Go off the record.

3                (At 12:30 p.m. a luncheon

4                recess was taken until 1:30

5                p.m.)

6        ARBITRATOR MALIN:  Back on the record.

7    Anything further in the Company's case in

8    chief?

9        MR. POTTER:  No, we rest.

10        ARBITRATOR MALIN:  Mr. Orlove,

11    whenever you're ready to proceed.

12        MR. ORLOVE:  Yes, we are.  We'll call

13    Dan Leppert as our first witness.  Dan, you

14    want to come up to the witness stand.

15                (The witness was duly sworn.)

16        ARBITRATOR MALIN:  Proceed whenever

17    you're ready.

18                DANIEL LEPPERT,

19    called as a witness herein, having been first

20    duly sworn, was examined and testified as

21    follows:

22                DIRECT EXAMINATION

23    BY MR. ORLOVE:

24        Q.  Dan, by whom are you employed?

1      A.   Illinois American Water.

2      Q.   And how long have you worked for them

3  or any predecessor company?

4      A.   Since 1983.

5      Q.   And what is your job?

6      A.   I'm a water and waste water operator.

7      Q.   Directing your attention to

8  October 19th, were you called into a meeting

9  with supervision?

10     A.   Yes.

11     Q.   And tell us who was present at that

12 meeting?

13     A.   Steve Phillips, John Stein, Ray Rossa,

14 and myself.

15     Q.   Tell us everything you can recall

16 being said at that meeting.

17     A.   Steve led the meeting.  Said they were

18 conducting an investigation, and it had come to

19 their attention that my license had expired.

20 They asked if I knew it was expired, and I told

21 them yes.

22     Q.   Anything else?

23     A.   Asked me why it had expired, when it

24 was -- had been due the year before, I had come

Page 225

1   up short about two and a half, three hours of

2   CEU's.  So I wasn't able to renew it.

3                   I told them I had planned on

4   taking -- upgrading my license to a Class B but

5   just hadn't gotten around to it.

6        Q.   What was your license at that time?

7        A.   A Class C.

8        Q.   And what would be required -- at that

9   time what would be required to go up to a Class

10  B?

11       A.   I would have to apply -- to take the

12  exam, I would need a letter of reference and

13  just apply to the EPA.

14       Q.   How did that meeting end?

15       A.   Steve said that they were going to

16  continue the investigation, and they considered

17  it very seriously.  Asked if I had anything to

18  say.  I told them, you know, I knew it was

19  wrong to let it lapse.  But I told them I made

20  sure in that year and a half that I had not

21  represented myself as a licensed operator.  I

22  signed nothing as a licensed operator.  As a

23  licensed operator I'm not a licensed operator

24  and responsible charge for any of the systems.

1   I don't file the reports.  I don't sign the

2   reports.

3        Q.  Can you explain that to the

4   Arbitrator, what the significance is of signing

5   reports?

6        A.  Properly for each water system we

7   have -- somebody has filed a document with the

8   EPA stating that they are the properly licensed

9   operator and responsible charge.

10             I used to sign those for Metro

11   Utility.  When Citizens took over Metro, I was

12   no longer that operator.

13        Q.  So there was Metro Utility, and then

14   Citizens took over from Metro Utility?

15        A.  They merged in '94.

16        Q.  And then Illinois American, when did

17   it come into the picture?

18        A.  2002.

19        Q.  So from the time Citizens Utilities

20   was the employer, had you ever signed any

21   paperwork as an operator?

22        A.  No.

23        Q.  And under Illinois American had you

24   ever signed any of the certification or

Page 227

1    paperwork?

      A.   No.

3    Q.   I'm going to ask you a few questions
4    about these different licenses.   What kinds of
5    licenses are there?

6    A.   A class A, B, C, and D.

7    Q.   And what do those classes represent?

8    A.   What kind of plants you're supposed to
9    be operating or what you can be a responsible
10   charge for.   Anywhere from a distribution
11   license on up through filtration and lime soda
12   softening.

13   Q.   What must one do to obtain a water
14   supply license?

15   A.   You have to have a minimum amount of a
16   year's experience.   You apply to the EPA, tell
17   them your work background, your education
18   background, and you need a letter of
19   recommendation from your supervisor.

20   Q.   You mentioned CEU's.   Can you tell
21   us -- or please tell us what that is.

22   A.   For the renewal program now they -- it
23   is now required that you have what they call
24   continuing education units.   For the Class C,

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 228

1    it's 15 hours in every three years.

2         Q.   So it's 15 hours for the total three

3    years or 15 hours per year?

4         A.   No.  For the total three years.

5         Q.   Okay.  And for an A and B -- A or B

6    license?

7         A.   30 hours.

8         Q.   For three years?

9         A.   Over three years.

10        Q.   When did the requirement of CEU's

11   first come into being or existence?

12        A.   I believe 2003 was the first renewal

13   year that you had to show your CEU's

14        Q.   Before you had to show your CEU's

15   before 2003, what did one do to renew a

16   license?

17        A.   You sign the renewal application and

18   sent in a check for $10.

19        Q.   And back in October when this meeting

20   was held, what kind of license did you have?

21        A.   My water license was expired.  It had

22   been a Class C.

23        Q.   Following that meeting, what if

24   anything was said or done by the company as far

Page 229

1    as your ability and qualifications to continue

2    on your job?

3        A.    Nothing.

4        Q.    Tell the Arbitrator did you continue

5    your work after that meeting?

6        A.    I went back to work the same day doing

7    the exact same job.

8        Q.    And that was my next question.  Did

9    your duties and responsibilities change in any

10   way?

11       A.    No.

12       Q.    Was there anyone supervising you

13   differently than you had been supervised

14   before?

15       A.    No.

16       Q.    There will be testimony -- it hasn't

17   come in yet -- of a meeting on October 24 where

18   other employees were called in a second time.

19   Were you called into a meeting on October 24?

20       A.    No.

21       Q.    Directing your attention to

22   November 7, and that's the day on which you

23   were issued a disciplinary letter or a letter

24   spelling out discipline, were you at a meeting

Page 230

1    on that day?

2        A.   Yes.

3        Q.   And tell us who was present at that

4    time.

5        A.   Steve Phillips, John Stein, Chris

6    Martens, and myself.

7        Q.   And tell us everything that you can

8    recall being said.

9        A.   Again, it was led by Steve.  And he

10   said as a result of the investigation, they had

11   determined that my discipline would consist of

12   15 days' suspension without pay.  I would be

13   given six months to renew my license, and it

14   would...

15       Q.   Was your pay rate reduced?

16       A.   No.

17       Q.   Just showing you Union Exhibit 3, is

18   that an accurate copy of what you were given at

19   that meeting?

20       A.   Yes.

21       Q.   What if anything did you do following

22   this meeting to -- strike that.

23               What if anything did you do after

24   October 19th, the first meeting you had, to

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 231

1    bring your license up to date or renew your

2    license?

