1          ARBITRATOR MALIN:  You may

2    cross-examine.

3          MR. POTTER:  Okay.

4              CROSS-EXAMINATION

5    BY MR. POTTER:

6     Q.  You've been an operator for like

7    20 years with the company?

8     A.  Yes.

9     Q.  So you have had to maintain a Class A

10   license for how many of those years?

11    A.  I received my Class A license in '94.

12    Q.  '94?

13    A.  Prior to that I had a Class C license.

14    Q.  Okay.  And so in terms of your Class C

15   license, did you have to take a test or how did

16   you obtain a Class C license?

17    A.  I took a class and then progressively

18   took the test, yes.

19    Q.  So you have had a Class C license

20   since when?

21    A.  I don't recall when I received the

22   Class C.  I may have only had it for a year,

23   and then I progressively -- when I had the time

24   and I took the A.

1       Q.   Okay.   So maybe you only had the Class
2   C a year before your A?
3       A.   A year or two.
4       Q.   And let me show you Company Exhibit 7.
5   And is that a document you've seen before
6   today?
7       A.   Yes.   This is a document that Steve
8   provided me with.
9       Q.   And when was that again, Glenn?   What
10   meeting; do you remember?
11       A.   I believe it was either the 19th or
12   the 24th.   I think it was --
13       Q.   One of those?
14       A.   Yes.
15       Q.   Early on in the investigation?
16       A.   Yes.
17       Q.   And did you have any recall of ever
18   receiving that document?
19       A.   I never did receive this because
20   that's why I brought the documentation that I
21   had moved from 265 Durham Lane, Bloomingdale,
22   to 6N210 Circle Medina in 1995, and they sent
23   this to my old address in April of 1997.   I was
24   gone from there two years already.

1    Q.  Okay.  And you told Steve that during

2    your meeting then about the address change?

3    A.  Yes.  I believe it came up.

4    Q.  All right.  And did you make any

5    inquiry to the Illinois Environmental

6    Protection Agency at any time during this

7    ten-year lapse about your license?

8    A.  I did not.  In fact, I had sent them

9    an application preparing to take a waste water

10   license, but not with regard to my water

11   license, no.

12   Q.  And you're familiar that there's like

13   a wallet card that often is part of your

14   license that you obtain?

15   A.  When I received my license in 1994, I

16   did not receive a wallet card.  I received a

17   wall certificate.

18   Q.  And pursuant to the -- and again, you

19   were talking about having the grandfather

20   clause and being grandfathered in the

21   Collective Bargaining Agreement, having a

22   little higher wage because of that, right?

23   A.  Yes.

24   Q.  You got to say yes or no for the court

1  reporter --

2       A.   Yes.

3       Q.   -- otherwise, it gets confusing.

4            So I'm assuming then you're also

5  familiar with Appendix A of the Collective

6  Bargaining Agreement too about the wage

7  structure?

8       A.   Yes.

9       Q.   So that, for example, you have a Class

10 A license operator gets paid more than a Class

11 B, and a Class B gets paid more than a Class C,

12 correct?

13      A.   Yes, I understand.

14      Q.   And in fact, you were paid -- putting

15 aside the grandfather provision for a moment,

16 you were paid more for your services because

17 you held a Class A license, correct?

18      A.   Yes.

19      Q.   Okay.

20      A.   But in addition to holding a Class A

21 license, I was being paid for the knowledge I

22 have up here.

23      Q.   Right.

24      A.   And I believe I proved that I have the

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    Class A knowledge up here because I went and

2    retested and got my license from the state.

3    It's always been there.

4         Q.   No one's disputing that.

5              MR. ORLOVE:  Up here, the witness was

6    pointing to his head.

7              ARBITRATOR MALIN:  The record may so

8    reflect.

9    BY MR. POTTER:

10        Q.   So anyway, you knew that you should

11   have had the license to get the pay, bottom

12   line?

13        A.   Yes.

14        Q.   No question about that?

15        A.   But I had no idea that the license was

16   expired.  That's why I immediate -- I couldn't

17   get that license reinstated fast enough, to be

18   honest with you.  I was shocked when I found

19   out it was expired.

20        Q.   Okay.  Let me show you too, Glenn, and

21   see if you know this or not.  I don't even know

22   if you do or not, but let's cover it while

23   we're all here.  Again, this is the Collective

24   Bargaining Agreement we just looked at in terms

Page 290

1    of the appendix for the wages.  Next I want to

2    look at it in terms of a particular area

3    regarding continuing education credits to

4    maintain your license.

5        A.  Uh-huh.

6        Q.  And it's 26.2 on Page 37.  Are you

7    familiar with this provision at all, 26.2?

8        A.  I am.  26.2 was -- there was a new

9    print of this contract handed to me.  I guess

10   it was -- I don't know when this went into

11   effect.  But I just received -- when I was

12   suspended is when I received a new copy of this

13   contract.

14       Q.  So you didn't realize this provision

15   26.6 even existed until your discipline

16   erupted over your lack of your license?

17       A.  Right.  I was aware that yes, you

18   needed CEU's to maintain your license.

19       Q.  Okay.  That you knew?

20       A.  Yes.

21       Q.  You didn't have to have the contract

22   to tell you that?

23       A.  Right.

24       Q.  Okay.  Thanks.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1      A.   I did not know it was in our contract.

2      Q.   Right.  But you knew from common

3  sense.

4      A.   (No Audible Response)

5      Q.   Okay.  And when you were first

6  disciplined, offered the last-chance agreement,

7  the union filed a grievance on your behalf; do

8  you remember that?  Let me show you Union

9  Exhibits 8 and 9, Glenn.  Are you familiar with

10  either one of these documents?  Have you ever

11  seen the grievance itself?

12      A.   No.  I was out on suspension for six

13  weeks effective that date, both of those.

14      Q.   So you weren't aware of the content of

15  either one of the grievances?

16      A.   No.  I didn't come back until

17  December 19th.

18      Q.   I didn't know how much of this was

19  explained to you by your union.

20      A.   I wasn't aware of it.

21      Q.   All right.  And let me just ask you

22  this.  You weren't aware then that the union's

23  position on your discipline was that they felt

24  your punishment is too severe and the lack of

1    reduction.  You weren't aware of that being the

2    union's position?

3         A.   No.

4         Q.   Okay.  And you were talking about

5    having a conversation with Wayne Clavio in

6    February of this year about signing or not

7    signing the --

8         A.   It was just days prior to -- I believe

9    it was on a Tuesday or a Wednesday prior to the

10   Friday, March the 2nd.

11        Q.   Okay.  And I guess the only real

12   question I have for you in that area is did --

13   let me strike that.  Let me start over.

14             You had a conversation with Wayne,

15   let's go back to that, in February or right

16   before your March 2nd termination.  Did you or

17   Wayne discuss other possible options in terms

18   of the repayment plan?

19        A.   No.

20        Q.   Didn't consider coming back and

21   talking to the company with some sort of

22   counter-offer?

23        A.   No.

24        Q.   And when you had your meeting where

1    the last-chance agreement was provided to

2    you -- here.  Let's make sure we're all clear.

3    Union Exhibit 1, Glenn, when you had your

4    meeting over this, you indicated that you

5    signed it because you were confused over the

6    intent?

7        A.  I believe there was two -- I believe

8    this is the format I received it in.  There was

9    this on top --

10       Q.  There was a letter and then the actual

11   last-chance agreement itself behind it?

