

Illinois
American Water®

## LAST CHANCE AGREEMENT

This Agreement is between Glen Williams (Employee), Illinois-American Water
Company (Company) and UFCW Local #1547 (Union).

1.      On August 18, 2006 and November 7, 2006, the Company issued letters citing
the Employee for two separate violations of the Code of Conduct Number 12 -- Neglect
of Assigned Duties. Under the Code of Conduct, the Employee normally would be
subject to termination for a second violation of that provision. Because of circumstances
in this case, the parties desire to give the Employee an opportunity to continue his
employment, on a last chance basis, subject to the following conditions:

- The Employee will be suspended for thirty (30) days without pay effective
  November 7, 2006. The Employee acknowledges that the Company had just
  cause to issue this suspension.
- The Employee will make restitution for the overpayment (difference in pay
  between his Operator pay rate and the Operator in Training pay rate) for not
  having his IEPA Class A Water License from 1/1/06 through the most recent date
  Employee received payment at the higher rate. The Employee will arrange a
  payment schedule with the Company within two weeks after he signs this
  Agreement. Restitution will be completed within a 12 month period.
- The Employee will obtain an IEPA Water License, at least at a Class "B" level,
  within six months from the signing of this Agreement.

2.      Failure to comply with any of these conditions will result in immediate
termination. Further, any future violation of Company policy or procedures, including the
Code of Ethics, the Safety Code or the Code of Conduct, will result in the Employee's
immediate termination. The Union and the Employee expressly waive any right to file a
grievance or other claim regarding Employee's discharge under this Agreement, except
to contest the fact of what occurred. If the conduct occurred, an Arbitrator will not have
any authority to modify the discharge to a lesser penalty.

3.      The Employee and the Union agree not to disclose the terms and conditions of
this Agreement or the negotiations leading up to this Agreement to any third party unless
authorized to do so by the Company or required by law.

4.      In consideration for this Agreement, the Employee agrees to release the
Company (and all related persons and entities) and the Union (and all related persons
and entities) from all claims, actions, demands or liabilities for injuries or damages or
other remedy, whether known or unknown, regarding the suspension of his employment
and the effects of the suspension. Employee's release includes all claims under the law
and all grievances under the Collective Bargaining Agreement.

5.      This Agreement reflects the parties' entire agreement, and it merges all
agreements, representations, and understandings among the parties, whether oral or
written, or both. As to Employee, this Agreement supersedes any conflicting provision or
right under the parties' collective bargaining agreement. This Agreement may only be
changed by a writing signed by all of the parties.

EXHIBIT

tabbies

4



RWE Group

6.      Any disputes regarding the meaning of this Agreement will be resolved solely through the parties' collective bargaining agreement grievance-arbitration procedure.

7.      The parties agree to each provision and term of this Agreement. Any invalid provision or term shall not invalidate the remaining provisions and terms.

8.      The Employee understands the meaning of this Agreement and the Employee's responsibilities under this Agreement. The Employee voluntarily agrees to these terms because they are in the Employee's best interest and waives any right to further advice regarding the Agreement or further time to consider the Agreement.

9.      This Agreement is made on a non-precedent setting basis. That is, it shall neither be used nor referred to in the case of any other employee.

IN WITNESS WHEREOF, the parties have executed this Last Chance Agreement.

_____  11/7/06
EMPLOYEE                             Date

_____  11/7/06
FOR THE UNION                    Date

_____  11/7/06
FOR THE COMPANY            Date

|  |  |
|---|---|
| In The Matter of the Arbitration Between | ) |
|  | ) |
| United Food and Commercial Workers Local 1546 | ) |
|  | ) |
| and | ) |
|  | ) |
| Illinois-American Water Company | ) |
|  | ) |
| No. 51 300 00214 07[1] | ) |

## OPINION AND AWARD

The hearing in the above captioned matter was held on November 20, 2007, at the Company's facility in Woodridge, Illinois, before Martin H. Malin, serving as the sole impartial arbitrator by selection of the parties. The Union was represented by Mr. Charles Orlove, its attorney. The Company was represented by Mr. Terry Potter, its attorney. The hearing was held pursuant to a collective bargaining agreement between the parties effective May 11, 2006 – April 30, 2009 (Jt. Ex.1).

At the hearing, both parties were afforded full opportunity to call, examine and cross-examine witnesses, introduce documentary evidence and present arguments. A verbatim record of the proceedings was maintained and a transcript prepared. Both parties filed post-hearing briefs.

## The Issues

The parties stipulated that the issues before me include (Tr. 91-92):

1. Whether the Company had cause to discipline Dan Leppert, Ken Nelson, and Glenn Williams in October and November of 2006?

2. Whether the Company had cause to terminate Glenn Williams on March 2, 2007?

The Union proposes the following additional issue, which the Company contends is more properly analyzed as part of the just cause inquiry:

3. Whether the extent or amount of discipline administered or given to employees Leppert, Nelson and Williams in October and November 2006 was appropriate under the circumstances of this case?

---

[1]This matter was initially filed with the American Arbitration Association which assigned the case number. On March 1, 2007, pursuant to the parties' agreement, AAA terminated its administration of this matter.

**EXHIBIT**

C

I agree with the Company that the Union's proposed third issue is already encompassed within the two stipulated issues.

**The Contract**

The following provisions of the collective bargaining agreement have been cited as relevant to the instant proceedings:[2]

Article II, Management Rights, provides:

**Section 2.1. Generally.**  Subject to the provisions of this Agreement and its grievance procedure, the Company may exercise its own discretion in any or all of the following matters: to decide on all machines, tools, materials, and equipment to be used; to move or remove any plant or office or any of its parts to other areas; to determine the work schedules and assignments of employees; to determine the process for wastewater and water treatment; to maintain order and efficiency in its plants and operations; to hire, lay off, assign, transfer, and promote employees; to determine job content and pay classifications independently of any state or local licensing arrangement; to determine starting and quitting times; to determine the number of hours to be worked; to establish such reasonable rules and regulations, not in conflict with this Agreement, as it may from time to time deem best for the purposes of maintaining order, safety and effective operation of its plants, and after advance notice thereof to the Union and other employees, to require compliance therewith by employees, and discipline and discharge post probationary employees for cause subject to the grievance procedure.

. . . . .

Article XIII, Stewards, provides:

. . . . .