3        A.   After October 19th?  Nothing before

4    the discipline meeting.  At the discipline

5    meeting I was told they thought there was a

6    clause in the EPA rules where I would be able

7    to have my license reinstated if I could show

8    further training, submit further training.

9        Q.   Who said that?

10       A.   Steve said that in their talks with

11   the EPA they thought there was a clause where I

12   could have my license reinstated because it had

13   been expired for less than two years.

14       Q.   Tell us what happened then as far

15   as -- what happened as far as you renewing your

16   license?

17       A.   Well, at that meeting I was told that

18   they had a number of a person I could contact

19   at the EPA, and they would get it to me later.

20   Never -- I didn't get the phone number.  Served

21   my suspension.  When I came back --

22       Q.   Excuse me.  Let me interrupt you.

23            Who told you there was a number

24   that they would give you to call EPA?

Page 232

1      A.   John Stein said they had a phone

2    number, a contact number of a Jewel

3    something -- her first name is Jewel -- that I

4    could contact at the EPA.

5      Q.   Did you ever get that number?

6      A.   No.  And I asked twice in March, and

7    he said he had the number.  He would get it to

8    me later.  And I never got it.

9      Q.   Okay.  Now, continue with what you

10   were saying, what steps you took to renew your

11   license.

12     A.   In April I filled out an application

13   and sent a letter to whom it may concern at the

14   EPA that, you know, I have additional credit

15   hours.  I sent them a check.  If you can

16   reinstate my license for -- with these hours,

17   you know, I'd like to do that.  I'd also like

18   to submit an application to test for a Class B

19   license.

20     Q.   Now, that was in April you say?

21     A.   Yes.

22     Q.   April of this year, 2007?

23     A.   Yes.

24     Q.   Okay.  Please continue.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    A.   The last week of April I got a call

2   back from Jewel, and she said yes, she would be

3   able to reinstate my license.  Did I want to go

4   ahead and take the test too?  And I said well,

5   I need to take the test, but I have to have it

6   reinstated as soon as possible.

7            And she told me she could send me

8   a form to reinstate.  And she would also give

9   me an admittance letter to the May exam.  She

10  never sent it to me.  When I called back after

11  the May date, that would be maybe about the 9th

12  or 10th of May, I contacted her and she said

13  well, she had sent it.  Didn't know why I

14  didn't get it.  And she said the hours that I

15  had submitted would not be acceptable because I

16  had to have all 15 hours before July 1st of

17  2005.  She could not accept any credit hours

18  after that.

19            So I told her I would need to test

20  in June.  The test is only given the first

21  Monday of every -- first Monday of every month.

22            I informed John that I was not

23  going to make the six-month deadline, but I was

24  testing on June 4th.  I put it in for time off

Page 234

1    so I could take the exam.  And May 30th I was

2    given a letter that I had far exceeded the six

3    months deadline.  And if I did not have my

4    license restored by July 31st, I would be

5    terminated.

6         Q.  Let me show you what I've marked as

7    Union Exhibit 16 and ask you to identify that,

8    please.

9         A.  Yes.

10        Q.  What is that?

11        A.  That's the letter I received March --

12   on May 31st.

13        Q.  And you got this from the company?

14        A.  From John Stein.

15        Q.  When did you actually get your

16   license?

17        A.  I had tested on June 4th.  I got a

18   letter dated June 7th.

19             MR. ORLOVE:  I move for the admission

20   of Union Exhibit 16.

21             MR. POTTER:  No objection.

22             ARBITRATOR MALIN:  Union 16 is

23   admitted.

24

Page 235

1                    (Union Exhibit No. 16

2                    received.)

3    BY MR. ORLOVE:

4         Q.  So you passed the deadline for which

5    you would be fired if you didn't meet the

6    deadline.  Were you fired?

7         A.  No.  I was -- I passed the original

8    discipline letter deadline.  I did not pass

9    this deadline.

10        Q.  This deadline meaning the one in Union

11   Exhibit 16?

12        A.  Yes.

13        Q.  Okay.  Thank you.  So you worked

14   without a license at the establishment for what

15   period to what period?

16        A.  From July 2005 until June of 2007.

17        Q.  And was any action taken against you

18   by the IEPA for having worked without a

19   license?

20        A.  No.

21        Q.  And was any action taken against you

22   by IEPA because your license had expired?

23        A.  No.

24        Q.  Now, the company's original letter to

Page 236

1    you gave you six months to reinstate your

2    license, and the failure to do so could result

3    in further discipline.  Was there any further

4    discipline given to you?

5          A.  No.

6                MR. ORLOVE:  I have no further

7    questions.

8                ARBITRATOR MALIN:  You may

9    cross-examine.

10                    CROSS-EXAMINATION

11   BY MR. POTTER:

12         Q.  Dan, Terry Potter.  So you went to the

13   exam and sat for the exam this last year, so

14   you probably have a pretty good recall of what

15   was on it, correct, as far as the exam

16   questions?

17         A.  Yeah.

18         Q.  Just in general.

19         A.  Okay.

20         Q.  What were the nature of the questions?

21   What was the exam about?

22         A.  General chemical addition and basic

23   math that we use.  Geometry.  Being able to

24   figure areas, volumes, chemical addition.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 237

1    Q.  Now, you know what all this means and

2  some other people in the room in terms of your

3  job content.  But for the Arbitrator and

4  frankly myself, who doesn't know what all an

5  arbitrator (sic) does, can you kind of expand

6  upon that in terms of the impact of what that

7  exam was testing you for?

8    A.  Being able to do simple -- basic math

9  that's used every day by an operator.  If you

10  have a known volume in a tank and you're

11  drawing out of it at a steady rate for so many

12  hours, how much is left?  How much did you pump

13  out?

14    Q.  Okay.

15    A.  Or how much chemical you would need to

16  dose that to a certain concentration.

17    Q.  What else do you remember being tested

18  on?

19    A.  Different types of wells.

20    Q.  There's different types of wells?

21    A.  There's gravel wells.  And if you met

22  a condition, if you had a -- if your drawdown

23  rate started changing, what symptoms would you

24  be looking at in a gravel well or if you're in

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 238

1    a sandstone well.

2        Q.   So like if there is a sudden change in

3    level?

4        A.   Yeah.  Could you identify it.

5        Q.   Troubleshooting?

6        A.   Different types of chlorination

7    equipment.  Different types of fluorination

8    equipment.  What's the purpose of this chemical

9    and so on.

10       Q.   And those are important facts to know

11   as an operator, correct?

12       A.   Correct.

13       Q.   And that's probably a pretty good

14   idea, I would assume, from your position that

15   operators, as a matter of public policy, get

16   tested on those basic procedures by Illinois

17   EPA, correct?

18       A.   They get tested once or only when --

19   if you have to renew your license.