12       A.  Yeah.  There was disciplinary

13   suspension last-chance agreement.  And then --

14   so one was on top of the other.  And what I did

15   was I went through and -- I mean, I didn't read

16   it word for word.  I fast read it.  I scanned

17   it.  I saw that I was being suspended for 30

18   workdays.  I scanned it.  Where it says, Your

19   signature is intended to only acknowledge

20   receipt of the notice.  It does not imply

21   agreement.  So I signed what I was being asked

22   to sign here.  I didn't --

23       Q.  But you signed twice, right?

24       A.  Yeah.

1    Q.  There was a second signature on Page 2

2  of the actual last-chance agreement, right?  So

3  it was a different signature line on Page 2,

4  the last-chance agreement versus your --

5    A.  I just -- I didn't have time to digest

6  all this.

7    Q.  Did you ask for time?

8    A.  I did take -- like I said, I took a

9  minute or two, I think, just to quick -- I

10  scanned through it.  I didn't -- like I said, I

11  didn't read it word for word.

12    Q.  I'm going back, I guess, to my

13  question of well, did you ask for more time?

14  Say hey, this is a big deal.  Can I have, you

15  know, some more time to look at this?

16    A.  No, I didn't.

17    Q.  And you're a former union steward?

18    A.  I was, yeah.

19    Q.  How long were you a union steward?

20    A.  About ten years.

21    Q.  Ten years.  Okay.  And did -- who was

22  your steward who was present during this time

23  for you, during this meeting over the

24  last-chance agreement; is that Chris Martens?

Page 295

1   A.  Chris Martens was there on the 7th,
2   November the 7th.
3   Q.  Did you have any discussion with Chris
4   about hey, maybe we should grab a telephone and
5   talk to somebody at the union about this?
6   A.  No.
7   Q.  Okay.
8   A.  I believe Ray was on vacation when
9   this took place.
10   Q.  And what about Wayne, do you have a
11   number to get ahold of him normally?
12   A.  I did not at the time.
13   Q.  Did you ask Chris whether he had a
14   phone number for Wayne?
15   A.  I didn't know until this -- I didn't
16   know my union officials real well until this.
17   Q.  Got you.  Which is normally good news.
18   In terms of -- I mean, did Chris
19   suggest anything to you about let's take some
20   more time with this?
21   A.  No.
22   Q.  Okay.
23   A.  I mean, basically Steve said come back
24   on December 19th.  And so I left the building.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 296

 1   I was told to leave the building right away.

 2       Q.  When was it that you had a change of

 3   heart over what you signed?

 4       A.  Over what?

 5       Q.  When did you have the change of heart

 6   regarding what you signed?

 7           MR. ORLOVE:  That's assuming a fact

 8   that hasn't been established here.

 9           THE WITNESS:  I never had a change of

10   heart over --

11           ARBITRATOR MALIN:  There's an

12   objection pending.  You can rephrase the

13   question.

14   BY MR. POTTER:

15       Q.  Why have you taken a position now that

16   you're grieving your discipline?

17           MR. ORLOVE:  I object.  I don't

18   understand the question based on the facts we

19   have in the record.

20           MR. POTTER:  I'm not sure I understand

21   the objection.

22           ARBITRATOR MALIN:  I do.  I thought

23   this witness testified that the grievance was

24   filed while he was on suspension and he didn't

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 297

1    know about it.  They were filed by the union,

2    not by...

3    BY MR. POTTER:

4        Q.  Well, as you sit here now, you

5    understand the basis for your grievance?

6            MR. ORLOVE:  Frankly, it's -- we're

7    going to put into evidence to this effect that

8    it's the union's grievance.

9            MR. POTTER:  Okay.  Well, I think I

10   still have the right to ask him what his intent

11   was, just as our --

12           MR. ORLOVE:  You do, but it's not his

13   grievance.

14           ARBITRATOR MALIN:  Rephrase the

15   question.

16   BY MR. POTTER:

17       Q.  Yeah.  I mean, do you understand,

18   Glenn, what this arbitration proceeding is

19   about?

20       A.  I do.

21       Q.  And in your mind, what is it about?

22       A.  It's about the disciplinary action

23   that went on during the -- from the time I --

24   you know, all the disciplinary action.

1    Q.  Over the loss of your license?

2    A.  Over the loss of my license, over the

3  loss of my job, over the loss of my wages.

4    Q.  And when you went into the meeting

5  with your shop steward and you were handed the

6  disciplinary suspension and last-chance

7  agreement, you had already had two

8  conversations with the company about this,

9  correct?

10        MR. ORLOVE:  About what?  What is

11  this?

12  BY MR. POTTER:

13    Q.  Well, about your lapse in your

14  license, in particular.  You had two meetings,

15  one on the 19th and one on the 24th?

16    A.  Yes.

17    Q.  With Steve Phillips and --

18    A.  Those were investigations that Steve

19  was conducting.

20    Q.  Right.  Steve and John Stein was

21  present and Ray Rossa?

22    A.  Yes.

23    Q.  And Steve told you in the first

24  meeting it was a very serious matter, correct?

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    A.   Yes.

2    Q.   And had you been in conversations with

3    your union representatives about the possible

4    outcomes as a result of the investigation?

5    A.   When I received the November 7th?  I

6    mean, I had no idea -- no, I had no idea what

7    was going to happen.

8    Q.   Were you fearful you might lose your

9    job?

10    A.   The thought occurred to me, yes.

11    Q.   Were you fearful -- okay.  Strike

12    that.

13         MR. POTTER:  Nothing further.

14         ARBITRATOR MALIN:  Redirect?

15         MR. ORLOVE:  No redirect.

16         ARBITRATOR MALIN:  Okay.  Thank you

17    very much, Mr. Williams.

18              (Witness Excused.)

19         MR. ORLOVE:  Chris Martens, please.

20              (The witness was duly sworn.)

21         ARBITRATOR MALIN:  Have a seat.

22    Please proceed whenever you're ready,

23    Mr. Orlove.

24              CHRIS MARTENS,

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 300

1  called as a witness herein, having been first

2  duly sworn, was examined and testified as

3  follows:

4              DIRECT EXAMINATION

5  BY MR. ORLOVE:

6      Q.  Give us your name, please.

7      A.  Chris Martens.

8      Q.  And by whom are you employed?

9      A.  Illinois American Water.

10     Q.  How long have you worked for them or

11  any predecessor company?

12     A.  June 12, 1989.

13     Q.  And what is your job?

14     A.  Plant maintenance technician.

15     Q.  Directing your attention to the month

16  of November of 2006, what if any position did

17  you occupy on behalf of the union?

18     A.  I was a steward.

19     Q.  And will you explain the steward

20  structure at that time with this company.

21     A.  We had two stewards, a chief steward.

22  And a steward's job was to investigate

23  grievances and file grievances and stuff.

24     Q.  What area did you cover?

17086b9a-99e3-4c02-b8d8-0a34a317d803

1      A.   I was just a plain old steward.

2      Q.   What if any authority did you have at

3   that time to agree to or to negotiate

4   company-administered discipline?

5      A.   None.

6      Q.   What authority did you have at that

7   time to agree to or negotiate last-chance

8   agreements?

9      A.   None.

10     Q.   Directing your attention to

11   November 7, were you called into a meeting

12   concerning Glenn Williams?

13     A.   Yes.

14     Q.   And who among the stewards usually

15   handles meetings that may result in discipline

16   or discharge?

17     A.   Discipline, you know, that's always

18   stewards and stuff.  And depending on the

19   severity, they might pull in the chief steward.

20     Q.   Can you tell us why you were called in

21   for the meeting with Glenn Williams?