**Section 13.2. Authority.**

The authority of Stewards and Chief Steward shall be limited to the following activities:

The investigation and presentation of grievances to the Company as provided herein.  The Stewards shall accept and present grievances, except for emergency situations, the first thing in the morning before leaving for the job site after obtaining approval from their immediate supervisor or his or her designated replacement.

---

[2]For purposes of brevity, I have not reproduced all of the contract provisions cited by the parties.  I wish to assure the parties that I have considered every provision they have cited, even though I may not have reproduced all of them.

Reasonable time necessary for processing or investigating such grievances will be during regular work hours and shall be paid for by the Company.

Article XIV, Grievance and Arbitration, provides:

. . . . .

### Section 14.2. Procedure.

Step 1: If any employee has a grievance, the employee and/or his/her Union Steward shall, within five (5) working days of its occurrence, present it verbally to his or her immediate supervisor, and the two parties shall endeavor to settle it. If the grievance is not resolved within five (5) working days of its filing, then within five (5) working days...

Step 2: The appropriate Steward shall reduce the grievance to writing and present it to the head of the functional area. The parties shall at that time set a meeting to discuss the grievance within forty-eight (48) hours or a reasonable time agreed upon by the parties. The grievance shall be discussed by the appropriate Steward and the department head and/or his/her designee. The grievant will be allowed to attend this second step meeting if his or her presence will significantly assist in the resolution of the grievance. If the grievance is not satisfactorily resolved within five (5) working days of its filing at this Step 2, then within five (5) working days...

. . . . .

Article XV Discipline and Discharge, provides:

**Section 15.1. Discipline for Cause.** The right to discipline or discharge an employee for cause shall be vested solely in the Company. The Union shall have the right in such cases to investigate the reasons therefore and to protest such discipline or discharge through the grievance procedure.

Article 26 Health, Welfare, Pension and 401(K) Plans, provides:

. . . . .

**Section 26.2. Continuing Education.** It is understood the employee will be responsible to áquire (sic) enough CEU credits to maintain their license. The Company shall endeavor to provide assistance through online courses and in house training.

Background

The instant grievances concern the discipline of Glenn Williams, Dan Leppert and Ken Nelson by the Company and the subsequent discharge of Glenn Williams. The expiration of the water licenses issued by the Illinois Environmental Protection Agency (IEPA) to each of these employees precipitated the disciplinary actions and the discharge.

The Company provides water and wastewater services in Illinois. The Grievants have all been employed by the Company as operators whose job descriptions include responsibility for the operation, routine servicing and care of plant equipment for wastewater treatment and/or water treatment processes (Co. Ex. 2). The minimum requirements for the position of operator include, among other things, state licensing as either a Class S-3 Wastewater Treatment Plant Operator or a Class C Water Plant Operator (*Id.*). Such operator licenses are issued by the IEPA to the operators and must be renewed every three years. Prior to 2003, renewal of a license was accomplished by payment of a renewal fee. As of 2003, the IEPA required continuing education to renew and maintain operator licenses. Holders of Class C water plant operator licenses must receive 15 units of continuing education every three-year period in order to renew their licenses. Holders of Class A or B water plant operator licenses must receive 30 units of continuing education to renew their licenses.

The Company has issued an "Employees' Guide for Conduct" (Co. Ex. 8). The Guide provides:

> In instances where acts are committed which are judged to be detrimental to fellow employees, the Company, and/or the public, disciplinary action is necessary. This policy is intended to insure impartial treatment in such instances. Disciplinary actions are to be taken as they relate to the offense specified. The Company does not waive the right to impose disciplinary action for an act not specifically enumerated in this Guide, nor does the Company waive its right to impose more or less severe discipline than specified, should circumstances so warrant.

The Guide provides four levels of discipline: 1, counseling and warning; 2, one to five days suspension; 3, more than five up to a maximum of thirty days suspension; and 4, discharge. The enumerated offenses include, "12. Neglect of assigned duty (including sleeping on the job during working hours)," which is indicated as a level 3 for a first offense and a level 4 for a second offense.

Mr. Williams testified that he has been employed by the Company or its predecessors since 1974 and that his most recent position had been that of operator (Tr. 265). On August 18, 2006, Mr. Williams received a five workday suspension for neglect of duty in violation of Offense number 12. The notice indicated that Mr. Williams was disciplined for failing to respond promptly to a water main break and two other emergencies on July 22, 2006, after indicating to the Central Control Operator that he would respond (Co. Ex. 10).

Mr. Williams testified that he had held a Class A water license (Tr. 266). Mr. Williams related that he received a telephone call on October 10, 2006, from an IEPA representative who informed him that his license had expired and that he would be required to retest in order to receive a new license (Tr. 266). Several days later, Mr. Williams notified his supervisor, John Stein, that his license had expired and requested Mr. Stein to provide him with a "letter of entrance" so that he could take the examination for a license (Tr. 267).

Stephen Phillips, the Company's production superintendent, testified that, after Mr. Williams had notified his supervisor of the expiration of his water license, the Company contacted the IEPA to determine whether the licenses of any of its other employees had expired (Tr. 137-38). Mr. Phillips testified that the Company learned that the licenses of Dan Leppert and Ken Nelson had also expired (Tr. 138). Mr. Phillips related that he and Mr. Stein interviewed each of the three employees in separate meetings on October 19, 2006, and interviewed each of them a second time on October 24, 2006, to investigate the circumstances regarding the expiration of their water licenses (Tr. 137-46). Chief Steward Ray Rossa accompanied each of the Grievants in the meetings on October 19 (Tr. 224, 246, 267) and either Mr. Rossa or Steward Chris Martens attended the meetings on October 24 (Tr. 140, 143, 248-49, 270).

Mr. Phillips testified that he met with each of the Grievants again on November 7, 2006, to present them with the Company's determination of discipline. Mr. Phillips testified that Mr. Stein again accompanied him in each of these meetings on November 7, and that Steward Chris Martens attended the meetings along with the Grievants.

Mr. Phillips and Mr. Stein delivered a written notice of discipline to Dan Leppert dated November 7, 2006, (Un. Ex. 3) pursuant to which Mr. Leppert was suspended for 15 workdays without pay for allowing his Water License to expire, which the Company considered as neglect of assigned duty, Offense Number 12 of the Employees' Guide For Conduct. The notice of discipline also informed Mr. Leppert that "you will remain at your current pay rate based on the Waste Water License you have maintained; however we expect you to obtain a Water License as well." (Un. Ex. 3). Mr. Leppert was granted six months from the date of that notice to reinstate his Class C Water License (*Id*).