20       Q.   Right.

21       A.   Not on a regular basis.

22       Q.   But three years you have --

23       A.   No.

24       Q.   -- 15?

1    A.   No.   You go through training.   You

2    select an outside training to show you sat in a

3    classroom in front of somebody and they talked

4    about something.   That's what their training

5    is.

6              You can go sit and listen to three

7    hours of how -- different types of water meters

8    or three hours of this is how we paint water

9    towers, and that's considered training.

10    Q.   Okay.   And again, you've been quite

11    honest that you fouled up here and you didn't

12    maintain your license, correct?

13    A.   I didn't get enough hours in.

14    Q.   And you knew that was against the

15    rules of the company, correct?

16    A.   In what way?

17    Q.   Well, in the way that you were hired

18    on and brought over from Metro, and you're

19    being paid a certain amount of money from day

20    one when you were brought over from Metro

21    because you had a certain license, correct?

22    A.   Correct.

23    Q.   And that as an operator, that status

24    with the company, you're required to maintain

Page 240

1    your licenses.  I mean, there's no question

2    about that, correct?

3         A.   Correct.

4         Q.   You knew that?

5         A.   Yes.

6         Q.   There's no hidden agenda here.

7              And you got the pay amount in the

8    contract based upon the license that you held,

9    correct?

10         MR. ORLOVE:  Objection.  They're

11    asking this witness to do a contract

12    construction evaluation.  He's not authorized

13    to do that.  Contract's in evidence.  And he

14    doesn't -- no foundation is laid for him to

15    make an interpretation of how the contract is

16    applied.

17         ARBITRATOR MALIN:  Mr. Potter?

18         MR. POTTER:  Well, I think, you know,

19    he's been working for the company for a number

20    of years.  It's cross-examination.  I've got a

21    right to figure out what he does know and the

22    basis for that.  He can --

23         ARBITRATOR MALIN:  I agree.  I'll

24    allow the question.

Page 241

1    BY MR. POTTER:

2        Q.   I'm going to show you the Collective

3    Bargaining Agreement that applies for your

4    group of employees, Joint Exhibit 1 is how we

5    refer to it.  On the backside, Dan, there is an

6    appendix or an addition.  Are you familiar with

7    this appendix?

8        A.   Yes.

9        Q.   So you know that under the wage scale,

10   or I hope you do anyway in terms of knowing

11   what your wages are, that under a certain

12   operator level you get paid different levels of

13   pay, correct?

14       A.   Correct.

15       Q.   So an Operator I with a license --

16   Class A license or an S1 license get paid

17   higher than an operator II or an operator III,

18   correct?

19       A.   Yes.

20       Q.   And you knew that at the time that

21   your license lapsed, correct?

22       A.   Yes.

23       Q.   Okay.  Again, no hidden agendas here.

24           MR. ORLOVE:  Nobody suggested any.

Page 242

1  BY MR. POTTER:

2      Q.  Okay.  And again, your pay wasn't

3  reduced, correct?

4      A.  Correct.

5      Q.  You simply got the 15-day suspension,

6  correct?

7      A.  Correct.

8      Q.  Okay.  Dan, let me show you what's

9  been marked as Company Exhibit 6.  And I don't

10  know whether you've seen this before or not.  I

11  was going to ask you that.

12          Do you have any recall of seeing

13  this document before today or what you're

14  reading here today?

15      A.  Yes.

16      Q.  Do you remember if you received it

17  about the time where it's dated, July 29, 2002?

18  Is that about when you think you received it?

19      A.  Yes.

20      Q.  Do you remember receiving this on or

21  about July 29th, 2002?

22      A.  Yes.

23      Q.  Okay.  All right.  And that gives you

24  the expiration date for your license; does it

Page 243

1    not?

2         A.   Yes.

3         Q.   And do you carry the wallet card with

4    you or do you keep that with you?

5         A.   Yes.

6         Q.   And it tells you your expiration date

7    on the wallet card too?

8         A.   Yes.

9              MR. POTTER:  That's all I have.

10             ARBITRATOR MALIN:  Redirect?

11             MR. ORLOVE:  Just a few questions.

12                  REDIRECT EXAMINATION

13   BY MR. ORLOVE:

14        Q.   Once you've taken the test and if you

15   timely renew, is there a requirement to take a

16   test again?

17        A.   No.

18        Q.   So you just renew and now currently

19   with CEU's, the required number of CEU's?

20        A.   Yes.

21        Q.   Mr. Potter asked you about the

22   substance of the test.  Was there anything on

23   there that you hadn't been doing since 1983?

24        A.   Only things that I don't work with.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 244

1    Some of the types of fluoride equipment we

2    don't use.  You still have to be able to answer

3    the question on the test.

4             MR. ORLOVE:  Nothing further.

5             MR. POTTER:  Nothing further.

6             ARBITRATOR MALIN:  The test you took

7    was to get your Class C license back?

8             THE WITNESS:  Yes.

9             ARBITRATOR MALIN:  Not the test to

10   upgrade to Class B?

11            THE WITNESS:  No.  I was told that I

12   had one chance to take the test; otherwise, I

13   didn't have the job.  So I took the one I knew

14   I could pass.

15            ARBITRATOR MALIN:  Any further inquiry

16   of this witness in light of my questions?

17            MR. ORLOVE:  No.

18            MR. POTTER:  No.

19            ARBITRATOR MALIN:  Thank you very

20   much.

21                 (Witness Excused)

22            MR. ORLOVE:  Ken Nelson, next witness.

23                 (The witness was duly sworn.)

24            ARBITRATOR MALIN:  Mr. Orlove, when

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    you're ready, you may proceed.

2                    KENNETH NELSON,

3    called as a witness herein, having been first

4    duly sworn, was examined and testified as

5    follows:

6                    DIRECT EXAMINATION

7    BY MR. ORLOVE:

8        Q.  Ken, by whom are you employed?

9        A.  Illinois American Water Company.

10       Q.  And how long have you been employed by

11   them or previous predecessor companies?

12       A.  Including the original company,

13   January 1st, 1969.

14       Q.  '69?

15       A.  Uh-huh.

16       Q.  What is your job?  Or what was your

17   job in 2006, and what is your job today?

18       A.  They're both one in the same.  I'm a

19   water treatment plant operator and also waste

20   water treatment.

21       Q.  Directing your attention to

22   October 19th, were you called in to a meeting

23   with supervision?

24       A.  Yes.

Page 246

1    Q.   And who was present?

2    A.   Steve Phillips, John Stein, Ray Rossa,

3  and myself.

4    Q.   Tell us everything you can recall

5  being said at that meeting.

6    A.   Steve said -- he asked me first if I

7  was aware that my license had expired, and I

8  said yes.  I was informed by Jewel Brand of the

9  Illinois EPA on October 11th.  She had given me

10  a call telling me that.

11    Q.   October 11th of 2006?

12    A.   Yes.

13    Q.   Okay.

14    A.   She informed me that she had gotten

15  one of the sheets for the credits, but that she

16  couldn't apply it to my license because it had

17  expired.