22     A.   I was the only one available.

23     Q.   Tell us what happened at that meeting.

24     A.   Well, they pulled all the guys in

Page 302

1   separately, but Glenn was the last one.  It was

2   me, Glenn, John Stein, and Steve.  Steve sat

3   down, explained the severity, went through,

4   gave us copies of the punishment and stuff.

5   Walked through it, told us, you know, he will

6   be suspended for 30 days, loss of pay.  He had

7   to pay back money.

8               And you know, we looked through

9   it.  You know, he told us we had to pretty much

10  sign it or Glenn was going to be terminated.

11      Q.   Now, I'm asking you and I think you're

12  answering about the meeting with Glenn

13  Williams, right?

14      A.   Correct.

15      Q.   And can you explain to the Arbitrator

16  why is it that you signed this?

17      A.   Well, Glenn's a friend and --

18      Q.   Here it is.  It's -- the union exhibit

19  is Exhibit Number 1.  I'm showing it to you.

20      A.   I mean, Glenn's a friend.  He's a

21  fellow union member.  I didn't want to see him

22  get fired.  I figured we'd sign it, and then

23  we'd file a grievance and deal with it later.

24      Q.   And was a grievance filed?

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    A.   Yes, it was.

2    Q.   And who filed that?

3    A.   I did.

4    Q.   And in terms of time, when was it

5    filed?

6    A.   I think we had five days.  I believe I

7    filed it within the five days, five working

8    days.

9    Q.   Let me show you what is in evidence as

10   Union Exhibit 8 and ask you if you recognize

11   that.  Tell us what it is.

12   A.   Yes, I do.  It's a Step 1 grievance.

13   Q.   And who filled that out?

14   A.   I filled it out and gave it to John

15   Stein.

16   Q.   And when did you do that?

17   A.   I filled it out on November 10,

18   three days after the meeting, the suspension.

19        MR. ORLOVE:  That's all we have for

20   Mr. Martens.

21        ARBITRATOR MALIN:  You may

22   cross-examine.

23

24

CROSS-EXAMINATION

BY MR. POTTER:

Q.  All right.  Let's look at Union

Exhibit 1, which you signed.  And did you read

through the last-chance agreement at all?

A.  Yes, I did.

Q.  Okay.  So Chris, I'm assuming you saw

in Paragraph 2 the provision, pointing it out

to you:  The union and employee expressly waive

any right to file a grievance or any other

claim regarding employee's discharge under this

agreement.

A.  Yes.  I see that.

Q.  All right.  So did you understand that

you were waiving a right to file any claim with

respect to the discipline that was taking

place?

A.  If I thought right though, somewhere

in here there's something that says that both

parties agree they can talk about it.

Q.  Okay.

A.  I may have misunderstood something.

Right here.  Any dispute regarding the meaning

of this agreement will be resolved solely

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 305

1    through the parties' Collective Bargaining

2    Agreement grievance arbitration procedure.

3        Q.   So you felt like if -- notwithstanding

4    signing this, if there was a dispute, you

5    could go ahead and --

6        A.   Yes.

7        Q.   -- file a grievance?

8        A.   That's correct.

9        Q.   And did you have any doubts when you

10   signed this agreement in terms of your ability

11   to sign off on it on behalf of the union?

12       A.   Yes and no.  I mean, I knew we had --

13   I had the right to -- for discipline and stuff.

14   This -- I'd never dealt with this.  I wasn't a

15   steward that long.  Maybe two years,

16   three years or something.  I'd never come

17   across this.  I figured by reading some of

18   that, I figured, you know what?  Sign it, keep

19   the guy's job, we'll fight it out later on.

20       Q.   And did you address this or flush it

21   out with Steve Phillips or anyone else on

22   behalf of management in the course of that

23   meeting just to make it clear what your intent

24   was?

1    A.   What, that I was going to grieve it?

2    Q.   Yeah.

3    A.   No.   No.   That's usually standard

4  operating procedure.

5    Q.   I mean, did you ask Steve the

6  question, hey, you know, we're probably going

7  to grieve this, you know?

8    A.   No.

9    Q.   Any statement of that nature?

10   A.   The only thing I asked him was what

11 would Glenn -- if Glenn got his license back,

12 what pay would he get, and would he become an

13 operator in charge again.

14   Q.   Okay.  And again, let's go to

15 Paragraph 4, you read that to yourself why

16 don't you, for a minute, and then I'll ask you

17 a question about it.

18             Okay?  You read it through?

19   A.   Yep.

20   Q.   Did that cause you to pause in terms

21 of not being able to file a grievance?

22   A.   Yeah, but then you read here --

23   Q.   Going back to Paragraph 6 again?

24   A.   Yeah.  Keep reading down.

Page 307

1    Q.  Okay.  And did you suggest at any time

2  to Glenn Williams that perhaps, you know, we

3  should make a phone call to somebody else

4  higher up with the union to make sure if this

5  is something we both want to sign?

6    A.  No.

7    Q.  So you were confident enough to not

8  make that phone call?

9    A.  No, not really confident enough.

10  Just, you know, had that article and I -- you

11  know, I never came across something like this.

12  It's kind of a whole lot, you know, three

13  grievances in one day, so...

14    Q.  And you said at the time you signed

15  this you had been a steward for two or three

16  years?

17    A.  Yeah.  Something like that.

18    Q.  And so how many grievances do you

19  think you handled while a steward in that time

20  frame, ballpark?

21    A.  Oh, 10, 15.

22    Q.  Were you able to resolve any of those

23  grievances?

24    A.  Maybe two or three.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    Q.   You personally resolved them?

2    A.   Yeah.

3    Q.   All right.  Without Ray's help?

4    A.   No, they went through -- some of them

5  went through the third step of grievance.

6    Q.   I'm talking about -- just to make it

7  clear, there was a grievance filed and Ray

8  wasn't involved and Wayne wasn't involved.  It

9  was just something -- a grievance that you

10 resolved on your own?

11   A.   Two.

12   Q.   Two?

13   A.   Two that I can think of.

14   Q.   You remember the nature of the issues?

15   A.   One was Wally Topar's truck on fire

16 and no fire extinguisher.

17   Q.   And was he disciplined or something?

18   A.   Yes.

19   Q.   Do you remember the level of

20 discipline?

21   A.   Written warning.

22   Q.   And what was the other one you can

23 remember?

24   A.   Oh, something about pay for on-call

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 309

1   guys.

2       Q.   A contract interpretation issue?

3       A.   Yes.

4       Q.   And what happened?

5       A.   We got the money.

6       Q.   Okay.

7       A.   I didn't have to file a grievance.   I

8   was able to talk it through without --

9       Q.   In the first step basically?

10      A.   Right.

11      Q.   And who did you deal with management

12  on that?

13      A.   Dan McGloon with that one and then the

14  first one was Kevin Hillen.

15      Q.   Who is Kevin Hillen?

16      A.   He is in charge of network.   He is

17  like the equivalent of Steve.

18      Q.   On the network side?

19      A.   Correct.

20      Q.   And I'm sorry.   For the other

21  grievance?

22      A.   Dan McGloon.   He's in charge of

23  maintenance, field maintenance.

24      Q.   And he works under Steve?

1    A.   No.   Under Kevin.

2    Q.   Under Kevin?   Okay.

3         MR. POTTER:   That's all I have.

4         ARBITRATOR MALIN:   Redirect?

5              REDIRECT EXAMINATION

6    BY MR. ORLOVE:

7    Q.   When Mr. Phillips presented these

8    papers to you and --

9         ARBITRATOR MALIN:   These papers, are

10   you referring to Union Exhibit 1?

11        MR. ORLOVE:   Union Exhibit 1.   Thank

12   you.