Mr. Phillips and Mr. Stein delivered a written notice of discipline to Ken Nelson dated November 7, 2006, (Un. Ex. 2) pursuant to which Mr. Nelson was also suspended for 15 workdays without pay. In addition, the Company required Mr. Nelson to repay the difference between the hourly rate of an Operator in Training and the hourly rate that he had received for the entire year of 2006. In that written notice, the Company asserted that it had relied on Mr. Nelson's representation that he had and maintained a Class B Water License and that he had been overpaid since his license expired on July 1, 2004. The notice stated that Mr. Nelson's failure to make the repayment within a one-year period would result in further discipline. Mr. Nelson was also informed that he would have six months within which to reinstate his Water License, at which time he would be reinstated to the Operator pay rate. Upon such reinstatement, however,

he would be paid at the standard Operator rate pursuant to the Collective Bargaining Agreement, and that the higher rate at which he had been grandfathered since the Company's predecessor acquired Metro Utility Company in 1994 would no longer apply.

Mr. Phillips and Mr. Stein also delivered a written notice of discipline to Glenn Williams dated November 7, 2006, together with a two-page Last Chance Agreement attached thereto (Un. Ex. 1). The notice recited that Mr. Williams's Water License had been expired for over nine years, since July 31, 1997. The notice further referred to Mr. Williams's 2006 five-day suspension for Offense Number 12 and that the Guide recommends termination for a second such offense. The notice related that because Mr. Williams brought the lapse of his license to the Company's attention, the Company was willing to forego termination and offer a Last Chance Agreement. As set forth in the notice of November 7, the Company suspended Mr. Williams for 30 workdays without pay, required reimbursement of the difference between the pay rate of an Operator in training and the rate that Mr. Williams had received during 2006 (predicated upon the Company's reliance on the representation of Mr. Williams that he had maintained his Class A Water License), and allowed Mr. Williams to be reinstated to the Operator rate upon successfully reinstating his Water License within six months, but that the higher rate at which he had been grandfathered since 1994 would no longer apply.

The Last Chance Agreement referenced the two violations of Code of Conduct Number 12 and stated, "Under the Code of Conduct, the Employee normally would be subject to termination for a second violation of that provision. Because of the circumstances in this case, the parties desire to give the Employee an opportunity to continue his employment, on a last chance basis, subject to the following conditions . . ." (Un. Ex. 1). The conditions specified that Mr. Williams would be suspended for 30 days and acknowledged that the Company has just cause to issue the suspension; Mr. Williams would make restitution for the difference in pay between his Operator pay rate and the Operator in Training rate for 2006 and arrange a repayment schedule within two weeks providing for repayment within 12 months; and Mr. Williams would obtain an IEPA Water License at least at a Class B level within six months. It further provided, "Failure to comply with any of these conditions will result in immediate termination," that Mr. Williams released all claims under the law and all grievances under the contract, and, "This Agreement reflects the parties' entire agreement, and it merges all agreements, representations, and understandings among the parties, whether oral or written, or both."

Mr. Phillips testified that he and Mr. Stein presented the disciplinary suspension and Last Chance Agreement to Mr. Williams and Mr. Martens on November 7, 2006, and explained the suspension and agreement to them (Tr. 154-55). Mr. Phillips testified that Mr. Williams and Mr. Martens read the agreement, "they took some time to go through it, they signed it, then there was really no questions." (Tr. 155). In his testimony, Mr. Williams acknowledged signing the Last Chance Agreement but stated, "I basically quickly scanned it. I didn't – I didn't read it word for word." (Tr. 272). "This is a high-stress, high-anxiety moment, so I actually needed more time to digest this, to be honest with you." (Tr. 273). Mr. Williams testified that he did not ask for more

time to review the agreement or discuss the need for more time with Mr. Martens (Tr. 294-95). Mr. Martens testified that he did not want to see Mr. Williams get fired and he "figured we'd sign it, and then we'd file a grievance and deal with it later." (Tr. 302).

At Step 1 of the grievance procedure, Mr. Martens, presented verbal grievances to Mr. Stein on behalf of all three Grievants, essentially contending that the discipline administered by the Company had been too severe in each instance. (Un. Ex. 8 (Williams), Un. Ex. 10 (Nelson) and Un. Ex. 12 (Leppert)). Mr. Stein denied those Step 1 grievances. Mr. Martens and Mr.Phillips participated in Step 2 Meetings on November 16, 2006, and the Company again denied the grievances (Un. Ex. 9 (Williams), Un. Ex. 11 (Nelson), Un. Ex. 13 (Leppert)). Step 3 meetings were conducted on December 8, 2006, concerning the grievances of each of the three employees. Mike Jackson, the Company's production manager, testified that he and Union Vice President and Business Representative Wayne Clavio participated in those Step 3 meetings, along with Mr. Phillips, Mr. Rossa and Mr. Martens (Tr. 214). The grievances remained unresolved and this arbitration ensued.

Mr. Leppert testified that he had been an employee of the Company or its predecessors since 1983, but that he had not signed any documents or reports to the IEPA as a licensed operator or "responsible charge" for the water systems since Citizen's Utilities, the immediate predecessor to the Company, acquired Metro Utility in 1994 (Tr. 224-26). Mr. Leppert also testified that, after the Company learned of the expiration of his Water License and reduced his pay rate to that of an Operator in Training, his duties, responsibilities and supervision did not change in any way (Tr. 229). In addition, Mr. Leppert testified, the IEPA took no action against him on account of his license having expired or his having worked without a license (Tr. 235). Mr. Leppert also testified that the Water License test could only be taken on the first Monday of every month and that he was unable to take the test until June 4, 2007, which was beyond the six month period within which the Company had required him to obtain reinstatement of his license (Tr. 233-34). Mr. Leppert testified that the Company did not fire him or otherwise discipline him for having failed to comply with the six month deadline for reinstating his license, but instead issued a letter to him dated May 30, 2007, requiring him to obtain reinstatement within 60 days of the date of that letter or be terminated (Un. Ex. 16, Tr. 234).