18    Q.   What had expired?

19    A.   My license had expired.  My water

20  treatment license.

21    Q.   And you got a sheet for credit; is

22  that the CEU?

23    A.   The CEU sheet that she had received

24  couldn't be applied because of that.

Page 247

1      Q.   And are you telling us what you told

2 the company?

3      A.   Yes.

4      Q.   Okay.  Please continue.

5      A.   At that point Steve said that they

6 were conducting an investigation, which was

7 ongoing at that point.  And that there would be

8 another meeting, and they were on a

9 fact-finding thing, and that I would be called

10 back.

11      Q.   Anything else that you can recall?

12      A.   No.  Basically that was it.

13      Q.   And tell the Arbitrator why or how it

14 happened that your license had lapsed.

15      A.   Well, it was -- why it had expired?

16      Q.   Yes.

17      A.   I made a mistake.  I didn't keep up

18 with it.

19      Q.   What if anything was said or done at

20 that meeting as far as your ability or

21 qualifications to continue on your job?

22      A.   What was the question?

23      Q.   By the company.  Did the company

24 change your job in any way?

Page 248

1      A.   No.  My job wasn't changed at all.

2      Q.   Did you return to your job?

3      A.   Yes.  I returned to my job right after

4  the meeting.

5      Q.   Was anything said to you by EPA about

6  your qualifications to continue working at the

7  company?

8      A.   No.

9      Q.   Do you sign off on official reports

10  for the company?

11      A.   No, I don't.

12      Q.   Have you ever?

13      A.   No.  Not with Citizens or Illinois

14  American.

15      Q.   Who does?

16      A.   The supervisors, Mike Walsh for one.

17      Q.   Okay.  Directing your attention to

18  October 24, were you called in to a meeting

19  that day concerning your expired license?

20      A.   Yes, I was.

21      Q.   And as of October 24 what was the

22  status of your license?

23      A.   It was expired.  And --

24      Q.   Who was present at this meeting?

Page 249

1    A.  Steve Phillips, John Stein.  I believe

2  Chris Martens was at that meeting, and myself.

3    Q.  Tell us everything you can remember

4  being said.

5    A.  Well, I was told that because of the

6  fact that I had let the license lapse, that I

7  would receive 15 days off, and I had to

8  reimburse the company for wages I received for

9  the license that I currently did not hold.

10    Q.  Ken, let me interrupt you for a

11  moment.  As I understood it, there were three

12  meetings on this subject.  And I'm asking you

13  about the second meeting.  But was there a

14  second meeting?  Or if you don't remember,

15  that's --

16    A.  I don't recall.  It seemed like there

17  were two.  There could have been three.

18    Q.  Okay.  But let me show you what's

19  marked Union Exhibit 2, which is a letter to

20  you dated November 7.  Did you get that letter

21  on that day?

22    A.  Yes.  That would have been the last

23  meeting.

24    Q.  Okay.  And are you now telling us or

Page 250

1   you're about to tell us everything that

2   happened at that November 7 meeting?

3       A.  Yes.

4       Q.  Okay.  Please continue.

5       A.  Okay.  I was told that my license had

6   been expired since July of 2004.  And in the

7   process of the investigation, it was clear that

8   I allowed my license to expire.  And that

9   because of that, I would be given 15 days off

10  and also required to pay back 10,000 some

11  dollars in repayment.

12      Q.  And were you given that letter, Union

13  Exhibit 2?

14      A.  Yes.

15      Q.  Okay.  I can take that back from you.

16      A.  Okay.

17      Q.  What if anything did you do to restore

18  or reinstate your license after this was first

19  brought to your attention?

20      A.  Well, I had been in contact with Jewel

21  Brand who had called me originally to inform me

22  that my license had expired.  So I called her

23  back to find out what I needed to do, and she

24  told me I needed a letter of referral from the

Page 251

1   company, which they gave me.  And then I

2   applied for the reexamination and took that

3   same exam February 5th, I believe it was, of

4   this year.

5        Q.   In your conversations with Ms. Brand

6   at the IEPA, tell us whether you made it known

7   to her that you were still working at Illinois

8   American Water.

9        A.   Yes.  I told her I was still there,

10  that I would get my letter of recommendation

11  and mail it off to her, and she would send me

12  the correspondence I needed, which she did.

13       Q.   And when did you -- or did you get

14  your license renewed?

15       A.   Yes.  I got it renewed -- it was

16  either February 4th or 5th.

17       Q.   So for what period of time did you

18  work without a license?

19       A.   Well, from the time it expired,

20  July 2004 until February of 2007.

21       Q.   And during that period of time you

22  continued to work for the company of course?

23       A.   Yes.

24       Q.   Were your duties, responsibilities,

Page 252

1    supervision changed in any way?

2        A.   In no way, no.  Same duties.

3        Q.   Was any action taken against you by

4    the IEPA by reason of your license having

5    expired?

6        A.   No.

7        Q.   Or any action taken against you

8    because you were working without a license?

9        A.   No.

10       Q.   Now, the letter of suspension that you

11   just looked at says quote:  You will be

12   required to reimburse the company for

13   overpayment of wages for a license you did not

14   have.

15              And going on, a different sentence

16   at the bottom of Exhibit 2, the first page:

17   You are hereby required to pay this difference

18   back to the company within a one-year period

19   from the date of this letter, and to -- and

20   will have to arrange a payment schedule.

21   Failure to make payments will result in further

22   discipline.  Close quote.

23              Did you pay back as required by

24   this letter?

Page 253

1    A.   No, I did not.

2    Q.   Was that brought -- and we're now

3  beyond one year of this letter.  Was that

4  brought to your attention in any way?

5    A.   Yes.  While I was on suspension, I

6  received a letter at home through the mail

7  stating that -- well, the facts and figures,

8  how much I had to pay every payday, and that I

9  was required to sign that or I would be

10  terminated.  And I didn't act on that.

11    Q.   And have you suffered any further

12  discipline or discharge as a result of not

13  acting on that?

14    A.   No.

15    Q.   Has that been brought to your

16  attention since that time?

17    A.   No.

18    Q.   And have you paid the money back?

19    A.   No, I have not.

20    Q.   How much was it that they wanted you

21  to pay?

22    A.   $10,562, right in there.

23         MR. ORLOVE:  Okay.  Nothing further.

24

Page 254

CROSS-EXAMINATION

1

2  BY MR. POTTER:

3      Q.  Bear with me, Ken.  I'm trying to find

4  my copy of Union 2.  Before we get there, let

5  me ask you this, Ken.

6              We're going to look at Company

7  Exhibit 5.  And I don't know.  Just tell me

8  whether or not you've ever seen that exhibit

9  before?

10     A.  Yes.  Steve Phillips gave that to me.

11     Q.  When was that?

12     A.  It was in one of our -- one of our --

13  well, the first or the second meeting.  I

14  believe it was the second meeting.