13   BY MR. ORLOVE:

14   Q.   To you and Glenn Williams, what were

15   the options in front of you?

16   A.   Pretty much you had to sign them or he

17   was going to be terminated that day.

18        MR. ORLOVE:   That's all.

19        ARBITRATOR MALIN:   Anything further of

20   this witness?

21        MR. POTTER:   Yeah.

22             RECROSS-EXAMINATION

23   BY MR. POTTER:

24   Q.   Chris, since you had been the steward

17086b9a-99e3-4c02-b8d8-0a34a317d803

1  at that point in time for two or three years,

2  I'm assuming when somebody in management was

3  suggesting something was going to happen, did

4  you ever make a counteroffer in terms of other

5  alternatives versus what management was

6  proposing?

7      A.  No, because usually I don't ask a lot

8  of questions when I'm doing that.  I just

9  listen to it, take it, and I sit there and I

10  file the grievances, and we deal with it that

11  way.

12      Q.  Deal with it later?

13      A.  Yeah, because it never works --

14      Q.  Okay.

15      A.  -- right away, so...

16      Q.  Well, in the course of -- in your

17  experience as a steward, oftentimes are there

18  resolutions based upon the parties coming to

19  some middle ground versus what was originally

20  proposed by management?

21      A.  Not in that step, no.

22      Q.  What do you mean that step?

23      A.  No.  When you go in there for your

24  punishment you don't --

1    Q.  No, no.  I don't mean in that initial

2  meeting.  I mean in the course of your

3  experience as a steward in getting issues

4  resolved no matter what they are at whatever

5  level, first, second, or third --

6    A.  It's rare.

7    Q.  But there are normally -- when you go

8  through the grievance arbitration process, you

9  have Step 1, and Step 2 and Step 3.  When the

10  parties meet, aren't they attempting to try to

11  resolve it through some middle ground?

12    A.  Yeah, we do.

13    Q.  Right.  And oftentimes you propose an

14  alternative position to the company in an

15  attempt to resolve it?

16    A.  It depends on what it -- sometimes.

17  Depends on what the -- what the punishment is

18  being thrown out.

19    Q.  Okay.  Or what about it's a contract

20  interpretation matter?  I mean, the company has

21  a certain way of looking at things.  Obviously

22  you won your case with the maintenance

23  supervisor.  You had a different perspective

24  and you made your point to him and you won,

Page 313

1    correct?

2        A.    Yeah.    Providing your deal doesn't

3    counter the contract.

4        Q.    Right, right, sure.

5        A.    Correct.

6        Q.    Sure.    So there's always room for

7    negotiation?

8        A.    Yes, if possible.

9            MR. POTTER:    Thank you.

10            ARBITRATOR MALIN:    Anything further of

11    this witness?

12            MR. ORLOVE:    Nothing further.

13            ARBITRATOR MALIN:    Thank you very

14    much, Mr. Martens.

15                    (Witness Excused.)

16            MR. ORLOVE:    Ray Rossa.

17                    (The witness was duly sworn.)

18            ARBITRATOR MALIN:    Thank you.    Have a

19    seat, please.    You may proceed whenever you're

20    ready, Mr. Orlove.

21                    RAY ROSSA,

22    called as a witness herein, having been first

23    duly sworn, was examined and testified as

24    follows:

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 314

                    DIRECT EXAMINATION

1

2  BY MR. ORLOVE:

3       Q.   State your name.

4       A.   Ray Rossa.

5       Q.   And by whom are you employed?

6       A.   Illinois American Water Company.

7       Q.   And how long have you worked for them

8  or a predecessor company?

9       A.   14 years.

10      Q.   And what is your job?

11      A.   My job is a waste water operator.

12      Q.   Directing your attention to the month

13  of November of 2006, what if any position did

14  you occupy on behalf of the union?

15      A.   At the time I was chief union steward.

16      Q.   And -- well, I'll just ask it this

17  way.

18           Tell us what the stewardship

19  structure is at this company.

20      A.   As previously mentioned by Chris

21  Martens, we have two stewards and then a chief

22  steward.

23      Q.   And what are your duties as chief

24  steward?

1      A.   My duties are generally to process the

2   grievances after the first and second step

3   unless a member of the union approaches me

4   first about filing a grievance initially.

5      Q.   What if any authority do you or any of

6   the other stewards have to agree to or

7   negotiate company-administered discipline?

8      A.   We don't have authority to do that.

9      Q.   What if any authority do you or any

10   other stewards have to negotiate or agree to

11   last-chance agreements?

12      A.   None.

13      Q.   Directing your attention to

14   November 7th, 2006, the day that the three

15   employees were called in in connection with

16   their expired water supply licenses, were you

17   at work at that day?

18      A.   No, I was not.

19      Q.   Were you previously aware of those

20   pending issues?

21      A.   Yes.

22      Q.   What if any procedure does the company

23   follow if an employee is about to be

24   disciplined?

1      A.   Can you repeat the question?

2      Q.   What is the procedure that the company

3  follows, as what do they do if they're going to

4  call an employee in to be disciplined?

5      A.   Generally what they'll do is they'll

6  do an investigation into the facts of the

7  matter.  They usually ask for one of the

8  stewards to be present during that

9  investigation.

10           Then once they reach a conclusion

11  by whatever means that they do that at the

12  discipline hearing or discipline sentencing,

13  however you want to phrase it, they'll ask one

14  of the stewards generally to come into that

15  while the discipline is being administered to

16  the employee.

17      Q.   And what's the steward's function at

18  that time?

19      A.   Basically we serve there to listen to

20  what the company has to say, listen to the

21  discipline that's being handed down.  And then

22  we may also ask questions at that.

23      Q.   And what is the procedure if, for

24  example -- strike that.

1          Who would occupy that role if you

2    were absent?

3         A.   Whoever steward is currently

4    available.

5         Q.   How long have you been chief steward?

6         A.   It's been approximately ten years.

7         Q.   In that period of time, will you

8    estimate for us the number of grievances that

9    arose on average per year?

10        A.   I would estimate anywhere from 10 to

11   15 grievances a year.

12        Q.   And during that period of time, on

13   average, how many grievances are resolved at

14   Step 1 or Step 2 of the grievance procedure?

15        A.   Very few, if any.

16        Q.   And have any been resolved at Step 1

17   or Step 2 that involve discipline or discharge?

18        A.   Not that I can recall, no.

19        Q.   Let me show you what the company has

20   put in evidence as Company Exhibit 11, which

21   indicates a grievance settlement which you

22   signed.  Is that correct?

23        A.   Yes.

24        Q.   Tell us whether or not you consulted

Page 318

1    with anyone else before signing that.

2        A.   Yes.   This one I contacted Wayne

3    Clavio on and got his input onto that.

4        Q.   And tell us whether or not Wayne

5    agreed or disagreed with what has been signed

6    off on?

7        A.   Yeah.   He said it was fine to go ahead

8    and sign that, yes.

9        Q.   And showing you Company Exhibit 12,

10   which bears your signature, tell us whether or

11   not you entered into that on your own or with

12   anyone else on behalf of the union?

13       A.   No.   This was another one that Wayne

14   Clavio also was involved in.   His name's on top

15   of that.

16       Q.   And it bears your signature on the

17   printed line Chief Steward's Signature.   Tell

18   us why you signed it.

19       A.   That is just indicating that we have

20   resolved this at Step 3.   Basically signed it

21   for Wayne Clavio.   He was involved in that.

22       Q.   Would you have had the authority to

23   sign off on these without Wayne's knowledge or

24   approval?