Mr. Nelson testified that he had been an employee of the Company or its predecessors since 1969, but that, like Mr. Leppert, he had not signed documents or reports to the IEPA as a licensed operator since the acquisition from Metro Utility in 1994 (Tr. 248). Mr. Nelson also testified that his duties, responsibilities and supervision did not change during the period in which his license was expired (Tr. 251-52) or the time for which he was paid at the rate of an Operator in Training (Tr. 264). Mr. Nelson also testified that the IEPA took no action against him as a result of his license expiration or because he was working without a license (Tr. 252). In addition, Mr. Nelson testified that, during his suspension, he received a letter from the Company regarding payroll deductions for the amount that he was required to repay the Company, but that he did not sign that letter and never paid any amounts to the Company as required by the disciplinary suspension notice of November 7, 2006 (Tr. 252-53). Despite his

failure to make such payment, Mr. Nelson testified, he did not suffer any further discipline or discharge by the Company (Tr. 255).

Mr. Williams testified that he had obtained his water license in 1994 and that it expired in 1997, but that he never received the renewal notice because he had moved to a new residence in 1995 (Tr. 269). Mr. Williams also testified that while his license was expired and he was being paid at the rate of an Operator in Training, there was no change in his duties or supervision (Tr. 276). Mr. Williams also testified that the IEPA took no action against him because his license had expired or because he had been working without a license (Tr. 277). Mr. Williams testified that, while he was on suspension, he received telephone messages from Messrs. Phillips and Stein concerning the repayment agreement that the Company wanted him to sign, but that the Company mailed the agreement to the wrong address (Tr. 278-79). Mr. Williams testified that he received a telephone call from Mr. Clavio in late February 2007, informing him that the Company was going to call him in to sign a repayment agreement, but that the Union was advising him not to sign it, even if that would result in his termination (Tr. 281). Mr. Williams testified that he attended a meeting on March 2, 2007, with Messrs. Phillips, Stein and Martens, that Mr. Phillips gave him an opportunity to sign a repayment agreement but that Mr. Williams followed Mr. Clavio's recommendation and declined to do so (Tr. 282-83). At that time, Mr. Phillips delivered a notice dated March 2, 2007, to Mr. Williams that referenced the union's position concerning the repayment requirement and terminated the employment of Mr. Williams (Un. Ex. 5, Tr. 282-84). Shortly thereafter, the union initiated a grievance protesting Mr. Williams' termination, which grievance is also the subject of this arbitration.

Mr. Phillips testified that one of the minimum requirements for the position of Operator at the Company is to have either a water license or a wastewater license from the state (Tr. 109-11). Mr. Phillips also testified that Appendix A to the Collective Bargaining Agreement sets forth "different classifications for licensing that is held ranging from operator in training all the way up to central control operator" so that the operators get paid as a function of the level of license they hold (Tr. 118). With respect to Mr. Nelson, Mr. Phillips testified that the Company reduced his pay status to that of an Operator in Training because he no longer held the proper licensing for an operator (Tr. 151). Mr. Phillips initially testified that Mr. Nelson's pay was a function of his job duties but when prompted by counsel corrected himself, stating that it was a function of Mr. Nelson's license (Tr. 152). With respect to Mr. Leppert, Mr. Phillips testified that his pay level remained the same because he had maintained a waste water license; nevertheless he was suspended because he was operating water facilities and did not maintain his water license (Tr. 153). Mr. Phillips acknowledged that all three of the employees continued working without licenses and that their duties and supervision remained unchanged during that time (Tr. 186-87). Mr. Phillips also testified that IEPA knew that the employees' licenses had expired but did not instruct the Company to take those employees out of service (Tr. 190). Mr. Phillips also acknowledged that the IEPA took no action against either the Company or the three employees as a result of the expiration of their licenses (Tr. 178-79).

Mr. Jackson, the production manager, testified that the payment of wages is "based on

their licensing and what their particular job is." (Tr. 222). On cross-examination, Mr. Leppert testified that different levels of operators received different levels of pay pursuant to Appendix A of the Collective Bargaining Agreement (Tr. 241). Mr. Nelson testified that Mr. Phillips had pointed out to him the relationship between licenses and pay levels in the Collective Bargaining Agreement, but that he had understood that wages were based upon job classification rather than licenses (Tr. 256, 260-61). Mr. Williams testified that he understood that a Class A license operator gets paid more than a Class B, but that he was being paid for the knowledge in his head as well as the license that he held (Tr. 288). Mr. Rossa, the Chief Steward, testified that he had been paid at the level of an Operator in Training for a period of three years although he held a Class A Water License and a Class 3 Sewer (Waste Water) license at the time (Tr. 322). Mr. Phillips testified in rebuttal that when the Company bids a particular position or job classification, the level of pay is determined by that job level without regard to whether the particular employee has a higher level of license (Tr. 345-46).

Mr. Phillips testified that, pursuant to the grievance procedure under the Collective Bargaining Agreement, the shop steward normally presents grievances at Steps 1 and 2 to the supervisor and that, as a matter of practice, grievances are resolved in those first two steps (Tr. 156-57). The Company introduced records of a grievance resolved at a Step 2 meeting by Mr. Rossa (Co. Ex. 11). More generally, Mr. Phillips testified that, from time to time, a steward is able to resolve a grievance at the first or second step of the procedure (Tr. 167). He also stated that, while stewards may be able to resolve 25 percent of grievances at the first or second step, their goal is to resolve 100 percent of such grievances (Tr. 168). On cross-examination, Mr. Phillips acknowledged that all discharge or discipline cases end up at Step 3 of the grievance procedure and are not resolved at the first or second steps (Tr. 170).

Mr. Martens testified that he had no authority to agree to or negotiate company-administered discipline or last chance agreements (Tr. 300-01). He also testified that Stewards always handle meetings that may result in discipline or discharge, "and depending on the severity, they might pull in the chief steward." (Tr. 301). When asked on cross-examination about his ability to sign the Last Chance Agreement on behalf of the Union, he responded (Tr. 305):

> Yes and no. I mean, I knew we had – I had the right to – for discipline and stuff. This – I'd never dealt with this. I wasn't a steward that long. Maybe two years, three years or something. I'd never come across this. I figured by reading some of that, I figured you know what? Sign it, keep the guy's job, we'll fight it out later on.

Mr. Martens also testified that of the ten or fifteen grievances that he had handled as a steward, he had been able to resolve two on his own without the involvement of the chief steward (Tr. 307-08). Mr. Martens testified that when the parties meet, whether at Step 1, Step 2 or Step 3 of the grievance procedure, they are normally attempting to resolve the matter through some middle ground (Tr. 312).