15     Q.  So it was part of this

16  investigation --

17     A.  Yes.

18     Q.  -- leading up to your discipline?

19     A.  Yes.

20     Q.  But prior to that you don't have any

21  recall of receiving this?

22     A.  No.

23     Q.  Is that your address at 306 Long

24  Avenue, North Aurora, Illinois?

1    A.   Yes, it is.

2    Q.   All right.  But you don't have any

3 recall of receiving it?

4    A.   No.

5    Q.   You just remember Steve Phillips

6 approaching you about it during the

7 investigation?

8    A.   Yes.

9    Q.   But you told Steve the same thing that

10 you just --

11    A.   Yes, sir.

12    Q.   Didn't have any prior knowledge?

13    A.   No.

14    Q.   Okay.

15    ARBITRATOR MALIN:  Mr. Nelson, let him

16 finish the question first, because our court

17 reporter can only take one person down at a

18 time.

19    THE WITNESS:  All right.

20 BY MR. POTTER:

21    Q.   And again, Ken, you've made it clear

22 you understand you fouled up.  You should have

23 maintained your license?

24    A.   Yes.

Page 256

1      Q.   And that under the Collective

2   Bargaining Agreement you get paid based upon

3   the license you hold.  You're aware of that

4   language in the --

5      A.   I wasn't aware of that at the time,

6   the different pay rates and everything.  But

7   Steve did point that out to me.

8      Q.   Okay.  Okay.

9      A.   You have to understand, I come from a

10   smaller company where we weren't paid on -- you

11   know, like this.  We were just paid according

12   to what we did.

13      Q.   Based upon your job classification

14   versus license held?

15      A.   Correct.

16      Q.   Okay.  Union Exhibit 2, which was your

17   discipline letter.

18          MR. ORLOVE:  You want mine?

19          MR. POTTER:  Yes, thank you.

20   BY MR. POTTER:

21      Q.   Ken, this is your discipline letter

22   you received on November 7th of '06.  Is there

23   anything in this letter which you believe to be

24   untrue?  I'm not asking you to address the

Page 257

1   discipline you received.  I'm understanding

2   you're contesting that.  But factually the

3   content of the letters or anything in there

4   that you disagree with?  Just take your time to

5   read through it.

6          MR. ORLOVE:  Well, I really object to

7   that.  If there's something -- the company

8   wrote the letter, and I object to having the

9   witness just approve or disapprove of how the

10  company characterized the facts.  If there's

11  something in the nature of facts that he needs

12  to be asked, of course he's here and he can be

13  asked.

14         ARBITRATOR MALIN:  Mr. Potter?

15         MR. POTTER:  Well, I think that we're

16  here trying to determine whether or not we had

17  just cause for the discipline.  And I think one

18  of the factors is whether or not we were -- had

19  the correct facts at hand when we made the

20  disciplinary action.  And if this person's

21  being disciplined based upon certain facts in

22  the letter, I have a right to ask him whether

23  he thinks the content of that letter is

24  factually correct.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    ARBITRATOR MALIN:  Well, I agree with

2  that, but I think Mr. Orlove's objection as to

3  the form is appropriate.  I think you can take

4  him through the letter and say is this

5  factually accurate?  Do you disagree with that?

6              But just handing him the letter

7  and saying tell me if there's anything in there

8  you disagree with is -- that's going to produce

9  ambiguous testimony, if anything.

10              So I think it will be more helpful

11  to me if you focus his attention on specific

12  allegations in the letter, then ask if he

13  agrees or disagrees.

14  BY MR. POTTER:

15      Q.  Okay.  Let's just go through again,

16  and I think most of this you're going to agree

17  with.

18              But in the second paragraph it

19  says, In the process of our investigation or

20  interview with you, it was clear that you

21  allowed your license to expire and made no

22  effort to keep track of your license or contact

23  the IEPA to check the status of your license,

24  at least for the past several years.  That's

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 259

1    correct?

2        A.   Yes.

3        Q.   Okay.  And it was also clear that you

4    had not maintained the necessary training,

5    education hours, CEU's required to maintain

6    your water license in violation of the

7    Collective Bargaining Agreement, Section 26.2.

8            MR. ORLOVE:  I object to that because

9    it requires the witness to make a judgment as

10   to the meaning and understanding of contract

11   term.

12           MR. POTTER:  Okay.  Well, let me

13   rephrase the question.

14           ARBITRATOR MALIN:  Okay.

15   BY MR. POTTER:

16       Q.   It was also clear that you have not

17   maintained the necessary training, education

18   hours or CEU's required to maintain your water

19   license?

20       A.   At first I disagreed with that because

21   I had so many pieces of paper stating otherwise

22   that I thought I had more than enough.  But

23   checking through them, I needed 30, and I only

24   had 22.  So yes.  That is correct.

Page 260

1    Q.  Okay.  Thank you.  And let's see.  And
2  with regard -- and just picking up "With
3  regard", continuing that same paragraph:  With
4  regard to wages specifically, because you did
5  not advise the company that your water license
6  expired, you continued to receive pay at a
7  higher rate than you were -- at a higher rate
8  than you were entitled to under Appendix A of
9  the CBA since July 1, 2004?
10       MR. ORLOVE:  I object to those
11  conclusions.  Again, it asks him to make a
12  judgment on the application of the contract.
13       ARBITRATOR MALIN:  As I understand the
14  dispute between the parties, that's an issue
15  that's being posed to me.
16       MR. POTTER:  Well, and -- but he's
17  admitted that he understood that his license
18  was tied into his pay rate.
19       ARBITRATOR MALIN:  That's correct.
20       MR. POTTER:  Okay.  And --
21       MR. ORLOVE:  Actually, he didn't,
22  but --
23       THE WITNESS:  No, I didn't.
24

Page 261

1    BY MR. POTTER:

2        Q.  You don't believe your license is tied

3    into your pay --

4        A.  I didn't understand it.  Let's put it

5    that way.

6        Q.  Okay.  But you understand that now?

7        A.  Now, I do, yeah.  Yeah.  I did say

8    Steve brought that to my attention.

9        Q.  Right.  Right.  I understand that.

10           So you understand now then knowing

11   what you know now --

12       A.  Yes.

13       Q.  -- that you were paid at the rate for

14   holding a -- I'm sorry.  A B license, was it?

15       A.  B, yes.

16       Q.  B license.  But there was a certain

17   point in time you didn't have that license?

18       A.  Correct.

19       Q.  So you didn't meet the requirements

20   for that pay rate?

21       A.  Yes.

22           MR. POTTER:  Okay.  That's all I have

23   on that letter, I believe.