17086b9a-99e3-4c02-b8d8-0a34a317d803

1          A.   No.

2          Q.   Directing your attention to

3    Article 26.2 of the contract, were you present

4    during the negotiations that gave rise to that?

5          A.   26.2, is that the continuing

6    education?

7          Q.   I'm going to show it to you right now.

8    Showing you that.

9          A.   Yes, I was.

10         Q.   Okay.  And which negotiations were --

11   did that first come up?

12         A.   That would have been our last contract

13   negotiations in 2006.

14         Q.   Were you present at those

15   negotiations?

16         A.   Yes.

17         Q.   Tell us how it came about that this

18   language was agreed to and put into the

19   Collective Bargaining Agreement.

20         A.   The union made a proposal asking the

21   company if we can obtain our CEU credits during

22   company time because that's how most

23   municipalities' operations work.

24              That language that we originally

Page 320

1   proposed was changed, and it was countered by

2   the company.  And that language there

3   ultimately ended up the way it is from the

4   company's counterproposal.

5        Q.  Had the company proposed anything in

6   connection with continuing education before

7   those negotiation -- or during those -- strike

8   that.

9             But for the union's proposal for

10  performing CEU credits on company time, had the

11  company any proposal in that regard?

12       A.  No.  We proposed that.

13       Q.  In the course of negotiating with the

14  company over 26.2, was anything said about

15  employees failing to maintain their license

16  would be grounds for discipline?

17       A.  No.

18       Q.  Or that discipline would result from

19  that at all?

20       A.  No.

21       Q.  What was the union's intendment or

22  intention in proposing 26.2?

23       A.  Again, the intent of that article was

24  to ask the company for help in obtaining CEU's

1   during company time.  And they countered a

2   proposal with that they would endeavor to help

3   us in-house, meaning training here at the

4   Woodridge facility with those CEU credits.

5       Q.  In the course of negotiating this back

6   and forth, did the company express any

7   different intention?

8       A.  No.

9       Q.  You are a water -- you hold a water

10   treatment license?

11       A.  Yes.

12       Q.  Have you worked in any pay grade other

13   than the license which you occupied at that

14   time?

15       A.  I'm sorry.  I don't understand the

16   question.

17       Q.  Okay.  Have you ever been paid a pay

18   grade other than the license which you

19   occupied?

20       A.  Yes.

21       Q.  And explain that to the Arbitrator,

22   please.

23       A.  As far as the previous pay grade?

24       Q.  Yes.

Page 322

1     A.   I was an operator in training for four

2   years.

3     Q.   And what were -- at what level were

4   you paid?

5     A.   I was paid at an operator in training

6   level.

7     Q.   And what license did you have at that

8   time?

9     A.   I had an A water license and a 3 sewer

10   license.

11     Q.   But you were paid at an operator in

12   training?

13     A.   Yes.

14     Q.   Okay.  Are you aware of any others who

15   were paid at a pay level other than the license

16   or classification that they occupied?

17     A.   There was at one time, but I can't

18   recall who it was now.

19     Q.   In the ten-year period that you've

20   been chief steward, with what frequency are

21   grievances resolved at the first or second

22   step?

23     A.   Very few, if any.

24     Q.   And of those that -- the few that may

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 323

1   be, have any of them involved, in your

2   experience, discharge or discipline?

3       A.   No.

4           MR. ORLOVE:   Nothing further.

5           ARBITRATOR MALIN:   You may

6   cross-examine.

7                   CROSS-EXAMINATION

8   BY MR. POTTER:

9       Q.   Have you ever informed the company or

10  has anyone to your knowledge with the union

11  informed the company that a steward, be it

12  chief steward or a standard steward, doesn't

13  have the authority to resolve grievances

14  resulting in discipline or discharge?

15      A.   No.   It's in our Collective Bargaining

16  Agreement, the language.

17      Q.   But I'm asking you have you ever

18  informed anyone with management or are you

19  aware of anyone with the union informing anyone

20  in management that a steward or a chief steward

21  doesn't have the power to resolve grievances

22  regarding discipline or discharge?

23      A.   No.   That's in our agreement.

24      Q.   So your answer is no, that's never

Page 324

1    been communicated to the company?

2         A.   It's in the agreement.

3         Q.   Outside of the agreement, has it ever

4    been communicated by the company by you or

5    any --

6         A.   Not that I'm aware of.

7         Q.   And you sat here and you heard Chris

8    Martens indicate that he had resolved a

9    disciplinary matter while he was a steward,

10   correct?

11        A.   Apparently he did.

12        Q.   And in fact, I mean you look at the

13   grievance arbitration procedures, Ray, if you

14   look at Step 1 on Page 25, it indicates that

15   the union steward will present it verbally, and

16   the two parties will endeavor to settle it,

17   correct?

18        A.   That's what it says there, yes.

19        Q.   And on Step 2, again, the appropriate

20   steward shall reduce the grievance in writing,

21   and then the parties shall meet to discuss the

22   grievance, correct?

23        A.   I'm sorry.  Can I see that?

24        Q.   Yeah.  I'm sorry.

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    A.   Yes.

2    Q.   Okay.   Let's see.   And again, it talks

3    about in the last sentence on Step 3:   If a

4    grievance is not satisfactorily resolved within

5    five working days of the filing at the Step 2,

6    then within five working days it goes to Step

7    3, correct?

8    A.   Yeah.   You started off by saying Step

9    3, but that's Step 2 --

10    Q.   I'm sorry.   Step 2.   Step 2 it says,

11    if it's not resolved, at this point the person

12    handling it is the steward, the appropriate

13    steward, correct, at Step 2?

14    A.   I'm sorry.   Can you repeat your

15    question?

16    Q.   Yeah.   I'm just trying to establish

17    that in Step 2 in the language in the contract

18    it says the grievance will be discussed by the

19    appropriate steward and the department head or

20    his designee.   And then if the grievance is not

21    satisfactorily resolved within five working

22    days of its filing at the Step 2 then it goes

23    to Step 3, correct?

24    A.   Well, you have five days to file, and

Page 326

1  then the company has five days to answer.

2      Q.  Right.

3      A.  And then it would go to a Step 3.

4  That's correct.

5      Q.  But it's resolved with a steward being

6  involved, correct?

7      A.  We rarely resolve anything at Step 2,

8  but...

9      Q.  At least in the language of the

10 contract?

11     A.  Right.

12     Q.  Okay.  All right.  And then Step 3,

13 you address it in terms of the chief steward

14 becoming involved, correct?

15     A.  Correct.

16     Q.  All right.  And if that matter is not

17 resolved, it goes to the fourth step, correct?

18     A.  Eventually, if it's not resolved at

19 Step 3, correct.

20     Q.  And again, the chief steward's in

21 charge of Step 3, correct?

22     A.  Correct.

23     Q.  For the union.  Okay.

24     A.  Can you repeat that last question?

Page 327

1      Q.  Yeah.  The chief steward is in charge

2  of the Step 3 processing on behalf of the

3  union?

4          MR. ORLOVE:  That's a

5  mischaracterization of the language.

6          THE WITNESS:  Yeah.  Step 3, we

7  usually involve the business agent --

8          ARBITRATOR MALIN:  There's an

9  objection pending.

10 BY MR. POTTER:

11     Q.  I'm sorry.  The Collective Bargaining

12 Agreement starts out with saying, The chief

13 steward shall notify the functional area

14 manager in writing of the union's intent to

15 proceed to the third step, correct?

16     A.  Yes.

17     Q.  And then the parties will set up a

18 meeting date, correct?

19     A.  That's when our business agent gets

20 involved, yes.