Mr. Rossa also testified that stewards have no authority to agree to or negotiate company-administered discipline or last chance agreements (Tr. 315). Mr. Rossa testified that he could not recall any grievances involving discipline or discharge that were resolved at either Step 1 or Step 2 of the procedure (Tr. 317). With regard to the grievance settlement introduced by the Company, Mr. Rossa testified that he had consulted with Mr. Clavio who approved Mr. Rossa's signing the settlement (Tr. 317-19). On cross-examination, Mr. Rossa testified that, other than what the Collective Bargaining Agreement might say regarding the matter, he was not aware that the Union had ever informed the Company that a steward does not have the authority to resolve grievances over discipline or discharge (Tr. 323-24).

Mr. Rossa testified that Article 26.2 of the contract was negotiated in the 2006 bargaining. He related that the Union proposed that the Company allow employees to obtain their CEU credits on Company time. According to Mr. Rossa, the language in Article 26.2 resulted from the Company's counter-proposal. Nothing was said about discipline for failing to maintain a license or failing to obtain the CLUs necessary to renew a license (Tr. 319-21). Mr. Clavio agreed with Mr. Rossa's testimony concerning the negotiation of Article 26.2 (Tr. 331-32).

Mr. Phillips testified as to the Company's intent as follows (Tr. 346-47):

> Well, the intent or the reason we put the language in is its mandatory. The EPA states that, you show, you need 15 hours or 30 hours to maintain your license. We wanted to make that loud and clear. It's very very important that operators maintain and get the training, the refresher training, just to keep them up to speed on new events, new technologies because you are handling it. You're touching it. You're actually putting that end product in the system. You're dealing with chemicals. You're dealing with the new technology.

On cross-examination, Mr. Phillips agreed that the subject of Article 26.2 was raised by the Union and that the Company had no initial proposals with respect to maintaining licenses (Tr. 349-50).

**Company's Position**

The Company contends that it had just cause to discipline Mr. Leppert after it had discovered that his Class C water license had been expired for over one year. The Company maintains that Section 26.2 of the Collective Bargaining Agreement expressly required Mr. Leppert to accumulate enough CEUs to maintain his license and that his failure to do so was properly classified as a "neglect of an assigned duty" pursuant to the Guide for Employee Conduct. The Company argues that the issuance of a 15-day suspension was consistent with the penalty indicated in the Guide for such an offense: "more than five (5) days off without pay, up to a maximum of thirty (30) work days." The Company emphasizes the public health issues at stake in connection with the education and expertise of water treatment plant operators and

argues that the failure of Mr. Leppert to maintain his license was a serious violation of Company policy that justified a 15-day suspension.

The Company argues similarly that it had just cause to administer a 15-day suspension to Mr. Nelson when the Company discovered that his Class B water license had been expired for over two years. The Company also contends that it was reasonable and appropriate for the Company to reduce Mr. Nelson's pay level to that of an Operator in Training until he renewed his license and to demand the repayment of approximately $10,500, representing the value of that pay differential over the course of one year, because Mr. Nelson had received an "overpayment" under "false pretenses" by failing to inform the Company that his license had expired. The Company argues that such repayment is "merely restitution for a fraud, however innocent the fraud may have been," and not disciplinary in nature. Alternatively, the Company contends that the overpayment was due to Mr. Nelson's mistake, and that the Company had a right to recoup overpaid wages when the mistake was not its fault. The Company maintains that without such repayment, Mr. Nelson would be unjustly enriched by his own negligence and mistake and that it would be unfair to other employees who maintained their licenses.

The Company argues that the Last Chance Agreement with Mr. Williams is valid and enforceable, that Mr. Williams was not coerced into signing it, and that Mr. Martens had authority, whether actual or apparent, to enter into that agreement. The Company points to past practice between the parties wherein Stewards have exercised authority to settle grievances. The Company argues that, based upon such past practice, it reasonably believed that Mr. Martens had authority to enter into the Last Chance Agreement. The Company also argues that the Last Chance Agreement acts as a modification to the Collective Bargaining Agreement so as to replace the just cause provision with respect to Mr. Williams. According to the Company, the only issue for arbitration is whether Mr. Williams violated the terms of the Last Chance Agreement.

Alternatively, assuming that the just cause analysis applies to Mr. Williams, the Company contends that it has satisfied that standard. Mr. Williams had allowed his license to be expired for over nine years. Importantly, in the Company's view, Mr. Williams had received a five-day suspension for a prior "neglect of duty" violation less than three months prior to the discovery of the expiration of his water license. The Guide for Employee Conduct indicates discharge as the penalty for a second Offense Number 12. In lieu of discharge, however, the Company offered Mr. Williams the opportunity to retain his job after serving a thirty-day suspension. In addition, the Company required a repayment schedule for the repayment of only one year's worth of excess wages. The Company maintains that it appropriately dealt with Mr. Williams as a repeat offender in accordance with accepted principles of progressive discipline so as to easily satisfy the just cause standard.

Finally, the Company argues that it had cause to terminate Mr. Williams for violating the Last Chance Agreement by failing to arrange a repayment schedule. The Company refers to paragraph 2 of that agreement which provides, "The Union and the Employee expressly waive

any right to file a grievance or other claim regarding Employee's discharge under this Agreement, except to contest the fact of what occurred. If the conduct occurred, an Arbitrator will not have any authority to modify the discharge to a lesser penalty." The Company contends that it had cause to discharge Mr. Williams under the Last Chance Agreement because he failed to arrange a repayment schedule as required by the agreement. If the agreement were to be determined to be invalid, however, the Company contends that the discharge is still justified under a "just cause" analysis because Mr. Williams had two offenses of Number 12 of the Guide for Employee Conduct in less than three months and the Guide indicates discharge as the stated penalty for such a second offense.

**Union's Position**

The Union argues that the issuance, retention and expiration of licenses is regulated by the IEPA, which took no action against these employees whose licenses had expired, and should have been of no concern to the Company. The Union contends that the Company had no policy to check on the status of employee licenses and did not suffer one wit by reason of any failure to renew them in a timely manner. The Union points out that the Guide for Employee Conduct does not contain any rule with respect to maintaining a license. The Union argues that Section 26.2 of the Collective Bargaining Agreement merely determined whether continuing education would be undertaken on Company time or on the employees' own time, that the Agreement contained no provision regarding the maintenance of licenses before the current contract, and that Section 26.2 is not mentioned in any of the disciplinary letters. The Union further contends that the failure to maintain a license cannot constitute a "neglect of assigned duty" in violation of Rule 12 because the Company had never assigned such a duty to the employees. In addition, the Union argues that it is irrational and outrageous for the Company to knowingly and deliberately continue to utilize these employees with expired licenses while punishing them for failing to have maintained their licenses.