24           MR. ORLOVE:  May I have it back?

Page 262

1          MR. POTTER:  Yeah.  Got to keep track
2   of it.
3          MR. ORLOVE:  After this letter, at
4   what rate --
5          ARBITRATOR MALIN:  Had you concluded
6   your cross-examination?
7          MR. ORLOVE:  Oh, I'm sorry.
8          MR. POTTER:  I think I may be.
9          ARBITRATOR MALIN:  He said that's all
10  I have on that letter.
11         MR. ORLOVE:  I'm sorry.  I apologize.
12         ARBITRATOR MALIN:  Could be
13  interpreted as the end of cross or I've got
14  stuff on other -- that's why I was --
15         MR. POTTER:  Give me a thought here.
16  BY MR. POTTER:
17     Q.  Since we're all kind of landing on
18  this one provision in the contract, I may as
19  ask what your knowledge is on that.  And again,
20  Ken, I don't know whether you're aware of this
21  or not.  This is the Collective Bargaining
22  Agreement for your bargaining unit, Joint
23  Exhibit 1.  And have you ever looked at this
24  agreement?

Page 263

1    A.  Not really, no, no.

2    Q.  Let me follow up with one question and

3  end it at that.

4         On Page 37 of that agreement it

5  addresses continuing education units to

6  maintain your license.  Were you familiar with

7  26.2 at all before today?

8    A.  No.

9         MR. POTTER:  All right.  That's all I

10  have.  That's all.

11         ARBITRATOR MALIN:  Okay.  Redirect?

12         MR. ORLOVE:  Yes.

13              REDIRECT EXAMINATION

14  BY MR. ORLOVE:

15    Q.  The letter of disciplinary suspension

16  also indicates that your pay was reduced to an

17  operator in training --

18    A.  That's correct.

19    Q.  -- is that correct?

20    A.  Yes.

21    Q.  And how long were you paid as an

22  operator in training?

23    A.  I believe it started the first of

24  November and lasted until my license was

Page 264

1   renewed, which was in February.

2       Q.   During that period of time, what if

3   any changes in your work supervision or duties

4   was there while you worked as an operator in

5   training?

6       A.   No changes.

7       Q.   What if any training other than

8   routine training everyone goes through were you

9   given while you were an operator in training --

10  while you were paid at an operator in training?

11      A.   None.

12          MR. ORLOVE:   That's all.

13          MR. POTTER:   Nothing further.

14          ARBITRATOR MALIN:   Thank you,

15  Mr. Nelson.   You're excused.

16              (Witness Excused.)

17          MR. ORLOVE:   Glenn Williams is our

18  next witness.

19              (The witness was duly sworn.)

20          ARBITRATOR MALIN:   Proceed whenever

21  you're ready, Mr. Orlove.

22          MR. POTTER:   I notice the witness has

23  a bunch of exhibits with him.   Perhaps we

24  could -- I would rather he not have those in

Page 265

1    his possession while he testifies.

2              MR. ORLOVE:  Yeah.  You can put them

3    down on the floor.

4              MR. POTTER:  Thank you.

5                   GLENN WILLIAMS,

6    called as a witness herein, having been first

7    duly sworn, was examined and testified as

8    follows:

9                   DIRECT EXAMINATION

10   BY MR. ORLOVE:

11        Q.  Are you the Glenn Williams who was

12   discharged by Illinois American Water?

13        A.  Yes.

14        Q.  When did you begin there?

15        A.  At American Water?

16        Q.  Yep -- no.  At the American Water or

17   any predecessor company.

18        A.  Originally October of 1974.

19        Q.  And what has been your work for those

20   predecessor companies and Illinois American

21   Water?

22        A.  Operator.  I started as a meter reader

23   and progressively moved up through the

24   different job positions.  About the last

1  20 years I've been an operator.

2       Q.  Directing your attention to October 10

3  of last year, 2006, what if anything came to

4  your attention concerning the status of your

5  water supply license?

6       A.  I received a call from Jewel at the

7  EPA.  She informed me that she attempted to

8  credit my account with CEU's I had earned, and

9  she wasn't even able to find me.  She did

10  locate me on an inactive list.  She said that

11  she was sorry, that it was not good news, that

12  my license was expired and -- over a year, and

13  that I would have to retest.

14       Q.  You recall anything further between

15  you and she being said at that time?

16       A.  No.

17       Q.  And at that time what was the license

18  you had which had expired?

19       A.  Class A.

20       Q.  What if anything did you do to bring

21  that to the attention of the company?

22       A.  I believe I got that news on a Friday.

23  My workweek at the time was Tuesday through

24  Saturday.  I was off Sunday, Monday.  Tuesday

1  when I got to work I notified my supervisor,

2  John Stein, what I had found out.

3      Q.  And what did you tell him?  Tell us

4  everything you recall saying to him and what he

5  said to you.

6      A.  I informed him that I found out my

7  license had expired.  That because it was over

8  a year, I would need to retest.  I asked him if

9  he could provide me with a letter of entrance.

10  He said he would do that.

11      Q.  Anything else said between you and

12  Mr. Stein?

13      A.  Not that I recall, no.

14      Q.  Directing your attention to about a

15  week later, October 19th, were you called into

16  a meeting with supervision?

17      A.  I was, yes.

18      Q.  And who was present?

19      A.  Steve Phillips, Ray Rossa, John Stein,

20  and myself.

21      Q.  Tell us everything that you can recall

22  being said.

23      A.  Steve informed me that he was still

24  investigating, that this was a very serious

Page 268

1    matter.  He asked me why I hadn't brought this

2    to his attention sooner.  I informed him:

3    Steve, I informed you or John Stein as soon as

4    I found out.  He told me, you know, it was an

5    open, ongoing investigation, and that's all I

6    recall from that meeting.

7        Q.   Was there any discussion as to whether

8    or not you had gotten notice from EPA?

9        A.   Yes.  He asked me if I had received a

10   renewal or anything like that, and I told him

11   no.  Informed him I had moved in 1995 and again

12   in 2004.

13       Q.   Tell the Arbitrator why or how it

14   happened that your license did expire, why you

15   weren't able to keep up with it.

16       A.   Well, what I basically found out later

17   was it had expired in '97, but I moved from

18   that address in 1995.  So they didn't forward

19   at the time for two years or -- so I never got

20   the notice forwarded to me.  I earned the

21   license in 1994.  So actually, I never -- I

22   never did a renewal on it.

23       Q.   You were aware that renewal was

24   necessary?

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 269

1    A.   Yes.

2    Q.   Can you explain why is it that it went

3  for that period of time without you attending

4  to a renewal?

5    A.   I don't know how that much time could

6  have gotten away that it could be expired that

7  long.

8    Q.   Was there anything happening in your

9  personal life that would have distracted you

10  from it?

11    A.   There were many things going on at the

12  time, yes.

13    Q.   Tell us what.

14    A.   Well, I had lost an adult son to

15  suicide and... Excuse me.  And a year later my

16  wife was diagnosed with breast cancer.

17    Q.   If you want, we can take a break or we

18  can continue.

19    A.   No, I'm fine.

20    Q.   Okay.  Was this brought to the

21  company's attention?