21     Q.  So there's no reference to the

22 business agent in Step 3 in terms of what's in

23 the Collective Bargaining Agreement, correct?

24         MR. ORLOVE:  That's not the correct

Page 328

1  characterization of the language in the

2  contract.  It says and the designated agent of

3  the union.

4  BY MR. POTTER:

5      Q.  But my question is is there a

6  reference to business agent or business

7  representative in that language regarding Step

8  3?

9      A.  The business agent's always involved

10  in Step 3.

11      Q.  But is there language expressing that

12  in Step 3?  No, it's not, is there?

13          MR. ORLOVE:  It says what it says.

14          THE WITNESS:  Well, it does say and a

15  designated agent.

16  BY MR. POTTER:

17      Q.  Well, I'm just saying those terms,

18  business agent --

19          ARBITRATOR MALIN:  We can all read it,

20  Mr. Potter.  Your point's been made.

21          MR. POTTER:  Okay.  Nothing further.

22          ARBITRATOR MALIN:  Redirect?

23

24

17086b9a-99e3-4c02-b8d8-0a34a317d803

REDIRECT EXAMINATION

BY MR. ORLOVE:

Q.  In Step 3 of the contract, who by practice in the union has been the quote, designated agent of the union?

A.  That's typically been our business agent, which would be currently Wayne Clavio.

MR. ORLOVE:  Nothing further.

ARBITRATOR MALIN:  Anything further of this witness?

MR. POTTER:  No.

ARBITRATOR MALIN:  Thank you, Mr. Rossa.  You're excused.

MR. ORLOVE:  Wayne Clavio is our next and last witness.

(The witness was duly sworn.)

ARBITRATOR MALIN:  Have a seat. Whenever you're ready, Mr. Orlove.

WAYNE CLAVIO,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ORLOVE:

1      Q.   State your name.

2      A.   Wayne Clavio.

3      Q.   To shorten this, Wayne, you've

4    previously testified that you are a full-time

5    officer of UFCW Local 1546?

6      A.   That's correct.

7      Q.   And you've serviced this unit for

8    about three years and that you get involved at

9    the third step of the grievance procedure?

10     A.   Correct.

11     Q.   I'm just stating what you previously

12   testified.

13          ARBITRATOR MALIN:   Back in April,

14   correct.

15   BY MR. ORLOVE:

16     Q.   Are those facts correct as of today?

17     A.   Agree as stated, yes.

18     Q.   Are you familiar with the contract

19   language of Section 13.2, that is the authority

20   of stewards in the Collective Bargaining

21   Agreement?

22     A.   13.2?

23     Q.   Let me show it to you.  13.2 of the

24   contract.

1    A.  Yes, I am.

2    Q.  And do stewards have the authority to

3  negotiate or agree to discipline including

4  discharge of employees?

5    MR. POTTER:  Well, I'd object because

6  I'll use Chuck's objection in the past that

7  contract speaks for itself.  So I'll use his

8  own objection back at him here.

9    MR. ORLOVE:  So stipulated.

10  BY MR. ORLOVE:

11    Q.  Directing your attention to

12  Article 26.2 of the Collective Bargaining

13  Agreement, were you involved in the

14  negotiations that occurred giving rise to this

15  current agreement?

16    A.  Yes, I was.

17    Q.  And were you involved in the

18  negotiations of 26.2?

19    A.  Yes, I was.

20    Q.  And to shorten this, unless Mr. Potter

21  objects, and certainly he can cross-examine,

22  were you present during the testimony given by

23  Ray Rossa?

24    A.  Yes, I was.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 332

1    Q.   And do you have anything to add or

2   change in connection with what he testified to

3   about the bargaining history of Article 26.2?

4    A.   No, sir.

5    Q.   Directing your attention to the case

6   of Glenn Williams, when did that first come to

7   your attention?

8    A.   I'm not sure who it was that first

9   called me.   It was shortly -- it was either

10  Chris Martens shortly after his meeting where

11  Glenn was suspended, or it was Ray the week

12  following that.

13   Q.   Ray Rossa?

14   A.   Ray Rossa, yes.

15   Q.   Let me show you what is in evidence as

16  Joint Exhibit 4, which is an unfair labor

17  practice charge against the union.

18           Was that charge referred to you

19  for handling internally in the union?

20   A.   Yes, it was.

21   Q.   And what did you understand the

22  company's claim to be in connection with that

23  charge?

24   A.   They felt we had a signed agreement in

1  regards to the restitution that was supposed to

2  be paid by Glenn Williams and that we had

3  reneged on the agreement.

4      Q.  And what was the union's position in

5  connection with that charge?

6      A.  By this point in time, we had gone all

7  the way -- I believe we had already had the

8  third-step grievance meeting.  And we had --

9  the company agreed, first of all, to hear the

10 third-step grievance meeting, okay?  And

11 Michael Jackson had actually responded to me

12 and was trying to negotiate a settlement.

13     Q.  And in connection with this charge,

14 tell us whether or not the union brought to the

15 attention of the Labor Board Article 13.2, that

16 is the authority of stewards?

17     A.  Yes, we did.

18     Q.  And I believe you have just said it,

19 but to make it clear, were you involved in the

20 third-step meeting with respect to the

21 grievance of Glenn Williams?

22     A.  Yes, I was.

23     Q.  That is his -- there were two

24 third-step meetings.  Let me make it clear.

Page 334

1          Were you involved in the first

2    third-step meeting involving Glenn Williams

3    with respect to his reduction in pay, the

4    payback requirements, and et cetera?

5          A.   Yes.   The first third-step grievance

6    meeting not only involved Glenn Williams, but

7    it involved the other two gentlemen here.

8          Q.   Involved them as well?

9          A.   Yes, it did.

10         Q.   Okay.  And you were involved in that?

11         A.   Yes, I was.

12         Q.   During the period of time that

13   followed that first third-step meeting, were

14   you in touch with Mr. Williams or he with you

15   about what to do with respect to the repayment

16   requirement that the company was insisting on?

17         A.   Can you restate the question?

18         Q.   I'm sorry.  I didn't say it that well

19   to begin with.  In fact, let me put that off to

20   the side for a moment.  Well, no.  Let me

21   restate it.

22              After that first third-step

23   meeting, which -- can you identify the date of

24   that, or do you recall the date of it?

Page 335

1    A.  Off the top of my head, I do not

2  recall the exact date.  I believe it was in

3  October of 2006.

4    Q.  Let me show you what we have put in

5  evidence the first hearing which is a redacted

6  copy of the company's third-step answer which

7  is addressed to you.  But you may want to make

8  reference to the date up at the top.

9    A.  Uh-huh.

10    Q.  Would that refresh your memory as to

11  when the third-step meeting -- the first

12  third-step meeting was?

13    A.  Yes, sir.  The first third-step

14  grievance meeting was on December 8th, 2006.

15    Q.  From that time, December 8, 2006, and

16  through to February, were there any

17  conversations between you and Glenn Williams on

18  the subject of the company's demand that he

19  sign an authorization to pay back money?

20    A.  Prior to the end of February, no,

21  there was not.

22    Q.  Directing your attention to about the

23  end of February, tell us if you had any

24  communications with the company over that

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    issue, that is the issue of him paying back

2    wages?

3        A.   At the end of February?

4        Q.   Yes.

5        A.   Yes.  Michael Jackson and I had had a

6    phone conversation.  He was requesting a

7    meeting, an immediate meeting that week.  And I

8    had just flown out of town to some pension

9    meetings that I was scheduled to be at through

10   that Friday night, Friday the second of March,

11   2007.

12       Q.   And was a meeting held on that subject

13   or was there communications on that subject?