The Union contends that the Company's interest in its employees' licenses, and its discipline for any failure to maintain those licenses, should be no greater than that of the IEPA which issues and regulates such licenses but did not take any action against these employees whose licenses had expired. If any discipline is warranted, the Union maintains, a warning without time off would have been sufficient under these circumstances. The Union emphasizes a number of factors that it believes would support such a limited discipline, including: the IEPA sanctioned neither the Company nor the employees; the Company failed to monitor the status of the licenses; Section 26.2 did not require licensing; there is no evidence of any willful misrepresentation or fraud; Mr. Williams alerted the Company to the expiration of his license; the Company continued to use unlicensed employees without any change in duties or supervision; early IEPA procedures required only a ten dollar renewal fee; and the long tenures of satisfactory performance by these employees. The Union argues that a fifteen or thirty day suspension is excessive and unjustified, given the range of not less than five or more than thirty days indicated in the Guide, especially when the governmental licensing authority treated the matter in a mechanical or automatic fashion.

The Union argues that it was grossly unfair for the Company to reduce the Grievants' wages on the basis of the expiration of their licenses, as employees are to be paid on the basis of the jobs that they do and these employees continued to perform the same functions without modification. The Union also maintains that the Company received the benefit of that labor and had no legitimate basis for the reduction of the employees' pay during that time period.

The Union argues that, as any reduction in wages was unjustified, the Company's demand for the repayment of a significant portion of the 2006 wages of Mr. Nelson and Mr. Williams was outrageous. The Union contends that, in the absence of any evidence of fraud or deceit, arbitrators will not order a return of wages previously earned and paid based on a mistake or oversight. The Union also argues that the Company acted disparately among the three employees. It did not require any repayment by Mr. Leppert because he held a license other than the one he was supposed to have. It failed to enforce its demand for repayment from Mr. Nelson, while at the same time terminated Mr. Williams for his refusal to agree to a repayment schedule while his grievance was pending. According to the Union, the employees were not unjustly enriched by any payment of wages for services performed, but the Company would be unjustly enriched by any reduction or repayment of those wages.

The Union also contends that the elimination of the grandfathered wage rates that had applied to Mr. Nelson and Mr. Williams constituted an additional loss of pay for which there is no basis. The Union argues that these grandfathered employees should not lose their status because they continued to perform the same duties in the same positions at the Company.

The Union argues that the Last Chance Agreement regarding Mr. Williams is null and void. The Union maintains that Mr. Williams signed the agreement in order to avoid termination, and that he thought he was signing to acknowledge receipt of the documents. The Union also maintains that Mr. Martens signed the agreement intending to grieve the matter, which he did soon thereafter. The Union argues that the Last Chance Agreement was misused in these circumstances that amounted to coercion, that it should be deemed unenforceable, and patently unfair.

The Union also argues that Mr. Martens had no authority to enter into the Last Chance Agreement, or any agreements with the Company. The Union contends that Section 13.2 of the Collective Bargaining Agreement limits the authority of Stewards and precludes them from entering into such agreements. Moreover, the Union argues, the agreement was not entered into as a settlement of a grievance because no grievance was yet pending at that point in time. The Union also contends that because the agreement has no termination date, its endless potential for discharge is enough to strike it down. The Union urges that the agreement arose from "individual bargaining" that attempted to bypass the Union rather than bargaining with the Union in good faith.

The Union contends that, at the time the Company terminated Mr. Williams, his grievance had proceeded through all three steps and arbitration had already been invoked.

Moreover, Mr. Clavio had advised Mr. Williams not to sign any repayment agreement while the matter was going to arbitration, and had informed the Company of its position and its advice to the employee. The Union argues that the Company's termination of Mr. Williams at such time and under such circumstances violated both his and the Union's rights under the National Labor Relations Act. The Union also contends that the discharge violated Illinois statutory law requiring employee consent to deductions from wages. Finally, the Union argues, the discharge of Mr. Williams constitutes unfair, disparate treatment in view of the fact that the Company did not discipline Mr. Nelson for his failure to agree to arrangements for a similar repayment, and granted Mr. Leppert an extension of time within which to renew his license rather than discharge him.

## Discussion

The arbitrator has considered the transcript and his notes of the hearing, the exhibits, the parties' briefs and arguments and all authority cited therein. Based on that review, I have concluded that the grievances must be sustained in part and denied in part.

All three Grievants neglected to maintain their water treatment licenses. That is undisputed. The union seeks to minimize the significance of the expiration of these licenses, while the Company relies in part on Article 26.2 of the Collective Bargaining Agreement in urging that the Grievants' failure to maintain their licenses constituted neglect of duty. The Union argues that the prior contract had no provision relating to licenses comparable to Article 26.2, and that the current provision arose from a proposal by the Union to have the Company pay for the continuing education requirements recently established by IEPA, which proposal was rejected by the Company. Although the Union contends that the provision is nothing more than an agreement by the parties that the employees would be responsible for the costs of the new continuing education requirements, the very fact that the union raised the issue of who would pay for continuing education indicates that the Union recognized that employees with IEPA licenses were expected to maintain them and would now face an additional cost of doing so. Indeed, the job description for the position of Operator expressly states that either a water license or a waste water license is a minimum requirement for that job classification. Accordingly, an employee's failure to maintain his license is not simply a technicality that would warrant no discipline beyond a mere reprimand.

The grievances of Messrs. Nelson and Leppert raise the question whether a failure to maintain a license warrants a fifteen day suspension. Unlike some contracts, the instant Collective Bargaining Agreement does not set forth any express schedule of progressive discipline, but provides only that discipline shall be for cause. In the absence of an express discipline schedule, the requirement of cause affords the Company a reasonable range of discretion within which to exercise its disciplinary authority. Nevertheless, the contractual requirement of cause mandates that the discipline imposed be reasonably proportionate to the offense at issue, and that it be consistent with the discipline imposed in the bargaining unit generally.