22    A.   Steve was aware of it.  He came to my

23  son's wake.  And I know I had conversations.

24  He was aware of my wife's situation as well

Page 270

1   too.

2        Q.   At the first meeting was anything said

3   to you one way or another about your ability to

4   continue working on the job?

5        A.   No.

6        Q.   And did your job duties change after

7   this meeting?

8        A.   No.

9        Q.   Was there a -- directing your

10  attention to a meeting on October 27th, were

11  you called into a meeting on that day?

12       A.   Yes.

13       Q.   And who was present at that meeting?

14       A.   Steve Phillips, John Stein, myself,

15  and Ray Rossa.

16       Q.   And tell us everything you can recall

17  taking place at that meeting?

18       A.   Steve had given me a copy of a renewal

19  that he had received from the EPA for my water

20  license.  And when I looked at it, I explained

21  to him that I had moved from 265 Durham Lane to

22  210 Circle Avenue in Medina two years prior to

23  that.  That was why I never received the

24  renewal.  He said didn't it dawn on you that

Page 271

1    your license needed to be renewed?  And I said

2    if I had received a renewal notice, I would

3    have certainly put a $10 check in the mail and

4    mailed it to them.

5        Q.  Did you explain to him why that could

6    have gotten behind you or --

7        A.  I believe -- yes, I mentioned that to

8    him, that I had a lot on my plate over the last

9    time...

10       Q.  I know you brought some papers up.

11   Are those papers having to deal with your move?

12       A.  Yes.

13       Q.  Okay.  So if there's any question by

14   Mr. Potter about when you moved, you're able to

15   show him the documentation?

16       A.  Yes.  I have a copy of the renewal

17   that Steve provided me with, and I have a copy

18   of some closing papers that have a County seal

19   and date substantiating that I was gone from

20   that address two years.

21       Q.  And those are the papers you brought

22   up which are now sitting on the floor?

23       A.  Yes.

24       Q.  Okay.  Directing your attention to

Page 272

1    November 7th, were you called into a meeting on

2    that day?

3        A.   Yes.

4        Q.   And who was present at that time?

5        A.   Steve Phillips, John Stein, myself,

6    and Chris Martens.

7        Q.   Let me show you what is already in

8    evidence as Union Exhibit 1 and ask you if that

9    was given to you at that meeting?

10       A.   Yes.

11       Q.   Tell the Arbitrator everything that

12   you can recall being said at that time or in

13   that meeting.

14       A.   Steve told me that I had to sign these

15   or basically I would be terminated on that day.

16   He gave me a few minutes.  He handed this to me

17   and told me to take my time and look it over.

18   I didn't -- I basically quickly scanned it.  I

19   didn't -- I didn't read it word for word.  I

20   picked up that there was 30 workdays without

21   pay.  It's six weeks without a paycheck.

22              Also noted what they were

23   requiring that -- they wanted me to get at

24   least a Class B level water license.  They

Page 273

1    informed me that they were cutting my wages

2    from about $7 an hour to operator in training.

3         Q.   Again, what did he say about signing

4    this or what?

5         A.   He said basically you have the option

6    of signing it or being terminated.

7         Q.   And did you sign this as its indicated

8    on Union Exhibit 1, which is the letter itself

9    and what's called the last-chance agreement?

10        A.   Yes.  It's my signature.

11        Q.   Why did you sign it?

12        A.   When I went through this the first

13   time I noticed it said, Your signature is

14   intended to acknowledge receipt of this notice.

15   It does not imply agreement or disagreement

16   with the notice itself.  And I figured there's

17   no harm in signing this.  I was simply signing

18   to acknowledge receipt of it.

19              This is a high-stress,

20   high-anxiety moment, so I actually needed more

21   time to digest this, to be honest with you.

22        Q.   What if anything did his statement

23   sign it or be fired have to do with your

24   signing it?

Page 274

1        A.   I didn't want to be terminated, so I

2   signed it, sure.

3        Q.   When did your suspension begin?

4        A.   Immediately.  On November 7th.

5        Q.   And when did you return to work?

6        A.   He asked me to return on December

7   the 17th.

8        Q.   When did it first come to your

9   attention that your pay had been reduced?

10       A.   October 24th.  I was reduced to

11  operator in training.  About $7-an-hour cut.

12       Q.   When did you learn that?  Did you

13  learn it on that day or when you got your

14  paycheck?

15       A.   He informed me that my wages were

16  being cut immediately.

17       Q.   And do you recall what you were

18  earning at that time before the reduction?

19       A.   I believe it was 26.38.

20       Q.   And what did your pay come to after

21  the reduction?

22       A.   I believe it was 19.31.

23       Q.   At the time that you -- before the

24  reduction, what status were you in for pay

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 275

1  purposes?

2      A.   I was being paid as a Class A

3  operator.

4      Q.   There's something in the contract with

5  respect to grandfather's clause.  Did that

6  apply to you?

7      A.   I believe when we were purchased by

8  American Water there was an attempt to mesh the

9  two pay grades together.  So this was something

10  they did for some of us that were long-term

11  employees that were at the higher wage rates.

12  They called it grandfathering.

13      Q.   And do you know if you were

14  grandfathered or not?

15      A.   Yes, I was.

16      Q.   And while I'm on that subject, when

17  your pay rate was eventually restored after you

18  got your license, did they continue paying you

19  at the grandfather rate?

20      A.   No.   They -- I took the license test.

21  I had the application prepared.  When I left

22  that meeting, Steve also handed me a notice of

23  entrance to exam with the EPA.

24          So while I was on suspension, I

1  tested and got my license reinstated.  And when

2  I got those results in the mail, I faxed a copy

3  of the license into my supervisor, John Stein.

4             And then when I came back to work,

5  I was paid for a Class A license, but at the

6  new pay rate, which was 25.10.

7        Q.  With or without the grandfather

8  provision?

9        A.  Without the grandfather provision.

10       Q.  When you were being -- were you at any

11 time paid as an operator in training?

12       A.  Yes.  From, I believe, October 24th

13 when he informed me that they were cutting my

14 wages to the time that -- December 19th when I

15 came back to work.

16       Q.  And while you were working and being

17 paid as an operator in training, were your

18 duties or supervision any different than

19 before?

20       A.  No, sir.

21       Q.  And did you have any conversation with

22 Mr. Stein when you faxed him your renewed

23 license?

24       A.  Oh, I called him -- I actually faxed

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    it in on a Saturday, as soon as I got the

2    results.   There was a console operator here.   I

3    faxed it in to him and I said please put this

4    in John Stein's in-basket.

5              And then I called John on Monday

6    to confirm that he had received it, and he said

7    he did and that he was impressed that I was

8    able to get it that quickly.

9         Q.   Are you telling us what he told you?

10        A.   Yes.

11        Q.   During the period that you worked for

12   this company without a license, when your

13   license had expired, was any action ever taken

14   against you by the licensing authority because

15   your license had lapsed?