14       A.   Michael and I talked at least twice

15   that week.  I believe we had two initial phone

16   calls, and then we had a conference call that

17   was on -- I believe it would have been on

18   Wednesday, February 28th.

19       Q.   Okay.  Let me direct your attention to

20   that conference call.  I gather by conference

21   call it was conducted by phone?

22       A.   Yes, it was.

23       Q.   And who participated in that

24   conference call?

1      A.  I believe -- well, I know Michael

2  Jackson and myself were on the line.  I believe

3  Steve was on the line.  And --

4      Q.  Steve Phillips?

5      A.  Steve Phillips and Chris Martens.

6      Q.  Okay.

7      A.  No, it wasn't Chris Martens.  It

8  was...

9      Q.  Another steward?

10     A.  Another steward, and his name is

11 escaping me at this second.  Erin Holden.

12     Q.  Erin Holden.

13         MR. ORLOVE:  And just for the record,

14 if it's necessary, Erin Holden is here or at

15 least reachable, but I'm -- and if the company

16 wishes, we can make arrangements to call him.

17 But I had made those arrangements.  But I just

18 wanted to explain his absence and that he's

19 available if someone wishes it.

20 BY MR. ORLOVE:

21     Q.  Tell us what happened during that

22 phone conversation, that conference call.

23     A.  Mike stated that -- Michael Jackson

24 stated that we had talked earlier in the week,

Page 338

1    and was I aware that either Glenn was going to

2    sign a repayment agreement with the company or

3    he would be terminated by the end of the week?

4                And I said yes, I was aware of our

5    conversations, and I was advising Glenn not to

6    sign the repayment agreement because it wasn't

7    reasonable.  I also stated that this was

8    already set to go to arbitration.  Why not just

9    let the arbitrator make that decision.  And

10   something this extreme didn't need to be

11   handled at this time.

12               Michael said if we did not get

13   that agreement signed by the end of the week,

14   that Glenn would be terminated.  And I asked

15   him -- in fact, I know I asked him more than

16   once what did Glenn do between the time he

17   returned from his suspension and now to warrant

18   termination?  And he said nothing.  He just

19   hasn't paid the money back, hasn't agreed to

20   pay the money back.

21        Q.   Anything else?

22        A.   I think I said to him, Do you realize

23   the liability you're opening up the company for

24   in regards to backpay by doing this?  And he

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    says yes, we do realize that, and we've

2    discussed that, and we decided if he did not

3    sign it that we will terminate him anyway.

4         Q.   Okay.   Have you told us everything you

5    can recall of that conversation?

6         A.   Yes, sir.

7         Q.   Did it come to your attention that

8    Mr. Williams was terminated?

9         A.   Yes.   I received calls immediately on

10   Friday.

11        Q.   And what, if anything, did the union

12   do in connection with that termination?

13        A.   First of all, it was shock over the

14   fact that they did it.   I didn't believe that

15   they did that to a 34-year employee.   Secondly,

16   got in touch with Ray Rossa, the chief steward,

17   on Monday following to make sure that

18   grievances had been filed.

19        Q.   Did the union take any legal action?

20   I'll show you what's in evidence as Joint

21   Exhibit 6.

22        A.   I did call your office for legal

23   advice on this issue.   Okay.

24        Q.   Well, did you authorize the filing of

Page 340

1  an unfair labor practice charge?

2      A.  Yes, I did.

3      Q.  And showing you Joint Exhibit 7, is

4  that the regional -- NLRB regional office's

5  disposition of that charge?

6      A.  Yes, it is.

7      MR. ORLOVE:  Thank you.  No further

8  questions.

9                  CROSS-EXAMINATION

10 BY MR. POTTER:

11     Q.  Well, turning back to Union

12 Exhibit 14, which was previously submitted in

13 the prior arbitration hearing, at the bottom of

14 that letter to you, Wayne, from Mike Jackson,

15 number one, it's dated December 21, 2006,

16 correct?

17     A.  Yes, it is.

18     Q.  So that was way before this meeting at

19 the end of February, right, the conference

20 call?

21     A.  Yes, it was.

22     Q.  Okay.  And in there the company was

23 providing until only December 29 to get the

24 matter resolved, correct?

1    A.   They wanted an answer by the 29th.

2    Q.   So again, we're going back -- way back

3  to the 29th when we were putting the union on

4  notice that the company was pressing forward

5  with this matter, correct?

6    A.   But if you read that completely, it

7  said, If they don't hear by the 29th, the

8  company will assume the matter will proceed

9  under the grievance arbitration procedure.

10    Q.   And that these grievances will be

11  considered denied by the company at the third

12  step, correct?

13    A.   Right.

14    Q.   So the next step being arbitration?

15    A.   Correct.

16    Q.   Okay.  And this -- actually, this

17  communication between you and Mr. Jackson going

18  back to December was an attempt to resolve

19  these outstanding issues on the repayment plan

20  in particular, correct?

21    A.   That was one part of it, yes.

22    Q.   Right.  Okay.  And did the union offer

23  any sort of counterproposal to what was

24  submitted by Mr. Clavio -- by Mr. Jackson to

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 342

1    you in December?

2         MR. ORLOVE:  Well, I'll object to any,

3    quote, settlement discussions.

4         ARBITRATOR MALIN:  I'll allow the

5    question as to whether a counterproposal was

6    offered, but I will sustain an objection if the

7    next question is what was offered.

8         MR. POTTER:  No, no, no, no.

9         ARBITRATOR MALIN:  Proceed.

10   BY MR. POTTER:

11        Q.  Was there a counterproposal made by

12   the union in response to Mr. Jackson's

13   communication to you?

14        A.  Michael and I did discuss it, yes.

15        Q.  Did you make a counterproposal though?

16        A.  I don't believe I did.

17        Q.  Okay.  In fact, from that point --

18   from December, this correspondence with

19   Mr. Jackson on December 21st through the

20   discharge of Mr. Williams, the union never

21   presented any counterproposal?

22        A.  I don't --

23        MR. ORLOVE:  Objection just on

24   relevance.

17086b9a-99e3-4c02-b8d8-0a34a317d803

Page 343

1          ARBITRATOR MALIN:  That's overruled.

2          THE WITNESS:  I don't believe so.

3   BY MR. POTTER:

4      Q.   Okay.

5      A.   Not that I can recall.

6      Q.   Now is your time to recall.

7      A.   I know I did not respond in writing

8   with a counterproposal.  It may have been

9   something discussed verbally.  I do not recall.

10         MR. POTTER:  That's all.

11         ARBITRATOR MALIN:  Anything further?

12         MR. ORLOVE:  Briefly.

13              REDIRECT EXAMINATION

14   BY MR. ORLOVE:

15     Q.   Just to keep the time lines current in

16   our respective minds, although it is in the

17   record, let me show you Joint Exhibit 2 and ask

18   you if you authorized these matters to be

19   forwarded to arbitration as indicated on

20   Joint 2?

21     A.   Absolutely, yes.

22     Q.   And that's dated February 7, 2007?

23     A.   Correct.

24     Q.   So in early February the union was

Page 344

1    demanding arbitration, and shortly thereafter

2    the company was demanding Mr. Williams'

3    discharge?

4        A.   Correct.

5            MR. ORLOVE:   That's all I have.

6            ARBITRATOR MALIN:   Anything further of

7    this witness?

8            MR. POTTER:   No.

9            ARBITRATOR MALIN:   Thank you,

10   Mr. Clavio.

11                (Witness Excused)

12           MR. ORLOVE:   And the union rests.

13           ARBITRATOR MALIN:   Any rebuttal from

14   the company?