The requirement of reasonable proportionality and consistency is, of course, bargaining unit specific. The requirement of cause is contractual and it is the available evidence of the parties' intent and practices that informs interpretation of the contract. The 15-day suspensions are consistent with the Guide for Employee Conduct, which calls for a suspension of more than five days but no more than thirty days for first offenses of this nature, but there is no evidence that the parties have actually followed this guideline. On the contrary, for his prior violation of Offense 12, Mr. Williams received a five-day suspension. Indeed, the prior offense of Mr. Williams appears to have been at least as serious as the offenses of Mr. Leppert and Mr. Nelson. Mr. Williams's prior offense consisted of a failure to respond promptly to three emergency calls even though he advised the Central Control Operator that he would respond. In contrast, the failure by Messrs. Nelson and Leppert to maintain their water licenses did not disrupt production or discipline. The evidence is uncontroverted that the actual work they performed did not require an IEPA license as both Mr. Leppert and Mr. Nelson continued to perform the same duties while their licenses were expired and neither they nor the Company were subjected to any penalties or other action by IEPA. The failures of Mr. Leppert and Mr. Nelson to maintain their licenses were first offenses for both employees. Considering all of the objective evidence in the record, it is apparent that the imposition of fifteen day suspensions on these Grievants was not reasonably proportionate to their offenses or consistent with prior disciplinary practice. I find that the Company has established cause for five-day suspensions but has not established cause for fifteen-day suspensions. Accordingly, the suspensions must be reduced to five days each and the Grievants made whole for the difference between the fifteen day suspensions administered to them and the five day suspensions justified under the contract.

In addition to the suspension, the Company reduced Mr. Nelson's pay level to that of an Operator in Training until he obtained the renewal of his license, and demanded repayment of the difference in pay levels for the year 2006. Contrary to the contentions of the Company, there is no showing of any deceit or fraud on the Grievant's part that would support a finding that he received wages under false pretenses. Moreover, the evidence establishes that the wage rate is based upon the job that is performed by the employee, not upon the license that he holds. For example, although the Company did not reduce the pay level of Mr. Leppert because he had maintained a sewer license, there was no showing that his sewer license was in any way relevant to or necessary for the job that he performed. Both Mr. Leppert and Mr. Nelson continued to perform the same work that they had performed prior to the discovery of the expiration of their water licenses and no temporary vacancy in those positions was declared. I find that the reduction of the pay level at which Mr. Nelson was to be compensated was unjustified and, therefore, the demand for repayment of compensation from 2006 was improper. Since the repayment for 2006 was never made and the Company has taken no steps to collect it, no make whole relief from that Company demand is necessary; however, to the extent that the Company continues to carry that demand "on the books," it must be cancelled. Additionally, Mr. Nelson must be made whole for the reduced wage rate that he suffered until his license was restored.

In addition, the elimination of the higher rate structure into which Mr. Nelson had been grandfathered was similarly unjustified as Mr. Nelson continued to perform the same job

functions. Although Appendix A to the Collective Bargaining Agreement suggests that grandfathered employees maintain that status so long as they "remain in their current position," that appendix expressly provides that such grandfathered employees become subject to the prevailing wage when they bid into a new classification and out of their current position. Mr. Nelson did not bid for a new position and is contractually entitled to be paid at his grandfathered rate. The Company must restore his grandfathered rate and make him whole for all losses he suffered by virtue of the Company's failure to pay him at the grandfathered rate.

Mr. Williams's grievances raise a threshold issue of the validity of the Last Chance Agreement. The Union attacks the Last Chance Agreement on the ground that Mr. Martens had no authority to enter into that agreement on behalf of the Union. Section 14.2 of the Collective Bargaining Agreement expressly provides that stewards shall present grievances to the Company and that two parties shall attempt to settle and resolve such grievances. Accordingly, if the Company had fired Mr. Williams and the Steward had grieved that discharge, it would certainly be consistent with the contract for the Steward to settle that grievance by agreeing to reinstatement subject to a Last Chance Agreement. Notwithstanding the Union's contentions regarding the limited authority of Stewards and the participation and approval of settlements by Mr. Clavio, there is no evidence that the Union ever informed the Company of any such limitation on the authority of stewards to enter into settlements. Based upon the grievance procedure established by the Collective Bargaining Agreement and the evidence concerning the past practices of the Union in settling grievances with the Company, Mr. Martens certainly would have had apparent authority to enter into the Last Chance Agreement in settlement of a grievance over Mr. Williams's discharge. I see no principled distinction between entering into a Last Chance Agreement to resolve a grievance over a discharge and entering into a Last Chance Agreement in lieu of a proposed discharge and thereby avoid the need for a grievance. The Company acted reasonably in its belief that Mr. Martens had authority to bind the Union to the agreement. Thus, at a minimum, Mr. Martens had apparent authority to enter into the agreement and the Union may not avoid the agreement on the ground of lack of authority.

The Union also argues that the Company coerced Mr. Williams into signing the Last Chance Agreement by threat of discharge if he did not sign it. If such circumstances are deemed to constitute duress, however, no last chance agreement in lieu of discharge could ever be valid or enforceable. Mr. Williams did have an alternative to signing the agreement. He could have refused to do so, and if the Company had discharged him, grieved his discharge. The Union has made no showing that the Company's position that it had cause to fire Mr. Williams was taken in bad faith. Such aggravating circumstances as Mr. Williams' prior suspension for neglect of duty and the length of time for which his license had been expired might arguably provide support for the Company's position that it had cause for discharge. The Union would assert various arguments to the contrary, such as Mr. Williams' length of service and the severity of the instant offense. Whatever the outcome of such arguments might have been, there has been no showing that the Company's threat to discharge Mr. Williams for his failure to maintain his license was made in bad faith or as a baseless threat simply to coerce him into signing the Last Chance Agreement. Accordingly, I find the Last Chance Agreement to be valid and enforceable and

binding upon Mr. Williams and the Union.

Under the Last Chance Agreement, Mr. Williams and the Union agreed that his thirty-day suspension was for cause, that he would restore his water license within six months and that he would "make restitution for the overpayment (difference in pay between his Operator pay rate and the Operator in Training pay rate) for not having his IEPA Class A Water License from 1/1/06 through the most recent date Employee received payment at the higher rate." Implicit within the recognition of an "overpayment" is recognition that Mr. Williams's pay rate would be reduced to Operator in Training until he restored his water license. Thus, in accordance with the Last Change Agreement, to the extent that Mr. Williams's November 10, 2006 grievance (Un. Ex. 8) attacks the suspension, repayment obligation and reduction in wage rate, it must be denied. However, nowhere does the Last Chance Agreement indicate that when Mr. Williams's license was restored he would be restored only to the standard Operator pay rate rather than his grandfathered rate. Furthermore, the Last Chance Agreement expressly provides that it "reflects the parties' entire agreement, and it merges all agreements, representations, and understandings among the parties, whether oral or written, or both." Thus, the Last Chance Agreement did not justify the Company's failure to restore Mr. Williams to his grandfathered rate. I have already found, in resolving Mr. Nelson's grievance, that the contract mandated that Grievants be restored to their grandfathered contractual rates. Consequently, to the extent that Mr. Williams' November 10, 2006, grievance challenged the Company's failure to restore him to his grandfathered rate following the reinstatement of his license, the grievance must be sustained and Mr. Williams made whole.