16        A.   No.

17        Q.   Was any action taken against you by

18   the licensing authority because you were

19   working without a license?

20        A.   No.

21        Q.   To your knowledge, was any action

22   taken against the company because your license

23   had lapsed?

24        A.   No.

Page 278

1    Q.    Did anyone ever explain to you why you

2    were not restored at your grandfathered rate?

3    A.    I had a conversation with Steve where

4    I just mentioned the operator in charge, and he

5    said well, that's not the direction the

6    company's going.   I said okay.

7    Q.    Did you receive vacation pay for the

8    time you worked in 2006?

9    A.    I did, but I had six weeks of

10   accumulated vacation when I was terminated, and

11   they paid me at the $19 wage rate.

12   Q.    The operator in training rate?

13   A.    Yes, sir.

14   Q.    For the six weeks you accumulated for

15   vacation?

16   A.    Plus the personal days I had coming.

17   Q.    After the November 7th meeting, what

18   if anything occurred in connection with the

19   demand by the company that you sign a repayment

20   plan that's called for in your suspension

21   letter?

22   A.    I had a meeting March 2nd, '07 with

23   Steve that -- that was the day I was

24   terminated.

1    Q.  Were there any conversations about

2    that before that time?

3    A.  I received two calls while I was on

4    suspension.  One from Steve and one from John

5    Stein saying that if I had received a copy of

6    the repayment plan, that they would -- if I

7    would sign it, they would come and pick it up.

8         But what happened was corporate

9    had the right address to send my pay vouchers

10   and all that to my house, but they hadn't

11   updated my address here.  So it turned out that

12   the stuff was going to the wrong address again.

13   I had updated that address with the company,

14   but it never got changed in this facility.

15   Q.  So they called you while you were on

16   suspension about that?

17   A.  Yes.  About me signing and they would

18   come and pick it up.

19   Q.  Okay.  What if anything did you say

20   about signing it?

21   A.  I never -- it was on the answering

22   machine.  I never spoke to them.

23   Q.  And from the time you were on

24   suspension until late February, were there any

Page 280

1    calls made to you to resign a repayment plan?

2         A.   No.  It was quiet.

3         Q.   Or any conversations, demands upon you

4    to sign a repayment plan?

5         A.   No.

6         Q.   After your return from your suspension

7    did the subject come up at all?

8         A.   No.

9         Q.   Had you seen the repayment plan?

10        A.   I did.

11        Q.   What would it have required of you in

12   dollars and cents?

13        A.   They were requesting $13,000.  They

14   wanted backpay -- they wanted it paid back

15   within 12 months, and they were requesting $549

16   per pay period.  So it was $1,100 a month.

17        Q.   How much were you earning per month or

18   per pay period?

19        A.   Not enough to cover another mortgage.

20        Q.   Okay.  What was your net take-home

21   during that period of time?

22        A.   $19 an hour, 19 something.

23        Q.   Well, after your license was renewed

24   in December, then what were you making?

Page 281

1      A.   25.10.

2      Q.   Okay.  So what was your -- roughly

3 your average net income after proper deductions

4 per month after your license was renewed?

5      A.   I think I would have had to live on

6 about $250 a pay period.  It was...

7      Q.   After their repayment plan?

8      A.   Yes.  So about $125 per week is what I

9 would have had left to live on.

10     Q.   If you complied with their repayment

11 plan?

12     A.   Yes.

13     Q.   Directing your attention to February

14 of this year, 2007, did you have a conversation

15 with Wayne Clavio from the union about the

16 repayment plan?

17     A.   Yes.

18     Q.   What did you and he discuss?

19     A.   He called me, I believe it was on a

20 Tuesday.  He said, Glenn, the company is going

21 to call you in on Friday, and they're going to

22 ask you to sign the reimbursement contract.

23 And our position is that you should not sign

24 it.  If you don't sign it, they're going to

Page 282

1    terminate it -- terminate you.

2        Q.  And what did you say about whether you

3    would sign it or not?

4        A.  I couldn't -- I can't pay my bills on

5    $125 a week.  I took Wayne's recommendation and

6    did what he recommended.

7        Q.  Directing your attention to March 2nd,

8    was there a meeting on that day?

9        A.  Yes.  That was the day I was

10   terminated.

11       Q.  Let me show you what is in evidence as

12   Union Exhibit 5 and ask you if you got that on

13   or about March 2nd.

14       A.  Yes, sir.  That's the...

15       Q.  And tell us what happened at that

16   time.

17       A.  I got a call from John Stein.  I

18   believe it was about noon.  I was working out

19   in the Village of Gilberts.  He asked me to be

20   in by early afternoon about 2:00 p.m., that

21   there was a meeting with Steve.

22       Q.  And what happened at that meeting?

23   Who was present at the meeting?

24       A.  Myself, Chris Martens, Steve Phillips,

Page 283

1   and John Stein.

2        Q.   Tell us what happened at the meeting.

3        A.   Basically Steve said you didn't live

4   up to the terms -- or no.  He said, I'll give

5   you an opportunity to sign the repayment

6   schedule, or we're going to terminate you.

7             I said, Well, I can't sign that.

8   There was -- if I remember reading it, there

9   was -- even if I resigned or was terminated or

10  died, I was liable to repay the company that

11  money.

12       Q.   Is that what you said?

13       A.   No.  But it was -- I mean, I'm not an

14  attorney, but it's what I -- what I read from

15  the notice, that it was binding.  That money

16  had to be repaid.

17       Q.   Okay.  Anything else said?

18       A.   I said, I can't -- I can't sign that

19  contract.  Then he pulled out another -- he had

20  several different types of paperwork prepared

21  depending on which way I guess I -- which way

22  my decision went.  And he said okay.  We're

23  going to have to terminate me and gave me the

24  paperwork to sign.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 284

1      Q.   And he gave you that letter that you

2   just looked at?

3      A.   Yes.

4           MR. ORLOVE:   Okay.   Nothing further.

5           ARBITRATOR MALIN:   Mr. Potter, before

6   you do your cross, why don't we take a short

7   recess so people can stretch, use the restroom.

8           MR. POTTER:   Sure.

9                (Break Taken)

10          ARBITRATOR MALIN:   Back on the record.

11   Mr. Orlove you may continue.

12          MR. ORLOVE:   Thank you.

13   BY MR. ORLOVE:

14      Q.   Glenn, I should have asked you this at

15   the outset, but you've worked there for quite a

16   long period of time.   There is in the record an

17   incident that -- for which -- in 2006 for which

18   you were given a five-day suspension.   And then

19   the facts that we just brought out.

20              Now, other than what you've just

21   testified about, what has your record been for

22   the 34 years of employment there?

23      A.   Basically squeaky clean.

24          MR. ORLOVE:   Okay.   That's all.

17086b9a-99e3-4c02-b8d8-0a34a317d803