15           MR. POTTER:   Just a short one so we

16   can all get out of here.

17           ARBITRATOR MALIN:   You ready or do you

18   need a minute?

19           MR. POTTER:   Give me a minute.

20           ARBITRATOR MALIN:   Sure.

21                (Break Taken)

22           ARBITRATOR MALIN:   Mr. Phillips,

23   welcome back.   Just a reminder, the oath that

24   you took earlier continues.

1          THE WITNESS:   Okay.

2               REDIRECT EXAMINATION

3    BY MR. POTTER:

4        Q.   Couple of things that Ray Rossa

5    brought up in his testimony I wanted to cover

6    with you, Steve, in particular.   One was this

7    item that Ray mentioned that there were others

8    in the workforce who were paid at a rate

9    different than the license occupied, as he put

10   it.

11            For example, he had -- he was an

12   operator in training and has a B license but

13   isn't paid at the B level.   Can you explain

14   that to the Arbitrator why that is?

15       A.   Yes.   When we bid positions -- there's

16   bid positions, whether it's operator in

17   training or a Class 2.   When we bid a position,

18   that's the rate of pay.   That's what we're

19   paying them for, is that operator in training

20   level.

21            If we bid a Class 2 waste water

22   license, that's the position we're bidding for.

23   That's the rate of pay we'll pay regardless of

24   obtaining a higher license.

Page 346

1    Q.   So the classification controls over

2  the license?

3    A.   The job bid.

4    Q.   In terms of pay rate?

5    A.   Uh-huh.

6    Q.   Okay.  And Ray also discussed under

7  26.2, going back to negotiations, which I know

8  you testified you were involved in, 26.2, the

9  continuing education requirement in the

10  contract, I want to address that in terms of

11  the company's intent in terms of negotiations

12  on that language.

13            The final format was the company's

14  language for the first sentence?

15    A.   Yes.

16    Q.   Okay.

17    A.   Yes.

18    Q.   And what was the company's intent if

19  the employees did not maintain their CEU

20  credits?

21    A.   Well, the intent or the reason we put

22  the language in is it's mandatory.  The EPA

23  states that, you show, you need 15 hours or

24  30 hours to maintain your license.  We wanted

1  to make that loud and clear.  It's very very

2  important that operators maintain and get the

3  training, the refresher training, just to keep

4  them up to speed on new events, new

5  technologies because you guys are handling it.

6  You're touching it.  You're actually putting

7  that end product in the system.  You're dealing

8  with chemicals.  You're dealing with the new

9  technology.

10            There's new regulation out there

11  as well.  And it's -- public health and safety

12  is very very important, particularly with the

13  new regulations now.  And it's just -- we felt

14  it was imperative that that needs to be

15  maintained.  It's continuing education for all

16  of us, myself included.

17      Q.  And if they fail to maintain their

18  license?

19      A.  They fail to maintain it, that's...

20      Q.  The company's intent was what?

21            MR. ORLOVE:  Well, are we talking

22  about the contract, or are we talking about

23  failing to maintain licenses?  I'm...

24            MR. POTTER:  The language in the

1  contract.  I mean, the company's intention in

2  drafting this language was that if the employee

3  failed to maintain the license, what would

4  happen?

5         MR. ORLOVE:  That's not what it says.

6  That's not what the language says.

7         ARBITRATOR MALIN:  Mr. Orlove, you may

8  cross-examine on this.

9         THE WITNESS:  The intent is we have an

10  issue.  We have a serious issue.

11  BY MR. POTTER:

12     Q.  That might result...

13     A.  In discipline, definite discipline.

14     Q.  Which is where we're at here?

15     A.  Exactly.

16     Q.  The union's counsel repeatedly in the

17  testimony for his witnesses established that

18  the grievants in these matters pending return

19  of their license operated as operators in

20  training and basically performed the same job

21  functions they did before and yet didn't get

22  paid in the same level.  And what's the

23  company's response to why that action was

24  taken?

1      A.  It was simply number one, they didn't

2  maintain -- they didn't maintain and get their

3  required CEU hours that were required to

4  maintain that license.  We view that as part of

5  the job.  Staying current with a refresher

6  training, new technologies, new regulations,

7  that's all a part of it, continuing education.

8  Very very important that our operators are up

9  to speed.

10     Q.  Why?  I mean, does Illinois EPA care?

11     A.  Yes.

12     Q.  Why?

13     A.  You're dealing with the public health

14  and safety.  It's water.  We're dealing with

15  water.

16     Q.  And in terms of the employees working

17  as an operator in training and receiving --

18  strike that.

19         MR. POTTER:  That's all.

20         ARBITRATOR MALIN:  You may cross.

21            RECROSS-EXAMINATION

22  BY MR. ORLOVE:

23     Q.  Let's revisit Section 26.2 again.  The

24  subject arose by the union; is that correct?

1          A.   That's correct.

2          Q.   The company had no initial proposals

3    with respect to the subject of maintaining

4    licenses; is that correct?

5          A.   That's correct.

6          Q.   Okay.  You told us what the company

7    intended -- strike that.

8               MR. ORLOVE:  Nothing further.

9               ARBITRATOR MALIN:  Anything further of

10   this witness?

11              MR. POTTER:  No.

12              ARBITRATOR MALIN:  Okay.  Thank you

13   very much, Mr. Phillips.  You're excused.

14   Anything further in rebuttal?

15              MR. POTTER:  No.

16              ARBITRATOR MALIN:  Anything further

17   from the union?

18              MR. ORLOVE:  No, sir.

19              ARBITRATOR MALIN:  Okay.  Both parties

20   rest.  Let's go off the record.

21                    (Discussion off the Record.)

22              ARBITRATOR MALIN:  The record should

23   reflect in the off-the-record discussions among

24   counsel and the Arbitrator, counsel have agreed

17086b9a-99e3-4c02-b8d8-0a34a317d803

1    to file briefs in this matter.  We've agreed

2    the briefs will be due 30 days following

3    receipt of the transcript.  When I receive my

4    copy of the transcript, I will e-mail counsel

5    advising the date of receipt.  The 30 days will

6    run from that date.  Briefs will be filed with

7    the Arbitrator via e-mail and will be exchanged

8    by the Arbitrator via e-mail.  Gentlemen,

9    anything further before we adjourn?

10              MR. POTTER:  I don't believe so.

11              MR. ORLOVE:  The union has nothing.

12              ARBITRATOR MALIN:  Thank you.  We are

13   adjourned.

14                        (Which were all the

15                        proceedings had in the

16                        above-entitled cause this

17                        date and time.)

18

19

20

21

22

23

24

17086b9a-99e3-4c02-b8d8-0a34a317d803

```
 1    STATE OF ILLINOIS    )
                           ) SS.
 2    COUNTY OF COOK       )

 3

 4              PAMELA A. STAFFORD, being first

 5    duly sworn on oath says that she is a court

 6    reporter doing business in the City of Chicago

 7    and that she reported in shorthand the

 8    proceedings of said hearing and that the

 9    foregoing is a true and correct transcript of

10    her shorthand notes so taken as aforesaid and

11    contains the proceedings given at said hearing.

12

13

14          Pamela A. Stfld
                    _____
15          Notary Public, Cook County
            Illinois,
16          My Commission expires 5/31/2010

17

18
                        "OFFICIAL SEAL"
19                      Pamela A. Stafford
                    Notary Public, State of Illinois
20                  My Commission Exp. 05/31/2010

21

22

23

24
```

MAYLEEN MENDELSON COURT REPORTING
(773) 761-0449