Subsequent to the execution of the Last Chance Agreement and Mr. Williams' thirty-day suspension and return therefrom, the Company discharged Mr. Williams for his refusal to enter into a repayment plan as required by that Last Chance Agreement. At that time, the Union's grievance was pending with respect to Mr. Williams' suspension, pay reduction and repayment of wages from 2006. Moreover, the Union had advised Mr. Williams not to enter into any repayment plan with the Company so long as the grievance was pending, and informed the Company of its position as well. Nevertheless, the Company defends the discharge on the ground that the Last Chance Agreement provided, "Failure to comply with any of these conditions will result in immediate termination." The question thus presented is whether this provision of the Last Chance Agreement justified discharge for failure to enter a repayment plan while a challenge to the validity of the agreement was unresolved. I hold that it did not.

Initially, I note that although I have rejected the Union's challenge to the validity of the Last Chance Agreement, there was considerable substance to the Union's arguments. It is clear that the Union's challenge was undertaken in good faith and was far from frivolous. Second, that the Company unilaterally drafted the Last Chance Agreement counsels that ambiguities, overt or latent, should be resolved against the Company as drafter. Third, the act of grieving the suspension and repayment obligation and, thereby, challenging the validity of the Last Chance Agreement was an act of concerted activity for mutual aid and protection under Section 7 of the National Labor Relations Act, *See, e.g., NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822

-17-

(1984), and the Last Chance Agreement should be interpreted in a manner that renders it consistent with the NLRA. Finally, it would be grossly unreasonable to allow for discharge of an employee for failure to comply with a provision of an agreement while the validity of that agreement was subject to good faith, non-frivolous attack. One should not infer that the parties intended such an unreasonable result in the absence of express and explicit agreement language mandating such a result.

Thus, considering generally accepted principles of contract interpretation; that contract language be interpreted against the drafter, that it be interpreted in harmony with external law, and that it be interpreted to avoid grossly unreasonable results; I find that the Last Chance Agreement does not permit the discharge of Mr. Williams for failure to comply with a provision of the Agreement while the validity of that provision is subject to a proper, good faith, non-frivolous challenge. Therefore, Mr. Williams's discharge violated the Last Chance Agreement. Although the Company argues that it had cause to discharge Mr. Williams independent of the Last Chance Agreement, I find such argument not properly before me. Just as Mr. Williams and the Union are bound by the Last Chance Agreement, so too is the Company. The validity of the discharge must be assessed under the Last Chance Agreement which by its own terms "supercedes any conflicting provision . . . under the parties' collective bargaining agreement." Accordingly, Mr. Williams is entitled to be reinstated to his position as an Operator, and to receive back pay dating to the time of his discharge, including the restoration of his grandfathered wage rate. Pursuant to the Last Chance Agreement, Mr. Williams is liable for "restitution for the overpayment (difference in pay between his Operator pay rate and the Operator in Training pay rate) for not having his IEPA Class A Water License from 1/1/06 through the most recent date Employee received payment at the higher rate," and the Company may set off that amount against the back pay that is owing to Mr. Williams.

The Union has reiterated its request for attorney fees which I rejected in my prior Award consolidating the four grievances for hearing. As in that proceeding, it is clear that, although I have rejected many of the Company's positions, its arguments had considerable substance and there is no evidence that the Company undertook its positions in bad faith. Accordingly, I reiterate my holding that the Union is not entitled to extraordinary relief, such as attorney fees.

The parties agreed that if I sustained the grievances and awarded make whole relief, I would remand the matter to them for calculation of the amount of monetary relief due the Grievants and retain jurisdiction to resolve any disputes concerning calculation of the remedy (Tr. 90). My Award below shall so provide.

## AWARD

1.    The Company did not have cause to suspend Dan Leppert for fifteen days but had cause to suspend him for a period of five working days. The Company shall make Mr. Leppert whole

for lost compensation for the period of his suspension in excess of five working days.

2.    The Company did not have cause to suspend Ken Nelson for fifteen days but had cause to suspend him for a period of five working days. The Company shall make Mr. Leppert whole for lost compensation for the period of his suspension in excess of five working days.

3.    The Company violated the Collective Bargaining Agreement when it reduced Mr. Nelson's wage rate to Operator in Training and demanded repayment of wages paid in 2006 in excess of the Operator in Training rate.. The Company shall rescind its demand for repayment and shall make Mr. Nelson whole for the difference between the wage rates at which it paid Mr. Nelson and his grandfathered wage rate.

3.    The Last Chance Agreement executed by Mr. Williams and the Union is valid and enforceable. Mr. Williams's November 10, 2007, grievance is denied, except to the extent that the Company violated the contract when following the restoration of Mr. Williams's water license, it failed to restore him to his grandfathered wage rate. The Company shall make Mr. Williams whole for the difference between the wag rate to which it restored him and his grandfathered wage rate.

4.    The Company violated the Last Chance Agreement when it discharged Mr. Williams. The Company shall reinstate Mr. Williams to his former position and make him whole for all compensation lost as a result of his discharge.

5.    The Company may offset Mr. Williams's obligation of repayment under the Last Chance Agreement against the make whole relief awarded herein.

6.    The Union's request for attorney fees is denied.

7.    The Arbitrator shall retain jurisdiction for sixty (60) days following the date of this Award to resolve any disputes that parties may have concerning the remedy, including the issue of monetary compensation. Either party may invoke the arbitrator's jurisdiction during this sixty-day period by written or e-mail notice to the other party and the Arbitrator. The parties may by mutual agreement extend the period of the Arbitrator's retained jurisdiction in thirty-day increments. The parties shall furnish written or e-mail notice of such agreed-on extension to the Arbitrator.

Chicago, Illinois

February 21, 2008          Martin H. Malin,  Arbitrator

-19-